# EXHIBIT OO

Client No. Columbia University    124513   Docket No. 17668a

Client Ref. No. _____

MAIL ROOM
FEB 25 1980
PAT. & TRADEMARK OFF.

# IN THE UNITED STATES PATENT OFFICE

The Commissioner of Patents,
Washington, D.C. 20231

Sir:

Transmitted herewith for filing is the patent application of Inventor: RICHARD AXEL, MICHAEL H WIGLER and SAUL J. SILVERSTEIN

For: PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

Enclosed are also:

- [X] ___2___ sheets of drawing.
- [ ] An assignment of the invention to _____
- [ ] A certified copy of a _____ application.
- [ ] Associate Power of Attorney.
- [ ] Preliminary Amendment

| For | Number filed | Number extra | Rate | |
|-----|------|------|------|------|
| Total claims. | 125 − 10= | 115 × | $2 = | 230.00 |
| Independent Claims. | 11 − 1= | 10 × | 10 = | 100.00 |
| Basic Fee | | | = | $65. |
| Total Filing Fee | → | | = | 395.00 |

Claims as filed

- [ ] Please charge our Deposit Account No. 03-3125 in the amount of $_____. A duplicate copy of this sheet is enclosed.

- [X] The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any over-payment to Account No. 03-3125 and notify the undersigned attorney of the amount so charged. A duplicate copy of this sheet is enclosed.

- [X] A check in the amount of $ 395.00 to cover the filing fee is enclosed.

Respectfully,

John P. White
Attorney for Applicant

John P. White, Reg. No. 28678
c/o COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 Rockefeller Plaza      New York, N.Y. 10020
(212) 977-9550

9/74

GENE-CEN 082991

## Declaration and Power of Attorney

We, RICHARD AXEL, MICHAEL H. WIGLER, SAUL J. SILVERSTEIN, *declare that we are respectively citizens of* The United States of America *residing at* 410 Riverside Drive, New York, New York, 10025, Cold Spring Harbor Laboratory, P. O. Box 100, Cold Spring Harbor, New York 11724, and 260 Birch Lane, Irvington, New York 10533

*that we have read the specification entitled:*

### PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

*and the claims thereof; that we understand the content of the foregoing specification, and we verily believe we are the original, first, and joint inventors of the invention described and claimed therein; that we do not know and do not believe that this invention was ever known or used in the United States before our invention thereof, or patented or described in any printed publication in any country before our invention thereof, or more than one year prior to this application, or in public use or on sale in the United States more than one year prior to this application; that this invention has not been patented or made the subject of an inventor's certificate in any country foreign to the United States on an application filed by us or our legal representatives or assigns more than twelve months before this application; and that no application for patent or inventor's certificate on this invention has been filed in any country foreign to the United States by us or our representatives or assigns, except as follows:*

None

*We further declare that we acknowledge our duty to disclose information of which we are aware which is material to the examination of this application.*

*And we hereby appoint:* John P. White (Reg. No. 28678); Jules P. Kirsch (Reg. No. 20293); Thomas F. Moran (Reg. No. 16579); Lester W. Clark (Reg. No. 14954); Christopher C. Dunham (Reg. No. 22031); Ivan S. Kavrukov (Reg. No. 25161) and Charles Guttman (Reg. No. 29161) and each of them, all c/o Cooper, Dunham, Clark, Griffin & Moran *of 30 Rockefeller Plaza, New York, New York 10020, (Tel. 212-977-9550), our attorneys, each with full power of substitution and revocation, to prosecute this application, to make alterations and amendments therein, to receive the patent, and to transact all business in the Patent and Trademark Office connected therewith.*

*Lastly we declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.*

*Inventor's full name* _____
                                    *(Signature)*
                                    RICHARD AXEL

*Date* _____Feb 23 1980_____

*Post Office Address*    410 Riverside Drive

                                    New York, New York 10025

GENE-CEN 082992

Exhibit OO
Page 1333

Inventor's full name _____
                          (Signature)

                      SAUL J. SILVERSTEIN

Date _____01-23-80_____

          Post Office Address    260 Birch Lane

                                 Irvington, New York  10533

GENE-CEN 082993

PRINT OF DRAWING
AS ORIGINALLY FILED



124513

RESCUE OF pBR FROM TRANSFORMED MOUSE CELLS

Fig. 2.

SCHEME FOR THE RESCUE OF BACTERIAL
PLASMIDS FROM TRANSFORMED CULTURED
CELLS USING DOUBLE SELECTION TECHNIQUES.

GENE-CEN 082994



PRINT OF DRAWING
AS ORIGINALLY FILED

124513

COTRANSFORMATION OF EUCARYOTIC CELLS

DNA I CODING FOR
DESIRED PROTEINACEOUS
MATERIAL

DNA II CODING FOR
SELECTABLE
MARKER (tk+)

+

NUCLEUS
CHROMOSONAL DNA
EUCARYOTIC CELL (tk⁻)
CYTOPLASM

COTRANSFORM IN PRESENCE
OF SELECTIVE CRITERIA (HAT)

Fig.1.

EUCARYOTIC CELL (tk+)
DNA II
DNA I

CULTURE IN PRESENCE OF
SELECTIVE CRITERIA (HAT)

DESIRED
MATERIAL

DESIRED
MATERIAL

RECOVERY

DESIRED MATERIAL
(e.g. INTERFERON, INSULIN, ETC.)

GENE-CEN 082995

124513

... OR INSERTING DNA INTO EUCARYOTIC
... AND FOR PRODUCING PROTEINACEOUS MATERIALS

ABSTRACT OF THE DISCLOSURE

The present invention relates to processes for inserting
DNA into eucaryotic cells, particularly DNA which includes
a gene or genes coding for desired proteinaceous materials
for which no selective criteria exist.  The insertion of
such DNA molecules is accomplished by cotransforming
eucaryotic cells with such DNA together with a second DNA
which corresponds to a gene coding for a selectable
marker.

This invention also concerns processes for producing
proteinaceous materials such as insulin, interferon
protein, growth hormone and the like which involve
cotransforming eucaryotic cells with DNA which codes
for these proteinaceous materials, growing the cotrans-
formed cells for production of the proteinaceous material
and recovering the proteinaceous material so produced.

The invention further relates to processes for inserting
into eucaryotic cells a multiplicity of DNA molecules
including genes coding for desired proteinaceous
materials.  The insertion of multiple copies of desired
genes is accomplished by cotransformation with the desired
genes and with amplifiable genes for a dominant selec-
marker in the presence of successively higher amo
an inhibitor.  Alternatively, the insertion of mu
copies of desired genes is accomplished by transf
using DNA molecules formed by ligating a DNA molec
including the desired gene to a DNA molecule which
includes an amplifiable gene coding for a dominant
selectable phenotype such as a gene associated with

0./.3/80  124513          1 101   65.00CK
0./.780  124513           1 10?  330.00CK

GENE-CEN 082996

resi....       .: a drug in the presence of successively
higher amounts of an agent such as a drug against which
the gene confers resistance so that only those eucaryotic
cells into which multiple copies of the amplifiable gene
5    have been inserted survive.  ~~Eucaryotic cells into which~~
multiple copies of the amplifiable gene have been inserted
additionally include multiple copies of the desired gene
and may be used to produce multiple copies of proteinaceous
molecules.  In this way otherwise rare proteinaceous
10   materials may be obtained in higher concentrations than
are obtainable using conventional techniques.

15

20

25

30

35

GENE-CEN 082997

-1-

## PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

### Field of the In

This invention concerns the introduction and expression
of genetic informational material, i.e., DNA which
5    includes genes coding for proteinaceous materials and/or
genes regulating or otherwise influencing the production
thereof, into eucaryotic cells, that is, cells of organisms
classified under the Superkingdom Eucaryotes including
organisms of the Plant and Animal Kingdoms. Such genetic
10   intervention is commonly referred to as genetic engineering
and in certain aspects involves the use of recombinant
DNA technology.  The invention disclosed is to be
distinguished from the introduction of DNA into organisms
of the Superkingdom Procaryotes including particularly
15   bacteria.  This distinction is based in part upon the
basic differences between eucaryotic and procaryotic cells,
the former being characterized by true nuclei formed
by nuclear envelopes and by meiosis and the latter being
characterized by the absence of well-defined nuclei and
20   the absence of meiosis.  Moreover, at the genetic level
many genes in eucaryotes are split by non-coding sequences
which are not continuously colinear, whereas in procaryotes,
the genes are continuously colinear.

25

30

35

GENE-CEN 082998

-2-

Background of the Inven

    Although advances in the understanding of procaryotic organisms, particularly bacteria, having for the most part proceeded independently of advances in the understanding of eucaryotic organisms, it may be helpful to an appreciation of the present invention to set forth certain developments involving procaryotes.

5

    In 1944, Avery reported the transformation of a procaryotic cell using DNA-mediated transfer of a cellular gene. Avery, O.T., et al., J. Exp. Med. 79: 137-158 (1944). Thereafter, reports of procaryotic transformation occurred in the literature. In 1975, Cohen and others reported results involving first transformation, then cotransformation of the procaryote Escherichia coli. Kretschmer, P.J., et al., J. Bacteriology 124: 225-231 (1975). In the experiments reported therein the authors disclosed the cotransformation of procaryotic cells using plasmid DNA, that is, extrachromosomal DNA which occurs naturally in many strains of Enterobacteriacae. In these experiments it was found that particular cells in a $CaCl_2$-treated bacterial population are preferentially competent for transformation. However, the frequency of transformation and the stability of the transformants obtained was low, possibly because the plasmid is not incorporated into the chromosomal DNA. As a result, cotransformants lost acquired traits after several generations. In addition, these experiments with bacteria required the addition of a gene promoter to the transforming DNA in order to obtain expression.

10

15

20

25

30

    Meanwhile, experiments with eucaryotic cells proceeded substantially independently of those with procaryotic cells.

35

GENE-CEN 082999

-3-

In 1962, Szybalska, E.H. and Szyba. .i, W. PNAS 48: 2026
(1962) reported the transformation of mammalian cells but
with such low frequency of transformation that it was not
possible to distinguish transformants from cells which
5   had merely undergone spontaneous reversion.  Again, as
with procaryotic cells, further reports of eucaryotic
transformation occurred in the literature, but such results
were oftentimes not reproducible by others.  In addition,
low frequencies of transformation, lack of understanding
10  of the molecular basis for gene expression and the lack of
molecular hybridization probes contributed to the lack
of progress in this area.  As a result, studies on the
transformation of eucaryotic cells were essentially
restricted to viral genes.  Graham, F.L., et al., Cold Spring
15  Harbor Symp. Quant. Biol. 39: 637-650 (1975) and McCutchen,
J.H. and Pagano. J.S., Journal National Cancer Institute,
41: 351-357 (1968).


More recently, however, eucaryotic cells, specifically
20  mammalian cells, were transformed with foreign DNA coding
for a selectable phenotype.  Wigler, M., et al., Cell 11:
223-232 (1977).  This work has been extended and has
resulted in the present invention wherein it has been
discovered inter alia that eucaryotic cells can be
25  cotransformed to yield transformants having foreign DNA
integrated into the chromosomal DNA of the eucaryotic
cell nucleus.  Moreover, it has unexpectedly been
discovered that such foreign DNA can be expressed by the
cotransformants to generate functional proteins.  In
30  addition, by contrast with procaryotic transformants,
the foreign DNA is stably expressed through hundreds
of generations, a result that may be attributable to
integration of the foreign DNA into the chromosomal DNA.


35  The present invention provides major advances over
bacterial systems for future use in the commercial prepar-

GENE-CEN 083000



-4-

ation of proteinaceous materials particular⸻ ⸻teins of
eucaryotic origin such as interferon protein, antibodies,
insulin, and the like.  Such advantages  include the ability
to use unaltered genes coding for precursors for such
5    proteinaceous materials.  After cellular synthesis, the
precursor can be further processed or converted within
the eucaryotic cell to produce the desired molecules of
biological significance.  This phenomenon is well known
for insulin which is initially produced in the eucaryotic
10   cell as  preproinsulin which is then converted to active
insulin within the cell by appropriate peptide cleavage.
Since procaryotic cells lack the requisite cellular
machinery for converting preproinsulin to insulin, the
insertion into a procaryotic cell of the eucaryotic
15   gene associated with insulin will result in the production
of preproinsulin, not insulin.  Although, in the case
of insulin, a relatively small and well characterized
protein, this difficulty can be overcome by chemical
synthesis of the appropriate gene, such an approach
20   is inherently limited by the level of understanding of
the amino acid sequence of the desired protein.  Thus,
for interferon protein, clotting factors, antibodies and
uncharacterized enzymes, for which the exact amino acid
sequence is not yet known, a procaryotic system will
25   likely not prove satisfactory.  By contrast, a eucaryotic
system is not associated with such disadvantages since the
eucaryotic cell possesses the necessary processing machinery.
It is thus one important object of the present invention
to provide a process for producing desired proteinaceous
30   materials such as interferon protein, insulin, antibodies
and the like which does not require a detailed molecular
understanding of amino acid sequence.

In addition to the problem of precursors having additional
35   amino acids which must be removed to produce active protein,

GENE-CEN 083001

-5-

important biological materials may be modified by chemical additions after synthesis and cleavage.  Thus, for example, human-produced interferon is a glycoprotein

5
containing sugar molecules in addition to protein.  If produced in a bacterial cell, the interferon lacks the sugar molecules which are added when interferon is produced in a human cell.  Moreover, proteinaceous materials produced within bacteria may include endo-

10
toxins which can cause inflammation if the protein-aceous material is administered to a mammal without significant purification.  By contrast, interferon produced in a eucaryotic cell would be free of endotoxins.

15
It is therefore another important object of this invention to provide a process for producing compounds which include both non-proteinaceous and proteinaceous moieties such as glycoproteins which cannot be

20
produced in bacterial cell.

25

30

35

GENE-CEN 083002

Exhibit OO
Page 1343

-6-

## Summary of the Invention

5        This invention provides a process for inserting foreign
DNA into eucaryotic cells by cotransforming the cells
with this foreign DNA and with unlinked DNA which codes
for proteinaceous material associated with a selectable
phenotype not otherwise expressed by the cell.  The
cotransformation is carried out in a suitable medium
10       and in the presence of selective conditions permitting
survival and/or identification of eucaryotic cells
which have acquired the selectable phenotype.  The
process of this invention is particularly suited for
the insertion into eucaryotic cells of DNA which codes
15       for proteinaceous materials which are not associated
with a selectable phenotype such as interferon protein,
insulin, growth hormones, clotting factors, viral
antigens, antibodies and certain enzymes.

20       By use of the cotransformation process of the present
invention is it possible to produce eucaryotic cells
which synthesize desired proteinaceous and other
materials and which can be grown in culture to produce
these materials in quantities not obtainable with
25       conventional technology.

In one embodiment of the invention, the cotransformation
process can be used to insert multiple copies of genes
coding for desired materials into eucaryotic cells.
30       Alternatively, a multiplicity of foreign DNA molecules
corresponding to multiple copies of a desired gene can
be inserted into eucaryotic cells by transformation
with molecules each of which is formed by linking a
foreign DNA molecule to a second DNA molecule corres-
35       ponding to an amplifiable gene for a dominant selectable

GENE-CEN 083003

Exhibit OO
Page 1344

-7-

phenotype not otherwise expressed by the cell.  The
transformation is then carried out in the presence of
successively elevated concentrations of an agent
5        permitting survival and/or identification of eucaryotic
cells which have acquired multiple copies of the
amplifiable gene.  This approach is particularly useful
when the dominant selectable phenotype is resistance
to a drug which is lethal unless multiple copies of
10       the drug resistant gene are present and the agent is
the drug.

By inserting multiple copies of genes coding for desired
materials into eucaryotic cells according to either of
15       these approaches it is possible to produce eucaryotic
cells which yield desired materials in high concentrations
and which can be grown in culture to produce such
materials in  quantities not obtainable with conventional
technology.

20

25

30

35

GENE-CEN 083004

Exhibit OO
Page 1345

-8-

Brief Description of the Drawings

5      FIG. 1 is a schematic flow diagram illustrating the
       cotransformation processs in accordance with the
       present invention.

       FIG. 2 is a schematic flow diagram illustrating a
       process for recovering foreign DNA I from cotransformed
10     cultured cells using double selection techniques.

15

20

25

30

35

GENE-CEN 083005

-9-

Detailed Description of the Invention

5
Prior to setting forth the invention, it may be helpful to an understanding thereof to set forth definitions of certain terms to be used hereinafter.

10
Transformation means the process for changing the genotype of a recipient cell mediated by the introduction of purified DNA.  Transformation is typically detected by a stable and heritable change in the phenotype of
15
the recipient cell that results from an alteration in either the biochemical or morphological properties of the recipient cell.

20
Cotransformation means the process for carrying out transformations of a recipient cell with more than one different gene.  Cotransformation includes both simultaneous and sequential changes in the genotype of a recipient cell mediated  by the introduction of
25
DNA corresponding to either unlinked or linked genes.

Proteinaceous material means any biopolymer formed from amino acids.

30

GENE-CEN 083006

Exhibit OO
Page 1347

-10-

Genotype means the genetic constitution of an organism as distinguished from its physical appearance.

Phenotype means the observable properties of an organism as produced by the genotype in conjunction with the environment.

Selectable phenotype is a phenotype which confers upon an organism the ability to exist under conditions which kill off all organisms not possessing the phenotype. Examples include drug resistance or the ability to synthesize some molecule necessary to cell metabolism in a given growth medium. As used herein, selectable phenotypes also include identifiable phenotypes such as the production of materials which pass from or are secreted by the cell and can be detected as new phenotypes either by functional, immunologic or biochemical assays.

Interferon protein means the proteinaceous part of the glycoprotein interferon, that is, the portion remaining after removal of the sugar portion. It includes the protein portion of interferon derived from human leukocyte, fibroblast or lymphoblastoid cells.

Chromosomal DNA means the DNA normally associated with histone in the form of chromosomes residing in the nucleus of a eucaryotic cell.

Transcription means the formation of a RNA chain in accordance with the genetic information contained in the DNA.

Translation means the process whereby the genetic information in an mRNA molecule directs the order of specific amino acids during protein synthesis.

GENE-CEN 083007

-11-

In accordance with the present invention, foreign DNA I
can be inserted into any eucaryotic cell by cotransforming
the cell with DNA I and with unlinked foreign DNA II
5    which includes a gene coding for a selectable phenotype
not expressed by the cell unless acquired by trans-
formation.  The cotransformation is carried out in a
suitable growth medium and in the presence of selective
conditions such that the only cells which survive
10   or are otherwise altered are those which have required
the selectable phenotype.  See Fig. 1.

Although the experiments discussed hereinafter concern
cultured eucaryotic cells of mammalian origin such as
15   human blood cells, mouse fibroblast cells, chinese
hamster ovary cells and mouse teratocarcinoma cells,
it is clear that the process described is generally
applicable to all eucaryotic cells including, for
example, cells from birds such as chickens, cells
20   from yeast and fungi, and cells from plants including
grains and flowers.  Therefore, it is to be understood
that the invention encompasses all eucaryotic cells
even though the invention may ultimately be most
useful in cotransforming mammalian cells.

25

The present invention is especially useful in connection
with the insertion into eucaryotic cells of foreign DNA
which includes genes which code for proteinaceous
materials not associated with selectable  phenotypes.
30   Since such proteinaceous materials are characterized
by the fact that they are not associated with a
selectable phenotype, cells which contain DNA coding
therefore cannot be identified except by destruction
of the transformed cell and examination of its contents.

35

GENE-CEN 083008

Exhibit OO
Page 1349

-12-

Examples of proteinaceous materials, the genes for
which may be inserted into and expressed by eucaryotic
cells using the cotransformation process include
5    interferon protein, insulin, growth hormones, clotting
factors, viral antigens, enzymes and antibodies.

Although in some cases the DNA I and DNA II may not need to
be purified to obtain integration and expression, it
10   is oftentimes preferable that the DNAs be purified
prior to use in cotransforming cells.  Such purification
limits the possibility of spurious results due to the
presence of contaminants and increases the probability
that cotransformed cells can be identified and stably
15   cultured.  Also, although not essential, it is sometimes
desirable that DNA I and/or DNA II have been obtained
by restriction endonuclease cleavage of chromosomal donor
DNAs, such as, for example, restriction endonuclease
cleavage of eucaryotic chromosomal DNA.  Additionally,
20   it is preferable that DNA I and DNA II be treated with
calcium phosphate prior to use in cotransforming
eucaryotic cells.  The procedure for so treating DNA
with calcium phosphate is set forth more fully hereinafter.
Finally, it is preferable that the foreign DNA I be present
25   during cotransformation in an amount relative to DNA II
coding for a selectable phenotype which constitutes an
excess of the former, such as an amount in the range
from about 1:1 to about 100,000:1.

30   In a preferred embodiment of the invention, the foreign
DNA I and/or the foreign DNA II are attached to bacterial
plasmid or phage DNA prior to use in cotransforming
eucaryotic cells.  In a particularly promising embodiment,
foreign DNA I and/or DNA II are attached to phage DNA and
35   then encapsidated in phage particles prior to cotransforma-
tion.

GENE-CEN 083009

Exhibit OO
Page 1350

-13-

Although any DNA II coding for a selectable phenotype
would be useful in the cotransformation process of
the present invention, the experimental details set
forth particularly concern the use of a gene for
5    thymidine kinase obtained from herpes simplex virus
and the use of a gene for adenine phosphoribosyl
transferase. In addition, a DNA II which includes
a gene coding for a selectable phenotype associated
with drug resistance, e.g., a mutant dihydrofolate
10   reductase gene which renders cells resistant to
methotrexate greatly extends the applicability of the
process.

15   In accordance with a preferred embodiment, the co-
transformation involves DNA I which is physically and
chemically unlinked to DNA II, and the DNA I is stably
integrated into the chromosomal DNA within the nucleus
of the cotransformed eucaryotic cell.

20

Cotransformation in accordance with this invention
may be carried out in any suitable medium limited
only in that cotransformed cells be capable of survival
and/or identification on the medium.  Merely by way of
25   example, a suitable medium for mouse fibroblast cells
which have acquired the thymidine kinase gene is HAT
described more fully hereinafter.  Also, the cotrans-
formation is carried out in the presence of selective
conditions which permit survival and/or identification
30   of those cells which have acquired the selectable
phenotype.  Such conditions may include the presence
of nutrients, drug or other chemical antagonists,
temperature and the like.

35

GENE-CEN 083010

Exhibit OO
Page 1351

-14-

Eucaryotic cells cotransformed in accordance with this
invention contain foreign DNA I coding for desired
materials which can be recovered from the cells using
5       techniques well known in the art.  Additionally, the
cells can be permitted to transcribe DNA I to form
mRNA which in turn is translated to form protein or
other desired material which may be recovered, again
using well known techniques.  Finally, the cells can
10      be grown in culture, harvested and protein or other
desired material recovered therefrom.

Although the desired proteinaceous materials identified
hereinabove are natural materials, the process can be
15      equally useful in the production of synthetic biopolymers
for which synthetic genes are constructed.  Thus, the
instant invention provides a process for producing novel
proteins not yet in existence.  Additionally, it provides
a process for producing proteins which, although they
20      presently exist, do so in such minute quantities or
in such impure form that their isolation and/or
identification cannot otherwise be effected.  Finally,
the invention provides a process for producing partially
proteinaceous products such as the glycoproteins and other
25      products, the synthesis of which is genetically directed.

Another aspect of the invention involves processes
for inserting multiple copies of genes into eucaryotic
cells in order to increase the amount of gene product
30      formed within the cell.  One process for inserting a
multiplicity of foreign DNA I molecules into a
eucaryotic cell comprises cotransforming the cell with
multiple DNA I molecules and with multiple, unlinked
foreign DNA II molecules corresponding to multiple
35      copies of an amplifiable gene for a dominant selectable

GENE-CEN 083011

Exhibit OO
Page 1352

-15-

phenotype not otherwise expressed by the cell.  This
cotransformation process is carried out in a suitable
medium and in the presence of an agent permitting

5      survival and/or identification of cells which acquire
the dominant selectable phenotype.  Preferably, this
is done in the presence of successively higher
concentrations of such an agent so that only those
cells acquiring the highest number of amplifiable

10     dominant genes (DNA II) survive and/or are identified.
These cells then also contain multiple copies of DNA I.
This approach is particularly appropriate for the
insertion of multiple copies of amplifiable genes which
confer drug resistance upon the cell, e.g., the mutant

15     dihydrofolate reductase gene which renders cells
resistant to methotrexate.

Cotransformed eucaryotic cells which have acquired
multiple copies of DNA I may then be used to produce

20     increased amounts of the gene product for which DNA I
codes in the same manner as described hereinabove.

Alternatively, multiple copies of foreign genes can be
generated in and ultimately expressed by eucaryotic

25     cells by transforming the eucaryotic cells with DNA
molecules, each of which has been formed by linking
a foreign DNA I to a foreign DNA II which corresponds
to an amplifiable gene for a dominant selectable
phenotype not normally expressed by the eucaryotic cell.

30     The linkage between DNA I and DNA II is preferably in
the form of a chemical bond, particularly a bond formed
as a result of enzymatic treatment with a ligase.
Transformation with such hybrid DNA molecules so formed
is then carried out in a suitable growth medium and in

35     the presence of successively elevated concentrations,

GENE-CEN 083012

Exhibit OO
Page 1353

-16-

e.g., amounts ranging from 1:1 to 10,000:1 on a molarity
basis, of an agent which permits survival and/or identi-
fication of those eucaryotic cells which have acquired
5      a sufficiently high number of copies of the amplifiable
gene.  Using this approach, eucaryotic cells which have
acquired multiple copies of the amplifiable gene for
a dominant selectable phenotype not otherwise expressed
by the cell survive and/or are identifiable in the
10     presence of elevated concentrations of an agent comple-
mentary to the amplifiable gene which would otherwise
result in death or inability to identify the cells.

Although various amplifiable genes for dominant selectable
15     phenotypes are useful in the practices of this invention,
genes associated with drug resistance, e.g., the gene for
dihydrofolate reductase which renders cells resistant
to methotrexate, are particularly  suitable.

20     By using either of the two approaches just described,
multiple copies of proteinaceous or other desired
molecules can be produced within eucaryotic cells.  Thus,
for example, multiple molecules of interferon protein,
insulin, growth hormone, clotting factor, viral antigen
25     or antibody or of interferon per se can be produced
by eucaryotic cells, particularly  mammalian cells, which
have been transformed using hybrid DNA or cotransformed
using purified DNA which has been treated with calcium
phosphate in the manner described hereinafter.  Thus,
30     this invention provides a process for producing
highly desired, rare and costly proteinaceous and other
biological materials in concentrations not obtainble
using conventional techniques.

35

GENE-CEN 083013

Exhibit OO
Page 1354

-17-

Still another aspect of the present invention involves the preparation of materials normally produced within eucaryotic cells in minute amounts such as glycoproteins including interferon, which are in part protein but

5 additionally include other chemical species such as sugars, ribonucleic acids, histones and the like.  Although the method or methods by which cells synthesize complicated cellular materials such as the glycoproteins are poorly understood, it is anticipated that by using the process

10 of the present invention it will be possible to synthesize such materials in commercially useful quantities. Specifically, it is anticipated that after inserting a gene or genes for the protein portion of a cellular material such as a glycoprotein, which includes a

15 non-protein portion, into a eucaryotic cell of the type which normally produces such material, the cell will not only produce the corresponding proteinaceous material but will utilize already existing cellular mechanisms to process the proteinaceous materials, if

20 and to the extent necessary, and will also add the appropriate non-proteinaceous material to form the complete, biologically active material.  Thus, for example, the complete biologically active glyprotein, interferon, could be prepared by first synthesizing inter-

25 feron protein in the manner described and additionally permitting the cell to produce the non-proteinaceous or sugar portion of interferon and to synthesize or assemble  true interferon therefrom.  The interferon so prepared could then be recovered using conventional

30 techniques.

In accordance with the present invention and as described more fully hereinafter, eucaryotic cells have been stably transformed with precisely defined procaryotic and

35 eucaryotic genes for which no selective criteria exist.

GENE-CEN 083014

-18-

The addition of a purified viral thymidine kinase (tk)
gene to mouse cells lacking this enzyme results in the
appearance of stable transformants which can be selected
5     by their ability to grow in HAT medium.  Since these
biochemical transformants might represent a subpopulation
of competent cells which are likely to integrate other
unlinked genes at frequencies higher than the general
population; cotransformation experiments were performed
10    with the viral tk gene and bacteriophage ΦX174, plasmid
pBR 322 or cloned chromosomal human or rabbit ß-globin
gene sequences.  Tk transformants were cloned and
analyzed for cotransfer of additional DNA sequences by
blot hybridization.  In this manner, mouse cell lines
15    were identified which contain multiple copies of ΦX,
pBR 322, or human and rabbit ß-globin sequences.  From
one to more than 50 cotransformed sequences are integrated
into high molecular weight DNA isolated from independent
clones.  Analysis of subclones demonstrates that the
20    cotransformed DNA is stable through many generations
in culture.  This cotransformation system allows the
introduction and stable integration of virtually any
defined gene into cultured eucaryotic cells.  Ligation
to either viral vectors or selectable biochemical markers
25    is not required.

Cotransformation with dominant-acting markers should in
principle permit the introduction of virtually any
cloned genetic element into wild-type cultured eucaryotic
30    cells.  To this end, a dominant-acting, methotrexate
resistant, dihydrofolate reducatse gene from CHO A29
cells was transferred to wild-type cultured mouse cells.
By demonstrating the presence of CHO DHFR sequences in
transformants, definitive evidence for gene transfer
35    was provided.  Exposure of these cells to elevated

GENE-CEN 083015

-19-

levels of methotrexate results in enhanced resistance to
this drug, accompanied by amplification of the newly
transferred gene.  The mutant DHFR gene, therefore, has
5       been used as a eucaryotic vector, by ligating CHO A29 cell
DNA to pBR 322 sequences prior to transformation. Amplifi-
cation of the DHFR sequences results in amplification
of the pBR 322 sequences.  The use of this gene as a
dominant-acting vector in eucaryotic cells will expand
10      the repetoire of potentially transformable cells, no
longer restricting these sort of studies to available
mutants.

Using the techniques described, the cloned chromosomal
15      rabbit β-globin gene has been introduced into mouse
fibroblasts by DNA-mediated gene transfer.  The cotrans-
formed mouse fibroblast containing this gene provides
a unique  opportunity to study the expression and
subsequent  processing of these sequences in a hetero-
20      logous host.   Solution hybridization experiments in
concert with RNA blotting techniques indicate that in at
least one transformed cell line rabbit globin sequences
are expressed in the cytoplasm as a polyadenylated 9S
species.  These 9S sequences result from perfect splicing
25      and removal of the two intervening sequences.  These
results therefor suggest that nonerythroid cells from
heterologous  species contain the enzymes necessary to
correctly process the intervening sequences of a rabbit
gene whose expression is usually restricted to erythroid
30      cells.  Surprisingly, however, 45  nucleotides present
at the 5' terminus of mature rabbit mRNA are absent from
the globin mRNA sequence detected in the cytoplasm of
the transformants examine.  These studies indicate the
potential value of cotransformation systems in the analysis
35      of eucaryotic gene expression.  The introduction of wild

-20-

type genes along with native and _in vitro_ constructed
mutant genes into cultured cells provides an assay for
the functional significance of sequence organization.

5

Recombinant DNA technology has facilitated the isolation
of several higher eucaryotic genes for which hybridization
probes are available.  Genes expressed at exceedingly
low levels, with mRNA transcripts present at from one

10  to 20 copies per cell, such as those genes coding for
essential metabolic functions, cannot be simply isolated
by conventional techniques involving construction of
cDNA clones and the ultimate screening of recombinant
libraries.  An alternative approach for the isolation of

15  such rarely expressed genes has therefore been developed
utilizing transformation in concert with a procedure
known as plasmid rescue.  This schema which is currently
underway in the laboratory is outlined below.  The aprt
gene of the chicken is not cleaved by the enzyme, Hin III

20  or Xba, and transformation of aprt$^-$ mouse cells with
cellular DNA digested with these enzymes results in the
generation of aprt$^+$ clonies which express the chicken
aprt genes.  Ligation of Hin III-cleaved chicken DNA with
Hin III-cleaved plasmid pBR 322 results in the formation

25  of hybrid DNA molecules in which the aprt gene is now
adjacent to plasmid sequences.  Transformation of aprt$^-$
cells is now performed with this DNA.  Transformants
should contain the aprt gene covalently linked to pBR 322
with this entire complex integrated into high molecular

30  weight DNA in the mouse cell.  This initial cellular
transformation serves to remove the chicken aprt gene
from the vast majority of other chick sequences.  This
transformed cell DNA is now treated with an enzyme, Xba I,
which does not cleave either pBR 322 or the aprt gene.

35  The resultant fragments are then circularized with ligase.

GENE-CEN 083017

-21-

One such fragment should contain the aprt gene covalently linked to pBR 322 sequences coding for an origin of replication and the ampicillin resistant marker.

5   Transformation of a bacterium such as E. coli with these circular markers selects for plasmid sequences from eucaryotic DNA which are now linked to chicken aprt sequences.  This double selection technique should permit the isolation of genes expressed at low

10  levels in eucaryotic cells for which hybridization probes are not readily obtained.

In order to assist in a better understanding of the present invention, the results of various experiments

15  are now set forth.

20

25

30

35

GENE-CEN 083018

-22-

EXPERIMENTAL DETAILS
FIRST SERIES OF EXPERIMENTS

5       The identification and isolation of cells trans-
        formed with genes which do not code for selectable
        markers is problematic since current transformation
        procedures are highly inefficient.  Thus, experiments
10      were undertaken to determine the feasibility of cotrans-
        forming cells with two physically unlinked genes.  In
        these experiments it was determined that cotransformed
        cells could be identified and isolated when one of the
        genes codes for a selectable marker.  Viral thymidine
15      kinase gene was used as a selectable marker to isolate
        mouse cell lines which contain the tk gene along with
        either bacteriphage ΦX 174, plasmid pBR 322 or cloned
        rabbit β-globin gene sequences stably integrated into
        cellular DNA.  The results of these experiments are also
20      set forth in Wigler, M., et al., Cell 16: 777-785 (1979)
        and Wold, B. et al., Proc. Nat'l. Acad. Sci. 76:
        5684-5688 (1979) are as follows:

Experimental Design

25      The addition of the purified thymidine kinase (tk)
        gene from herpes simplex virus to mutant mouse cells
        lacking tk results in the appearance of stable trans-
        formants expressing the viral gene which can be selected
30      by their ability to grow in HAT.  Maitland, N. J. and
        McDougall J. K. Cell, 11: 233-241 (1977); Wigler, M. et al.,
        Cell 11: 223-232 (1977).  To obtain cotransformants,
        cultures are exposed to the tk gene in the presence of an
        excess of a well-defined DNA sequence for which hybridiza-
35      tion probes are available.  Tk transformants are isolated
        and scored for the cotransfer of additional DNA sequences
        by molecular hybridization.

**GENE-CEN 083019**

Exhibit OO
Page 1360

-23-

## Cotransformation of Mouse Cells with $\phi$X174 DNA

$\phi$X174 DNA was initially used in cotransformation experi-
ments with the tk gene as the selectable marker. $\phi$X
replicative form DNA was cleaved with Pst l, which
recognizes a single site in the circular genome.  Sanger,
F. et al., Nature 265: 687-695 (1977).  500 pg of the
purified tk gene were mixed with 1-10 µg of Pst-cleaved
$\phi$X replicative form DNA.  This DNA was then added to
mouse Ltk⁻ cells using the transformation conditions
described under Methods and Materials hereinafter.
After 2 weeks in selective medium (HAT), tk⁺ transformants
were observed at a frequency of one colony per 10 cells
per 20 pg of purified gene.  Clones were picked and grown
to mass culture.

It was then asked whether tk⁺ transformants also contained
$\phi$X DNA sequences.  High molecular weight DNA from the
transformants was cleaved with the restriction endo-
nuclease Eco RI, which recognizes no sites in the
$\phi$X genome.  The DNA was fractionated by agarose gel
electrophoresis and transferred to nitrocellulose filters,
and these filters were then annealed with nick-translated
³²P-$\phi$X DNA (blot hybridization).  Southern, E. M., J.
Mol. Biol. 98: 503-517 (1975); Botchan, M., et al., Cell
9: 269-287 (1976); Pellicer, A., et al. Cell 14: 133-141
(1978).  These annealing experiments demonstrate that
six of the seven transformants had acquired bacteriophage
sequences.  Since the $\phi$X genome is not cut by the enzyme
Eco RI, the number of bands observed reflects the minimum
number of eucaryotic DNA fragments containing informa-
tion homologous to $\phi$X.  The clones contain variable
amounts of $\phi$X sequences.  Clones $\phi$X1 and $\phi$X2
reveal a single annealing fragment which is smaller
than the $\phi$X genome. In these clones, therefore, only a
portion of the transforming sequences persist.  There

GENE-CEN 083020

-24-

was also observed a tk$^+$ transformant (clone ΦX3) with no
detectable ΦX sequences.  Clones ΦX4, 5, 6, and 7 reveal
numerous high molecular weight bands which are too closely
5   spaced to count, indicating that these clones contain
multiple ΦX-specific fragments.  These experiments
demonstrate cotransformation of cultured mammalian
cells with the viral tk gene and ΦX DNA.

10  <u>Selection is Necessary to identify ΦX Transformants</u>

It was next asked whether transformants with ΦX DNA was
restricted to the population of tk$^+$ cells or whether
a significant proportion of the original culture now
15  contained ΦX sequences.  Cultures were exposed to a
mixture of the tk gene and ΦX DNA in a molar ratio of
1:2000 or 1:20,000.  Half of the cultures were plated
under selective conditions, while the other half were
plated in neutral media at low density to facilitate
20  cloning.  Both selected (tk$^+$) and unselected (tk$^-$) col-
onies were picked, grown into mass culture and scored for
the presence of ΦX sequences.  In this series of experi-
ments, eight of the nine tk$^+$ selected colonies contained
phage information.  As in the previous experiments, the
25  clones contained varying amounts of ΦX DNA.  In contrast,
none of fifteen clones picked at random from neutral
medium contained any ΦX information.  Thus, the addition
of a selectable marker facilitates the identification of
those cells which contain ΦX DNA.
30

<u>ΦX Sequences are Integrated into Cellular DNA</u>

Cleavage of DNA from ΦX transformants with Eco RI
generates a series of fragments which contain ΦX DNA
35  sequences.  These fragments may reflect multiple inte-
gration events.  Alternatively, these fragments could

GENE-CEN 083021

Exhibit OO
Page 1362

-25-

result from tandem arrays of complete or partial ΦX
sequences which are not integrated into cellular DNA.
To distinguish between these possibilities, transformed
cell DNA was cut with BAM HI or Eco RI, neither of which
cleaves the ΦX genome.  If the ΦX DNA sequences were
not integrated, neither of these enzymes would cleave
the ΦX fragments.  If the ΦX DNA sequences were not
integrated, neither of these enzymes would cleave the
ΦX fragments.  Identical patterns would be generated
from undigested DNA and from DNA cleaved with either of
these enzymes.  If the sequences are integrated, then
BAM HI and Eco RI should recognize different sites in
the flanking cellular DNA and generate unique restriction
patterns.  DNA from clones ΦX4 and ΦX5 was cleaved with
BAM III or Eco RI and analyzed by Southern hybridization.
In each instance, the annealing pattern with Eco RI
fragments differed from that observed with the BAM HI
fragments.  Furthermore, the profile obtained with
undigested DNA reveals annealing only in very high
molecular weight regions with no discrete fragments
observed.  Similar observations were made on clone ΦXl.
Thus, the most of the ΦX sequences in these three clones
are integrated into cellular DNA.

## Intracellular Localization of the ΦX Sequences

The location of ΦX sequences in transformed cells was
determined by subcellular fractionation.  Nuclear and
cytoplasmic fractions was prepared, and the ΦX DNA
sequence content of each was assayed by blot hybridization.
The data indicate that 95% of the ΦX sequences are located
in the nucleus.  High and low molecular weight nuclear
DNA was prepared by Hirt fractionation.  Hirt, B. J.,
Mol. Biol. $\underline{26}$: 365-369 (1967).  Hybridization with DNA
from these two fractions indicates that more than 95% of
the ΦX information co-purifies with the high molecular

GENE-CEN 083022

Exhibit OO
Page 1363

-26-

weight DNA fraction.   The small amount of hybridization observed in the supernatant fraction reveals a profile identical to that of the high molecular weight DNA, suggesting contamination of this fraction with high
5   molecular weight DNA.

Extent of Sequence Representation of the φX Genome

The annealing profiles of DNA from transformed clones
10   digested wtih enzymes that do not cleave the φX genome provide evidence that integration of φX sequences has occurred and allow us to estimate the number of φX sequences integrated.   Annealing profiles of DNA from transformed clones digested with
15   enzymes which cleave within the φX genome allow us to determine what proportion of the genome is present and how these sequences are arranged following integration.   Cleavage of φX with the enzyme Hpa I generates three fragments for each integration event:
20   two "internal" fragments of 3.7 and 1.3 kb which together comprise 90% of the φX genome, and one "bridge" fragment of 0.5 kb which spans the Pst I cleavage site.   In the annealing profile observed when clone φX4 is digested with Hpa I, two intense bands are
25   observed at 3.7 and 1.3 kb.   A less intense series of bands of higher molecular weight is also observed, some of which probably represent φX sequences adjacent to cellular DNA.   These results indicate that at least 90% of the φX genome is present in these cells.   It is worth
30   noting that the internal 1.3 kb Hpa I fragment is bounded by an Hpa I site only 30 bp from the Pst I cleavage site. Comparison of the intensities of the internal bands with known quantities of Hpa I-cleaved φX DNA suggests that this clone contains approximately 100 copies of the φX
35   genome.   The annealing pattern of clone 5 DNA cleaved with

GENE-CEN 083023

-27-

Hpa I is more complex.  If internal fragments are present, they are markedly reduced in intensity; instead, multiple bands of varying molecular weight are observed.  The 0.5 kb Hpa I fragment which bridges the Pst 1 cleavage site is not observed for either clone φX4 or clone φX5.

A similar analysis of clone φX4 and φX5 was performed with the enzyme Hpa II.  This enzyme cleaves the φX genome five times, thus generating four "internal" fragments of 1.7, 0.5, 0.5 and 0.2 kb, and a 2.6 kb "bridge" fragment which spans the Pst I cleavage site. The annealing patterns for Hpa II-cleaved DNA from φX clones 4 and 5 each show an intense 1.7 kb band, consistent with the retention of at least two internal Hpa II sites. The 0.5 kb internal fragments can also be observed, but they are not shown on this gel.  Many additional fragments, mostly of high molecular weight, are also present in each clone.  These presumably reflect the multiple inte- gration sites of φX DNA in the cellular genome.  The 2.6 kb fragment bridging the Pst I cleavage site, however, is absent from clone φX4.  Reduced amounts of annealing fragments which co-migrate with the 2.6 kb Hpa II bridge fragment are observed in clone φX5. Similar observations were made in experiments with the enzyme Hae III.  The annealing pattern of Hae III-digested DNA from these clones was determined.  In accord with previous data, the 0.87 kb Hae III bridge fragment spanning the Pst site is absent or present in reduced amount in transformed cell DNA.  Thus, in  general, "internal" fragments of φX are found in these transfor- mants, while "bridge" fragments which span the Pst I cleavage site are reduced or absent.

GENE-CEN 083024

-28-

## Stability of the Transformed Genotype

Previous observations on the transfer of selectable
biochemical markers indicate that the transformed pheno-
type remains stable for hundreds of generations if cells
are maintained under selective pressure.  If maintained
in neutral medium, the transformed phenotype is lost at
frequencies which range from  0.1 to as high as 30%
per generation. Wigler, M., et al., Cell 11: 223-232
(1977); Wigler, M. et al., PNAS 76: 5684-5688 (1979).
The use of transformation to study the expression of
foreign genes depends upon the stability of the
transformed genotype.  This  is an important consideration
with genes for which no selective criteria are available.
It was assumed that the presence of φX DNA in transformants
confers no selective advantage on the recipient cell.
Therefore, the stability of the φX genotype was examined
in the descendants of two clones after numerous
generations in culture.  Clone φX4 and φX5, both
containing multiple-copies of φX DNA, were subcloned
and six independent subclones from each clone were
picked and grown into mass culture.  DNA from each of
these subclones from each original clone were picked
and grown into mass culture.  DNA from each of these
subclones was then digested with either Eco RI or Hpa I,
and the annealing profiles of φX-containing fragments
were compared with those of the original parental clone.
The annealing pattern observed for four of the six
φX4 subclones is virtually identical to that of the
parent.  In two subclones, an additional Eco RI fragment
appeared which is of identical molecular weight in both.
This may have resulted from genotypic heterogeneity in
the parental clone prior to subcloning.  The patterns
obtained for the subclones of φX5 are again virtually
identical to the parental annealing profile.  These data

GENE-CEN 083025

Exhibit OO
Page 1366

-29-

indicate that φX DNA is maintained within the ten
subclones examined for numerous generations without
significant loss or translocation or information.

5

Integration of pBR322 into Mouse Cells

The observations in cotransformation have been extended
to the EK2-approved bacterial vector, plasmid pBR322.

10    pBR322 linearized with BAM HI was mixed with the purified
viral tk gene in a molar ratio of 1000:1.   Tk$^+$ trans-
formants were selected and scored for the presence of
pBR322 sequences.   Cleavage of BAM HI linearized
pBR322 DNA with Bgl I generates two internal fragments

15    of 2.4 and 0.3 kb.   The sequence content of the
pBR322 transformants was determined by digestion of
transformed cell DNA with Bgl I followed by annealing
with $^{32}$P-labeled plasmid DNA.   Four of five clones
screened contained the 2.4 kb internal fragment.   The

20    0.3 kb fragment would not be detected on these gels.
From the intensity of the 2.4 kb band in comparison
with controls, we conclude that multiple copies of this
fragment are present in these transformants.   Other
bands are observed which presumably represent the

25    segments of pBR322 attached to cellular DNA.

Transformation of Mouse Cells with the
Rabbit β-Globin Gene

30    Transformation with purified eucaryotic genes may provide
a means for studying the expression of cloned genes in
a heterologous host.   Cotransformation experiments were
therefore performed with the rabbit β major globin gene
which was isolated from a cloned library of rabbit
chromosomal DNA (Maniatis, T., et al., Cell 15: 687-701

35    (1978).   One β-globin clone designated RβG-1 consists of a

**GENE-CEN 083026**

Exhibit OO
Page 1367

-30-

15 kb rabbit DNA fragment carried on the bacteriophage
cloning vector Charon 4a.  Intact DNA from this clone
(RβG-1) was mixed with the viral tk DNA at a molar ratio
of 100:1, and tk$^+$ transformants were isolated and examined
for the presence of rabbit globin sequences.  Cleavage
of RβG-1 with the enzyme Kpn I generates a 4.7 kb fragment
which contains the entire rabbit β-globin gene.  This
fragment was purified by gel electrophoresis and nick-
translated to generate a probe for subsequent annealing
experiments.  The β-globin genes of mouse and rabbit
are partially homologous, although we do not observe
annealing of the rabbit β-globin probe with Kpn-cleaved
mouse DNA under our experimental conditions.  In contrast,
cleavage of rabbit liver DNA with Kpn I generates the
expected 4.7 kb globin band.  Cleavage of transformed cell
DNA with the enzyme Kpn I generates a 4.7 kb fragment
containing globin-specific information in six of the
eight tk$^+$ transformants examined.  In two of the clones,
additional rabbit globin bands are observed which
probably result from the loss of at least one of the Kpn
sites during transformation.  The number of rabbit globin
genes integrated in these transformants is variable.
In comparison with controls, some clones contain a single
copy of the gene, while others contain multiple copies
of this heterologous gene.  These results  demonstrate
that cloned eucaryotic genes can be introduced into
cultured mammalian cells by cotransformation.

Transformation Competence Is Not Stably Inherited

Our data suggest the  existence of a subpopulation of
transformation-competent cells within the total cell
population.  If competence is a stably inherited trait,
then cells selected for transformation should be better
recipients in subsequent gene transfer experiments than

GENE-CEN 083027

-31-

their parental cells. Two results indicate that as in
procaryotes, competence is not stably heritable. In
the first series of experiments, a double mutant, Ltk⁻
5    aprt⁻ (deficient in both tk and aprt), was transformed
to either the tk⁺ aprt⁻ or the tk⁻ aprt⁺ phenotype
using cellular DNA as donor. Wigler, M. et al., Cell
14: 725-731 (1978); Wigler, M. et al., PNAS 76: 5684-
5688 (1979). These clones were then transformed to the
10   tk⁺ aprt⁺ phenotype. The frequency of the second
transformation was not significantly higher than the
first. In another series of experiments, clones φX4
and φX5 were used as recipients for the transfer of
a mutant folate reductase gene which renders recipient
15   cells resistant to methotrexate (mtx). The cell line
A29 Mtx$^{RIII}$ contains a mutation in the structural gene
for dihydrofolate reductase, reducing the affinity of
this enzyme for methotrexate. Flintoff, W. F. et al.,
Somatic Cell Genetic 2: 245-261 (1976). Genomic DNA
20   from this line was used to transform clones φX4 and φX5
and Ltk⁻ cells. The frequency of transformation to
mtx resistance for the φX clones was identical to that
observed with the parental Ltk⁻ cells. It is therefore
concluded that competence is not a stably heritable trait
25   and may be a transient property of cells.


Discussion

In these studies, we have stably transformed mammalian
30   cells with precisely defined procaryotic and eucaryotic
genes for which no selective criteria exist. Our chosen
design derives from studies of transformation in bacteria
which indicate that a small but selectable subpopulation
of cells is competent in transformation. Thomas, R.
35   Biochim. Biophys. Acta 18: 467-481 (1955); Hotchkiss, R.

GENE-CEN 083028

-32-

PNAS <u>40</u>: 49-55 (1959); Thomasz, A. and Hotchkiss R.
PNAS <u>51</u>: 480-487 (1964); Spizizen, J. et al., Ann
Rev. Microbiol. <u>20</u>: 371-400 (1966). If this is also

5   true for animal cells, then biochemical transformants
will represent a subpopulation of competent cells which
are likely to integrate other unlinked genes at
frequencies higher than the general population. Thus,
to identify transformants containing genes which provide

10  no selectable trait, cultures were cotransformed with a
physically unlinked gene which provided a selectable
marker. This cotransformation system should allow the
introduction and stable integration of virtually any
defined  gene into cultured cells. Ligation to either

15  viral vectors or selectable biochemical markers is not
required.

Cotransformation experiments were performed using the
HSV tk gene as the selectable biochemical marker. The

20  addition  of this purified tk gene to mouse cells lacking
thymidine kinase results in the appearance of stable
transformants which can be selected by their ability to
grow in HAT. Tk$^+$ transformants were cloned and analyzed
by blot hybridization for cotransfer of additional DNA

25  sequences. In this manner, we have constructed mouse
cell lines which contain multiple copies of φX, pBR322
and rabbit β-globin gene sequences.

The suggestion that these observations could result from

30  contaminating procaryotic cells in our cultures is highly
improbable. At least one of the rabbit β-globin mouse
transformants expresses polyadenylated rabbit β-globin RNA
sequences as a discrete 9S cytoplasmic species. The
elaborate processing events required to generate 9S globin

35  RNA correctly are unlikely to occur in procaryotes.

GENE-CEN 083029

Exhibit OO
Page 1370

-33-

The $\phi$X cotransformants were studied in greatest detail. The frequency of cotransformation is high: 14 of 16 tk[+] transformants contain $\phi$X sequences. The $\phi$X sequences
5   are integrated into high molecular weight nuclear DNA. The number of integration events varies from one to more than fifty in independent clones. The extent of the bacteriophage genome present within a given transformant is also variable; while some clones have lost up to
10   half the genome, other clones contain over 90% of the $\phi$X sequences. Analysis of subclones demonstrates that the $\phi$X genotype is stable through many generations in culture. Similar conclusions are emerging from the characterization of the pBR322 and globin gene cotransformants.

15

Hybridization analysis of restriction endonuclease-cleaved transformed cell DNA allows one to make some preliminary statements on the nature of the integration intermediate. Only two $\phi$X clones have been examined in detail.  In
20   both clones, the donor DNA was Pst I-linearized $\phi$X DNA. Attempts were made to distinguish between the integration of a linear or circular intermediate.  If either precise circularization or the formation of linear concatamers had occurred at the Pst I cleavage site, and if integration
25   occurred at random points along this DNA, one would expect cleavage maps of transformed cell DNA to mirror the circular $\phi$X map.  The bridge fragment, however, is not observed or is present  in reduced amounts in digests of transformed cell DNA with three different restriction
30   endonucleases.  The fragments observed are in accord with a model in which $\phi$X DNA integrates as a linear molecule. Alternatively, it is possible that intramolecular re-combination of $\phi$X DNA occurs, resulting in circularization with deletions at the Pst termini.  Lai, C. J. and Nathans,
35   D. Cold Spring Harbor Symp. Quant. Biol. **39**: 53-60 (1974).

GENE-CEN 083030

Exhibit OO
Page 1371

-34-

Random integration of this circular molecule would generate
a restriction map similar to that observed for clones φX4
and φX5.  Other more complex models of events occurring
5   before, during or after integration can also be considered.
Although variable amounts of DNA may be deleted from
termini during transformation, most copies of integrated
φX sequences in clone φX4 retain the Hpa I site, which is
only 30 bp from the Pst I cleavage site.  Whatever the
10  mode of integration, it appears that cells can be stably
transformed with long stretches of donor DNA.  Transformants
have been observed containing continuous stretches of
donor DNA 50 kb long.

15  There have been attempts to identify cells transformed
with φX sequences in the absence of selective pressure.
Cultures were exposed to φX and tk DNA and cells were
cloned under nonselective conditions.  φX sequences were
absent from all fifteen clones picked.  In contrast,
20  14 of 16 clones selected for the tk$^+$ phenotype contained
φX DNA.  The simplest interpretation is that a subpopula-
tion of cells within the culture is competent in the
uptake and integration of DNA. In this subpopulation of
cells, two physically unlinked genes can be introduced
25  into the same cell with high frequency.  At present one
can only speculate on the biological basis of competence.
Competent cells may be genetic variants within the
culture; however, these studies indicate that the competent
phenotype is not stably inherited.  If one can extrapolate
30  from studies in procaryotes, the phenomenon of competence
is likely to be a complex and transient property reflecting
the metabolic state of the cell.

Cotransformants contain at least one copy of the tk gene
35  and variable amounts of φX DNA.  Although transformation
was performed with φX and tk sequences at a molar ratio of

GENE-CEN 083031

Exhibit OO
Page 1372

-35-

1000:1, the sequence ratio observed in the transformants
never exceeded 100:1.  There may be an upper limit to
the number of integration events that a cell can tolerate,
5   beyond which lethal mutations occur.  Alternatively, it
is possible that the efficiency of transformation may
depend upon the nature of the transforming fragment.
The tk gene may therefore represent a more efficient
transforming agent than phage DNA.

10

In other studies there has been demonstrated the co-
transfer of plasmid pBR322 DNA into Ltk$^-$ aprt$^-$ cells
using aprt$^+$ cellular DNA as donor and aprt as selectable
marker.  Furthermore, the use of dominant acting mutant
15   genes which can confer drug resistance will extend
the host range for cotransformation to virtually any
cultured cell.

The stable transfer of $\phi$X DNA sequences to mammalian
20   cells serves as a model system for the introduction
of defined  genes for which no selective criteria exist.
The tk cotransformation system has been used to transform
cells with the bacterial plasmid pBR322 and the cloned
rabbit ß-globin gene.  Experiments which indicate that
25   several of the pBR transformants contain an uninterrupted
sequence which includes the replicative origin and the
gene coding for ampicillin resistance (ß-lactamase),
suggest that DNA from pBR transformants may transfer
ampicillin resistance to E. coli.  Although preliminary,
30   these studies indicate the potential value of cotrans-
formation in the analysis of eucaryotic gene expression.

35

GENE-CEN 083032

Exhibit OO
Page 1373

-36-

## SECOND SERIES OF EXPERIMENTS

Cotransformed mouse fibroblasts containing the rabbit
ß-globin gene provide an opportunity to study the
expression and subsequent processing of these sequences

5   in a heterologous host.  In these experiments, we
demonstrate the expression of the transformed rabbit
ß-globin gene generating a discrete polyadenylated 9S
species of globin RNA.  This RNA results from correct
processing of both intervening sequences, but lacks

10  approximately 48 nucleotides present at the 5' terminus
of mature rabbit ß-globin mRNA.

## Transformation of Mouse Cells with the Rabbit ß-Globin Gene

15  We have performed cotransformation experiments with the
chromosomal adult rabbit ß-globin gene, using the purified
herpes virus tk gene as a biochemical marker.  The
addition of the tk gene to mutant Ltk⁻ mouse fibroblasts
results in the appearance of stable transformants that

20  can be selected by their ability to grow in hypoxanthine/
aminopterin/thymidine (HAT) medium.  Cells were cotrans-
formed with a ß-globin gene clone designated RßGl, which
consists of a 15.5-kbp insert of rabbit DNA carried in
the bacteriophage λ cloning vector Charon 4A.  The purified

25  tk gene was mixed with a 100-fold molar excess of intact
recombinant DNA from clone RßGl.  This DNA was then
exposed to mouse Ltk⁻ cells under transformation conditions
described herein under Methods and Materials.  After 2
weeks in selective medium, tk⁺ transformants were

30  observed at a frequency of one colony per $10^6$ cells
per 20 pg of tk gene.  Clones were picked and grown
into mass culture.

35  It was then asked if the tk⁺ transformants also contain
rabbit ß-globin sequences.  High molecular weight

GENE-CEN 083033

-37-

DNA from eight transformants was cleaved with the restric-
tion endonuclease Knp I.  The DNA was fractionated by
agarose gel electrophoresis and transferred to nitrocellulose
5  filters, and these filters were then annealed with nick-
translated globin [$^{32}$P] DNA blot hybridization.  Southern,
E. M., J. Mol. Biol. 98: 503-517 (1975).  Cleavage of this
recombinant phage with the enzyme Kpn I  generates a
4.7-kpb fragment that contains the entire adult β-globin
10  gene, along with 1.4 kbp of 5' flanking information and
2.0 kbp of 3' flanking information.  This fragment was
purified by gel electrophoresis and nick translated to
generate a hybridization probe.  Blot hybridization
experiments showed that the 4.7-kbp Kpn I fragment
15  containing the globin gene was present in the DNA of
six of the eight tk[+] transformants.  In three of the
clones additional rabbit globin bands were observed, which
probably resulted from the loss of at least one of
the Kpn I sites during transformation.  The number of
20  rabbit globin genes integrated in these transformants
was variable: some clones contained a single copy of the
gene, whereas others contained up to 20 copies of the
heterologous gene.  It should be noted that the
β-globin genes of mouse and rabbit are partially homologous.
25  However, we do not observe hybridization of the rabbit
β-globin probe to Kpn-cleaved mouse DNA, presumably because
Kpn cleaveage of mouse DNA leaves the β-gene cluster in
exceedingly high molecular weight fragments not readily
detected in these experiments.  These results demonstrate
30  the introduction of the cloned chromosomal rabbit β-globin
transfer.

Rabbit β-Globin Sequences are Transcribed
in Mouse Transformants

35  The cotransformation system we have developed may
provide a functional assay for cloned eucaryotic genes

GENE-CEN 083034

-38-

if these genes are expressed in the heterologous recipient
cell.  Six transformed cell clones were therefore analyzed
for the presence of rabbit β-globin RNA sequences.  In
initial experiments, solution hybridization reactions
5   were performed to determine the cellular concentration of
rabbit globin transcripts in our transformants.  A
radioactive cDNA copy of purified rabbit α- and β-globin
mRNA was annealed with the vast excess of cellular RNA.
Because homology exists between the mouse and rabbit
10   globin sequences, it was necessary to determine experimental
conditions such that the rabbit globin cDNAs did not form
stable hybrids with mouse globin mRNA but did react
completely with homologous rabbit sequences.  At 75°C in
the presence of 0.4 M NaCl, over 80% hybridization was
15   observed with the rabbit globin mRNA, whereas the
heterologous reaction with purified mouse globin mRNA
did not exceed 10% hybridization.  The $R_0 t_{1/2}$ of the
homologous hybridization reaction was $6 \times 10^{-4}$, a value
consistent with a complexity of 1250 nucleotides con-
20   tributed by the α- plus β-globin sequences in our cDNA
probe.  Axel, R., et al., Cell 7: 247-254 (1976).

This rabbit globin cDNA was used as a probe in hybridization
reactions with total RNA isolated from six transformed
25   cell lines.  Total RNA from transformed clone 6 protected
44% of the rabbit cDNA at completion, the value expected
if only β-gene transcripts were present.  This reaction
displayed pseudo-first-order kinetics with $R_0 t_{1/2}$ of
$2 \times 10^3$.  A second transformant reacted with an $R_0 t_{1/2}$ of
30   $8 \times 10^3$.  No significant hybridization was observed
at $R_0 ts \geq 10^4$ with total RNA preparations from the four
additional transformants.

We have characterized the RNA from clone 6 in greatest
35   detail.  RNA from this transformant was fractionated
into nuclear and cytoplasmic populations to determine

GENE-CEN 083035

Exhibit OO
Page 1376

-39-

the intracellular localization of the rabbit globin
RNA.  The cytoplasmic RNA was further fractionated by
oligo (dT)-cellulose chromatography into poly (A)$^+$
5   and poly (A)$^-$ RNA.  Poly (A)$^+$ cytoplasmic RNA from
clone 6 hybridizes with the rabbit cDNA with an
$R_0t_{1/2}$ of 25.  This value is 1/80th of the $R_0t_{1/2}$
observed with total cellular RNA, consistent with the
observation that poly (A)$^+$ cytoplasmic RNA is 1-2% of
10   the total RNA in a mouse cell.  Hybridization is not
detectable with either nuclear RNA or cytoplasmic poly
(A)$^-$ RNA at $R_0t$ values of $1 \times 10^4$ and $2 \times 10^4$, respectively.
The steady-state concentration of rabbit β-globin RNA
present in our transformant can be calculated from the
15   $R_0t_{1/2}$ to be about five copies per cell, with greater
than 90% localized in the cytoplasm.

Several independent experiments argue that the globin RNA
detected derives from transcription of the rabbit DNA
20   sequences present in this transformant: (i)  cDNA was
prepared from purified 9S mouse globin RNA.  This
cDNA does not hybridize with poly (A)$^+$ RNA from clone
6 at $R_0t$ values at which the reaction with rabbit
globin cDNA is complete (ii) Rabbit globin cDNA does
25   not hybridize with total cellular RNA obtained with
tk$^+$ globin$^-$ transformants at $R_0t$ vlaues exceeding $10^4$.
(iii) The hybridization observed does not result from
duplex formation with rabbit globin DNA possibly contamin-
ating the RNA preparations.  Rabbit cDNA was annealed with
30   total cellular RNA from clone 6, the reaction product
was treated with *nuclease*, and the duplex was subjected
to equilibrium density centrifugation in cesium sulfate
under conditions that separate DNA-RNA hybrids from duplex
DNA.  The Sl-resistant cDNA banded at a density of 1.54
35   g/ml, as expected for DNA-RNA hybrid structures.  These
data, along with the observation that globin RNA is poly-

GENE-CEN 083036

Exhibit OO
Page 1377

-40-

adenylated, demonstrate that the hybridization observed
with RNA preparations does not result from contaminating
DNA sequences.

5

## Characterization of Rabbit Globin Transcripts in Transformed Cells

In rabbit erythroblast nuclei, the β-globin gene sequences
10 are detected as a 14S precursor RNA that       reflects
transcription of two intervening sequences that are
subsequently removed from this molecule to generate a 9S
messenger RNA.  It was therefore of interest to determine
whether the globin transcripts detected exist at a discrete
15 9S species, which is likely to reflect appropriate
splicing of the rabbit gene transcript by the mouse
fibroblast.  Cytoplasmic poly (A)-containing RNA from
clone 6 was electrophoresed on a methyl-mercury/agarose
gel, Bailey, J. & Davidson, N., Anal. Biochem. 70: 75-85
20 (1976), and transferred to diazotized cellulose paper.
Alwine, J. C. et al., Proc. Natl. Acad. Sci. USA 74:
5340-5454 (1977).  After transfer, the RNA on the filters
was hybridized with DNA from the plasmid pβGl, which
contains rabbit β-globin cDNA sequences.  Maniatis, T.,
25 et al., Cell 8: 163-182 (1976).  Using this $^{32}$P-labeled
probe, a discrete 9S species of RNA was observed in the
cytoplasm of the transformant, which comigrated with
rabbit globin mRNA isolated from rabbit erythroblasts.
Hybridization to 9S RNA species was not observed in
30 parallel lanes containing either purified mouse 9S globin
RNA or poly (A)-containing cytoplasmic RNA from a tk$^+$
transformant containing no rabbit globin genes.

In these experiments, it was not possible to detect
35 the presence of a 14S precursor in nuclear RNA pop-
ulations from the transformants.   This is not
surprising, because the levels expected in nuclear RNA,

GENE-CEN 083037

Exhibit OO
Page 1378

-41-

given the observed cytoplasmic concentration, are likely
to be below the limits of detection of this techniques.

5    The 5' and 3' boundaries of the rabbit globin sequences
expressed in transformed fibroblasts along with the
internal processing sites can be defined more accurately
by hybridizing this RNA with cloned DNAs, followed by
S1 nuclease digestion and subsequent gel analysis of

10   the DNA products.  Berk, A. J. & Sharp, P. A., Cell 12:
721-732 (1977).  When β-globin mRNA from rabbit erythroid
cells was hybridized with cDNA clone p βG1 under appropriate
conditions, the entire 576-base pair insert of cDNA was
protected from S1 nuclease attack.  When the cDNA clone

15   was hybridized with RNA from our transformant, surprisingly,
a discrete DNA band was observed at 525 base pairs, but
not at 576 base pairs.  These results suggest that, in
this transformant, rabbit globin RNA molecules are
present that have a deletion in a portion of the globin

20   mRNA sequence at the 5' or 3' termini.  To distinguish
between these possibilities, DNA of the λ clone, R βG1,
containing the chromosomal rabbit β- globin sequence
hybridized with transformed fibroblast RNA.  The hybrid
formed was treated with S1 nuclease, and the protected

25   DNA fragments were analyzed by alkaline agarose gel
electrophoresis and identified by Southern blotting pro-
cedures.  Southern, E. M., J. Mol. Biol. 98: 503-517
(1975).  Because the rabbit β-globin gene is interrupted
by two intervening sequences, the hybridization of mature

30   rabbit mRNA to RβG1 DNA generates three DNA fragments in
this sort of analysis: a 146-base pair fragment spanning
the 5' terminus to the junction of the small intervening
sequence, a 222-base pair internal fragment bridging the
small and large intervening sequences, and a 221-base pair

35   fragment spanning the 3' junction of the large intervening
sequence to the 3' terminus of the mRNA molecule.  When
transformant RNA was analyzed in this fashion, a 222-base

GENE-CEN 083038

-42-

pair fragment was observed as well as an aberrant fragment
of 100 base pairs but no 146-base pair fragment.
Hybridization with a specific 5' probe showed that the
internal 222 base pair fragment was present.  The sum of
the protected lengths equaled the length of the DNA
fragment protected by using the cDNA clone.  Taken
together, these results indicate that although the
intervening sequences expressed in transformed mouse
fibroblast are removed from the RNA transcripts precisely,
the 5' termini of the cytoplasmic transcripts observed
do not contain about 48 ± 5 nucleotides present in
mature 9S RNA of rabbit erythroblasts.

DISCUSSION

In these studies, mouse cell lines have been constructed
that contain the rabbit β-globin gene.  The ability of the
mouse fibroblast recipient to transcribe and process this
heterologous gene has then been analyzed.  Solution hy-
bridization experiments in concert with RNA blotting
techniques indicate that, in at least one transformed cell
line, rabbit globin sequences are expressed in the cyto-
plasm as a polyadenylylated 9S species.  Correct processing
of the rabbit β-globin gene has also been observed in tk[+]
mouse cell transformants in which the globin and tk plasmids
have been ligated prior to transformation.  Mantei, N., et
al., Nature (London) 281: 40-46 (1970).  Similar results
have been obtained by using a viral vector to introduce the
rabbit globin gene into monkey cells.  Hamer, D.H. & Leder,
P., Nature (London), 281: 35-39 (1979); Mulligan, R.C., et
al., Nature (London) 277: 108-114 (1979).  Taken together,
these results suggest that nonerythroid cells from hetero-
logous species contain the enzymes necessary to correctly
process the intervening sequences of a rabbit gene whose
expression usually is restricted to erythroid cells.

GENE-CEN 083039

Exhibit OO
Page 1380

-43-

The level of expression of rabbit globin sequences in the
transformant is low: five copies of globin RNA are present
in the cytoplasm of each cell. The results indicate that
the two intervening sequences present in the original
globin transcript are processed and removed at loci in-
distinguishable from those observed in rabbit erythroid
cells. Surprisingly, 45 nucleotides present at the 5'
terminus of mature rabbit mRNA are absent from the β-
globin RNA sequence detected in the cytoplasm of the trans-
formant examined. It is possible that incorrect initiation
of transcription occurs about the globin gene in this mouse
cell line. Alternatively, the globin sequences detected
may result from transcription of a long precursor that ul-
timately must undergo 5' processing to generate the mature
9S species. Incorrect processing at the 5' terminus in the
mouse fibroblast could be responsible for the results. At
present, it is difficult to distinguish among these alterna-
tives. Because the analysis is restricted to a single trans-
formant, it is not known whether these observations are
common to all transformants expressing the globin gene or
reflect a rare, but interesting abberation. It should be
noted, however, that in similar experiments by Weissman and
his colleagues, Mantei, N., et al., Nature (London) 281:
40-46 (1979), at least a portion of the rabbit globin RNA
molecules transcribed in transformed mouse fibroblasts re-
tain the correct 5' terminus.

Several alternative explanations can be offered for the
expression of globin sequences in transformed fibroblasts.
It is possible that constitutive synthesis of globin RNA
occurs in cultured fibroblasts, Humphries, S., et al., Cell
7: 267-277 (1976), at levels five to six orders of magni-
tude below the level observed in erythroblasts. The intro-
duction of 20 additional globin DNA templates may simply
increase this constitutive transcription to the levels ob-
served in the transformant. Alternatively, it is possible

GENE-CEN 083040

-44-

5   that the homologous globin gene is repressed by factors
that are partially overcome by a gene dosage effect pro-
vided by the introduction of 20 additional globin genes.
Finally, normal repression of the globin gene in a fibro-
blast may depend upon the position of these sequences in
10  the chromosome.  At least some of the newly introduced
genes are likely to reside at loci distant from the
resident mouse globin genes.  Some of these ectopic sites
may support low level transcription.  Present data do not
permit one to distinguish among these and other alternatives.

15  Although the number of rabbit globin genes within a given
transformant remains stable for over a hundred generations
of culture in hypoxanthine/aminopterin/thymidine, it has not
been possible to prove that these sequences are covalently
integrated into recipient cell DNA.  In previous studies,
20  however, it has been demonstrated that cotransformation of
either ΦX174 or plasmid pBR322 results in the stable in-
tegration of these sequences into high molecular nuclear
DNA.  In the present study, the globin gene represents a
small internal segment of the high molecular weight con-
25  catenated phage DNA used in the transformation.  Analysis
of integration sites covalently linked to donor DNA is
therefore difficult.  Preliminary studies using radioactive
λ sequences as a probe in DNA blotting experiments indicate
that, in some cell lines, a contiguous stretch of recom-
30  binant phage DNA with a minimum length of 50 kbp has been
introduced.

The presence of 9S globin RNA in the cytoplasm of trans-
formants suggests that this RNA may be translated to give
35  rabbit β-globin polypeptide.  Attempts to detect this pro-
tein in cell lysates using a purified anti-rabbit β-globin
antibody have thus far been unsuccessful.  It is possible
that the globin RNAs in the transformant are not translated
or are translated with very low efficiency due to the ab-

GENE-CEN 083041

Exhibit OO
Page 1382

-45-

sence of a functional ribosomal binding site.  The cyto-
5  plasmic globin transcripts in the transformant lack about
48 nucleotides of untranslated 5' sequence, which includes
13 nucleotides known to interact with the 40S ribosomal
subunit in nuclease protection studies.  Efstratiadis, A.,
et al., Cell 10: 571-585 (1977); Legon, S., J. Mol. Biol.
10  106: 37-53 (1976).  Even if translation did occur with
normal efficiency, it is probable that the protein would
exist at levels below the limits of detection of the
immunologic assay due to the low level of globin RNA, and
the observation that the half-life of ß-globin in the ab-
15  sence of heme and  globin may be less than 30 min.
Mulligan, R.C., et al., Nature (London) 277: 108-114 (1979).

These studies indicate the potential value of cotransforma-
tion systems in the analysis of eucaryotic gene expression.
20  The introduction of wild-type genes along with native and
in vitro-constructed mutant genes into cultured cells pro-
vides an assay for the functional significance of sequence
organization.  It is obvious from these studies that this
analysis will be facilitated by the ability to extend the
25  generality of cotransformation to recipient cell lines,
such as murine erythroleukemia cells, that provide a more
appropriate environment for the study of heterologous
globin gene expression.

30  THIRD SERIES OF EXPERIMENTS

The cotransformation experiments involving transformation
of mouse cells with rabbit ß-globin and with plasmid
pBR322 and ΦX-174 DNA were continued and extended with the
35  following results.

ΦX DNA was used in cotransformation experiments with the
tk gene as the selectable marker.  ΦX replicative form DNA
was cleaved with Pst I, which recognizes a single site in
the circular genome, Sanger, F. et al., Nature 265: 687-695

GENE-CEN 083042

-46-

(1977).  Purified tk gene (500 pg) was mixed with 1-10 µg
of Pst-cleaved φX replicative form DNA.  This DNA was then
added to mouse Ltk$^-$ cells using the transformation condi-
tions described herein and in Wigler, M., et al., Cell
16:777-785 (1979).  After two weeks in selective medium
(HAT), tk$^+$ transformants were observed at a frequency of
one colony per $10^6$ cells per 20 pg of purified gene.
Clones were picked and grown into mass culture.

It was then asked whether tk$^+$ transformants contained
φX DNA sequences.  High molecular weight DNA from the
transformants was cleaved with the restriction endo-
nuclease Eco RI, which recognizes no sites in the φX
genome.  The DNA was fractionated by agarose gel electro-
phoresis and transferred to nitrocellulose filters, and
these filters were then annealed with nick-translated
$^{32}$P-φX DNA (blot hybridization).

These annealing experiments indicated that 15 of 16
transformants acquired bacteriophage sequences.  Since
the φX genome is not cut with the enzyme Eco RI, the number
of bands observed reflects the minimum number of eucaryotic
DNA fragments containing information homologous to φX.
The clones contain variable amounts of φX sequences: 4 of
the 15 positive clones reveal only a single annealing frag-
ment while others reveal at least fifty φX-specific fragments.

It should be noted that none of 15 clones picked at random
from neutral medium, following exposure to tk and φX DNA,
contain φX information.  Transformation with φX therefore
is restricted to a subpopulation of tk$^+$ transformants.  The
addition of a selectable marker therefore facilitates the
identification of cotransformants.

GENE-CEN 083043

-47-

## Transformation of Mouse Cells with the Rabbit β-Globin Gene

Transformation with purified eucaryotic genes provides a means for studying the expression of cloned genes in a heterologous host.  Cotransformation experiments were per-formed with the rabbit β major globin gene which was iso-lated from a cloned library of rabbit chromosomal DNA.  One β-globin clone, designated R G-1 consists of a 15 kb rabbit DNA fragment carried on the bacteriophage λ cloning vector Charon 4A.  Intact DNA from this clone (RβG-1) was mixed with the viral tk DNA at a molar ratio of 100:1, and tk$^+$ transformants were isolated and examined for the presence of rabbit globin sequences.  Cleavage of RβG-1 with the enzyme Kpn I generates a 4.7 kb fragment which contains the entire rabbit β-globin gene.  This fragment was purified by gel electrophoresis and nick-translated to generate a probe for subsequent annealing experiments.  The β-globin genes of mouse and rabbit are partially homologous, although we do not observe annealing of the rabbit β-globin probe with Kpn-cleaved mouse DNA, presumably because Kpn generates very large globin-specific fragments.  In contrast, cleavage of rabbit liver DNA with Kpn I generates the expected 4.7 kb globin band.  Cleavage of transformed cell DNA with the enzyme Kpn I generates a 4.7 kb fragment containing globin-specific information in six of the eight tk$^+$ transformants examined.  The number of rabbit globin genes present in these transformants is variable.  In comparison with con-trols, some of the clones contain a single copy of the gene, while others may contain as many as 20 copies of this hetero-logous gene.

## Rabbit β-Globin Sequences are Transcribed in Mouse Transform-ants

The cotransformation system developed provides a functional assay for cloned eucaryotic genes if these genes are expressed in the heterologous recipient cell.  Six transformed cell

GENE-CEN 083044

Exhibit OO
Page 1385

-48-

5    clones were analyzed for the presence of rabbit ß-globin
RNA sequences.  In initial experiments, solution hybridiza-
tion reactions were performed to determine the cellular
concentration of rabbit globin transcripts in transformants.

10   A radioactive cDNA copy of purified rabbit α and ß-globin
mRNA was annealed with a vast excess of total cellular RNA
from transformants under experimental conditions such that
rabbit globin cDNA does not form a stable hybrid with mouse
sequences.  Total RNA from transformed clone 6 protects 44%
of the rabbit cDNA at completion, the value expected if only
15   ß gene transcripts are present.  This reaction displays
pseudo-first-order kinetics with an $R_ot_{1/2}$ of $2 \times 10^3$.  A
second transformant (clone 2) reacts with an $R_ot_{1/2}$ of
$8 \times 10^3$.  No significant hybridization was observed with
total RNA preparations from four other transformants.
20   Further analysis of clone 6 demonstrates that virtually all
of the rabbit ß-globin RNA detected in this transformant is
polyadenylated and exists at a steady state concentration
of about five copies per cell with greater then 90% of the
sequences localized in the cytoplasm.
25

Globin Sequences Exist as a Discrete 9S Species in Trans-
formed Cells

In rabbit erythroblast nuclei, the ß-globin gene sequences
30   are detected as a 14S precursor RNA which reflects trans-
cription of two intervening sequences which are subsequently
spliced from this molecule to generate a 9S messenger RNA.
Our solution hybridization experiments only indicate that
polyadenylated rabbit globin RNA sequences are present in
35   the mouse transformant.  It was therefore of interest to
determine whether the globin transcripts we detected exist
as a discrete 9S species, which is likely to reflect
appropriate splicing of the rabbit gene transcript by the
mouse fibroblast.  Cytoplasmic poly A-containing RNA from
clone 6 was denatured by treatment with 6M urea at 70°C,

**GENE-CEN 083045**

Exhibit OO
Page 1386

-49-

and electrophoresed on a 1% acid-urea-agarose gel and
transferred to diazotized cellulose paper.  Following
transfer, the RNA filters were hybridized with DNA from the
plasmid RβG-1 containing rabbit β-globin cDNA sequences.
Using this $^{32}$P-labeled probe, a discrete 9S species of cyto-
plasmic RNA is seen which co-migrates with rabbit globin
mRNA isolated from rabbit erythroblasts.  Hybridization to
9S RNA species is not observed in parallel lanes containing
either purified mouse 9S globin RNA or polyadenylated
cytoplasmic RNA from a tk$^{+}$ transformant containing no
rabbit globin genes.

One is unable in these experiments to detect the presence
of a 14S precursor in nuclear RNA populations from the trans-
formant.  This is not surprising, since the levels expected
in nuclear RNA, given the observed cytoplasmic concentration,
are likely to be below the limits of detection of this
technique.  Nevertheless, the results with cytoplasmic RNA
strongly suggest that the mouse fibroblast is capable of
processing a transcript of the rabbit β-globin gene to
generate a 9S polyadenylated species which is indistinguish-
able from the β-globin mRNA in rabbit erythroblasts.

Rescue of pBR 322 DNA from Transformed Mouse Cells

Observations on cotransformation were extended to the EK-2
approved bacterial vector, plasmid pBR 322.  Using the co-
transformation scheme outlined herein, cell lines were
constructed containing multiple copies of the pBR 322 genome.
Blot hybridization analyses indicate that the pBR 322 se-
quences integrate into cellular DNA without significant loss
of plasmid DNA.  pBR 322 DNA linearized with either Hind III
or Bam HI, which destroys the tetracycline resistance gene,
integrates into mouse DNA with retention of both the plasmid
replication origin and the ampicillin resistance (β-lacta-
mase) gene.  It was therefore asked whether these plasmid

GENE-CEN 083046

Exhibit OO
Page 1387

-50-

sequences could be rescued from the mouse genome by a
second transformation of bacterial cells.

The experimental approach chosen is outlined in Figure 2.
Linearized pBR 322 DNA is introduced into mouse Ltk⁻ cells
via cotransformation using the tk gene as a selectable
marker.  DNA is isolated from transformants and screened
for the presence of pBR 322 sequences.  Since the donor
plasmid is linearized, interrupting the tetracycline re-
sistant gene, transformed cell DNA contains a linear stretch
of plasmid DNA consisting of the replication origin and
the β-lactamase gene covalently linked to mouse cellular
DNA.  This DNA is cleaved with an enzyme such as Xho I,
which does not digest the plasmid genome.  The resulting
fragments are circularized at low DNA concentrations in
the presence of ligase.  Circular molecules containing
plasmid DNA are selected from the vast excess of eucaryotic
circles by transformation of E. coli strain χ1776.

This series of experiments has been carried out and a
recombinant plasmid isolated from transformed mouse cell
DNA which displays the following properties: 1) The
rescued plasmid is ampicillin resistant, but tetracycline
sensitive consistent with the fact that the donor pBR 322
was linearized by cleavage within the tetracycline re-
sistance gene.  2) The rescued plasmid is 1.9 kb larger than
pBR 322 and therefore contains additional DNA.  3) The
rescued plasmid anneals to a single band in blot hybridiza-
tions to Eco RI-cleaved mouse liver DNA, suggesting that the
plasmid contains an insert of single copy mouse DNA.
These observations demonstrate that bacterial plasmids
stably integrated into the mouse genome via transformation,
can be rescued from this unnatural environment, and retain
their ability to function in bacterial hosts.

GENE-CEN 083047

-51-

This result immediately suggests modified schemes utilizing
plasmid rescue to isolate virtually any cellular gene for
which selective growth criteria are available.  The aprt gene
of the chicken is not cleaved by Hind III or Xho I and trans-
formation of aprt⁻ mouse cells with cellular DNA digested
with these enzymes results in the generation of aprt⁺
colonies which express the chicken aprt gene.  Ligation of
Hind III cleaved chicken DNA with Hind III cleaved pBR 322
results in the formation of hybrid DNA molecules, in which
the aprt gene is now adjacent to plasmid sequences.  Trans-
formation of aprt⁻ cells is now performed with this DNA.
Transformants should contain the aprt gene covalently linked
to pBR 322, integrated into the mouse genome.  This trans-
formed cell DNA is now treated with an enzyme which does not
cleave either pBR 322 or the aprt gene, and the resultant
fragments are circularized with ligase.  Transformation of
E. coli with these circular molecules should select for
plasmid sequences from eucaryotic DNA and enormously enrich
for chicken aprt sequences.  This double selection technique
permits the isolation of genes expressed at low levels in
eucaryotic cells, for which hybridization probes are not
readily obtained.

DISCUSSION

The frequency with which DNA is stably introduced into com-
petent cells is high.  Furthermore, the cotransformed se-
quences appear to be integrated into high molecular weight
nuclear DNA.  The number of integration events varies from
one to greater than fifty in independent transformed clones.
At present, precise statements cannot be made concerning the
nature of the integration intermediate.  Although data with
φX are in accord with the model in which φX DNA integrates
as a linear molecule, it is possible that more complex
intramolecular recombination events generating circular
intermediates may have occurred prior to or during the in-
tegration process.  Whatever the mode of integration, it

GENE-CEN 083048

-52-

appears that cells can be stably transformed with long
5    stretches of donor DNA.  It has been observed that trans-
formants contain contiguous stretches of donor DNA 50 kb
long.  Furthermore, the frequency of competent cells in
culture is also high.  At least one percent of the mouse
Ltk$^-$ cell recipients can be transformed to the tk$^+$ pheno-
10   type.  Although the frequency of transformation in nature
is not known, this process could have profound physiologic
and evolutionary consequences.

The introduction of cloned eucaryotic genes into animal
15   cells provides an _in vivo_ system to study the functional
significance of various features of DNA sequence organiza-
tion.  In these studies, stable mouse cell lines have been
constructed which contain up to 20 copies of the rabbit
β-globin gene.  The ability of the mouse fibroblast re-
20   cipient to transcribe and process this heterologous gene
has been analyzed.  Solution hybridization experiments in
concert with RNA blotting techniques indicate that in at
least one transformed cell line, rabbit globin sequences are
expressed in the cytoplasm as a 9S species indistinguishable
25   from the mature messenger RNA of rabbit erythroblasts.  These
results suggest that the mouse fibroblast contains the en-
zymes necessary to transcribe and correctly process a
rabbit gene whose expression ~~expresseion~~ is normally restricted to
erythroid cells.  Similar observations have been made by
30   others using a viral vector to introduce the rabbit globin
gene into monkey cells.

These studies indicate the potential value of cotrans-
formation systems in the analysis of eucaryotic gene ex-
35   pression.  The introduction of wild type genes along with
native and _in vitro_ constructed mutant genes into cultured
cells provides an assay for the functional significance of
sequence organization.  It is obvious from these studies

GENE-CEN 083049

-53-

that this analysis will be facilitated by the ability to
extend the generality of cotransformation to recipient cell
lines, such as murine erythroleukemia cells, which may pro-
vide a more appropriate environment for the study of
heterologous globin gene expression.

## FOURTH SERIES OF EXPERIMENTS

The ability to transfer purified genes into cultured cells
provides the unique opportunity to study the function and
physical state of exogenous genes in the transformed host.
The development of a system for DNA-mediated transfer of the
HSV thymidine kinase (tk) gene to mutant mouse cells,
Wigler, M., et al., Cell 11:223-232 (1977), has permitted
extension of these studies to unique cellular genes.  Wigler,
M., et al., Cell 14:725-731 (1979).  It has been found that
high molecular weight DNA obtained from tk$^+$ tissues and
cultured cells from a variety of eucaryotic organisms can
be used to transfer tk activity to mutant mouse cells de-
ficient in this enzyme.  The generality of the transformation
process has been demonstrated by the successful transfer of
the cellular adenine phosphoribosyl transferase (aprt)
gene and the hypoxanthine phosphoribosyl transferase (hprt)
gene.  Wigler, M., et al., Proc. Nat. Acad. Sci. USA 76:
1373-1376 (1979); Willicke, K., et al., Molec. Gen. Genet.
170:179-185 (1979); Graf, L. Y., et al., Somatic Cell
Genetics, in press (1979).

More recently, it has been demonstrated that cells trans-
formed with genes coding for selectable biochemical markers
also integrate other physically unlinked DNA fragments at
high frequency.  In this manner, the tk gene has been used as
a marker to identify mammalian cells cotransformed with de-
fined procaryotic and eucaryotic genes into cultured mammalian
cells.  Wigler, M., et al., Cell 16:777-785 (1979).

GENE-CEN 083050

Exhibit OO
Page 1391

-54-

Detection of gene transfer has in the past relied exten-
sively on the use of appropriate mutant cell lines.   In
some cases, cells resistant to metabolic inhibitors contain
dominant acting mutant genes.   Cotransformation with such
dominant acting markers should in principle permit the
introduction of virtually any cloned genetic element into
wild type cultured cells.   In this study, cells were trans-
formed with the gene coding for a mutant dihydrofolate
reductase (dhfr) gene which renders cells resistant to high
concentrations of methotrexate (mtx).   Flintoff, W. F., et
al., Cell 2:245-262 (1976).

Cultured mammalian cells are exquisitely sensitive to the
folate antagonist, methotrexate.   Mtx resistant cell lines
have been identified which fall into three categories:
1) cells with decreased transport of this drug.   Fischer,
G. A. Biochem. Pharmacol. 11:1233-1237 (1962); Sirotnak, F.
M., et al., Cancer Res. 28:75-80 (1968); 2) cells with
structural mutations which lower the affinity of dhfr for
methotrexate.   Flintoff, W. F., et al., Cell 2:245-262
(1976); and 3) cells which produce inordinately high levels
of dhfr.   Biedler, J. L., et al., Cancer Res. 32: 153-161
(1972); Chang, S. E., and Littlefield, J. W., Cell 7:391-396
(1976).   Where they have been examined, cells producing high
levels of dhfr have been found to contain elevated levels of
the dhfr gene (gene amplification).   Schimke, R. T., et al,
Science 202:1051-1055 (1978).

An interesting methotrexate resistant variant cell line (A29)
has been identified that synthesizes elevated levels of a
mutant dihydrofolate reductase with reduced affinity for
methotrexate.   Wigler, M., et al., Cell 16:777-785 (1979).
Genomic DNA from this cell line has been used as donor in
experiments to transfer the mutant dhfr gene to mtx sensitive
cells.   Exposure of mtx resistant transformed cells to in-
creasing levels of mtx selects for cells which have amplified
the transferred gene.   In this way, it is possible to trans-

GENE-CEN 083051

-55-

5  fer and amplify virtually any genetic element in cultured
   mammalian cells.

   Transfer of the Mutant Hamster Dihydrofolate Reductase Gene
   to Mouse Cells

10 High molecular weight cellular DNA was prepared from wild-
   type mtx sensitive CHO cells and from A29 cells, an mtx
   resistant CHO derivative synthesizing increased levels of
   a mutant dhfr.  Flintoff, W. F., et al., Cell 2:245-262
   (1976).  The ability of these DNA preparations to transfer
15 either the dhfr gene or the tk gene to tk⁻ mouse L cells
   (Ltk⁻ aprt⁻) was tested using a modification of the calcium
   phosphate coprecipitation method. Wigler, M., et al., Proc.
   Nat. Acad. Sci. USA 76:1373-1376 (1979).  DNA from both
   mutant A29 and wild-type CHO cells was competent in trans-
20 ferring the tk gene to Ltk⁻ aprt⁻ cells.  Methotrexate re-
   sistant colonies were observed only following treatment of
   cells with DNA from A29.  The data obtained suggest that
   treatment of methotrexate sensitive cells with A29 DNA re-
   sulted in the transfer and expression of a mutant dhfr gene,
25 thus rendering these cells insensitive to elevated levels of
   methotrexate.


   In order to test this hypothesis directly, molecular hybrid-
   ization studies were performed to demonstrate the presence
30 of the hamster dhfr gene in DNA from presumed transformants.
   A mouse dhfr cDNA clone (pdfr-21), Chang, A.C.Y., et al.,
   Nature 275:617-624 (1978), that shares homology with the
   structural gene sequences of the hamster dhfr gene was used
   to detect the presence of this gene in our transformants.
35 Restriction analysis of the dhfr gene from A29, from pre-
   sumed transformants, and from amplified mouse cells, was
   performed by blot hybridization.  Southern, E. M., J. Mol.
   Biol. 98:503-517 (1975).  DNA was cleaved with restriction
   endonuclease Hind III, electrophoresed in agarose gels, and
   transferred to nitrocellulose filters.  These filters were

GENE-CEN 083052

-56-

then hybridized with high specific activity, $^{32}$P-labeled
5    nick-translated pdhfr-21 and developed by autoradiography.
This procedure visualizes restriction fragments of genomic
DNA homologous to the dhfr probe.  Prominent bands are
observed at 15 kb, 3.5 kb and 3 kb for mouse DNA and 17 kb,
7.9 kb, 3.7 kb and 1.4 kb for hamster DNA.  The restriction
10   profiles between these two species are sufficiently differ-
ent to permit one to distinguish the hamster gene in the
presence of an endogenous mouse gene.  Five L cell trans-
formants resistant to methotrexate were therefore examined
by blot hybridization.  In each transformed cell line, one
15   observed the expected profile of bands resulting from
cleavage of the endogenous mouse dhfr gene and a series of
additional bands whose molecular weights are identical
to those observed upon cleavage of hamster DNA.  The 17.9 kb,
7.9 kb and 1.4 kb bands observed in hamster DNA are diag-
20   nostic for the presence of the hamster dhfr gene and are
present in all transformants.

In initial experiments, the lowest concentration of metho-
trexate (0.1 μg per ml) was chosen which would decrease
25   survival of Ltk⁻ aprt⁻ cells to less than $10^{-7}$.  Previous
studies, Flintoff, W. F., et al., Cell 2:245-262 (1976),
suggested that the presence of a single mutant dhfr gene can
render cells resistant to this concentration of methotrexate.
Comparison of the intensity of the hamster dhfr gene fragments
30   of transformed cell DNA with those of wild-type hamster DNA
suggest that our transformants contain one or at most a few
methotrexate resistant hamster genes.  By contrast, donor
A29 cells, which have been shown to produce elevated levels
of the mutant dhfr, Flintoff, W. F., et al., Cell 2:245-262
35   (1976), appear to contain multiple copies of this gene.

Amplification of the Transferred dhfr Gene

Initial transformants were selected for resistance to
relatively low levels of mtx (0.1 μg/ml).  For every clone,

GENE-CEN 083053

-57-

however, it was possible to select cells resistant to
5    elevated levels of mtx by exposing mass cultures to
successively increasing concentrations of this drug.  In
this manner, we isolated cultures resistant to up to 40
µg/ml of methotrexate starting from clones that were ini-
tially resistant to 0.1 µg/ml.  We next asked if increased
10   resistance to methotrexate in these transformants was
associated with amplification of a dhfr gene and, if so,
whether the endogenous mouse or the newly transferred ham-
ster gene was amplified.  DNA from four independent isolates
and their resistant derivatives was examined by blot hy-
15   bridization.  In each instance, enhanced resistance to
methotrexate was accompanied by an increase in the copy
number of the hamster gene.  This is most readily seen by
comparing the intensities of the 1.5 kb band.  In no in-
stance have we detected amplification of the endogenous
20   mouse dhfr gene.  Lastly, it is noted that not all lines
selected at equivalent methotrexate concentrations appear
to have the same dhfr gene copy number.

## The dhfr Gene as a Generalized Transformation Vector

25   Selectable genes can be used as vectors for the introduction
of other genetic elements into cultured cells.  In previous
studies, it has been demonstrated that cells transformed with
the tk gene are likely to incorporate other unlinked genes.
30   Wigler, M., et al., Cell 16:777-785 (1979).  The generality
of this approach was tested for the selectable marker, the
mutant dhfr gene.  20 µg of total cellular DNA from A29 was
mixed with 1 µg of Hind III-linearized pBR 322 DNA.  Re-
cipient cells were exposed to this DNA mixture and, after two
35   weeks, methotrexate resistant colonies were picked.  Genomic
DNA from transformants was isolated, cleaved with Hind III
and analyzed for the presence of pBR322 sequences.  Two in-
dependent isolates were examined in this way and in both

GENE-CEN 083054

-58-

cases multiple copies of pBR322 sequences were present in these methotrexate transformants.

An alternate approach to generalized transformation involves ligation of a nonselectable DNA sequence to a selectable gene.  Since the muant dhfr gene is a dominant acting drug resistance factor, this gene is an ideal vector. Furthermore, it should be possible to amplify any genetic element ligated to this vector by selecting cells resistant to elevated levels of mtx.  To explore this possibility, restriction endonucleases that do not destroy the dhfr gene of A29 were identified by transformation assay.  One such restriction endonuclease, Sal I, does not destroy the transformation potential of A29 DNA.  Sal I-cleaved A29 DNA was therefore ligated to an equal mass of Sal I-linearized pBR322.  This ligation product was subsequently used in transformation experiments.  Methotrexate resistant colonies were picked and grown into mass culture at 0.1 µg methotrexate/ml.  Mass cultures were subsequently exposed to increasing concentrations of methotrexate.

DNAs were obtained from mass cultures resistant to 0.1, 2, 10 and 40 µg/ml methotrexate, and the copy number of pBR322 and dhfr sequences was determined by blot hybridization.  Six independent transformed lines were examined in this fashion.  Five of these lines exhibited multiple bands homologous to pBR322 sequences.  In four of these transformed clones, at least one of the pBR 322-specific bands increased in intensity upon amplification of dhfr.  In SS-1, two pBR322-specific bands are observed in DNA from cells resistant to 0.1 µg/ml methotrexate.  These bands increase several-fold in intensity in cells resistant to 2 µg/ml. No further increase in intensity is observed, however, in cells selected for resistance to 40 µg/ml.  In a second line, SS-6, all pBR 322 bands present at 0.1 µg/ml continue to

GENE-CEN 083055

Exhibit OO
Page 1396

-59-

increase in intensity as cells are selected first at 2 µg/
ml and then at 40 µg/ml methotrexate.  Curiously, new
pBR322-specific bands appear after selection at higher
methotrexate concentrations.  It was estimated that there
is at least a fifty-fold increase in copy number for
pBR322 sequences in this cell line.  In a third cell line,
HH-1, two pBR322-specific bands increase in intensity upon
amplification, others remain constant or decrease in inten-
sity.  Thus, the pattern of amplification of pBR322 se-
quences observed in these cells can be quite varied.  Never-
theless, it appears that the mutant dhfr gene can be used
as vector for the introduction and amplification of defined
DNA sequences into cultured animal cells.

## DISCUSSION

The potential usefulness of DNA-mediated transformation in
the study of eucaryotic gene expression depends to a large
extent on its generality.  Cellular genes coding for select-
able biochemical functions have previously been introduced
into mutant cultured cells, Wigler, M., et al., Cell 14:725-
731 (1979); Wigler, M., et al., Proc. Nat. Acad. Sci. USA
76:1373-1376 (1979); Willecke, K., et al., Molec. Gen. Genet.
170:179-185 (1979); Graf, L. H., et al., Somatic Cell
Genetics, in press (1979).  In the present study, a dominant
acting, methotrexate resistant dhfr gene has been transferred
to wild-type cultured cells.  The use of this gene as a vector
in cotransformation systems may now permit the introduction
of virtually any genetic element into a host of new cellular
environments.

In initial experiments, DNA from A29 cells, a methotrexate
resistant CHO derivative synthesizing a mutant dhfr was
added to cultures of mouse L cells.  Methotrexate resistant
colonies appeared at a frequency of one to ten colonies/
5 X 10$^5$ cells/20 µg cellular DNA.  No colonies were observed

GENE-CEN 083056

-60-

upon transformation with DNA obtained from wild-type, methotrexate sensitive cells, although this DNA was a competent donor of the thymidine kinase gene. Definitive

5   evidence that we have effected transfer of a mutant hamster dhfr gene was obtained by demonstrating the presence of the hamster gene in mouse transformants. The restriction maps of the mouse and hamster dhfr genes are significantly different and permit one to distinguish

10   these genes in blot hybridization experiments. In all transformants examined, one observes two sets of restriction fragments homologous to a mouse dhfr cDNA clone: a series of bands characteristic of the endogenous mouse gene and a second series characteristic of the

15   donor hamster gene.

The utility of transformation of the dhfr locus is a function of the relative frequencies both of transformation and of spontaneous resistance to mtx. The demonstration

20   that all mtx resistant L cells picked result from transformation rather than amplification of endogenous genes suggests that amplification of dhfr is a rare event in this cell line. Attempts were made to transform other cell lines, including mouse teratoma and rat liver cells and,

25   in these instances, hybridization studies reveal that the acquisition of mtx resistance results from amplification of endogenous dhfr genes. The use of a purified dhfr gene is likely to overcome these difficulties by enormously increasing the frequency of transformation.

30

The dhfr copy number observed in initial transformants is low. This observation is consistent with previous studies suggesting that a single mutant dhfr gene is capable of rendering cells mtx resistant under

35   selective criteria (0.1 µg/ml mtx). Flintoff, W. F., et al., Cell 2: 245-262 (1976). Exposure of these initial

GENE-CEN 083057

-61-

mtx resistant transformants to stepwise increases in drug
concentration results in the selection of cells with
enhanced mtx resistance resulting from amplification of
5      the newly transferred mutant hamster dhfr gene.  In no
transformants has amplification of the endogenous mouse
gene been observed in response to selective pressure.
It is likely that a single mutant gene affords signifi-
cantly greater resistance to a given concentration of mtx
10     than a single wild-type gene.  If the frequency of the
amplification is low, one is merely selecting resistance
variants having the minimum number of amplification events.
It is also possible that newly transferred genes may be
amplified more readily than endogenous genes.

15

The mutant dhfr gene has been used as a dominant transfer
vector to introduce nonselectable genetic elements into
cultured cells.  One experimental approach exploits the
observation made previously, Wigler, M., et al.; Cell 16:
20     777-785 (1979), that competent cells integrate other
physically unlinked genes at high frequency.  Cultures
exposed to pBR322 DNA, along with the genomic DNA
containing the mutant dhfr gene give rise to mtx resistant
cell lines containing multiple copies of the bacterial
25     plasmid.

An alternative approach to genetic vectoring involves
ligation of pBR322 sequences to the selectable dhfr gene
prior to transformation.This procedure also generates
30     transformants containing multiple pBR322 sequences.
Amplification of dhfr genes results in amplification of
of pBR322 sequences, but the patterns of amplification
differ among cell lines.  In one instance, all pBR322
sequences amplify with increasing mtx concentrations.
35     In other lines, only a subset of the sequences amplify.

GENE-CEN 083058

-62-

In yet other lines, sequences appear to have been lost
or rearranged.  In some lines, amplification proceeds
with increasing mtx concentrations up to 40 µg/ml, whereas
5   in others, amplification ceases at 2 µg/ml.  At present,
the amplification process is not understood nor has the
amplification unit been defined.  Whatever the mechanisms
responsible for these complex events, it is apparent that
they can be expolited to control the dosage of virtually
10  any gene introduced into cultured cells.

15

20

25

30

35

GENE-CEN 083059

Exhibit OO
Page 1400

-63-

## FIFTH SERIES OF EXPERIMENTS

Mouse teratocarcinoma (TCC) stem cells provide a unique
vector for the introduction of specific, predetermined,
5    genetic changes into mice.Mintz, B. & Illmensee, K.,
Proc. Natl. Acad. Sci. 72: 3585-3589 (1975); Mintz, B.,
Brookhaven Symp. Biol. 29: 82-85 (1977).  These cells
lose their neoplastic properties and undergo normal
differentiation when placed in the environment of the
10   early embryo.  There they can contribute to formation
of all somatic tissues in a mosaic animal comprising
both donor- and host-derived cells, and also to the
germ line, from which the progeny have genes of the
tumor strain in all their cells.  Thus, during initial
15   propagation of TCC stem cells in culture, clones with
experimentally selected nuclear, Dewey, M. J., et al.,
Proc.Natl. Acad. Sci., 74 : 5564-5568 (1977), and
cytoplasmic, Watanabe, T., et al., Proc. Natl. Acad.
Sci., 75: 5113-5117 (1978), gene mutations have been
20   obtained and the cells have proved capable of participat-
ing in embryogenesis.

The effective application of this system in probing the
control of gene expression during differentiation would
25   be greatly enhanced if, as proposed, Mintz, B.,
Differentiation 13: 25-27 (1979), precisely defined
genes, either in native or modified form, with known
associated sequences, could be introduced into develop-
mentally totipotent TCC cells prior to their develop-
30   ment in vivo.  DNA-mediated gene transfer into cultured
mouse cells has now been reported for a variety of
viral and cellular genes coding for selectable bio-
chemical functions.  The purified viral thymidine
40   kinase (tk; ATP: thymidine 5'-phosphotransferase, EC
35   2.7.1.21) gene has provided a model system for gene

GENE-CEN 083060

Exhibit OO
Page 1401

-64-

transfer, Wigler, M. et al., Cell 11: 223-232 (1977),
and has been followed by the DNA-mediated transfer of
the cellular genes coding for thymidine kinase, Wigler,
M., et al., Cell 14: 725-731 (1978), hypoxanthine
5  phosphoribosyltransferase, Willecke, K., et al.,
Molec. Gen. Genet. 170: 179-185 (1979); Graf, L. H.,
et al., Somat. Cell Genet., in press (1979), adenine
phosphoribosyltransferase, Wigler, M., et al., Proc.
Natl. Acad. Sci. USA, 76: 1373-1376 (1979), and
10  dihydrofolate reductase, Wigler, M., et al., Proc.
Natl. Acad. Sci, in press (1980); Lewis, W. H., et al.,
Somat. Cell. Genet., in press (1979).  In this report
is demonstrated the contransfer of the cloned Herpes
simplex (HSV) thymidine kinase gene along with the
human β-globin gene into mutant (tk⁻) teratocarcinoma
stem cells in culture.  These transformed cells, when
tested by subcutaneous inoculation into mice, retain
their developmental capacities in the tumors that are
produced, and exhibit the viral-specific tk enzymatic
20  activity for numerous cell generations in vivo.

Transformation of tk⁻ Teratocarcinoma Cells.

The addition of plasmid DNA containing the HSV thymidine
25  kinase gene to cultures of attached mouse L tk⁻ cells
yields L tk⁺ transformants in HAT at a frequency of one
colony per 100 pg of DNA per 5 X 10⁵ cells.  Under
identical transformation procedures, tk⁻ teratocarcinoma
cells showed a strikingly lower transformation efficiency.
30  Based on the average of three independent experiments,
one surviving colony was obtained per 4 μg of plasmid
DNA per 5 X 10⁵ cells, a value four to five orders of
magnitude below that of the L tk⁻ cells.  This relatively
low efficiency was confirmed when the DNA was added to
35  TCC tk⁻ cells in suspension.  Addition of 10 μg of Bam

GENE-CEN 083061

Exhibit OO
Page 1402

-65-

Hl-restricted ptk-l DNA to 7 X 10$^6$ cells resulted in only four transformants in HAT.  With identical trans- formation conditions, L tk$^-$ cells gave 3 X 10$^3$ tk$^+$ colonies per 10$^7$ cells per 1.5 μg of ptk-l DNA.  While

5   high concentrations of gene are thus required to effect transformation in this teratocarcinoma cell line, the availability of cloned DNA nonetheless allows numerous tk$^+$ transformants to be obtained.

10   Expression of HSV tk Activity in Transformed Teratocarcinoma Cells.

To ascertain whether the tk$^+$ phenotypes of the TCC clones were indeed attributable to expression of the

15   viral tk gene, seven colonies were picked from independent culture dishes and grown into mass cultures for testing. The activity of five clones were characterized by serological, and of two by biochemical, techniques. The Herpes-type antigenic identity of tk was verified

20   by assaying the ability of HSV- tk-specific antibody to neutralize enzymatic activity.  Over 90% inhibition of tk activity was in fact observed when immune serum was reacted with extracts of each of the five trans- formed clones chosen (Table I). The low residual activity

25   remaining after neutralization of transformed-cell extracts may represent mitochondrial tk activity, which by itself is unable to afford survival in HAT.  Cell extracts from the other two TCC tk$^+$ clones chosen were tested for   tk electrophoretic mobility because of the marked difference

30   between the mouse and HSV tk enzymes.  While the TCC tk$^-$ control, as expected, shows no major peak of activity, the transformants have the HSV tk characteristic peak migrating with an R$_f$ of 0.45, as shown for one of the clones.

35

GENE-CEN 083062

Exhibit OO
Page 1403

hidden

-66-

Table 1.  Specific neutralization of Herpes thymidine kinase in transformants

| Cell line source of extract | Activity with preimmune serum | Activity with antiserum | |
|---|---|---|---|
| | Units X $10^{-3}$ per ml | Units X $10^{-3}$ per ml | % Residual activity |
| TCC wt* | 2.8 | 3.0 | 107.0 |
| TCC tk$^{-†}$ | 0.05 | 0.06 | 100.0 |
| LHB 2b‡ | 3.4 | 0.06 | 2.0 |
| TCC tk-1§ | 2.1 | 0.17 | 8.0 |
| TCC tk-3 | 5.5 | 0.43 | 8.0 |
| TCC tk-4 | 6.1 | 0.15 | 2.5 |
| TCC tk-5 | 3.7 | 0.21 | 6.0 |

30,000 X g supernatants of homogenates (S-30) from the indicated cell lines were mixed with preimmune serum or antiserum to purified HSV-1 tk, and tk activity was assayed as described in Materials and Method.  Activity is expressed as units per ml of the S-30 fraction.

*TCC wt is a mouse teratocarcinoma feeder-independent cell line (6050P) with tk$^{+}$ (wild-type) phenotype.

†TCC tk$^{-}$ is a derivative of TCC wt that is resistant to BrdUrd and is tk-deficient.

‡LHB 2b is a mouse L tk$^{-}$ cell line transformed to the tk$^{+}$ phenotype with the Herpes thymidine kinase gene.

§TCC tk-1, -3, -4, and -5 are HAT-resistant teratocarcinoma clones derived from TCC tk$^{-}$ after transformation with the Herpes thymidine kinase gene.

GENE-CEN 083063

Exhibit OO
Page 1404

-67-

**The Physical State of the tk Gene in Transformed Teratocarcinoma Cells**

The number of viral tk gene fragments and the location
of these fragments in independent transformants were
5   examined utilizing the blot hybridization technique
of Southern, Southern, E. M., J. Mol. Biol., 98: 503-
517 (1975).  The donor DNA was the recombinant plasmid,
ptk-1, digested to completion with Bam Hl.  This plasmid
contains a 3.4 kb fragment with the viral tk gene
10   inserted at the single Bam Hl site within the tetracycline
resistance gene of pBR322.  Transformation with Bam
cleaved tk DNA results in integration with loss of the
Bam sites at the termini of the 3.4 kb fragment.  High
molecular weight DNA from transformants was cleaved with
15   Bam Hl, fractionated by agarose gel electrophoresis,
and transferred to nitrocellulose filters; the filters
were then annealed with nick-translated $^{32}$P-tk DNA.
In each cell clone, a single annealing fragment was
seen; therefore, each clone contains at least one viral
20   tk gene.  As expected, each clone reveals a band of mol-
ecular weight greater than 3.4 kb.  The molecular weights
of the annealing fragments differ among the transformed
clones, a result suggesting that integration has
occurred at different sites within the DNA of the
25   respective transformants.

**Stability of the Transformed Phenotype in Culture**

To test the capacity of the TCC transformants to retain
30   expression of the donor tk gene in culture in the absence
of selective pressure, individual clones grown into
mass culture in HAT selective medium were subcultured
for various periods in the absence of the selective agent.
The fraction of cells that retained the tk$^+$ phenotype
35   was determined by measuring cloning efficiencies in
selective and nonselective media.  Wide differences
among clones became apparent (Table II).  Some cell lines,

**GENE-CEN 083064**

Exhibit OO
Page 1405

-68-

Table II.  In vitro stability of the transformed phenotype
in teratocarcinoma cells.

| Clonal cell line | Experiment | Generations in nonselective medium* | Relative cloning efficiency in selective medium† | Rate of loss of tk+ phenotype per generation‡ |
|---|---|---|---|---|
| TCC tk-1 | 1 | 28 | 0.45 | |
| | 2 | 150 | 0.50 | <0.001 |
| TCC tk-2 | 1 | 28 | 0.23 | |
| | 2 | 150 | 0.02 | 0.017 |
| TCC tk-3 | 1 | 28 | 0.47 | |
| | 2 | 150 | 0.27 | 0.002 |
| TCC tk-4 | 1 | 28 | 0.26 | |
| | 2 | 150 | 0.16 | 0.003 |
| TCC tk-5 | 1 | 28 | 0.14 | |
| | 2 | 150 | 0.01 | 0.021 |

*Clones were picked and grown in HAT selective medium for 40
cell generations.  Cells were then grown in nonselective
medium for 28 or 150 generations prior to determining their
cloning  efficiencies under selective and nonselective condi-
tions.

†One hundred cells were plated in triplicate into HAT selec-
tive and nonselective media. The relative cloning efficiency
in selective medium is defined as the ratio of the cloning
efficiency under selective conditions to the cloning effi-
ciency under nonselective conditions (50-70%).

‡In these calculations it is assumed that for any given cell
line the rate of loss of the tk phenotype is constant in each
cell generation. The rate of loss per generation  may then be
calculated from the formula $F_M (1-X)^{N-M} + F_N$, in which $F_M$ is
the relative cloning efficiency in selective medium after M
generations in non-selective medium; $F_N$ is similarly defined
for N generations; and X is the rate of loss per cell generation.

GENE-CEN 083065

Exhibit OO
Page 1406

-69-

such as TCC tk-1, were relatively stable and lost the tk$^+$
phenotype at frequencies less than 0.1% per generation in
nonselective medium.  Other, less stable, lines (TCC
tk-2 and TCC tk-5) lost tk$^+$ expression at 2% per
generation in the absence of selection.

## Maintenance and Expression of the HSV tk Gene in Vivo During Tissue Differentiation in Tumors

The more critical question of retention of the foreign
gene and of its expression during TCC cell differentiation
in vivo in the absence of selection was examined in solid
tumors.  Tumors were formed by inoculating syngeneic hosts
(usually two hosts per clone) subcutaneously with 10$^7$
cells from each of the same five transformed clones.  DNA
from these tumors was analyzed by blot hybridization.
Neutralization assays and electrophoretic mobility tests
of the tk enzyme were also carried out to identify ex-
pression of the viral gene.  In addition, samples of the
same tumors were fixed and examined histologically for
evidence of differentiation.

The restriction fragment profiles of the viral tk gene
demonstrated that the gene was retained in all nine tumors
analyzed.  When each tumor (grown without HAT selection)
was compared with its cell line of origin (cultured under
HAT selective pressure), the number and location of the
annealing fragments in seven of the tumors was identical
to that of the corresponding cell line.  Thus, the
introduced tk gene was, in most cases, maintained for
many cell generations spanning at least three weeks in
vivo without significant loss or translocation.  In two
instances, however, a gene rearrangement had occurred,
resulting from the loss of the original tk-containing
fragment and the appearance of a new fragment of
different molecular weight.  It is of interest that

GENE-CEN 083066

Exhibit OO
Page 1407

-70-

these two tumors were produced from the two TCC clones
30 that lost the tk$^+$ phenotype in vitro at highest fre-
quencies (Table II).

5

The results of neutralization tests with HSV-tk-specific
antiserum demonstrated that at least three of the nine
tumors (including one from the TCC tk-1 clone) had
viral-type tk activity.  (The presence of host cells
10 in the tumors probably contributed substantial amounts
of non-neutralized mouse tk in the remaining cases.)
Another sample of the tumor derived from the TCC tk-1
line was also analyzed electrophoretically for HSV
tk activity; a predominant peak migrating with an R$_f$
15 of 0.45, characteristic of the viral enzyme, was
observed.

Histological speciments from each of the tumors were
prepared and examined.  In addition to the TCC stem cells,
20 tumors contained an array of differentiated tissues
similar to those in tumors from the untransformed TCC wt
31 and TCC tk$^-$ cell lines of origin.  Included were muscle,
neural formations, adipose tissue, some bone, squamous
keratinizing epithelium, and other epithelia, ducts, and
25 tubules.

Cotransformation of Teratocarcinoma Cells with
the Human β-Globin Gene

30 Biochemical transformants of mouse L may constitute a
competent subpopulation in which an unselectable gene
can be introduced, along with an unlinked selectable
gene, at frequencies higher than in the general popu-
lation, Wigler, M., et al., Cell 16: 777-785 (1979).
35 Cotransformation experiments have therefore been carried
out in which the Herpes viral tk  gene was used as a

73

GENE-CEN 083067

Exhibit OO
Page 1408

-71-

selectable marker to introduce the human β-globin gene
into tk⁻ TCC cells.  A cloned <u>Hind</u> III restriction
endonuclease fragment of human chromosomal DNA containing
the β-globin gene (plasmid phβ-8) was cleaved with the
enzyme <u>Hind</u> III and mixed with Hind III-linearized ptk-1.
After TCC tk⁻ cells were exposed to these genes, they
were grown for two weeks in HAT selection medium and
tk⁺ transformants were cloned and analyzed by blot
hybridization for presence of human β-globin sequences.
A 4.3 kb <u>Bgl</u> II restriction fragment containing the intact
human β-globin gene is entirely contained within the donor
pH -8 plasmid.  High molecular weight DNA from the
transformants was therefore cleaved with the <u>Bgl</u> II enzyme
and analyzed in blot hybridization using the $^{32}$P-labeled
4.3 kb <u>Bgl</u> II fragment as an annealing probe.

In two of the ten TCC transformants examined, human
β-globin sequences were detected.  One of the transformants
contains one to three copies of the 4.3 kb <u>Bgl</u> II fragment;
in this cell line, therefore, the globin gene is evidently
intact.  The other TCC isolate containing the human
β-αlobin gene displays an aberrant high molecular weight
annealing fragment, a result suggesting that cleavage
and integration have occurred within the <u>Bgl</u> II fragment.
These data demonstrate that those TCC cells that are
competent for uptake and expression of the tk gene also
integrate another unlinked and unselectable gene at
high frequency.

<u>DISCUSSION</u>

The experimental introduction of foreign DNA into early
mammalian embryos, and its persistence and augmentation
during development, were first reported some six years

GENE-CEN 083068

Exhibit OO
Page 1409

-72-

ago, Jaenisch, R. & Mintz, B., Proc. Natl. Acad. Sci.
71: 1250-1254 (1974).  Purified (nonrecombinant) SV 40
viral DNA was microinjected into mouse blastocysts; they
gave rise to healthy adults whose tissue DNA contained
5   SV 40 gene sequences.  Newer technologies such as described
herein  should allow a wide range of specific genes to
be incorporated into the genome of the embryo for in vivo
analyses of control of gene expression during differentia-
tion.  With the advent of recombinant DNA, quantities of
10  particular genes in native or specifically modified form
can be obtained.  In the biological sphere, the malignant
stem cells of mouse teratocarcinomas have contributed
a novel avenue of intervention.  These cells can be
grown in culture, selected for specific mutations, and
15  microinjected into blastocysts, where they lose their
neoplastic properties and participate in development,
Dewey, M., J. et al., Proc. Natl. Acad, Sci. USA, 74:
5564-5568 (1977); Watanabe, T., et al., Proc. Natl.
20  Acad. Sci., 75:  5113-5117 (1978).  The cultured TCC cells
have therefore been viewed as vehicles for transmitting
predetermined genetic changes to mice, Mintz, B., Brook-
haven Symp., Bio., 29: 82-85, (1977); Mintz, B.,
Differentiation 13: 25-27 (1979).  Such changes obviously
25  might include genes acquired by uptake of DNA.

DNA-mediated gene transfer into cells of fibroblast lines
has been accomplished in culture, Wigler, M., et al.,
Cell 11: 223-232 (1977); Wigler, M., et al., Cell 14:
30  725-731 (1978); Willecke, K., et al., Molec. Gen. Genet.
170: 179-185 (1979), Graf, L. H., et al., Somat. Cell
Genet., in press (1979); Wigler, M., et al., Proc. Natl.
Acad. Sci. USA, 76: 1373-1376 (1979); Wigler, M., et al.
Proc. Natl. Acad. Sci., in press (1980); Lewis, W. H.
35  et al., Somat. Cell Genet., in press (1979), and
furnished the basis for similar attempts here with tera-

GENE-CEN 083069

715

Exhibit OO
Page 1410

-73-

tocarcinoma lines.  The TCC-cell route for gene transfer
into embryos, as compared with embryo injection of DNA,
offers the advantage that transformants, i.e., cell
5    clones in which the specific gene has been retained, can
be identified and isolated by selection or screening.
In the case of unselectable genes, cotransfer with a
selectable one has been found to occur with relatively
high frequency, Wigler, M., et al., Cell 16: 777-785
10   (1979).

In the present study, tk⁻ teratocarcinoma cells have been
treated with the cloned thymidine kinase gene of Herpes
simplex and a number of HAT-resistant tk+ clones have
15   been obtained with a frequency of about one transformant
per μg of DNA.  The reason for the markedly lower frequency
of TCC transformants than of L-cell transformants, Wigler,
M., et al., Cell 14: 725-731 (1978), is obscure since the
basis for transformation competence in eucaryotic cells
20   remains unknown.  The donor origin of the tk⁺ phenotype
in the TCC transformants was demonstrated by the HSV-
type electrophoretic mobility of their tk enzyme, and also
by neutralization of the tk activity by specific antiserum
raised against HSV-1 tk  (Table I).  Furthermore, blot
25   hybridization tests indicated that at least one intact
copy of the viral tk gene was present and integrated into
other DNA in the transformed cells.  These data support
the conclusion that the tk activity in the transformed
clones is indeed attributable to presence and expression
30   of the viral gene.

A requirement for experiments involving the introduction
of genes is that they remain stable in vivo, even in the
absence of selective pressure, during many cell generations.
35   Stability of the tk⁺ transformed phenotype was in fact
not only in culture (Table II), but also in tumors arising

GENE-CEN 083070

Exhibit OO
Page 1411

-74-

after subcutaneous inoculation of the stem cells into
mice.  These tumors exhibited various types of tissue
differentiation, similar to the range observed in the
5   untransformed parent TCC line.  Hybridization experiments
comparing each tumor with its transformed cell line
of origin indicated that the donor tk gene was maintained
without significant loss or rearrangement in seven of
nine tumors examined.

10  Many genes of interest in a developmental context are not
selectable.  An example is the globin gene.  As in related
experiments with L-cells, Wigler, M., et al., Cell 16:
777-785 (1979), a fragment of human genomic DNA containing
an intact ß-globin gene was administered to TCC tk⁻ cells
15  along with the unlinked HSV tk gene.  This proved to be
an effective method to obtain TCC tk⁺ clones in which,
from hybridization evidence, the human ß-globin gene was
present.

20  The experiments described herein therefore demonstrate
that cultured TCC stem cells can accept exogenous genes
and that such genes can be stably retained as well as
expressed during in vivo differentiation in tumors.
25  On this basis, experiments with a euploid TCC cell
line can proceed, for the purpose of creating in vivo
markers appropriate for analyses of gene regulation
during embryogenesis.

30

35

GENE-CEN 083071

Exhibit OO
Page 1412

-75-

MATERIALS AND METHODS

Cell Cultures

Ltk aprt, a derivative of Ltk clone D, Kit, S. et al., Esp. Cell Res. 31:291-312 (1963), was maintained in Dulbecco's modified Eagle's medium (DME) containing 10% calf serum (Flow Laboratories, Rockville, Maryland) and 50 µg/ml of diaminopurine (DAP). Prior to transformation, cells were washed and grown for three generations in the absence of DAP. A Chinese hamster cell line containing an altered dihydrofolate reductase (rendering it resistant to methoxtrexate) A29 Mtx$^{RIII}$, Flintoff, W. F., et al., Somatic Cell Genetics 2:245-261 (1976), was propagated in DME supplemented with 3x non-essential amino acids, 10% calf serum and 1 µg/ml amethopterin. For the amplification experiments, the medium was additionally supplemented with 20 µg/ml of methotrexate.

Murine Ltk⁻ aprt⁻ cells are adenine phosphoribosyltransferase-negative derivatives of Ltk⁻ clone D cells. Cells were maintained in growth medium and prepared for transformation as described, Wigler, M., et al., PNAS 76:1373-1376 (1979).

HEp-2(human), HeLa(human), CHO (Chinese hamster ovary), and Ltk⁻ cells were grown in growth medium. LH2b, a derivative of Ltk⁻ transformed with herpes simples virus tk DNA, was maintained in growth medium containing hypoxanthine at 15 µg/ml, aminopterin at 0.2 µg/ml, and thymidine at 5.0 µg/ml (HAT), Wigler, M., et al., Cell 1:223-232 (1977). All culture dishes were Nunclon (Vanguard International, Neptune, N. J.) plastic.

The feeder-independent mouse teratocarcinoma cell culture line 6050P, Watanabe, T., et al., PNAS 75:5113-5117 (1978),

GENE-CEN 083072

-76-

obtained from a tumor of the OTT 6050 transplant line, was used as the wild-type, or tk$^+$, parent and is here designated TCC wt.  This line is of the X/O sex chromosome type and has a modal number of 39 chromosomes with characteristics described in Watanabe, T., et al., (1978). The cells were grown in Dulbecco's modified Eagle's medium with 10% fetal calf serum.  After 3 hr of exposure to 3 µg/ml of the mutagen N-methyl-N'-nitro-N-nitrosoguanidine, the cells were allowed to recover for two days and were then transferred to medium with 80 µg/ml of BrdUrd. A series of resistant clones were isolated; one supplied the clonal line (TCC tk$^-$) used in the present transformation experiments.  This line had a reversion frequency to wild-type of less then 10$^{-8}$.  The cells were maintained in medium with 30 µg/ml of BrdUrd and, prior to transformation, were washed and grown for three generations in the absence of the drug.  Transformation efficiency was compared with that of a tk-deficient line, Kit, S., et al., Exp. Cell. Res. 31:297-312 (1963) of mouse L-cells (L tk$^-$).

Extraction and Restriction Endonuclease Cleavage of Genomic DNA

High molecular weight DNA was obtained from cultured cells (CHO, LH2b, and HeLa) or from frozen rabbit livers as previously described. Wigler, M., et al., Cell 14:725-731 (1978).  High molecular weight salmon sperm DNA was obtained from Worthington.  Restriction endonuclease cleavage (Bam I, HindIII, Kpn I, and Xba I) was performed in a buffer containing 50 mM NaCl, 10 mM Tris○HCL, 5 mM MgCl$_2$, 7 mM mercaptoethanol, and bovine serum albumin at 100 µg/ml (pH 7.9). The enzyme-to-DNA ratio was at least two units/µg of DNA, and reaction mixtures were incubated at 37°C for at least 2 hrs (one unit is the amount of enzyme that digests 1 µg of DNA in 1 hr).  To monitor the completeness of digestion, 1 µl of nick-translated adenovirus-2 [$^{32}$P]DNA was incubated

GENE-CEN 083073

-77-

with 5 µl of reaction volume for at least 2 hr, cleavage
products were separated by electrophoresis in 1% agarose
gels, and digestion was monitored by exposing the dried gel
to Cronex 2DC x-ray film.

Intact herpes simplex virus (HSV) DNA was isolated from
CV-1-infected cells as previously described.  Pellicer, A.,
et al., Cell 14:133-141 (1978).  DNA was digested to com-
letion with Kpn I (New England Biolabs) in a buffer con-
taining 6 mM Tris (pH 7.9), 6mM $MgCl_2$, 6 mM 2-mercapto-
ethanol, 6 mM NaCl and 200 µg/ml bovine serum albumin.  The
restricted DNA was fractionated by electrophoresis through
0.5% agarose gels (17 x 20 x 0.5 cm) for 24 hr at 70 V, and
the 5.1 kb tk-containing fragment was extracted from the gel
as described by Maxam, A. M. and Gilbert, W. PNAS 74:560-
564 (1977) and Wigler, M., et al., Cell 14:725-731 (1978)

φX174 am3 RFI DNA was purchased from Bethesda Research
Laboratories.  Plasmid pBR322 DNA was grown in E. coli HB
101 and purified according to the method of Clewell, D. B.,
J. Bacteriol. 110:667-676 (1972).  The cloned rabbit ß major
globin gene in the λ Charon 4A derivative (RßG-1) was iden-
tified and isolated as previously described.  Maniatis, T.,
et al., Cell 15:687-701 (1978).

In the amplification experiments, the size of the high
molecular weight DNA was determined by electrophoresis in
0.3% agarose gels using herpes simplex virus DNA and its
Xba I fragments as markers.  Only DNA whose average size was
larger than 75 kb was found to possess transforming activity
in the amplification experiments.  In these experiments,
plasmid DNAs were isolated from chloramphenicol amplified
cultures by isopycnic centrifugation in CsCl gradients con-
taining 300 µg/ml ethidium bromide.

GENE-CEN 083074

Exhibit OO
Page 1415

-78-

### Transformation and Selection

The transformation protocol was as described in Graham, F. L. and Van der Eb, A. J., Virology, 52:456-457 (1973) with the following modifications.  One day prior to transformation, cells were seeded at 0.7 X $10^6$ cells per dish.  The medium was changed 4 hr prior to transformation.  Sterile, ethanol-precipitated high molecular weight or restriction endonuclease-cleaved eucaryotic DNA dissolved in 1 mM Tris (pH 7.9)/0.1 mM EDTA was used to prepare DNA/CaCl$_2$ which contains DNA at 40 µg/ml and 250 mM CaCl$_2$ (Mallinkrodt).  Twice-concentrated Hepes-buffered saline (2X HBS) was prepared; it contains 280 mM NaCl, 50 mM Hepes, and 1.5 mM sodium phosphate, pH adjusted to 7.10 $\pm$ 0.05.  DNA/CaCl$_2$ solution was added dropwise to an equal volume of sterile 2X HBS.  A 1-ml sterile plastic pipette with a cotton plug was inserted into the mixing tube containing 2X HBS, and bubbles were introduced by blowing while the DNA was being added.  The calcium phosphate/DNA precipitate was allowed to form without agitation for 30-45 min at room temperature.  The precipitate was then mixed by gentle pipetting with a plastic pipette, and 1 ml of precipitate was added per plate, directly to the 10 ml of growth medium that covered the recipient cells.  After 4-hr incubation at 37°C, the medium was replaced and the cells were allowed to incubate for an additional 20 hr.  At that time, selective pressure was applied.  For tk$^+$ selection, medium was changed to growth medium containing HAT.  For aprt$^+$ selection, cells were trypsinized and replated at lower density (about 0.5 X $10^6$ cells per 10-cm dish) in medium containing 0.05 mM azaserine and 0.1 mM adenine.  For both tk$^+$ and aprt$^+$ selection, selective media were changed the next day, 2 days after that, and subsequently every 3 days for 2-3 weeks while transformant clones arose.  Colonies were picked by using cloning cylinders and the remainder of the colonies were scored after formaldehyde fixation and staining with Giemsa.  For

GENE-CEN 083075

Exhibit OO
Page 1416

-79-

characterization, clones were grown into mass culture under
5   continued selective pressure.  A record was kept of the
apparent number of cell doublings for each clone isolated.

Methotrexate-resistant transformants of Ltk$^-$ aprt$^-$ cells
were obtained following transformation with 20 μg of high
10   molecular weight DNA from A29 Mtx$^{RIII}$ cells and selection
in DME containing 10% calf serum and 0.2 μg/ml amethopterin.

For tk$^+$ selection, cells were grown in HAT medium; for re-
sistance to methotrexate, cells were selected in medium
15   supplemented with 0.1 μg/ml of methotrexate.  Colonies were
cloned from individual dishes to assure that each trans-
formant arose from an independent event.  Ligates between
A29 DNA and linearized pBR322 DNA were prepared by incubating
a 1:1 ration(w/w) of Sal I-cleaved DNAs with T$_4$ ligase
20   (Bethesda Research Laboratories) under the conditions re-
commended by the supplier.  A calcium phosphate precipitate
was prepared using 2 μg ligate and 18 μg carrier/ml, and
added to recipient cells (the amount of ligate was limited
because of the observation that plasmid inhibits transforma-
25   tion).  The DNA was allowed to remain in contact with the
cells for 4-12 hr and the medium was then aspirated and re-
placed with fresh DME.  Selective pressure was applied 24 hr
following exposure to DNA.  After 2-3 weeks, colonies were
isolated using cloning cylinders.

30

In the mouse teratocarcinoma cell experiments, transformation
was performed as described previously except that the TCC
tk$^-$ cells were seeded at 3 X 10$^5$ cells/plate one day prior
35   to transformation.  To each plate of attached cells was
added a calcium phosphate/DNA precipitate prepared with 4
μg of the recombinant plasmid, Ptk-1, digested with Bam H1,
in the presence of 20 μg of high molecular weight DNA ob-
tained from L tk$^-$ aprt$^-$ cells.

GENE-CEN 083076

Exhibit OO
Page 1417

-80-

In addition, some cells were treated in suspension,
Willecke, K. et al., Molec. Gen. Genet. 170:179-185 (1979).
7 X $10^6$ freshly trypsinized TCC tk$^-$ cells were mixed with
a calcium phosphate/DNA precipitate prepared with 10 μg
of DNA from the Bam Hl-cleaved plasmid Ptk-1 and 150 μg
of high molecular weight DNA from salmon sperm.  Following
10   centrifugation, resuspension, and shaking, as described
in Willecke, K. et al. (1979), the cells were again plated
in growth medium.  After three days, the medium was re-
placed with HAT medium and colonies of transformants were
isolated after two weeks.

15

Cotransformation experiments were performed with 4 μg of
Bam Hl-digested Ptk-1 DNA along with 4 μg of Hind III-
cleaved plasmid pHβ-8 containing the chromosomal adult
human β-globin gene, Lawn, R. M., et al., Cell 15:1157-
20   1174 (1978).  Tk$^+$ transformants were selected in growth
medium containing 0.1 mM hypoxanthine/0.4 μM aminopterin/
16 μM thymidine (HAT).  Colonies were picked with cloning
cylinders and were grown into mass cultures.

25   Cotransformation  of Defined DNA Sequences and the HSV tk
Gene

Ltk$^-$ aprt$^-$ mouse cells were transformed with either 1 - 10
μg of ΦX174, 1 μg of pBR322 or 1 μg of RβG-1 DNA in the
30   presence of 1 ng of HSV-1 tk gene and 10-20 μg of salmon
sperm carrier DNA, as previously described. Wigler, M. et
al., PNAS 76:1373-1376 (1979) .  Tk$^+$ transformants were
selected in DME containing hypoxanthine, aminopterin and
thymidine (HAT) and 10% calf serum.  Isolated colonies were
35   picked using cloning cylinders and grown into mass cultures.

Enzyme Assays

Extracts were prepared by resuspending washed cell pellets

GENE-CEN 083077

Exhibit OO
Page 1418

-81-

(approximately $10^7$ cells) in 0.1 ml of 0.02 M potassium
phosphate, pH 7, containing 0.5% Triton X-100.  The super-
natant (cytoplasm) obtained after 25 min of 700 X g centri-
fugation was used for the quantitation of enzymatic activity
and for electrophoresis.  aprt and protein were assayed as
previously described.  Chasin, L. A., Cell 2:37-41 (1974).
Inclusion of 3 mM thymidine triphosphate, an inhibitor of
5'-nucleotidase, Murray, A. W. and Friedrichs, B., Biochem,
J. 111:83-89 (1969), in the reaction mixture did not in-
crease AMP recovery, indicating that the nucleotidase was
not interfering with the measurement of aprt activity.  Iso-
electric focusing of aprt was carried out essentially as
described for hypoxanthine phosphoribosyltransferase, Chasin,
L. A. and Urlaub, G. Somat. Cell Genet. 2:453-467 (1976), with
the following exceptions:  The polyacrylamide gel contained
an Ampholine (LKB) mixture of 0.8% pH 2.5-4, 0.8% pH 4-6,
and 0.4% pH 5-7.  For assaying enzymatic activity, [2-$^3$H]
adenine [0.04 mM, 1 Ci/mmol, New England Nuclear (1 Ci =
3.7 X $10^{10}$ becquerels)] was substituted for hypoxanthine.

## Assays of Thymidine Kinase Activity

For specific activity measurements, cells from monolayer
cultures were scraped into phosphate buffered saline and
washed.  The cell pellet was suspended in 5 volumes of ex-
traction buffer (0.01 M Tris∘HCl, pH 7.5, 0.01 M KCl, 1mM
MgCl$_2$, 1mM 2-mercaptoethanol, and 50 µM thymidine).  The
cell suspension was frozen and thawed three times and the
KCl concentration was then adjusted to 0.15 M.  After
sonication, the cytoplasmic extract was obtained by centri-
fugation at 30,000 X g for 30 min, and the supernatant was
used for tk assays as described in Wigler, M. et al. Cell
16:777-785 (1979).  Cytoplasmic extracts from tumors were
obtained after disruption of the cells in a Potter-Elvejehm
homogenizer.  They were then treated as described above for
cultured cells.  One unit of thymidine kinase is defined as
the amount of enzyme which converts one nanomole of thymi-

GENE-CEN 083078

Exhibit OO
Page 1419

-82-

dine into tnymidine monophosphate per minute.

5

In enzyme neutralization studies, anti-HSV-1 tk anti-
serum or preimmune serum was mixed with an equal volume of
cytoplasmic extract, and ATP and magnesium were added to
6.7 mM.  The enzyme-antibody mixture was incubated for 30
10 min at room temperature, centrifuged at 2,000 X g for 10
min, and the supernatant was assayed for tk activity.

In an additional biochemical assay, 30,000 X g super-
natants of homogenates from cell cultures and from solid
15 tumors were electrophoresed on 5% polyacrylamide gels
which were then cut into 1.6 mm slices and assayed for tk
activity as described.  Lee, L. S. and Cheng, Y. C., J.
Biol. Chem., 251:2600-2604 (1976).

RNA Isolation

Total RNA was isolated from logarithmic-phase cultures of
transformed L cells by successive extractions with phenol at
pH 5.1, phenol/chloroform/isoamyl alcohol (25:24:1, vol/vol),
25 and chloroform/isoamyl alcohol (24:1, vol/vol).  After
ethanol precipitation, the RNA was digested with DNase,
Maxwell, I. H., et al., Nucleic Acids Res. 4:241-246 (1977)
and precipitated with ethanol.  Nuclear and cytoplasmic
fractions were isolated as described in Wigler, M. et al.,
30 PNAS 76:1373-1376 (1979) and RNAs were extracted as describ-
ed above.  Cytoplasmic polyadenylylated RNA was isolated by
oligo(dT)-cellulose chromatography.  Axel, R. et al., Cell
7:247-254 (1976).

cDNA Synthesis

Rabbit and mouse cDNAs were prepared by using avian myelo-
blastosis virus reverse transcriptase (RNA-dependent DNA
polymerase) as described in Myers, J. C. and Spiegelman, S.,
PNAS 75:5329-5333 (1978).

GENE-CEN 083079

Exhibit OO
Page 1420

-83-

## Isolation of Transformed Cell DNA

Cells were harvested by scraping into PBS and centrifuging
at 1000 X g for 10 min.  The pellet was resuspended in 40
vol of TNE [10 mM Tris-HCl (ph 8.0), 150 mM NaCl, 10 mM
EDTA], and SDS and proteinase K were added to 0.2% and 100
10   µg/ml, respectively.  The lysate was incubated at 37°C for
5-10 hr and then extracted sequentially with buffer-
saturated phenol and CHCl$_3$.  High molecular weight DNA
isolated by mixing the aqueous phase with 2 vol of cold
ethanol and immediately removing the precipitate that
15   formed.  The DNA was washed with 70% ethanol and dissolved
in 1 mM Tris, 0.1 EDTA.

Nuclei and cytoplasm from clones φX4 and φX5 were prepared
as described by Ringold, G. M., et al. Cell 10:19-26 (1977).
20   The nuclear fraction was further fractionated into high and
low molecular weight DNA as described by Hirt, B., J. Mol.
Biol. 26:365-369 (1967).

## DNA Filter Hybridizations

25   Cellular DNA was digested with restriction endonucleases,
electrophoresed on agarose slab gels, transferred to nitro-
cellulose filter sheets, and hybridized with $^{32}$P-labeled DNA
probes as described by Wigler, M. et al., PNAS 76:1373-1376
30   (1979).

DNA from transformed cells was digested with various re-
striction endonucleases using the conditions specified by
the supplier (New England Biolabs or Bethesda Research
35   Laboratories).  Digestions were performed at an enzyme to
DNA ratio of 1.5 U/µg for 2 hr at 37°C.  Reactions were
terminated by the addition of EDTA, and the product was
electrophoresed on horizontal agarose slab gels in 36 mM

GENE-CEN 083080

Exhibit OO
Page 1421

-84-

5    Tris, 30 mM $NaH_2PO_4$, 1 mM EDTA (pH 7.7).  DNA fragments
     were transferred to nitrocellulose sheets, hybridized and
     washed as previously described.  Weinstock, R., et al.,
     PNAS 75:1299-1303 (1978) with two modifications.  Two
     nitrocellulose filters were used during transfer.
     Jeffreys, A. J. and Flavell, R. A., Cell 12:1097-1108
10   (1977).  The lower filter was discarded,  and following
     hybridization the filter was washed 4 times for 20 min
     in 2 X SSC, 25 mM sodium phosphate, 1.5 mM $Na_4P_2O_7$,
     0.05% SDS at 65°C and then successively in 1:1 and 1:5
     dilutions of this buffer.  Jeffreys, A. J. and Flavell,
15   R. A., Cell 12:429-439 (1977).

     In the amplification experiments the probes were either
     [32]P-nick translated pBR322 or pdhfr-21, a cDNA copy of
     mouse dhfr mRNA.  Chang, A.C.Y., et al., Nature 275:617-
20   624 (1978).

## Solution Hybridizations

     [32]P-Labeled globin cDNAs (specific activities of 2-9 X
25   $10^8$ cpm/µg) were hybridized with excess RNA in 0.4 M
     NaCl/25 mM 1,4-piperazinediethanesulfonic acid (Pipes), pH
     6.5/5 mM EDTA at 75°C.  Incubation times did not exceed 70
     hr.  $R_0$ts were calculated as moles of RNA nucleotides per
     liter times time in seconds.  The fraction of cDNA rendered
30   resistant to the single-strand nuclease S1 in hybridization
     was determined as described.  Axel, R. et al., Cell 7:247-
     254 (1976).

## RNA Filter Hybridization

35   RNA was electrophoresed through 1% agarose slab gels (17 X
     20 X 0.4 cm) containing 5 mM methylmercury hydroxide as
     described by Bailey, J. and Davidson, N., Anal. Biochem.

GENE-CEN 083081

Exhibit OO
Page 1422

-85-

70:75-85 (1976).  The concentration of RNA in each slot was 0.5 µg/µl.  Electrophoresis was at 110 V for 12 hr at room temperature.

RNA was transferred from the gel to diazotized cellulose paper as described by Alwine, J. C. , et al., PNAS 74:5350-5354 (1979) by using pH 4.0 citrate transfer buffer.  After transfer, the RNA filter was incubated for 1 hr with transfer buffer containing carrier RNA at 500 µg/ml.  The RNA on the filters was hybridized with cloned DNA probe at 50 ng/ml labeled by $^{32}$P-nick translation, Weinstock, R., et al., PNAS 75:1299-1303 (1978) to specific activities of 2-8 X $10^8$ cpm/µg.  Reaction volumes were 25 µl/cm$^2$ of filter. Hybridization was in 4X standard saline citrate (0.15 M NaCl/0.015 M sodium citrate)/50% formamide at 57°C for 36-48 hr.

After hybridization, filters were soaked in two changes of 2X standard saline citrate/25 mM sodium phosphate/1.5 mM sodium pyrophosphate/0.1% sodium dodecyl sulfate/5 mM EDTA at 37°C for 30 min with shaking to remove formamide. Successive washes were at 68°C with 1X and O.1X standard saline citrate containing 5 mM EDTA and 0.1% sodium dodecyl sulfate for 30 min each.

Berk Sharp Analysis of Rabbit ß-Globin RNA in Transformed Mouse L Cells

The hybridizations were carried out in 80% (vol/vol) formamide (Eastman)/0.4 M Pipes, pH 6.5/0.1 mM EDTA/0.4 M NaCl, Casey, J. and Davidson, N., Nucleic Acid Res., 4:1539-1552 (1977); Berk, A. J. and Sharp, P. A., Cell 12: 721-732 (1977) for 18 hr at 51°C for the 1.8 kbp Hha I fragment and 49°C for the Pst 1 fragment.  The hybrids were treated with S1 nuclease and analyzed essentially by the procedure described by Berk, A. J. and Sharp, P. A. (1977).

GENE-CEN 083082

Exhibit OO
Page 1423



-86-

Although the instant disclosure sets forth all essential
information in connection with the invention, the numerous
publications cited herein may be of assistance in under-
standing the background of the invention and the state of
the art.  Accordingly, all of the publications cited are
hereby incorporated by reference into the present dis-
closure.

*Can what is claimed is:*

*Claims*

GENE-CEN 083083

Exhibit OO
Page 1424



-87-

WHAT IS CLAIMED IS:

1. A process for inserting foreign DNA I into a eucaryotic
cell which comprises cotransforming said eucaryotic cell
with said foreign DNA I and with unlinked foreign DNA II
which codes for a selectable phenotype not expressed by
said eucaryotic cell, said cotransformation being carried
out in a suitable medium and in the presence of selective
conditions permitting survival or identification of
eucaryotic cells which have acquired said selectable
phenotype.

2.  A process in accordance with Claim 1 wherein said
foreign DNA I codes for proteinaceous material which
is not associated with a selectable phenotype.

3.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for interferon protein.

4.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for insulin.

5.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for growth hormone.

6.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for a clotting factor.

7.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for a viral antigen or an  antibody.

8.  A process in accordance with Claim 2 wherein said
foreign DNA I codes for an enzyme.

GENE-CEN 083084

-88-

9.   A process in accordance with Claim 1 wherein said foreign DNA I is substantially purified.

10.   A process in accordance with Claim 1 wherein said foreign DNA I and/or DNA II are attached to bacterial plasmid or phage DNA.

11.   A process in accordance with Claim 1 wherein said foreign DNA I and/or DNA II are attached to phage DNA encapsidated in a phage particle.

12.   A process in accordance with Claim 1 wherein said foreign DNA I has been obtained from restriction en-donuclease cleavage of eucaryotic chromosomal DNA.

13.   A process in accordance with Claim 1 wherein said foreign DNA I and DNA II have been treated with calcium phosphate.

14.   A process in accordance with Claim 1 wherein said eucaryotic cell is a mammalian cell.

15.   A process in accordance with Claim 14 wherein said mammalian cell is an erythroblast.

16.   A process in accordance with Claim 14 wherein said mammalian cell is a fibroblast.

17.   A process in accordance with Claim 1 wherein said foreign DNA I is present in an amount relative to said DNA II which codes for a selectable phenotype in the range from about 1:1 to about 100,000:1.

GENE-CEN 083085

-89-

*16*
18. A process in accordance with Claim 1 wherein said DNA II which codes for a selectable phenotype comprises the gene for thymidine kinase from herpes simplex virus.

*17*
19. A process in accordance with Claim 1 wherein said DNA II which codes for proteinaceous material which is associated with a selectable phenotype comprises the gene for adenine phosphoribosyl-transferase.

*18*
20. A process in accordance with Claim 1 wherein said DNA II which codes for a selectable phenotype comprises a gene associated with drug resistance.

*19*
21. A process in accordance with Claim *18* wherein said gene associated with drug resistance is the gene coding for a mutant dihydrofolate reductase which renders cells resistant to methotrexate.

22. A process in accordance with Claim 1 wherein said foreign DNA I is incorporated into the chromosomal DNA of said eucaryotic cell.

23. A process for inserting purified foeign DNA I coding for proteinaceous material which is not associated with a selectable phenotype into a eucaryotic cell which comprises cotransforming said eucaryotic cell with said foreign DNA I coding for pro-teinaceous material which is not associated with a selectable phenotype and with physically unlinked foreign DNA II coding for proteinaceous material which is associated with a selectable phenotype, said cotrans-formation being carried out in the presence of selective conditions permitting survival or identification of eucaryotic cells which have acquired said selectable phenotype.

GENE-CEN 083086

Exhibit OO
Page 1427

-90-

29

24.   A process in accordance with Claim 28 wherein said proteinaceous material which is not associated with a selectable phenotype comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or antibody.

20

25.   A eucaryotic cell into which foreign DNA I has been inserted in accordance with the process of Claim 1.

21

26.   A mammalian cell into which foreign DNA I has been inserted in accordance with the process of Claim 1.

30

27.   A eucaryotic cell into which foreign DNA I has been inserted in accordance with the process of Claim 28.

28.   A eucaryotic cell which comprises foreign DNA I coding for proteinaceous material which is not associated with a selectable phenotype.

29.   A mammalian cell in accordance with Claim 28.

30.   A eucaryotic cell in accordance with Claim 28 wherein said proteinaceous material which is not associated with a selectable phenotype comprises interferon protein, antibody, insulin, growth hormone, clotting factor or viral antigen.

GENE-CEN 083087

-91-

31.  A process for producing proteinaceous material
which comprises cotransforming a eucaryotic cell with
foreign DNA I coding for said proteinaceous material
in accordance with the process of Claim 1, maintaining
said cotransformed eucaryotic cell under suitable
conditions  to enable said foreign DNA I to be
transcribed to form complementary RNA and said comple-
mentary RNA so formed to be translated to produce
said proteinaceous material, and recovering said
proteinaceous material so produced.

32.  A process in accordance with Claim 30 wherein
said proteinaceous material comprises interferon
protein, insulin, growth hormone, clotting factor,
viral antigen or antibody.

33.  A process in accordance with Claim 31 wherein
said eucaryotic cell is a mammalian cell.

34.  A process in accordance with Claim 31 wherein
said foreign DNA I coding for said proteinaceous
material is purified DNA.

35.  A process for producing proteinaceous material
which comprises cotransforming a eucaryotic cell with
foreign DNA I coding for said proteinaceous material
in accordance with the process of Claim 1, culturing
or cloning said selective conditions to produce a
multiplicity of eucaryotic cells derived therefrom
and recovering said proteinaceous material from the
eucaryotic cells so produced.

GENE-CEN 083088

Exhibit OO
Page 1429

-92-

23

~~36.~~  A process in accordance with Claim ~~35~~ wherein said proteinaceous material comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or antibody.

24

~~37.~~  A process in accordance with Claim ~~35~~ wherein said eucaryotic cell is a mammalian cell.

38.  A process in accordance with Claim 35 wherein said foreign DNA I is purified DNA.

39.  A process for producing proteinaceous material which is not associated with a selectable phenotype which comprises cotransforming a eucaryotic cell with foreign DNA I coding for said proteinaceous material in accordance with the process of Claim 23, culturing or cloning said cotransformed eucaryotic cell in the presence of said selective conditions to produce a multiplicity of eucaryotic cells derived therefrom, and recovering said proteinaceous material from the eucaryotic cells so produced.

40.  A process in accordance with Claim 39 wherein said proteinaceous material comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or antibody.

41.  A process in accordance with Claim 39 wherein said eucaryotic cell is a mammalian cell.

42.  A process in accordance with Claim 39 wherein said foreign DNA is purified DNA.

43.  Proteinaceous material produced in accordance with the process of Claim 35.

GENE-CEN 083089

Exhibit OO
Page 1430

-93-

44.  Proteinaceous material produced in accordance
with the process of Claim 39.

5

45.  A process for inserting a multiplicity
of foreign DNA I molecules corresponding to multiple
copies of a gene coding for a proteinaceous material
into a eucaryotic cell which comprises cotransforming
said eucaryotic cell with said multiplicity of foreign
10  DNA I molecules and with a multiplicity of unlinked DNA
II molecules coding for a selectable phenotype not
expressed by said eucaryotic cell, said cotransformation
being carried out in a suitable medium and in the
presence of an agent permitting survival or identifi-
15  cation of eucaryotic cells which have acquired said
multiplicity of genes coding for said selectable
phenotype.

*32*                                            *31*
20  46.  A process in accordance with Claim 45 wherein
said foreign DNA I codes for proteinaceous material
which is not associated with a selectable phenotype.

*33*                                            *32*
47.  A process in accordance with Claim 46 wherein
25  said foreign DNA I codes for interferon protein.

*34*                                            *32*
48.  A process in accordance with Claim 46 wherein
said foreign DNA I codes for insulin.

*35*                                            *32*
30  49.  A process in accordance with Claim 46 wherein
said foreign DNA I codes for growth hormone.

*36*                                            *32*
50.  A process in accordance with Claim 46 wherein
said foreign DNA I codes for a clotting factor.

35  *37*                                         *32*
51.  A process in accordance with Claim 46 wherein
said foreign DNA I codes for a viral antigen or
an antibody.

GENE-CEN 083090

-94-

38
~~52.~~   A process in accordance with Claim ~~46~~ 32 wherein said
foreign DNA I codes for an enzyme.

39
~~53.~~   A process in accordance with Claim ~~45~~ 31 wherein
said foreign DNA I is substantially purified.

40
~~54.~~   A process in accordance with Claim ~~45~~ 31 wherein said
foreign DNA I has been obtained from restriction
endonuclease cleavage of eucaryotic chromosomal DNA.

55.   A process in accordance with Claim 45 wherein said
foreign DNA I and/or DNA II are attached to bacterial
or phage DNA.

56.   A process in accordance with Claim 45 wherein
said foreign DNA I and/or DNA II are attached to
phage DNA encapsidated in a phage particle.

41
~~57.~~   A process in accordance with  Claim ~~45~~ 31 wherein said
foreign DNA I and DNA II have been treated with calcium
phosphate.

42
~~58.~~   A process in accordance with Claim ~~45~~ 31 wherein said
eucaryotic cell is a mammalian cell.

43
~~59.~~   A process in accordance with Claim ~~58~~ 42 wherein
said mammalian cell is an erythroblast.

44
~~60.~~   A process in accordance with Claim ~~58~~ 42 wherein
said mammalian cell is a fibroblast.

GENE-CEN 083091

-95-

61. A process in accordance with Claim 65 wherein said foreign DNA I is present in an amount relative to said DNA II which codes for proteinaceous material associated with a selectable phenotype in the range from about 1:1 to about 100,000:1.

62. A process in accordance with Claim 65 wherein said foreign DNA II which codes for proteinaceous material which is associated with a selectable phenotype comprises a gene associated with drug resistance.

63. A process in accordance with Claim 62 wherein said gene associated with drug resistance is a gene coding for a mutant dihydrofolate reductase which renders cells resistant to methotrexate.

64. A process in accordance with Claim 65 wherein said foreign DNA I is incorporated into the chromosomal DNA of said eucaryotic cell.

65. A eucaryotic cell into which foreign DNA I has been inserted in accordance with the process of Claim 45.

66. A mammalian cell into which foreign DNA I has been inserted in accordance with the process of Claim 45.

67. A eucaryotic cell which comprises a multiplicity of foreign DNA I molecules.

68. A eucaryotic cell in accordance with Claim 67 which comprises a multiplicity of foreign DNA I molecules coding for proteinaceous material which is not associated with a selectable phenotype.

**GENE-CEN 083092**

-96-

69.   A eucaryotic cell in accordance with Claim 68 wherein said proteinaceous material which is not associated with a selectable phenotype comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or antibody.

70.   A mammalian cell in accordance with Claim 67.

71.   A process for producing proteinaceous material which comprises cotransforming a eucaryotic cell with a multiplicity of foreign DNA I molecules coding for said proteinaceous material in accordance with the process of Claim 45, maintaining said cotransformed eucaryotic cell under suitable conditions to enable said foreign DNA I to be transcribed to form complementary RNA and said complementary RNA so formed to be translated to produce said proteinaceous material, and recovering said proteinaceous material so produced.

72.   A process in accordance with Claim 71 wherein said proteinaceous material comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or antibody.

73.   A process in accordance with Claim 71 wherein said eucaryotic cell is a mammalian cell.

74.   A process in accordance with Claim 71 wherein said foreign DNA I coding for said proteinaceous material is purified DNA.

GENE-CEN 083093

Exhibit OO
Page 1434

-97-

75.  A process for producing proteinaceous material
which comprises cotransforming a eucaryotic cell with
a multiplicity of foreign DNA I molecules coding for
said proteinaceous material in accordance with the
process of Claim 45, culturing or cloning said
cotransformed eucaryotic cell in the presence of
said agent permitting survival or identification
of eucaryotic cells which have acquired said mul-
tiplicity of genes coding for said selectable pheno-
type to produce a multiplicity of eucaryotic cells
derived therefrom,  and recovering said proteinaceous
material from the eucaryotic cells so produced.

76.  A process in accordance with Claim 75 wherein
said proteinaceous material comprises interferon
protein, insulin, growth hormone, clotting factor,
viral antigen or antibody.

77.  A process in accordance with Claim 75 wherein
said eucaryotic cell is a mammalian cell.

78.  A process in accordance with Claim 75 wherein
said foreign DNA I is purified DNA.

79.  Proteinaceous material produced in accordance
with Claim 71.

80.  Proteinaceous material produced in accordance
with Claim 75.

GENE-CEN 083094

Exhibit OO
Page 1435

-98-

54
81. A process for generating a multiplicity of
foreign DNA I molecules corresponding to multiple
copies of a gene in a eucaryotic cell which comprises
transforming said eucaryotic cell with a molecule
which is formed by linking one of said foreign DNA I
molecules to a DNA II molecule corresponding to
an amplifiable gene for a dominant selectable phenotype
not expressed by said eucaryotic cell, and culturing
the transformed eucaryotic cells in the presence of
successively elevated concentrations of an agent
permitting survival or identification of eucaryotic
cells which have acquired multiple copies of said
amplifiable gene, said transformation and culturing
being carried out under suitable conditions in a suitable medium.

55
82. A process in accordance with claim 81 wherein
said foreign DNA I codes for proteinaceous material
which is not associated with a selectable phenotype.

56
83. A process in accordance with claim 82 wherein
said foreign DNA I codes for interferon protein.

57
84. A process in accordance with claim 82 wherein
said foreign DNA I codes for insulin.

58
85. A process in accordance with claim 82 wherein
said foreign DNA I codes for growth hormone.

59
86. A process in accordance with claim 82 wherein
said foreign DNA I codes for a clotting factor.

GENE-CEN 083095

Exhibit OO
Page 1436

-99-

87.   A process in accordance with Claim 82 wherein said foreign DNA I codes for a viral antigen or antibody.

88.   A process in accordance with Claim 82 wherein said foreign DNA I codes for an enzyme.

89.   A process in accordance with Claim 81 wherein said foreign DNA I is substantially purified.

90.   A process in accordance with Claim 81 wherein said foreign DNA I has been obtained from restriction endonuclease cleavage of eucaryotic chromosomal DNA.

91.   A process in accordance with Claim 81 wherein said foreign DNA I and/or DNA II are attached to bacterial or phage DNA.

92.   A process in accordance with Claim 81 wherein said foreign DNA I and/or DNA II are attached to phage DNA encapsided in a phage particle.

93.   A process in accordance with Claim 81 wherein said foreign DNA I and DNA II have been treated with calcium phosphate.

94.   A process in accordance with Claim 81 wherein said eucaryotic cell is a mammalian cell.

95.   A process in accordance with Claim 94 wherein said mammalian cell is an erythroblast.

GENE-CEN 083096

Exhibit OO
Page 1437

-100-

*67*

96. A process in accordance with Claim 94 *65* wherein said mammalian cell is a fibroblast.

5

*68*

97. A process in accordance with Claim 81 *54* wherein said foreign DNA I is present in an amount relative to said DNA II which codes for proteinaceous material associated with a selectable phenotype in the range

10  from about 1:1 to about 100,000:1.

*69*

98. A process in accordance with Claim 81 *54* wherein said DNA II which codes for proteinaceous material which is associated with a selectable phenotype comprises

15  a gene associated with resistance to a drug or chemical antagonist.

*70*

99. A process in accordance with Claim 98 *69* wherein said gene associated with resistance to a drug or chemical

20  antagonist is a gene coding for a mutant dihydrofolate reductase which renders cells resistant to methotrexate.

*71*

100. A process in accordance with Claim 81 *54* wherein said foreign DNA I is incorporated into the chromosomal DNA

25  of said eucaryotic cell.

*72*

101. A eucaryotic cell into which foreign DNA I has been inserted in accordance with the process of Claim 81. *54*

30

*73*

102. A mammalian cell into which foreign DNA I has *54* been inserted in accordance with the process of Claim 81.

35

*113*

GENE-CEN 083097

-101-

103.  A process for producing proteinaceous material
which comprises transforming a eucaryotic cell with a
multiplicity of foreign DNA I molecules coding for pro-
teinaceous material in accordance with the process of Claim
81, maintaining said transformed eucaryotic cells under
suitable conditions to enable said multiplicity of foreign
DNA I genes to be transcribed to form complementary RNA
and said complementary RNA so formed to be translated to
produce said proteinaceous material, and recovering said
proteinaceous material so produced.

104.  A process in accordance with Claim 103 wherein
said proteinaceous material comprises interferon
protein, insulin, growth hormone, clotting factor,
viral antigen or an antibody.

105.  A process in accordance with Claim 103 wherein
said eucaryotic cell is a mammalian cell.

106.  A process in accordance with Claim 103 wherein
said foreign DNA I coding for said proteinaceous
material is purified DNA.

107.  A process for producing proteinaceous material
which comprises transforming a eucaryotic cell with
a multiplicity of foreign DNA I molecules coding for
said proteinaceous material in accordance with the
process of Claim 81, culturing or cloning said
transformed eucaryotic cells in the presence of said
agent permitting survival or identification of eu-
caryotic cells which have acquired said dominant
selectable phenotype so as to produce a multiplicity of
eucaryotic cells derived therefrom, and recovering
said proteinaceous material from the eucaryotic
cells so produced.

GENE-CEN 083098

-102-

108. A process in accordance with Claim 107 wherein said proteinaceous material comprises interferon protein, insulin, growth hormone, clotting factor, viral antigen or an antibody.

109. A process in accordance with Claim 107 wherein said eucaryotic cell is a mammalian cell.

110. A process in accordance with Claim 107 wherein said foreign DNA I is purified DNA.

111. Proteinaceous material produced in accordance with Claim 103.

112. Proteinaceous material produced in accordance with Claim 107.

113. A process for cotransforming a eucaryotic cell which comprises transforming said eucaryotic cell with foreign DNA I and with DNA II, said DNA I and DNA II being unlinked and said DNA II coding for a selectable phenotype not expressed by said eucaryotic cell prior to cotransformation.

114. A method of detecting eucaryotic cells which have been transformed with foreign DNA I which is not associated with a selectable phenotype which comprises cotransforming said eucaryotic cell with said DNA I and with DNA II which is associated with a selectable phenotype in accordance with the process of Claim 1, and screening for eucaryotic cells so co-transformed.

GENE-CEN 083099

Exhibit OO
Page 1440

-103-

115.   A process for producing a biological material, a portion of which is proteinaceous, which comprises producing said proteinaceous portion within a eucaryotic cell in accordance with any of the processes of Claims 31, 35, 39, 71, 75, 103 or 107, maintaining said eucaryotic cell under suitable conditions to permit the eucaryotic cell to form, synthesize, or assemble said material, and recovering said material so produced.

116.   A process in accordance with Claim 115 wherein said compound is interferon.

117.   Biological material produced in accordance with Claim 115.

118.   A process for inserting foreign DNA I into a eucaryotic cell which comprises cotransforming said eucaryotic cell with said foreign DNA I and with unlinked foreign DNA II which codes for a selectable phenotype not expressed by said eucaryotic cell, said cotransformation being carried out in a suitable medium and in the presence of conditions permitting identification and recovery of eucaryotic cells which have acquired said selectable phenotype.

119.   A process for producing a non-proteinaceous biological material, the synthesis or assembly of which is regulated or otherwise controlled by a gene, which comprises cotransforming a eucaryotic cell with said gene and with a gene coding for a selectable phenotype, maintaining said eucaryotic cell under suitable conditions to permit said eucaryotic cell to synthesize or assemble said non-proteinaceous biological material, and recovering said biological material so produced.

GENE-CEN 083100

Exhibit OO
Page 1441

-104-

120. A pharmaceutical composition which comprises a pharmaceutically effective amount of a proteinaceous material produced in accordance with any of the processes of Claims 31, 35, 39, 71, 75, 103 or 107 and a physiologically acceptable carrier.

121. A pharmaceutical composition which comprises a pharmaceutically effective amount of a biological material in accordance with Claim 117 and a physiologically acceptable carrier.

122. A pharmaceutical composition which comprises a pharmaceutically effective amount of a non-proteinaceous material produced in accordance with Claim 119 and a physiologically acceptable carrier.

123. A method of treatment which comprises administering to a patient a pharmaceutical composition in accordance with any of Claims 120, 121 or 122.

124. A method for recovering a desired eucaryotic gene not subject to cleavage by endonuclease I from a eucaryotic cell X, which includes said desired gene which comprises transforming a eucaryotic cell Y deficient in said eucaryotic gene with hybrid-DNA, said hybrid-DNA being formed by ligating total eucaryotic cell X DNA cleaved by endonuclease I with plasmid DNA cleaved with endonuclease I, so as to effect integration of said hybrid-DNA into said eucaryotic cell Y DNA, selecting for eucaryotic cells Y containing said desired eucaryotic gene, removing said eucaryotic cell Y DNA containing said desired eucaryotic gene, cleaving said removed eucaryotic cell Y DNA with an endonuclease which does not cleave either said plasmid DNA or said desired

GENE-CEN 083101

Exhibit OO
Page 1442

-105-

eucaryotic gene, circularizing the resulting cleaved
5    DNA fragments with ligase, transforming a bacterial cell
with said circularized DNA fragments so as to produce
transformed bacterial cells containing said desired
eucaryotic gene and said plasmid DNA and removing said
desired gene therefrom.

10

125.   A method for recovering a desired eucaryotic gene
not subject to cleavage by endonuclease I from a
eucaryotic cell X which includes said desired gene
which comprises cotransforming a eucaryotic cell Y
15   deficient in said eucaryotic gene with total eucaryotic
cell X DNA cleaved by endonuclease I and with plasmid DNA
so as to effect integration of said desired eucaryotic
gene into said eucaryotic cell Y DNA, selecting for
eucaryotic cells Y containing said desired eucaryotic
20   gene and said plasmid DNA, removing said eucaryotic cell
Y DNA containing said desired eucaryotic gene, cleaving
said removed eucaryotic cell Y DNA with an endonuclease
which does not cleave either said plasmid DNA or said
desired eucaryotic gene, circularizing the resulting
25   cleaved DNA fragments with ligase, transforming a bacterial
cell with said circularized DNA fragments so as to pro-
duce transformed bacterial cells containing said desired
eucaryotic gene and said plasmid DNA and recovering said
desired gene therefrom.

GENE-CEN 083102

Exhibit OO
Page 1443

Best Available Copy



GENE-CEN-083103

Best Available Copy

GENE-CEN 083104

Exhibit OO
Page 1445



SUBCLAS     GROUP ART

6               4399216

H. WIGLER, COLD SPRING HAR, NY

4399216

241-97-150
4/46-47-6-3
#61  Small Entity

36

| foreign priority claimed USC 119 conditions met | yes ☑no | AS FILED → | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged |  |  | NY | 2 | 125 | 11 | $ 455 |  |

JOHN P. WHITE
DUBERN DUNHAM, CLARK, GRIFFIN & MORAN
OF ROCKEFELLER PLAZA
NEW YORK, NY 10020

PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

U.S. DEPT. of COMM.-Pat & TM Office — PTO-436L (rev.)

CERTIFICATE

MAR 26 1985

OF CORRECTION

PARTS OF APPLICATION FILED SEPARATELY

PREPARED FOR ISSUE

(Assistant Examiner)           (Docket Clerk)

| AT ALLOWANCE | | | |
|---|---|---|---|
| FIGURES DRWGS. | CLAIMS | CLASS | SUBCLASS |
| 2 | 73 | 435 | 6 |

EXAMINED AND PASSED FOR ISSUE

ESTHER M. KEPPLINGER
PRIMARY EXAMINER               172
(Primary Examiner)            (Art Unit)

Estimate of printed pages         Issue fee due

Drawing(s)        Spec(s)

Notice of allowance and issue fee due (est.)

Date mailed

GENE-CEN 083105

17668-A JPK

RECEIVED
MAY 7 56TH 01

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Richard Axel, et al.   GROUP 170

Serial No.: 124,513                    Examiner: Esther Kepplinger

Filed     : February 25, 1980          Group Art Unit: 170

For       : PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
            AND FOR PRODUCING PROTEINACEOUS MATERIALS

                              30 Rockefeller Plaza
                              New York, New York  10112

                              1 May 1981

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C.  20231

SIR:

                        COMMUNICATION

        In response to the Examiner's telephone request,

applicants herewith submit copies of the following articles:

EXHIBIT            REFERENCE

  A        Kretschmer, P.J., et al., "Indirect Selection of

           Bacterial Plasmids Lacking Identifiable Phenotypic

           Properties," J. Bacteriology $\underline{124}$: 225-231 (1975);


  B        Szybalska, E.H. and Szybalski, W., "Genetics of Human

           Cell Lines, IV. DNA-Mediated Heritable Transformation

           of a Biochemical Trait," PNAS $\underline{48}$: 2026-2034 (1962);


  C        McCutchan, J.H. and Pagano, J.S., "Enhancement of

           the Infectivity of Simian Virus 40 Deoxyribonucleic

           Acid with Diethylaminoethyl-Dextran," Journal National

           Cancer Institute, $\underline{41}$: 351-356 (1968);


  D        Wigler, M., et al., "Transfer of Purified Herpes

           Virus Thymidine Kinase Gene to Cultured Mouse Cells,"

           Cell $\underline{11}$: 223-232 (1977);

GENE-CEN 083106

Exhibit OO
Page 1447

| EXHIBIT | REFERENCE |
|---------|-----------|
| E | Wigler, M., et al., "Transformation of Mammalian Cells with Genes from Procaryotes and Eucaryotes," Cell 16:  777-785 (1979); |
| F | Wold B., et al., "Introduction and Expression of a Rabbit  β-globin Gene in Mouse Fibroblasts," PNAS 76: 5684-5688 (1979); |
| G | Wigler, M., et al., "Biochemical Transfer of Single-Copy Eucaryotic Genes Using Total Cellular DNA as Donor," Cell 14:  725-731 (1978); |
| H | Wigler, M., et al., "DNA-Mediated Transfer of the Adenine Phosphoribosyltransferase Locus into Mammalian Cells," PNAS 76: 1373-1376 (1979); |
| I | Willecke, K., et al., "Intraspecies Transfer via Total Cellular DNA of the Gene for Hypoxanthine Phosphoribosyltransferase into Cultured Mouse Cells," Molec. gen. Genet. 170:  179-185 (1979); |
| J | Graf, L. H., Jr., et al., "Transformation of the Gene for Hypoxanthine Phosphoribosyltransferase," Somatic Cell Genetics 5:  1031-1044 (1979); |
| K | Pellicer, A., et al., "The Transfer and Stable Integration of the HSV Thymidine Kinase Gene into Mouse Cells," Cell 14:  131-141 (1978); |

GENE-CEN 083107

| EXHIBIT | REFERENCE |
|---|---|
| L | Pellicer, A., et al., "Introduction of a Viral Thymidine Kinase Gene and the Human β-Globin Gene into Developmentally Multipotential Mouse Teratocarcinoma Cells," PNAS <u>77</u>:  2098-2102 (1980); |
| M | Wigler, M., et al., "Transformation of Mammalian Cells with an Amplifiable Dominant-Acting Gene," PNAS <u>77</u>: 3567-3570 (1980); |
| N | Wigler, M., et al., "Transformation of Mammalian Cells with Prokaryotic and Eukaryotic Genes," <u>Eucaryotic Gene Regulation</u> Proc. ICN-UCLA Symposia, R. Axel and T. Maniatis, editors, Academic Press, pp. 457-475 (1979); |
| O | Pellicer, A., et al., "Altering Genotype and Phenotype by DNA-Mediated Gene Transfer," Science <u>209</u>: 1414-1422 (1980); and |
| P | Perucho, M., et al., "Genetic Physical Linkage of Exogenous Sequences in Transformed Cells," Cell <u>22</u>:  309-317 (1980). |

Respectfully submitted,

John P. White (Reg. No. 28678)
Attorney for Applicants
Tel.:  212-977-9550

**GENE-CEN 083108**

Exhibit OO
Page 1449

 

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124,513 | 02/25/80 | RICHARD AXEL | |

JOHN P. WHITE
COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 ROCKEFELLER PLAZA
NEW YORK, NY  10020

dh

| EXAMINER |  |
|---|---|
| E. M. KEPPLINGER |  |
| ART UNIT | PAPER NUMBER |
| 172 | 4 |

DATE MAILED MAILED

July 14 1981

GROUP 170

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined.   ☐ Responsive to communication filed on _____   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _3_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.   35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☑ Notice of References Cited by Examiner, PTO-892   2. ☐ Notice of Informal Patent Drawing, PTO-948
3. ☐ Notice of References Cited by Applicant, PTO-1449   4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☑ Claims _1 — 125_ _____ are pending in the application.

   Of the above, claims _43, 44, 79, 80, 111, 112, 124 and 125_ _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☑ Claims _1 — 42, 45 — 78 81 — 97, 100 — 110 and 113 — 122_ are rejected.

5. ☑ Claims _98, 99 and 123_ _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ The formal drawings filed on _____ are acceptable.

8. ☐ The drawing correction request filed on _____ has been   ☐ approved.   ☐ disapproved.

9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has
     ☐ been received.   ☐ not been received.   ☐ been filed in parent application, serial no. _____
     filed on _____

10. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

11. ☐ Other

PTOL-326 (rev. 7-79)

**EXAMINER'S ACTION**

GENE-CEN 083109

Restriction has been required under 35 USC 121 between the following inventions:

I.      Claims 1-42, 45-78, 113, 114, 118 and 119 which are drawn to a process of cotransforming encaryotic cells and the cells produced classified in class 435, subclass 172

II.     Claims 43, 44, 79, 80, 111, 112 and 117 which are drawn to proteinaceons material classified in class 260, subclass 112

III.    Claims 81-110 which are drawn to a process of cotrans-forming encaryotic cells with linked DNA classified in class 435, subclass 91

IV.     Claims 124 and 125 which are drawn to a process of recovering a gene classified in class 435, subclass 91

V.      Claims 115-117 and 120-123 are linking claims which are drawn to a process of producing a biological material, pharmaceutical compositions and method of using them classified in class 424, subclass 177 prosecutable with either Group I or II.

The inventions as grouped are separate and distinct because the processes of Groups I, III and IV do not require the processes of the other Groups.  Each of these groups could support a separate patent.  Also, the processes of Groups I, III and IV may be used to make products other than those of Group II, such as DNA or vectors for transforming other cells.  The products of Group II can be made by other processes such an in genetically transformed procaryotic cells or human beings.

Since these distinct inventions have acquired a separate status in the art, as shown by the above classification, restriction for examination purposes is proper.

Applicants are required to elect a single invention under 35 USC 121 even though this requirement be traversed.  In order to be complete, a response must include a proper election.

/169

GENE-CEN 083110

In accordance with M.P.E.P. 812.01 a telephone call was made by Examiner Kepplinger, Art unit 172, to applicants' attorney, John P White, on April 29, 1980, who provisionally elected with oral traverse the Group I invention.

To be complete, applicants' response must include an affirmation of the above mentioned provisional election, even through the requirement is traversed.

Claims 81-112, 124 and 125 stand withdrawn from further consideration by the examiner as being drawn to provisionally non-elected inventions.

43, 44, 79, 80, 111, 112

EMKEPPLINGER:dh
703-557-3685
6/23/81

ESTHER M. KEPPLINGER
EXAMINER
GROUP ART UNIT 172

GENE-CEN 083111

TO SEPARATE, HOLD TOP AND BOTTOM EDGES . . . APART AND . . . . ARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 124513 | GROUP ART UNIT 172 | ATTACHMENT TO PAPER NUMBER 4 |
|---|---|---|---|---|

**NOTICE OF REFERENCES CITED** 6/02

APPLICANT (S) *Axel et al*

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|
| A | 3 8 0 0 0 3 5 | 3/74 | *Goore* | 435 | 68 | |
| B | 4 1 9 5 1 2 5 | 3/80 | *Wacker* | 435 | 172 | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |
| I | | | | | | |
| J | | | | | | |
| K | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC |
|---|---|---|---|---|---|---|---|---|
| L | 2 0 1 0 8 4 7 | 7/79 | *Great Britain* | *Wacker* | 435 | 71 | | |
| M | | | | | | | | |
| N | | | | | | | | |
| O | | | | | | | | |
| P | | | | | | | | |
| Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | *Kretschmer et al, J. Bacteriology 124, 225-231 (1975).* |
| S | *Wigler, Cell 11, 223-232 (1977).* |
| T | *Mantei et al, Nature 281, 40-46 (1979).* |
| U | *Lai et al, PNAS 77(1), 244-248 (Jan. 1980).* |

| EXAMINER *E. M. Kepplinger* | DATE 5/22/81 | *page 1* | **GENE-CEN 083112** |
|---|---|---|---|

* A copy of this reference is not being furnished with this office action

TO SEPARATE

| FORM PTO-892 (REV. 7-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | SERIAL NO. 124513 | GROUP ART UNIT 172 | ATTACHMENT TO PAPER NUMBER 4 |
|---|---|---|---|---|---|
| NOTICE OF REFERENCES CITED 6/12 | | APPLICANT (S) Axel et al | | | |

**U.S. PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| D | | | | | | | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |
| I | | | | | | | |
| J | | | | | | | |
| K | | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB CLASS | PERTINENT SHTS. DWG. | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| L | | | | | | | | | |
| M | | | | | | | | | |
| N | | | | | | | | | |
| O | | | | | | | | | |
| P | | | | | | | | | |
| Q | | | | | | | | | |

**OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)**

✓ Wigler et al, Cell 16, 777-785 (1979). ✓

Wigler et al, Eucaryotic Gene Regulation Proc. INK-UCLA Symposia, R. Axel and T. Maniatis editors, Academic Press, 457-475 (1979).

✓ Wigler et al, PNAS 76(3), 1373-1376 (1979). ✓

✓ Wald et al, PNAS 76(11), 5684-5688 (1979). ✓

| EXAMINER E. M. Kepplinger | DATE 6/5/81 | page 2 |
|---|---|---|

**GENE-CEN 083113**

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

TO SEPARATE, H~ ~P ANI ~LIDGES, SNAP—APART AND DISCARI

| FORM PTO-892<br>(REV. 3-78) | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | | SERIAL NO.<br>124513 | | GROUP ART UNIT<br>172 | ATTACHMENT<br>TO<br>PAPER<br>NUMBER | 4 |
|---|---|---|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | 6/2 | APPLICANT (S)<br>Axel et al | | | | |

## U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | | | | | | |
| | B | | | | | | |
| | C | | | | | | |
| | D | | | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

## FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

## OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | R | The Merck Index, 8th Edition, Merck + Co., Inc., Rahway, N.J., 568 (1968). ✓ |
| | S | Szybalska et al, PNAS 48, 2026-2034 (1962). — |
| | T | McCutchan et al, Journal National Cancer Institute, 41, 351-356 (1968) — |
| | U | Wigler et al, Cell 14, 725-731 (1978). ✓ |

| EXAMINER<br>E. M. Kipplinger | DATE<br>6/5/81 | Page 3 |
|---|---|---|

**GENE-CEN 083114**

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

Exhibit OO
Page 1455

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 124513 | GROUP ART UNIT 172 | ATTACHMENT TO PAPER NUMBER 4 |
|---|---|---|---|---|

NOTICE OF REFERENCES CITED    6/12

APPLICANT (S)    Axel et al

### U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | | | | | | |
| | B | | | | | | |
| | C | | | | | | |
| | D | | | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PERTINENT PP. SPEC |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| V V | Willecke et al, Molec. gen. Genet. 170, 179-185 (1979). |
| W W | Graf et al, Somatic Cell Genetics 5, 1031-1044 (1979). |
| X X | Pellicer et al, Cell 14, 131-141 (1978). |
| Y Y | Mercola et al, Science 208, 1033-1035 (May 1980). |

| EXAMINER E. M. Kepplinger | DATE 6/5/81 | page 4 |
|---|---|---|

GENE-CEN 083115

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

517668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:  Richard Axel, et al.

Serial No.:  124,513                    Examiner:  Esther Kepplinger

Filed      :  February 25, 1980        Group Art Unit:  172

For        :  PROCESSES FOR INSERTING DNA INTO EUCARYOTIC
              CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

                              30 Rockefeller Plaza
                              New York, New York  10112

                              10 September 1981

Honorable Commissioner of Patents
    and Trademarks
Washington, D.C.  20231

Sir:

                FIRST REQUEST FOR A ONE MONTH EXTENSION OF TIME

         It is respectfully requested that the period for
filing a response to the July 14, 1981 Office Action, now set
to expire October 14, 1981, be extended one month to expire
November 14, 1981.

         This is the first request for an extension of time
for filing a response to the outstanding Office Action and it
is not anticipated that another request will be submitted.

         After the Office Action dated July 14, 1981 was re-
ceived, a letter reporting on this Office Action, together with
copies of the Office Action and of the Examiner was promptly
mailed to applicants.  Nevertheless, in view of the numerous
grounds for rejection set forth in the Action and the large
number of cited references, Applicants and Applicants' undersigned
attorney require additional time to confer and to prepare a com-
plete response to the Office Action.

                                        **GENE-CEN 083116**

                              Exhibit OO
                              Page 1457

It is therefore requested that a one month extension of the deadline for filing a response, from October 14, 1981 to November 14, 1981, be favorably considered and granted.

Respectfully submitted,

John P. White
Reg. No. 28,678
Attorney for Applicant
(212) 977-9550

Approved
JOwens
9/11/81

GENE-CEN 083117

Exhibit OO
Page 1458

D17668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants : Richard Axel, et al.

Serial No. : 124,513          Examiner: Esther M. Kepplinger

         : February 25, 1980   Group Art Unit: 172

For      : PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
           AND FOR PRODUCING PROTEINACEOUS MATERIALS

                    30 Rockefeller Plaza
                    New York, New York  10112

                    5 November 1981

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C.   20231

Sir:

                      AMENDMENT

         This Amendment is submitted in response to the July 14,
1981 Office Action issued in connection with the above-identified
application.  A response to that Office Action is presently due
no later than November 14, 1981.  Please amend the subject
application as follows:


IN THE CLAIMS


         In Claim 32, change "30" to --31--.

         In Claim 113, between "for a" and "phenotype not
expressed", insert --selectable--.

         Cancel Claims 10, 11, 22, 55, 56, 91, 92, 117 and
120-123.

         Amend Claims 1 and 23 as follows:

--1. (amended)  A process for inserting foreign DNA I into a
eucaryotic cell which comprises cotransforming said eucaryotic
cell with said foreign DNA I and with unlinked foreign DNA II
which codes for a selectable phenotype not expressed by said
eucaryotic cell, said cotransformation being carried out in a
suitable medium and in the presence of selective conditions

**GENE-CEN 083118**

permitting survival or identification of eucaryotic cells which have acquired said selectable phenotype[.], said foreign DNA I being incorporated into the chromosomal DNA of said eucaryotic cell.

--23. (amended)  A process for inserting purified foreign DNA I coding for proteinaceous material which is not associated with a selectable phenotype into a eucaryotic cell which comprises co-transforming said eucaryotic cell with said foreign DNA I coding for proteinaceous material which is not associated with a select-able phenotype and with physically unlinked foreign DNA II coding for proteinaceous material which is associated with a selectable phenotype, said cotransformation being carried out in the presence of selective conditions permitting survival or identification of eucaryotic cells which have acquired said selectable phenotype[.], said foreign DNA I being incorporated into the chromosomal DNA of said eucaryotic cell.--

REMARKS

In the July 14, 1981 Office Action, the Examiner reiterated the restriction requirement previously entered in the subject application.  As indicated in the Office Action, Applicants' undersigned attorney provisionally elected Invention I, Claims 1-42, 45-78, 113, 114, 118 and 119 with traverse on April 29, 1980. However, the Examiner carried out an extended International Search in a corresponding International Application under the Patent Cooperation Treaty.  As a result, the July 14, 1981 Office Action includes an examination on the merits with respect to Claims 1-42, 45-78, 81-99, 100-110 and 113-123.  In the Office Action, Claims 43, 44, 79, 80, 111, 112, 124 and 125 were held withdrawn from consideration at this time.  This communication responds to all of the grounds for rejection and objection set forth in the July 14, 1981 Office Action wherein Claims 1-42, 45-78, 81-97, 100-110 and 113-122 were rejected and Claims 98, 99 and 123 were objected to.



-2-

GENE-CEN 083119

Exhibit OO
Page 1460

In view of the extensive number of rejections asserted by the Examiner, Applicants will discuss the rejections using the following format. The grounds for each rejection or objection will be separately reiterated, followed by the reasons urged by Applicants for withdrawing the rejection or objection. A request for reconsideration is not separately stated with respect to each ground for rejection or objection, but is made now and again in the Summary at the end of this Amendment with respect to all of the grounds asserted by the Examiner.

As a result of this Amendment, the claims now under examination in this application are the following: 1(as amended), 2-9, 12-21, 23(as amended), 24-31, 32(as amended), 33-42, 45-54, 57-78, 81-90, 93-110, 113(as amended), 114-116 and 118-119.

I. <u>REJECTIONS UNDER 35 U.S.C. § 112</u>

1. Claim 32 was rejected under 35 U.S.C. § 112, 2nd paragraph, on the ground that the claim is allegedly indefinite. The Examiner suggested that dependence from Claim 30 was improper and suggested that Claim 31 was intended.

Applicants agree with the Examiner and have amended Claim 32 as suggested.

2. Claim 113 was rejected under 35 U.S.C. § 112, 1st paragraph, on the ground that the claim is allegedly based on an insufficient disclosure in failing to define the phenotype as "selectable". According to the Examiner, "The transformed cells can be identified only if they can be selected. Thus, it is essential."

Applicants disagree with the Examiner's stated reason for rejecting Claim 113, namely, that the claim is based upon an insufficient disclosure. Nevertheless, Applicants agree that Claim 113 should define the phenotype as "selectable" and have so amended Claim 113.

132

-3-

GENE-CEN 083120

Exhibit OO
Page 1461

3.   Claims 3-8, 24, 30, 32, 36, 40, 47-52, 69, 72, 104, 108, 76, 116 and 83-88 were rejected under 35 U.S.C. § 112, 1st paragraph, as allegedly based on a specification which is non-enabling in regard to the various proteins claimed.  According to the Examiner, "The specification does not show insertion of any of the proteins claimed.  It is not seen that one skilled in the art could practice the invention."

Applicants are somewhat confused as to the precise basis for the Examiner's rejection.  Nevertheless, Applicants will attempt to respond by making certain assumptions regarding the basis for the rejection and then replying thereto.

If the Examiner's position is based upon an alleged lack of disclosure of the specific proteins claimed, Applicants direct the Examiner to various portions of the Specification, for example, page 12, lines 3-7, where full support may be found for the claims.

If the Examiner's position is based upon the fact that none of the proteins claimed is described in the "Experimental Details" portion of the application, Applicants respond that 35 U.S.C. § 112 does not require that the process invented and claimed by Applicants be used to make specific claimed products. 35 U.S.C. § 112, 1st paragraph, only requires that, "The Specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." Thus, there is no requirement that Applicants show actual reduction to practice of their process for specific, claimed proteins.

If the Examiner's position is that the application does not contain a written description of the invention sufficient to enable one skilled in the art to use the invention, Applicants reply that the application does contain a sufficient written



-4-

GENE-CEN 083121

Exhibit OO
Page 1462

description.  In support of their position, Applicants direct the Examiner's attention to the Detailed Description of the Invention, pages 9-86 of the application.  In addition, Applicants direct the Examiner's attention to several cited references, each of which establishes that persons skilled in the art, upon reading disclosures of the invention identical to the disclosure set forth in the application were able to use the invention.

Thus, cited reference R, Mantei, N., et al., Nature, Vol. 281, pp.40-46 (1979) refers to and shows use of Applicants' cotransformation system.  It also refers to published papers coauthored by Applicants.  Specifically, the Mantei, et al. article includes, as footnoted reference 41, Wigler, M., et al., Cell, Vol. 16, pp.777-785 (1979).  This Wigler, et al. article, cited reference V of the Office Action, is referred to on page 22, line 20, of the application where Applicants indicate that the "First Series of Experiments" set forth at pages 22-35 of the application are also set forth in this publication.

Similarly, Lai, Eugene C., et al., PNAS, Vol 77, pp.244-248 (1980), cited reference U, describes "the transfor-mation of mouse LMTK⁻ cells with the chromosomal ovalbumin gene by using this DNA-mediated gene transfer system."  The system referred to is identified in footnoted references 8 and 9, the aforementioned Mantei, et al. and Wigler, et al. articles.

Likewise, cited reference YY, Mercola, K.M., et al., Science, Vol. 208, pp.1033-1036 (1980) describes insertion of a gene into the bone marrow of mice, indicating on page 1033 that, "We used the technique of Wigler, et al.[1]."

These cited references clearly establish that Applicants' description of the invention, as identically set forth in both this application and in various publications, is sufficient to enable one skilled in the art to use the invention.  In fact, as these references show, others skilled in the art have used these descriptions as a basis for practicing the invention and for further experimentation.

GENE-CEN 083122

Exhibit OO
Page 1463

In view of the foregoing, Applicants maintain that the application describes their invention in sufficient detail to enable one skilled in the art to use the invention.

4.   Claims 11, 56 and 92 were rejected under 35 U.S.C. § 112, 1st paragraph, on the ground that the claims allegedly are based on a specification which is non-enabling in regard to having the DNA encapsidated in a phage.  According to the Examiner, "It is not shown and one skilled in the art would not know how to practice the invention.  No best mode is shown."

Although Applicants disagree with the Examiner's stated basis for rejection, Applicants are cancelling Claims 11, 56 and 92 at this time in order to advance prosecution of their application.  However, cancellation of these claims is made without prejudice to Applicants' right to present the claims in a subsequent application derived from this application.

5.   Claims 31-42, 71-78, 103-110, 115-117 and 119-123 were rejected under 35 U.S.C. § 112, 1st paragraph, on the ground that the claims allegedly are based on a specification which is non-enabling in regard to producing protein products.  The Examiner stated, "Applicants do not show any production and recovery (although the globin gene is inserted, no protein is recovered); no best mode is shown.  One skilled in the art could not practice the invention."

Initially, Applicants point out that the Examiner errs regarding Applicants' alleged failure to shown production and recovery of protein.  Although Applicants do not disclose recovery of globin protein, production of rabbit β-globin would be clear to one skilled in the art given the fact that expression of the rabbit β-globin gene to form RNA was shown by hybridization experiments.  See pages 48-49 of the application.

More importantly, production and recovery of protein is described on page 65 and in Table 1 on page 66.  As set forth, production of the protein, thymidine kinase, was verified by assaying the ability of HSV-tk-specific antibody to neutralize enzymatic activity in extracts of transformed clones.  Production and recovery was further shown by electrophoretic analysis.

GENE-CEN 083123

-6-

Exhibit OO
Page 1464

Applicants also assert that their application sets forth the best mode contemplated by them for carrying out the invention and describes the invention in sufficient detail to enable one skilled in the art to practice the invention and to produce and recover protein products.

Two of the references cited by the Examiner, reference U [Lai, E.C., et al., PNAS, Vol. 77, pp.244-248 (1980)] and reference WW [Graff, L.H., et al., Somatic Cell Genetics, Vol. 5, pp.1031-1044 (1979)], illustrate the fact that others skilled in the art were able to produce and recover protein using Applicants' invention. Thus, in reference U, the authors report that they used the DNA-mediated gene transfer system of Wigler, et al. [Cell, Vol. 16, pp.777-785 (1979)] to transform mouse cells with an ovalbumin gene and detected the ovalbumin polypeptide in the transformants.  Similarly, in reference WW, the authors report that they used the transformation system of Wigler, et al. to produce the protein hypoxanthine phosphoribosyltransferase as confirmed by enzymatic activity in extracts of transformed cells.

In view of the foregoing, Applicants maintain that their application sufficiently teaches the production and recovery of protein to satisfy the requirements of 35 U.S.C. § 112.

6.    Claims 10, 11, 55, 56, 91 and 92 were rejected under 35 U.S.C. § 112, 2nd paragraph, on the ground that the claims allegedly contradict independent claims which recite unlinked DNA.  The Examiner stated, "The alternative and DNA I and DNA II being attached to other DNA contradicts that."

Although Applicants disagree with the Examiner's stated basis for rejection, Applicants are cancelling Claims 10, 11, 55, 56, 91 and 92 at this time in order to advance prosecution of this application.  However, cancellation of these claims is made without prejudice to Applicants' right to present the claims in a subsequent application derived from this application.

GENE-CEN 083124

Exhibit OO
Page 1465

II.   <u>REJECTIONS UNDER 35 U.S.C. § 102 and/or § 103</u>

     1.    Claims 1-42 were rejected under 35 U.S.C. § 103 on the basis that the claimed invention would allegedly have been obvious to one skilled in the art at the time made given the teachings of reference <u>R</u>, Kretschmer, et al., <u>J. Bacteriology</u>, Vol. 124, pp.225-231 (1975), in view of the disclosure of reference <u>S</u>, Wigler, et al., <u>Cell</u>, Vol. 11, pp.223-232 (1977).  The Examiner stated, "R shows cotransformation of procaryotic cells with unlinked pieces of DNA, one of which has selectable characteristics. S shows eucaryotic cells capable of transformation with gene coding for selectable characteristic.  Combination suggests eucaryotes capable of cotransformation with unlinked DNA also since single gene transformation is successful.  Use of gene for any protein would be obvious.  Phage vectors and calcium phosphate treatment are conventional and obvious."

As set forth more fully on pages 1-5 of the application, Applicants maintain that their invention is not obvious over the teachings of Kretschmer, et al. (reference <u>R</u>) either alone or in combination with other teachings for at least the following reasons:

    a.    Applicants' invention is in a different field from the prior teachings concerning the modification of procaryotic cells, e.g. bacteria.  Applicants' invention involves eucaryotic cells which have long been recognized by those skilled in the art as different from procaryotic cells for numerous reasons, including those set forth at lines 15-23 on page 1.

    b.    Applicants' invention provides major advantages over bacterial systems as indicated at line 35, page 3 to line 14, page 5.

    c.    Applicants' invention involves integration of foreign DNA in the chromosomal DNA of the cotrans- formed eucaryotic cell.  The Kretschmer, et al. publication involves plasmids, extrachromosomal DNA molecules, which are not chromosomally integrated in cotransformed procaryotic cells.  As a result, the bacterial cotransformants lose acquired



-8-

GENE-CEN 083125

Exhibit OO
Page 1466

traits, whereas the eucaryotic cotransformants can be stably reproduced.  Applicants have amended Claims 1 and 23 to more clearly define their invention and distinguish over work with bacterial systems.

In view of the foregoing, Applicants maintain that one skilled in the art of eucaryotic cell manipulations would not consider it obvious that processes applicable to bacterial cells would be applicable to eucaryotic cells.  Moreover, based upon the bacterial work, one would not expect integration of foreign DNA into the chromosomes of eucaryotic cells, but rather extra-chromosomal replication of foreign DNA.  In this respect, the Kretschmer, et al. article teaches away from Applicants' invention. Accordingly, Applicants maintain that there is no teaching or suggestion in Kretschmer, et al. which renders their invention obvious.

As for the combination of the teachings of Kretschmer, et al. with those of Wigler, et al., <u>Cell</u>, Vol. 11, pp.223-232 (1977), Applicants maintain that such a combination involves the use of non-analogous prior art.  Moreover, the cited Wigler, et al. article neither teaches or suggests cotransformation in eucaryotic cells.  Therefore, combining a teaching of cotransfor-mation in bacterial cells with a teaching of transformation in eucaryotic cells is not proper, and, more importantly, does not result in Applicants' claimed invention.

2.   Claims 28-30, 67 and 70 were rejected under 35 U.S.C. § 102 on the grounds that the claims are allegedly fully met by either reference <u>B</u>, Wacker, U.S. Patent No. 4,195,125 (1980), or reference <u>L</u>, corresponding British Patent 2,010,847 (1979).

The disclosures of these references are substantially identical and relate to processes for fusing cells and to the hybrid fusion products which result.  Applicants' rejected claims



GENE-CEN 083126

are not directed to hybrid fusion products created by cell fusion.
Accordingly, Applicants maintain that the Examiner's rejection
under 35 U.S.C. § 102 is erroneous since the cited references
neither teach, suggest, nor relate to Applicants' claimed invention.

     3.    Claims 45-64 and 71-78 were rejected under 35 U.S.C.
§ 103 on the ground that the claimed invention allegedly
would have been obvious at the time made to one skilled
in the art given the teachings of Kretschmer, et al.
(reference R) and Mantei, et al. (reference T).  Accord-
ing to the Examiner, "R shows cotransformation of pro-
caryotes with unlinked DNA one of which codes for a
selectable characteristic.  T shows transforming L
cells with linked globin and TK DNA by mixing high
ratios of globin DNA and TK DNA to introduce multiple
copies of the β-globin.  Combination suggests transfor-
mation of eucaryotes with unlinked DNA in amounts of
high protein DNA to indicator DNA will insert multiple
copies.  Use of DNA for other proteins obvious.  Phage
vectors are conventional and obvious."

Applicants' position, namely, that the Kretschmer,
et al. article, neither singly nor in combination with other
references, teaches or suggests their invention is set forth in
Section II, point 1, hereinabove, and the Examiners' attention is
directed to the argument set forth there.  In addition, the
argument there advanced in opposition to an obviousness rejection
based upon combining the teachings of Kretschmer, et al. with
those of the Wigler, et al. (reference S) are also applicable to
this rejection, particularly since the Mantei, et al. article
involves linked DNA which is distinguishable from Applicants'
unlinked DNA.  Combining the teachings of Kretschmer, et al. with
those of Mantei, et al. is not proper and, more importantly, does
not result in Applicants' claimed invention.

Finally, the Mantei, et al. paper was published on
September 6, 1979, less than one year prior to the filing date of
this application.  As set forth more fully in the accompanying
DECLARATION UNDER 37 C.F.R. § 1.131, Applicants' invention was
conceived at least as early as February 25, 1979 and reduced to
practice in the United States at least as early as February 25,
1980, either actually with respect to certain embodiments or



-10-

GENE-CEN 083127

Exhibit OO
Page 1468

constructively with respect to others.  With respect to all embodiments, Applicants proceeded diligently from the date of conception to a reduction to practice of the invention.  Accordingly, Applicants request that the Mantei, et al. article be removed as a reference and contend that once the reference is removed, the present ground for rejection is obviated.

    4.    Claims 25-29, 65-68, 70, 101 and 102 were rejected under 35 U.S.C. § 102 or § 103 on the ground that the invention claimed allegedly is anticipated by or would have been obvious when made to one skilled ian the art given the teachings of Lai, et al. (reference U) or Mantei, et al. (reference T).  According to the Examiner, "Both show eucaryotic cells transformed by linked protein DNA and TK DNA.  No difference in the transformed cell is seen whether linked or unlinked DNA is used."

Applicants initially wish to point out that the Examiner is in error regarding the Lai, et al. reference.  This reference involves unlinked cotransformation, not linked as urged by the Examiner.  This article was published in January 1980, less than one year prior to the filing date of this application.

With respect to the Mantei, et al. reference, Applicants reiterate their position that use of linked DNA is patentably distinguishable from their claimed invention.

Applicants again direct the Examiner's attention to the accompanying DECLARATION UNDER 37 C.F.R. § 1.131 and request that the Lai, et al. and the Mantei, et al. references be removed. Once removed, Applicants maintain that the rejection is obviated.

    5.    Claims 30, 81-97, 100 and 103-110 were rejected under 35 U.S.C. § 103 on the ground that the claimed invention allegedly would have been obvious at the time made to one skilled in the art given the teachings of Lai, et al. (reference U) or Mantei, et al. (reference T). According to the Examiner, "U shows transforming L cells with TK gene linked to ovalbumin gene so that multiple copies of the ovalbumin gene are inserted and ovalbumin is synthesized.  T shows transforming L cells with β-globin DNA and TK DNA linked so multiple copies of globin gene are inserted into cell.  Obvious to use other protein genes and eucaryotic cells."

Applicants' argument set forth in Section II, point 4, is equally pertinent to this rejection.  Applicants therefore direct the Examiner's attention to this argument and to the



-11-

GENE-CEN 083128

Exhibit OO

Page 1469

accompanying DECLARATION UNDER 37 C.F.R. § 1.131.  In view of the latter, Applicants again request that the Examiner remove the Lai, et al. and Mantei, et al. references.  Once removed, Applicants maintain that the subject rejection is obviated.

6.   Claims 1,2,9, 10, 12, 14, 16, 17-23, 25-29, 45, 46, 53-55, 58, 60-68, 70, 113, 114 and 118 were rejected under 35 U.S.C. § 102 on the ground that the claims allegedly are fully met by Wigler, et al., Eucaryotic Gene Regulation, Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis, editors, Academic Press, pp.457-475 (1979) (reference W), or Wigler, et al., Cell, Vol. 16, pp.777-785 (1979) (reference V) or Wigler, et al., PNAS, Vol. 76, pp.1373-1376 (1979) (reference X).

Each of references W, V and X is coauthored by Applicants.

The disclosure of reference W is substantially identical to the "Third Series of Experiments" set forth on pages 45-53 of the application.  Reference W was published in December 1979, less than one year prior to the filing date of the subject application.  In support of the fact that reference W was published in December 1979, Applicants submit copies of correspondence between Applicants' attorney and the publisher, Academic Press.  (Exhibit A).

The disclosure of reference V is substantially identical to the "First Series of Experiments" set forth on pages 22-35.  Reference V was published in April 1979, less than one year prior to the filing date of the subject application.

The disclosure of reference X does not relate to cotransformation.  Accordingly, the rejection under 35 U.S.C. § 102 is improper.  In addition, reference X was published in March 1979, less than one year prior to the filing date of the subject application.

Applicants again direct the Examiner's attention to the accompanying DECLARATION UNDER 37 C.F.R. § 1.131 and request that the Examiner remove references W, V and X, each of which was coauthored by Applicants and published less than one year prior to the filing date of the subject application.

GENE-CEN 083129

7.   Claims 3-8, 11, 13, 15, 24, 30-42, 47-52, 56, 57, 59, 69, 71-78, 115-117 and 119 were rejected under 35 U.S.C. § 103 on the ground that the claimed invention allegedly would have been obvious when made to one skilled in the art given the teachings of either reference W, reference V or reference X.  According to the Examiner, "All three show cotransformation of eucaryotic cells with unlinked DNA of which one codes for a selectable characteristic. Use of DNA for various proteins obvious.  Recovery of protein and transformation of other eucaryotic cells would be obvious.

Applicants direct the Examiner's attention to their remarks under immediately preceding point 6.  In addition, Applicants reiterate their request that references W, V and X be removed in view of the accompany DECLARATION UNDER 37 C.F.R. § 1.131.

8.   Claims 1, 2, 9, 10, 12, 14, 16-18, 22, 23, 25-29, 45, 46, 53-55, 58, 60, 61, 64, 65-68, 70, 113, 114 and 118 were rejected under 35 U.S.C. § 102 on the ground that the claims allegedly are fully met by Wold, et al., PNAS, Vol. 76, pp.5684-5688 (1979) (reference Y).

Reference Y is also coauthored by Applicants.  Its disclosure is substantially identical to the "Second Series of Experiments" set forth on pages 36-45.  Reference Y was published in November 1979, less than one year prior to the filing date of the subject application.

Once again, Applicants direct the Examiner's attention to the accompanying Rule 131 Declaration and request that the Examiner also remove reference Y.

9.   Claims 3-8, 11, 13, 15, 19-21, 24, 30-42, 47-52, 56, 57, 59, 62, 63, 69, 71-78, 115-117 and 119 were rejected under 35 U.S.C. § 103 on the ground that the claimed invention allegedly would have been obvious at the time made to one skilled in the art given the teachings of reference Y.  According to the Examiner, "Y shows cotransformation of eucaryotic cells with unlinked DNA of which one codes for a selectable characteristic. Use of DNA for various proteins, recovery of protein and transformation of other eucaryotic cells would be obvious.

Applicants direct the Examiner's attention to their remarks under immediately preceding point 8.  In addition, Applicants reiterate their request that the reference Y be removed in view of the accompanying DECLARATION UNDER 37 C.F.R. § 1.131.

GENE-CEN 083130

10.   Claim 120 was rejected under 35 U.S.C. § 102 on the ground that the claim is fully met by <u>The Merck Index</u>, 8th Edition, Merck & Co., Inc., Rahway, New Jersey, 07568 (1968) (reference <u>RR</u>).

Although Applicants disagree with the Examiner's stated basis for rejection, Applicants are cancelling Claim 120 at this time in order to advance prosecution of their application.  However, cancellation of Claim 120 is made without prejudice to Applicants' right to again present the claim in a subsequent application derived from this application.

11.   Claims 117, 121 and 122 were rejected under 35 U.S.C. § 102 on the ground that these claims allegedly are fully met by Goore, U.S. Patent 3,800,035 (1974).

Once again Applicants, although disagreeing with the Examiner's stated basis for rejection, are cancelling Claims 117, 121 and 122 at this time in order to advance prosecution of their application.  Cancellation of these claims is made without prejudice to Applicants' right to present the claims in a subsequent application derived from this application.

III.   <u>OBJECTIONS</u>

1.   The Specification was objected to under 35 U.S.C. § 112, 1st paragraph, as allegedly nonenabling because it does not set forth enough information for one skilled in the art to practice the invention as claimed; does not show inserting or producing the various proteins claimed; and does not show a best mode.  Additionally, the Examiner stated that, in regard to products which are partially protein, the Specification only speculates that it should be possible which allegedly is not an enabling disclosure.  Finally, the Examiner stated that one skilled in the art could not practice the invention.

Applicants understand the reasons asserted for objecting to the specification to be identical to those asserted by the Examiner in rejecting the claims.  Accordingly, Applicants do not reiterate their previously set forth position that the application contains a sufficient disclosure of the invention to enable one skilled in the art to practice the invention and that the application sets forth the best mode contemplated by Applicants.

GENE-CEN 083131



-14-

Exhibit OO
Page 1472

With respect to partially proteinaceous products, Applicants maintain that the application is enabling since it teaches one skilled in the art how to practice the invention.  An actual experiment involving partially proteinaceous products is not required under 35 U.S.C. § 112.

2.   Claim 123 was objected to as an improper multiply dependent claim since it allegedly is not in proper form as required by 37 C.F.R. § 1.75 and therefore was not treated on its merits.  In this regard, the Examiner directed Applicants' attention to M.P.E.P. § 608.01(n).

In order to advance prosecution of the application, Claim 123 is being cancelled at this time without prejudice to Applicants' right to present the claim in a subsequent application derived from this application.

3.   Claims 98 and 99 were objected to on the cover sheet of the July 14, 1981 Office Action.  No further reference to these claims or to the basis for the objection was set forth.

Applicants have reviewed Claims 98 and 99 but find no basis for an objection to these claims.  Applicants therefore request that the Examiner reconsider any objection to them.

IV.   <u>SUMMARY</u>

In summary, Applicants maintain that the claims now pending in this application accurately define their invention, and that the claims are patentably distinguishable over the prior art, particularly in view of the accompanying DECLARATION UNDER 37 C.F.R. § 1.131.  Accordingly, Applicants request that the Examiner reconsider the various grounds of rejection and objection set forth in the outstanding Office Action and earnestly solicit allowance of the claims now pending.



GENE-CEN 083132

-15-

Exhibit OO
Page 1473

If a telephone interview would assist in advancing prosecution of this application, Applicants' undersigned attorney invites the Examiner to telephone him at the number provided.

No fee is deemed necessary in connection with this Amendment.  If a fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Reg. No. 28,678
Attorney for Applicant
212-977-9550

I hereby certify that this paper is being deposited this date with the U.S. Postal Service as first class mail addressed to Commissioner of Patents and Trademarks, Washington, D. C. 20231.

John P. White          4|5|01
John P. White          Date
Reg. No. 28,678

-16-

GENE-CEN 083133

Exhibit OO
Page 1474

D17668-A JPW

RECEIVED

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

GROUP 170

Applicants:    Richard Axel, et al.

Serial No.:    124,513          Examiner:   Esther M. Kepplinger

Filed     :    February 25, 1980   Group Art Unit:   172

For       :    PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
               AND FOR PRODUCING PROTEINACEOUS MATERIALS

                        30 Rockefeller Plaza
                        New York, New York   10112


                        5 November 1981


Honorable Commissioner of Patents
    and Trademarks
Washington, D.C.   20231

    Sir:


                        COMMUNICATION

        Applicants herewith submit a Declaration Under 37 C.F.R.
§ 1.131 signed by Richard Axel and Saul J. Silverstein and an
identical Declaration signed by Michael H. Wigler.  This Declaration
is submitted along with an Amendment dated 5 November 1981.


                        Respectfully submitted,

I hereby certify that this paper is being
deposited this date with the U.S. Postal
Service as first class mail addressed to
Commissioner of Patents and Trademarks,
Washington, D. C. 20231.

John P. White                    11/5/81
Reg. No. 28,678                  Date

                        John P. White
                        Reg. No. 28,678
                        Attorney for Applicants
                        212-977-9550


149

GENE-CEN 083134

Exhibit OO
Page 1475



D17668-A JPW

*182*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Richard Axel, et al.

Serial No. : 124,513            Examiner:  Esther M. Kepplinger

Filed     : February 25, 1980   Group Art Unit:  172

For       : PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
            AND FOR PRODUCING PROTEINACEOUS MATERIALS

                        30 Rockefeller Plaza
                        New York, New York  10112


Honorable Commissioner of Patents
   and Trademarks
Washington, D.C.   20231

Sir:

              DECLARATION UNDER 37 C.F.R. § 1.131

        We, RICHARD AXEL, MICHAEL H. WIGLER and SAUL J.
SILVERSTEIN, declare as follows:


        1.   We are the RICHARD AXEL, MICHAEL H. WIGLER and
SAUL J. SILVERSTEIN who are named as Applicants in the above-
identified patent application.


        2.   We have read the Office Action issued in connection
with the subject application on July 14, 1981.  We have also read
the references cited therein, including the following:

        T:   Mantei, N., et al., Nature, Vol. 281, pp.40-46,
             published September 6, 1979;

        U:   Lai, E.C., et al., PNAS, Vol. 77, pp.244-248,
             published January 1980;

        V:   Wigler, M., et al., Cell, Vol. 16, pp.777-785,
             published April 1979;

        W:   Wigler, M., et al., Eucaryotic Gene Regulation,
             Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis,
             editors, Academic Press, pp.457-475, published
             December 1979;

        X:   Wigler, M., et al., PNAS, Vol. 76, pp.1373-1376,
             published March 1979;

*noted*
*Ewr*
*1/20/82*

*150*

**GENE-CEN 083135**

Exhibit OO
Page 1476

Y:   Wold, B., et al., PNAS, Vol. 76, pp.5684-5688,
     published November 1979.

3.   The invention described and claimed in the subject
application was conceived by us at least as early as February 25,
1979.

4.   Subsequent to our conception, we, either personally
or through persons working under our direct supervision, conducted
experiments in the United States reducing the invention to practice.
The results of these experiments are set forth in the subject
application and in various articles coauthored by us.

5.   Specifically, one series of experiments involving
the cotransformation process is set forth as the "First Series of
Experiments" on pages 22-35 of the application.  These experiments
are also described in coauthored reference V, Wigler, M., et al.,
Cell, Vol. 76, pp.777-785, published April 1979.  As this publi-
cation indicates, the manuscript was received by Cell on January 8,
1979.  Therefore, it is clear that an actual reduction to practice
of this embodiment of our invention was completed prior to
January 8, 1979.

6.   Another series of experiments involving cotrans-
formation with multiple DNA molecules is set forth as the "Second
Series of Experiments" on pages 36-45 of the application.  These
experiments are also described in coauthored reference Y, Wold,
et al., PNAS, Vol. 76, pp.5684-5688, published November 1979.  As
this publication indicates, the manuscript was communicated to
PNAS on July 16, 1979.  Therefore, it is clear that an actual
reduction to practice of this embodiment of our invention was
completed prior to July 16, 1979.

GENE-CEN 083136

-2-

Exhibit OO
Page 1477

7.    Another series of experiments involving cotrans-
formation is set forth as the "Third Series of Experiments" on
pages 45-53 of the application.  These experiments are also des-
cribed in coauthored reference W, Wigler, M., et al., Eucaryotic
Gene Regulation, Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis,
editors, Academic Press, pp.457-475, published December 1979.  It
is clear that an actual reduction to practice of this embodiment
of our invention was completed prior to December 1979.

8.    Another series of experiments involving amplifi-
cation of cotransformed genes is set forth as the "Fourth Series
of Experiments" on pages 54-62 of the application.  These experi-
ments were not published prior to the February 25, 1980 filing
date of this application, but were subsequently published as the
coauthored article, Wigler, M., et al., PNAS, Vol. 77, pp.3567-
3570, in June 1980.  This manuscript was communicated to PNAS on
March 10, 1980.  The experiments described were carried out at
least as early as February 25, 1980.

9.    A final series of experiments involving production
of protein by cotransformed genes is set forth as the "Fifth
Series of Experiments" on pages 63-74 of the application.  These
experiments were not published prior to the Feburary 25, 1980
filing date of this application, but were subsequently published
as the coauthored article, Pellicer, A., et al., PNAS, Vol. 77,
pp.2098-2102, published April 1980.  This manuscript was communi-
cated to PNAS on January 10, 1980.  The experiments described
were completed at least as early as December 31, 1979.

10.    Another series of experiments involving transfor-
mation was carried out by us.  These experiments are not described
in the application and do not relate to unlinked cotransformation.

GENE-CEN 083137

Exhibit OO
Page 1478



These experiments are described in coauthored reference X, Wigler, M., et al., PNAS, Vol. 76, pp.1373-1376, published March 1979. As this publication indicates, the manuscript was communicated to PNAS on December 14, 1978.  Therefore, it is clear that the experiments described were completed prior to December 14, 1978.

11.  As stated in preceding paragraphs 5, 6, 7 and 10, cited references V, Y, W and X, respectively, were coauthored by us.  All were published less than one year prior to the February 25, 1980 filing date of this application.  References V, Y and W describe embodiments of the invention conceived and actually reduced to practice in the United States prior to the publication dates of these references.  Reference X describes experiments actually performed in the United States prior to the publication date of this reference.

12.  Reference T, Mantei, N., et al., Nature, Vol. 281, pp.40-46 was published on September 6, 1979, less than one year prior to the February 25, 1980 filing date of this application. The Mantei, et al. paper concerns transformation with linked genes, not unlinked cotransformation.  Moreover, the Mantei, et al. article does not relate to amplification of transformed genes.  In addition, as clearly indicated by the second to the last paragraph of the Mantei, et al. paper, Applicants "reported cotransformation of mouse L cells with rabbit β-globin DNA and HSVI-TK DNA" in Wigler, M., et al., Cell, Vol. 16, pp.777-785, published April 1979, prior to this Mantei, et al. publication. As stated in paragraph (6) hereinabove, we actually reduced to practice the embodiment of our invention relating to cotransformation with multiple copies of transformed genes at least as early as July 16, 1979.



-4-

GENE-CEN·083138

Exhibit OO
Page 1479

13.   Reference U, Lai, E.C., et al., PNAS, Vol. 77, pp.244-248 was published in January 1980, less than one year prior to the February 25, 1980 filing date of this application. The Lai, et al. paper concerns use of Applicants' cotransformation process to introduce into eucaryotic cells the gene for ovalbumin and produce polypeptide.  See last eight lines of the first full paragraph (preceding Materials and Methods).  As stated in paragraph (9) hereinabove, we demonstrated production of protein by cotransformation at least as early as December 31, 1979.

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these state- ments are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any patent issuing thereon.

_____         _____
DATE                               RICHARD AXEL


_Nov 1, 1981_                      _Michael H Wigler_
DATE                               MICHAEL H. WIGLER


_____         _____
DATE                               SAUL J. SILVERSTEIN


-5-

GENE-CEN 083139

Exhibit OO
Page 1480

D17668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants :  Richard Axel, et al.

Serial No. :  124,513                    Examiner:  Esther M. Kepplinger

Filed      :  February 25, 1980    Group Art Unit:  172

For        :  PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
              AND FOR PRODUCING PROTEINACEOUS MATERIALS

30 Rockefeller Plaza
New York, New York  10112

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C.  20231

Sir:

## DECLARATION UNDER 37 C.F.R. § 1.131

We, RICHARD AXEL, MICHAEL H. WIGLER and SAUL J. SILVERSTEIN, declare as follows:

1.  We are the RICHARD AXEL, MICHAEL H. WIGLER and SAUL J. SILVERSTEIN who are named as Applicants in the above-identified patent application.

2.  We have read the Office Action issued in connection with the subject application on July 14, 1981.  We have also read the references cited therein, including the following:

T: Mantei, N., et al., Nature, Vol. 281, pp.40-46, published September 6, 1979;

U: Lai, E.C., et al., PNAS, Vol. 77, pp.244-248, published January 1980;

V: Wigler, M., et al., Cell, Vol. 16, pp.777-785, published April 1979;

W: Wigler, M., et al., Eucaryotic Gene Regulation, Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis, editors, Academic Press, pp.457-475, published December 1979;

X: Wigler, M., et al., PNAS, Vol. 76, pp.1373-1376, published March 1979;

15b

**GENE-CEN 083140**

Y:   Wold, B., et al., PNAS, Vol. 76, pp.5684-5688,
     published November 1979.


3.   The invention described and claimed in the subject
application was conceived by us at least as early as February 25,
1979.


4.   Subsequent to our conception, we, either personally
or through persons working under our direct supervision, conducted
experiments in the United States reducing the invention to practice.
The results of these experiments are set forth in the subject
application and in various articles coauthored by us.


5.   Specifically, one series of experiments involving
the cotransformation process is set forth as the "First Series of
Experiments" on pages 22-35 of the application.  These experiments
are also described in coauthored reference V, Wigler, M., et al.,
Cell, Vol. 76, pp.777-785, published April 1979.  As this publi-
cation indicates, the manuscript was received by Cell on January 8,
1979.  Therefore, it is clear that an actual reduction to practice
of this embodiment of our invention was completed prior to
January 8, 1979.


6.   Another series of experiments involving cotrans-
formation with multiple DNA molecules is set forth as the "Second
Series of Experiments" on pages 36-45 of the application.  These
experiments are also described in coauthored reference Y, Wold,
et al., PNAS, Vol. 76, pp.5684-5688, published November 1979.  As
this publication indicates, the manuscript was communicated to
PNAS on July 16, 1979.  Therefore, it is clear that an actual
reduction to practice of this embodiment of our invention was
completed prior to July 16, 1979.


GENE-CEN 083141

-2-

7.     Another series of experiments involving cotrans--
formation is set forth as the "Third Series of Experiments" on
pages 45-53 of the application.   These experiments are also des-
cribed in coauthored reference W, Wigler, M., et al., Eucaryotic
Gene Regulation, Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis,
editors, Academic Press, pp.457-475, published December 1979.   It
is clear that an actual reduction to practice of this embodiment
of our invention was completed prior to December 1979.

8.     Another series of experiments involving amplifi-
cation of cotransformed genes is set forth as the "Fourth Series
of Experiments" on pages 54-62 of the application.   These experi-
ments were not published prior to the February 25, 1980 filing
date of this application, but were subsequently published as the
coauthored article, Wigler, M., et al., PNAS, Vol. 77, pp.3567-
3570, in June 1980.   This manuscript was communicated to PNAS on
March 10, 1980.   The experiments described were carried out at
least as early as February 25, 1980.

9.     A final series of experiments involving production
of protein by cotransformed genes is set forth as the "Fifth
Series of Experiments" on pages 63-74 of the application.   These
experiments were not published prior to the Feburary 25, 1980
filing date of this application, but were subsequently published
as the coauthored article, Pellicer, A., et al., PNAS, Vol. 77,
pp.2098-2102, published April 1980.   This manuscript was communi-
cated to PNAS on January 10, 1980.   The experiments described
were completed at least as early as December 31, 1979.

10.    Another series of experiments involving transfor-
mation was carried out by us.   These experiments are not described
in the application and do not relate to unlinked cotransformation.

GENE-CEN 083142

These experiments are described in coauthored reference X, Wigler, M., et al., PNAS, Vol. 76, pp.1373-1376, published March 1979. As this publication indicates, the manuscript was communicated to PNAS on December 14, 1978.  Therefore, it is clear that the experiments described were completed prior to December 14, 1978.

11.  As stated in preceding paragraphs 5, 6, 7 and 10, cited references V, Y, W and X, respectively, were coauthored by us.  All were published less than one year prior to the February 25, 1980 filing date of this application.  References V, Y and W describe embodiments of the invention conceived and actually reduced to practice in the United States prior to the publication dates of these references.  Reference X describes experiments actually performed in the United States prior to the publication date of this reference.

12.  Reference T, Mantei, N., et al., Nature, Vol. 281, pp.40-46 was published on September 6, 1979, less than one year prior to the February 25, 1980 filing date of this application. The Mantei, et al. paper concerns transformation with linked genes, not unlinked cotransformation.  Moreover, the Mantei, et al. article does not relate to amplification of transformed genes.  In addition, as clearly indicated by the second to the last paragraph of the Mantei, et al. paper, Applicants "reported cotransformation of mouse L cells with rabbit β-globin DNA and HSVI-TK DNA" in Wigler, M., et al., Cell, Vol. 16, pp.777-785, published April 1979, prior to this Mantei, et al. publication. As stated in paragraph (6) hereinabove, we actually reduced to practice the embodiment of our invention relating to cotransformation with multiple copies of transformed genes at least as early as July 16, 1979.

GENE-CEN 083143

13. Reference U, Lai, E.C., et al., PNAS, Vol. 77, pp.244-248 was published in January 1980, less than one year prior to the February 25, 1980 filing date of this application. The Lai, et al. paper concerns use of Applicants' cotransformation process to introduce into eucaryotic cells the gene for ovalbumin and produce polypeptide. See last eight lines of the first full paragraph (preceding Materials and Methods). As stated in paragraph (9) hereinabove, we demonstrated production of protein by cotransformation at least as early as December 31, 1979.

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any patent issuing thereon.

Nov 2 1981
_____        _____
DATE                            RICHARD AXEL


_____        _____
DATE                            MICHAEL H. WIGLER


11-03-81
_____        _____
DATE                            SAUL J. SILVERSTEIN

GENE-CEN 083144

D17668-N JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:   Richard Axel, et al.

Serial No.:   124,513          Examiner: Esther M. Kepplinger

Filed     :   February 25, 1980   Group Art Unit: 172

For       :   PROCESSES FOR INSERTING DNA INTO EUCARYOTIC
              CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

                    30 Rockefeller Plaza
                    New York, New York  10112

                    11 November 1981

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C.  20231

Sir:

                    COMMUNICATION

        Applicants submit herewith the following documents

which are of interest in connection with the above-identified

invention:


        (a)  a copy of an article from <u>Scientific American</u>,

Volume 245, Number 1, published July 1981, entitled

"Genetic Engineering in Mammalian Cells".  This copy

refers to work by Applicants using DNA-mediated gene

transfer and is attached hereto as Exhibit A;


        (b)  a copy of an article entitled "Questions

muddy gene transplant successes" which appeared in

the September 29, 1980 issue of <u>Chemical & Engineering</u>

<u>News</u>.  This article which refers to work by Applicants

and states:  "Axel, whose team has done much to

develop the method for mass movement of foreign DNA

across mammalian cell membranes, has found that such

cells can take up surprisingly large amounts of DNA -

up to about 0.5% as much as their own DNA".  This

copy is attached hereto as Exhibit B;

GENE-CEN 083145

Exhibit OO
Page 1486

(c)  a copy of an article entitled "Gene Transfer Given a New Twist" which appeared in <u>Science</u>, Volume 208, published April 28, 1980.  This copy which refers to use of methods developed by Applicants is attached hereto as Exhibit C; and

(d)  a copy of an article entitled "Curing Disease With Genes" which appeared in <u>Newsweek</u> on April 21, 1980.  This article refers to "Richard Axel of Columbia University, a pioneer in mammalian-gene transfer".  This copy is attached hereto as Exhibit D.

These documents are submitted to provide the Examiner with additional information concerning the subject invention. They provide further evidence of the broad scope, pioneering nature and widespread utility of Applicants' invention.  The Examiner is requested to consider these documents from this perspective and to make them of record in the subject application.

Respectfully submitted,

John P. White
Reg. No. 28,678
Attorney for Applicants
212-977-9550

GENE-CEN 083146

-2-

Exhibit OO
Page 1487

# SCIENTIFIC
# AMERICAN



.HRISTOPHER WREN

Richard Axel, et al.
Serial No. 124,513
Group Art Unit 172

<u>EXHIBIT A</u>

$2.00

*July 1981*

**GENE-CEN 083147**



# SCIENTIFIC AMERICAN

Established 1845          July 1981     Volume 245     Number 1

## ARTICLES

**45**  **VALUES AND ATTITUDES OF THE POLISH PEOPLE,** by Stefan Nowak
Recent events in Poland stem from a demand for social institutions in accord with people's values.

**54**  **THE SALINITY OF RIVERS,** by Arthur F. Pillsbury
Irrigation tends to deposit salts in the soil. How can they be made to continue on to the sea?

**66**  **THE ATMOSPHERE OF VENUS,** by Gerald Schubert and Curt Covey
Its clouds of sulfuric acid are driven by winds that attain a speed of 360 kilometers per hour.

**106**  **GENETIC ENGINEERING IN MAMMALIAN CELLS,** by W. French Anderson and
Elaine G. Diacumakos     One potential of recombinant DNA is curing human genetic disease.

**122**  **FIBER BUNDLES AND QUANTUM THEORY,** by Herbert J. Bernstein and
Anthony V. Phillips     Topological ideas illuminate the interactions of elementary particles.

**138**  **MIMICRY IN THE SEXUAL SIGNALS OF FIREFLIES,** by James E. Lloyd
Some of the females responding to male flashes are members of other species looking for a meal.

**148**  **BINOCULAR DEPTH INVERSION,** by John I. Yellott, Jr.
When the mask of a face is seen from the back instead of the front, its relief reverses. Why?

**160**  **THE ARCHITECTURE OF CHRISTOPHER WREN,** by Harold Dorn and Robert Mark
Wren was a man of science, but it seems he did not exploit theoretical mechanics in his buildings.

## DEPARTMENTS

**8**  LETTERS

**13**  50 AND 100 YEARS AGO

**14**  THE AUTHORS

**18**  METAMAGICAL THEMAS

**32**  BOOKS

**76**  SCIENCE AND THE CITIZEN

**176**  THE AMATEUR SCIENTIST

**188**  BIBLIOGRAPHY

BOARD OF EDITORS     Gerard Piel (Publisher), Dennis Flanagan (Editor), Brian P. Hayes (Associate Editor), Philip Morrison (Book Editor), Francis Bello, Peter G. Brown, Michael Feirtag, Paul W. Hoffman, Jonathan B. Piel, John Purcell, James T. Rogers, Armand Schwab, Jr., Joseph Wisnovsky

ART DEPARTMENT     Samuel L. Howard (Art Director), Steven R. Black (Assistant Art Director), Iiil Arbel, Edward Bell

PRODUCTION DEPARTMENT     Richard Sasso (Production Manager), Carol Hansen and Leo J. Petruzzi (Assistants to the Production Manager), Carol Eisler (Senior Production Associate), Karen O'Connor (Assistant Production Manager), Carol Albert, Martin O. K. Paul, Julio E. Xavier

COPY DEPARTMENT     Sally Porter Jenks (Copy Chief), Nancy Ellen Bates, Mary Knight, Dorothy R. Patterson

GENERAL MANAGER     George S. Conn

ADVERTISING DIRECTOR     C. John Kirby

CIRCULATION MANAGER     William H. Yokel

SECRETARY     Arlene Wright

SCIENTIFIC AMERICAN (ISSN 0036-8733), PUBLISHED MONTHLY BY SCIENTIFIC AMERICAN, INC., 415 MADISON AVENUE, NEW YORK, N.Y. 10017. COPYRIGHT © 1981 BY SCIENTIFIC AMERICAN, INC. ALL RIGHTS RESERVED. PRINTED IN THE U.S.A. NO PART OF THIS ISSUE MAY BE REPRODUCED BY ANY MECHANICAL, PHOTOGRAPHIC OR ELECTRONIC PROCESS, OR IN THE FORM OF A PHONOGRAPHIC RECORDING, NOR MAY IT BE STORED IN A RETRIEVAL SYSTEM, TRANSMITTED OR OTHERWISE COPIED FOR PUBLIC OR PRIVATE USE WITHOUT WRITTEN PERMISSION OF THE PUBLISHER. SECOND-CLASS POSTAGE PAID AT NEW YORK, N.Y. AND AT ADDITIONAL MAILING OFFICES. AUTHORIZED AS SECOND-CLASS MAIL BY THE POST OFFICE DEPARTMENT, OTTAWA, CANADA, AND FOR PAYMENT OF POSTAGE IN CASH. SUBSCRIPTION RATE $21 PER YEAR, U.S., ITS POSSESSIONS AND CANADA, $27 PER YEAR, ALL OTHER COUNTRIES. POSTMASTER: SEND ADDRESS CHANGES TO SCIENTIFIC AMERICAN, 415 MADISON AVENUE, NEW YORK, N.Y. 10017

**GENE-CEN 083148**

## Questions muddy gene transplant successes

At the behest of improving manipulative skills, scientists are moving genes between cells of higher organisms and back into those organisms to test the outer limits of genetic plasticity.

Yet, even as these manipulations are becoming increasingly successful—almost startlingly so—in a mechanical sense, some frustrations are developing among scientists when they deal with the question of whether such swapped genes can be made to work in their new cellular settings.

Two recent developments underscore the growing excitement and frustrations apparent in the gene transfer camp. One involves the placement of viral genes into mouse embryo cells and the subsequent stability of those genes during an embryo's maturation. The other involves successful placement of the full battery of genes responsible for biological nitrogen fixation into yeast cells. Though both achievements are important in their own right, each leaves open crucial and possibly unsettling questions.

The success with mice of Yale University geneticist Francis H. Ruddle and his colleagues Jon Gordon and George Scangos follows closely other mouse gene manipulations. They include insertion of a gene into mouse bone marrow cells and then back into mice (C&EN, April 21, page 8), and injection of specific single gene copies into mouse cells growing in tissue culture (C&EN, Oct. 15, 1979, page 6).

The latest work by the Yale team represents what might be called the "genetic overload" approach to gene transfer into mammalian cells. First, plasmids (small rings of DNA that are obtained originally from bacterial cells) are prepared containing, in addition to bacterial genes, specific virus genes. One of the virus genes, coding for an enzyme called thymidine kinase, serves as the marker card in a stacked genetic deck. Thus, it's put there not so much because it's an interesting or useful enzyme to mice, as it is one that scientists can follow with relative ease.

The plasmids are introduced into the mouse embryo cells in massive amounts—from about 1000 to 30,000 copies of the plasmid with its accompanying virus enzyme gene were made available to each mouse embryo cell. Yet even with this large-scale infusion, the cells only infrequently took up the DNA, judging from the newborn mice that still contained it. In preliminary tests, just two of 78

mice were still carrying the added DNA in their cells, Ruddle reports.

The remarkable finding is that the intruding genetic material is not thrown out of the mouse embryo cells altogether. Instead, at least in these few cases so far, some of the DNA is carried along and duplicated with the mouse's own genetic material.

Other scientists, particularly Richard Axel and his collaborators at Columbia University in New York City, have helped pave the way for Ruddle's manipulations. Axel, whose team has done much to develop the method for mass movement of foreign DNA across mammalian cell membranes, has found that such cells can take up surprisingly large amounts of DNA—up to about 0.5% as much as their own DNA.

The outsider DNA is "plunked down" at various places at the ends of mouse chromosomes, according to one scientist active in the field. Apparently enzymes in the cell "integrate" the foreign DNA with the cell's own genetic material, possibly attaching the new material at places where the chromosome has been broken. Ruddle speculated recently that the new material first passes through an unstable phase before it's integrated stably into the cell's DNA. Whatever happens, so far it's under very loose experimental control, meaning that the scientists must rely on a cell's poorly understood enzymic apparatus to accept and process the preferred DNA. This approach is "very nonphysiologic," according to one scientist.

Another approach delivers a somewhat more physiologic gene dose to a mouse cell, albeit by means of an intruding apparatus that briefly pierces through a cell's membranes into its nucleus before metering in the new genes. The microinjection apparatus and method, developed by Elaine G. Diacumakos of Rockefeller University in New York City, was used by W. French Anderson and his colleagues at the National Institutes of Health in Bethesda, Md., to bring foreign genes into cultured mouse cells, in experiments first made public a year ago.

Like Ruddle's team, the NIH group uses DNA in the form of a plasmid. But unlike the Yale group, Anderson and his colleagues introduce that plasmid into a mouse cell in a minuscule instead of a massive dose: essentially as a "single copy," Anderson says. That is, the plasmid is treated just like any chemical solution and is diluted appropriately so that a single copy is injected into a single



# AMINES



$CH_3 \cdot O \cdot C_3H_6 \cdot NH_2$
Methoxypropylamine

$CH_3 \cdot O \cdot C_2H_4 \cdot O \cdot C_3H_6 \cdot NH_2$
Methoxyethoxypropylamine

$CH_3CH_2 \cdot O \cdot C_3H_6 \cdot NH_2$
Ethoxypropylamine

$(CH_3)_2CH \cdot O \cdot C_3H_6 \cdot NH_2$
Isopropoxypropylamine

$CH_3(CH_2)_6 \cdot O \cdot C_3H_6 \cdot NHC_3H_6 \cdot NH_2$
$C_{16} \cdot C_1$ ether diamine

$(C_nH_{2n+1})_3N$
$C_8 \cdot C_{10}$ tri alkylamines

$(C_{10}H_{21})_3N$
$C_{10}$ tri alkylamines

$(CH_3)_2N \cdot C_3H_6 \cdot NH_2$
Dimethylaminopropylamine

$H_2N \cdot C_3H_6 \cdot NH \, C_3H_6 \cdot NH_2$
Dipropylenetriamine

## Specialty Amines
## Supplied by
# MARS
### Chemical Corporation

A Subsidiary of



WRITE FOR OUR
NEW INDEX OF
SPECIALTY AMINES

Mars Chemical

Richard Axel, et al.
Serial No. 124,513
Group Art Unit 172

EXHIBIT B

CIRCLE 71 ON READER SERVICE CARD

GENENTECH 083149

# Selectively Recover Precious Metals from Solution.



# Amborane does it fast!

Amborane™ reductive resins are solid spherical reducing agents offering unusual selectivity and processing convenience for metal recovery applications.

■ High selectivity for $Au^{+3}$, $Pt^{+2}$, $Pt^{+4}$, $Rh^{+3}$ and $Ir^{+3}$ in the presence of base metals.

■ High capacity – Up to 2 grams of precious metal per gram of dry resin.

■ Efficiency – Metal values are concentrated within the porous bead matrix. Complete reduction is possible even at low levels.

■ Operational Flexibility – For column or batch operations, aqueous or non-aqueous. Wide pH range (1-10).

■ Other uses – Selective reduction of mercury, methylmercury, arsenic, antimony and bismuth complexes. Stereospecific reduction of organic aldehydes and ketones to alcohols.

Write for Amborane technical bulletins and sample information. Rohm and Haas Co., Marketing Services IE20-6. Independence Mall West, Philadelphia, PA 19105.



ROHM IHAAS
PHILADELPHIA PA 19105

CIRCLE 52 ON READER SERVICE CARD

36   C&EN Sept. 29, 1980

mouse cell, held in place, and observed under a microscope.

The injected single copy acts very differently from the way the massively introduced material behaves, Anderson continues. "We see free, extrachromosomal plasmids that can be rescued back out of cells even after multiple generations of cell growth," he says. Exactly what is going on is not particularly clear, he adds, but the material acts unlike the integrated DNA described by Ruddle. There are hints that some copies of the microinjected DNA also might be integrated into the recipient cell's chromosome. Nonetheless, at least one copy is carried by such cells as an intact, circular plasmid.

That's remarkable for several reasons. One is that mammalian cells normally do not carry plasmids, which after all are DNA rings that have been purloined from microbial cells. Thus their presence and continued tolerance in mammalian cells is unusual, to say the least. But the plasmids are remarkable for still other reasons. During their stay in the mouse cells, which reproduce in vitro, the plasmids undergo genetic recombination, following an unexpected pattern, Anderson says.

Recombination is a natural process whereby similar but distinct bits of genes are exchanged from one molecule to another. For example, arms of duplicate chromosomes can be interchanged, typically through a particular region. Anderson says that the interloping plasmid DNA also can go through this process repeatedly in the mammalian cell, and that one particular region of the plasmid is a "hot spot" for recombination. Thus, something about this foreign bit of DNA is familiar to a mouse cell's recombination apparatus.

Despite this interesting and seemingly successful gene-introduction phenomenology, a key problem is beginning to nag many of the scientists doing this research. Will the genes work once they're placed into the mammalian cells? The answer is crucial to the clinical future of such experiments where the eventual goal is to correct certain genetic defects, such as various debilitating anemias (see page 42) and other enzyme deficiency diseases.

The underlying strategy with this is to replace or to augment inadequate genes with test-tube-improved variants. And, although some people fear such genetic manipulation is prone to misuse, the scientists now working toward it see themselves laboring on behalf of patients whose current hopes for a near normal life are extremely slim and depend on lifelong reliance on various drugs.

So far, the genes introduced artificially into mammalian cells work only fitfully, at best. Relatively unspecialized enzymes having what one scientist terms "housekeeping duties" seem to function more successfully than do more specialized gene products, such as the globin proteins that make up the oxygen-carrying hemoglobin molecule in blood.

Here the central problem is that scientists have few clues on how such specialized genes are regulated. There are a variety of technical tricks already available to get some of these genes to work minimally. But the big question remains whether that low activity can approximate the body's needs in a reasonable way. Normally, for instance, hemoglobin is made only in red blood cells, and there in huge amounts. Few researchers can be coaxed into thinking that it will be satisfactory either to make small amounts of hemoglobin in every cell of the body or to make huge amounts everywhere.

Current findings indicate that whatever controls the hemoglobin gene is not present or is not working properly in some very large DNA pieces that are attached to the hemoglobin gene proper and that have been moved into mouse cells, Anderson says. This may mean that the whole question [...] portant gene [...] to be enti[...] plicated t[...] far. But th[...] sphisticate[...] yet have b[...]

A simila[...] scientists [...] are equally crucial in nature, but in the plant instead of the animal kingdom. Aladar A. Szalay and Ada Zamir (a visiting scientist from Israel) working at Cornell University, Ithaca, N.Y., have put the genes controlling biological nitrogen fixation into yeast. The team also includes yeast geneticist Gerald R. Fink, who has helped develop reliable methods for moving genes into and out of yeast cells.

"We do not know anything yet about expression [function] of the genes in yeast," Szalay says. "We're just beginning to look."

The situation is unusual because the Cornell team has introduced so many genes deliberately at once into a recipient cell. (Thus it's different from the work where one or a few genes are introduced singly or in multiple copies into mouse cells.) The more than a dozen genes necessary for nitrogen fixation are carried on a really big-sized piece of DNA, containing about 45,000 nucleotide bases (this is roughly 1% of the entire DNA

Continued on page 42

184

Continued from page ( )

found in a bacterium, such as *Escherichia coli*).

"It's amazing this big piece is stable in yeast," Szalay says. The whole piece is integrated into a yeast chromosome and is carried along (and replicated) during the yeast's normal growth cycle for many generations. The nitrogen-fixation genes are preserved when yeast cells undergo meiosis, during which duplicate copies of genetic material are halved in preparation for the sexual reproduction side of the yeast life cycle.

The available means for manipulating such complex packages of genes are more sophisticated for yeast cells than for mammalian cells. The plasmids that carry the nitrogen fixation genes are, in effect, programmed to integrate into the yeast chromosome. The Cornell team's work is even a bit more fanciful than that, involving a kind of flying trapeze effect, during which one set of genes on a plasmid was used to swing into the chromosome another set of genes on a second plasmid.

Regardless of such high-flying techniques, the question remains whether the genes can work inside the yeast cells. And, the answer to that question is the premise for going on to the eventual challenge of transferring those genes into green plants, such as corn, that currently depend on an expensive outside supply of nitrogen fertilizer.

"If we can't get expression [of the nitrogen fixation genes] in yeast, it's not worth spending the public's money to get it to work in plants," Szalay says. But he's confident that "we can push yeast to do it."

*Jeffrey Fox, Washington*

## Iron chelators may aid in anemia treatment

The National Institutes of Health's six-year-old project to develop a new drug for use in treating patients with the genetic blood disease Cooley's anemia is coming up with some unexpected findings. As its initiators had hoped, the project is beginning to produce some very promising drug candidates.

But it also is showing both academic researchers and governmental administrators that the task of developing a successful drug is an enormously complicated one in which successful chemistry is by no means the only critical factor.

The project's aim is to develop a safe, effective, inexpensive, and easy-to-take drug to remove the excess iron that builds up in patients

with Cooley's anemia (C&EN, May 1977, page 24). These people produce inadequate amounts of the beta chain of the hemoglobin molecule so that their own blood is not an effective oxygen carrier. They require regular blood transfusions to survive, but this treatment eventually overloads their bodies with iron. The iron accumulates particularly in the kidneys, liver, and heart, where it leads to organ malfunction and death, often when the patient is in the mid-teens or early twenties. The current project does not aim at curing Cooley's anemia, but rather at controlling a potentially fatal side effect—the buildup of iron in critical tissues.

An early success of the program, most involved in it agree, was getting a drug approved for removing excess iron from Cooley's anemia patients. This was accomplished in 1977 when deferrioxamine, a drug used for treating acute iron poisoning, was approved for use in this disease.

Deferrioxamine is not an ideal drug, however. It must be given by injection, and, since its half-life in the body is very short, it works best when it is slowly infused for six to 12 hours each day. Such treatment is prohibitively expensive: Elmer B. Brown, professor of medicine at Washington University school of medicine in St. Louis, and a participant in the NIH project, estimates that drug costs alone are more than $4500 per year for this therapy.

However, better drugs may be on the way. The one that is presently causing the most excitement is being developed by Colin G. Pitt, a chemist at Research Triangle Institute in North Carolina. Pitt has several compounds that remove more iron from rat and mouse models than does deferrioxamine. His most promising compounds are ester derivatives of *N,N'*-bis(2-hydroxybenzyl) ethylenediamine-*N,N'*-diacetic acid or HBED. This compound itself is a

better remover of iron from these animal models than is deferrioxamine. However, when it is made into the dimethyl, dipropyl, or dipentyl ester derivative, it becomes even better. These ester derivatives are orally active and less toxic than HBED in acute toxicity tests in animals, but like HBED they are better than deferrioxamine at removing iron from animals. The derivatives are an order of magnitude better at removing iron from the animals than anything previously tested, Pitt says. In fact, they are able to remove nearly 30% of the iron theoretically available in the animal, he says.

"If the efficacy of the esters of HBED is confirmed clinically, the goal of identifying an orally active chelating agent capable of controlling iron overload will have been achieved," Pitt told a symposium on the development of iron chelation drugs held in San Francisco last month.

Finding these compounds was a combination of logical chemical investigation and pure luck, Pitt points out. The compounds are phenol derivatives, a class of compounds expected to bind ferric ion tightly based on the stability constants of iron(III) complexes of phenol. Furthermore, many bacteria contain phenolate compounds called siderophores, which the bacteria produce in order to scavenge iron from their environment. In the molecule HBED, carboxylate and amino groups also are present to assist the compound in binding iron. These groups, too, often are found in naturally occurring siderophores.

However, the chemical behavior of these compounds is not completely predictable from their structures and the stability constants of their iron complexes. Pitt and colleagues tested many compounds expected to have a high affinity for iron based on these criteria, and found them to be inac-



**HBED shows promise as replacement for deferrioxamine in treating Cooley's anemia**

HBED
(N,N'-bis(2-hydroxybenzyl)ethylenediamine-
N,N'-diacetic acid)

Deferrioxamine

**GENE-CEN 083151**

Exhibit OO
Page 1492

particles and their behavior in order to deduce a flow velocity and direction.

The Voyager radio-wave sensor, much to the surprise of its designers, made some observations that may tip the balance on the corotation controversy. Joseph Alexander and Michael Kaiser of Goddard Space Flight Center, Greenbelt, Maryland, discovered a new type of radio emission from Jupiter's magnetosphere. And the source region seems to circle the planet 3 to 5 percent slower than the planet spins. Kaiser and Alexander think that the signal comes from the outer edge of Io's doughnut-shaped cloud. They conclude that the plasma that is producing the radio waves in this region is not quite keeping up with the planet's rotation—in agreement with Bridge's measurements of the flow velocity in the same area.

Krimigis's data indicate that the Jovian merry-go-round does not go on forever. On the nightside of Jupiter, between 9 million and 10 million kilometers from the planet, "the plasma can't hang on anymore—it streams off away from Jupiter:" This flow, which Krimigis dubs the magnetospheric wind, may resemble the solar wind, a flow of particles away from the sun. By studying in detail the Jovian magnetospheric wind, Krimigis hopes to understand the physics that drives it and, by analogy, the solar wind and the winds emanating from many other stars.

While the two Voyagers and the two Pioneer spacecraft that preceded them have revealed much about the Jovian magnetosphere, many of the new findings are surprises or cannot be fathomed completely with available data. Scientists eagerly await the Galileo spacecraft, "may it fly," to test their speculations about how material from Io's volcanoes is distributed into the magnetosphere and to resolve the corotation controversy. Galileo is supposed to orbit Jupiter after it is launched in the mid-1980's by the problem-plagued Space Shuttle.

—BEVERLY KARPLUS HARTLINE

Richard Axel, et al.
Serial No. 124,513
Group Art Unit 172

EXHIBIT C

# Gene Transfer Given a New Twist

*The demonstration that genes introduced into bone marrow cells work in living mice is the most recent development in a series of advances in gene transfer.*

biology has seen so many prises in the past few years that the unexpected is becoming commonplace. Still, reports on television and in the newspapers that a "revolutionary" method of gene transfer had been discovered surprised many people, among them a number of scientists who are themselves studying methods of gene transfer between cells.

The reports described experiments in which a group of investigators* at the University of California at Los Angeles (UCLA) successfully introduced new genes into mouse cells and showed that the genes appeared to work when the cells were put back into living mice. Now this, in outline, is just what genetic engineering is all about.

Investigators have long sought a practical method of introducing new, functional genes into living organisms because such a technique might permit gene replacement therapy—a true cure for diseases, sickle-cell anemia, for example, which are caused by a single defective gene. And so the UCLA results were newsworthy.

Some news reports overstated their import, however, possibly aided by a press release from the university that

hailed the techniques as "revolutionary," a word that subsequently appeared in the headline of a Washington *Post* story on the new developments. A more circumspect description was given by one researcher, who requested that he not be identified. "It is a nice experiment," he said, "but a logical extension of previous research." In other words, it fell something short of revolutionary.

In fact, investigators have been transferring genes between mammalian cells for years by a variety of techniques. Some of the earlier methods used cell fusion to produce hybrids bearing whole chromosomes or chromosome pieces from both cell types. More recently, investigators, with the aid of recombinant DNA technology, have devised more specific procedures for introducing individual genes into cells. During the past year and a half, for example, three groups of investigators reported the introduction of a globin gene from one animal species into cells from another. (Globin is the protein portion of the hemoglobin molecule.) In at least two of these cases, the transferred gene expressed itself in the synthesis of the appropriate globin protein.

The UCLA achievements grew out of this previous gene transfer work. According to Martin Cline, leader of the research group reporting the results, "We

used established techniques for transferring the genes, but took them one step further—to an in vivo system."

In one series of experiments, described in the 3 April issue of *Nature*, the investigators induced resistance to the drug methotrexate in bone marrow cells by incubating them with DNA prepared from a line of methotrexate-resistant mouse cells. Methotrexate, which is used for cancer chemotherapy, kills cancer cells by inhibiting the enzyme dihydrofolate reductase (DHFR) and thus preventing the synthesis of the essential chemical folic acid.

Cancer cells may become resistant to methotrexate (or other cancer drugs, for that matter), in which case they are no longer killed by the drug, at least in concentrations that are tolerated by the rest of the body. Work from the laboratory of Robert Schimke, who is also at UCLA, has shown that methotrexate resistance is sometimes caused by amplification of the DHFR gene. Resistant cells, having many more copies of the gene than nonresistant ones, produce so much of the enzyme that they can live even in the presence of the drug.

The Cline group prepared DNA from methotrexate-resistant mouse cells having many extra copies of the DHFR gene. For the DNA preparation and subsequent gene transfer, they used their

*Martin Cline, Howard Stang, Karen Mercola, L. Morse, R. Ruprecht, Jeffrey Browne, and Winston Salser.

0036-8075/80/0425-0386$00.50/0 Copyright © 1980 AAAS

GENE CEN 083152

ods developed in the laboratory of Richard Axel, of Columbia University College of Physicians and Surgeons, that are themselves based on procedures devised by Silvia Bacchetti and Frank Graham of McMaster University in Hamilton, Ontario.

The DNA preparation was then incubated with bone marrow cells taken from a strain of mice whose cells all bear a distinctive and easily recognizable marker chromosome. During the incubation, some of the cells took up the DNA, a process called transformation. (This kind of transformation, simply meaning the acquisition of new genes, is different from the malignant transformation by which normal cells become cancerous.)

One of the major problems in gene transfer experiments is identifying the cells bearing the desired new gene. Drug resistance provides a solution to the problem because only cells with the resistance gene can multiply in the presence of the drug and, consequently, they can be selected out of a mixture of cells, most of which lack the resistance gene. Usually selection is carried out on cells in culture. And it is here that the Cline group added a new twist to gene transfer because they injected the transformed bone marrow cells, together with an equal number of "mock transformed" cells, back into living mice for the selection procedure. Cells were mock transformed by incubating them with DNA not containing multiple DHFR genes; they did not carry the chromosome marker and so could be distinguished from the transformed variety. The mice, which were genetically and immunologically compatible with both types of injected cells, had been previously irradiated to destroy their own bone marrow.

To select for resistant bone marrow cells, Cline and his colleagues then treated the mice with methotrexate. This drug, like most of the others used for cancer therapy, may also kill normal cells, especially those, including bone marrow cells, that divide rapidly. The methotrexate dose was carefully chosen to depress the division of nonresistant bone marrow cells without being so high that it killed the mice.

Under this selective pressure, the bone marrow of the animals became enriched with cells bearing the marker chromosome—that is, with cells that had been transformed by exposure to DNA carrying multiple DHFR genes. This result indicates that the methotrexate-resistance genes entered the cells and were

working there. In support of this hypothesis, Cline points out that cells taken from the animals had two to four times as much DHFR activity as cells taken from controls that had not received transformed cells. In addition, the blood status of methotrexate-treated mice that had been injected with transformed cells was better than that of drug-treated controls. For example, the former had a higher percentage of red cells in their blood than the latter.

All in all, the evidence strongly suggests that genes for methotrexate resistance were transferred into the bone marrow cells, but a direct demonstration of the presence there of the transferred genes was not possible. The DHFR genes obtained from methotrexate-resistant mouse cells are not distinguishable from those already present, although in smaller numbers, in all mouse cells, Cline explains.

For this reason, the UCLA workers undertook a second series of experiments in which they transferred a viral gene, the thymidine kinase gene of herpes simplex virus, into murine bone marrow cells. Because the viral DNA can be distinguished from that of mice, the investigators could detect the viral material in the transformed cells, thus obtaining direct evidence for gene transfer. In these experiments, as in the case of the DHFR gene transfer, the investigators selected for the cells bearing the viral thymidine kinase gene in living mice. A description of the thymidine kinase work is currently in press at Science.

Although the UCLA group has taken another step on the road to a practical method for genetic engineering, a number of barriers, some formidable, will have to be surmounted before there is a cure for sickle-cell anemia or any other genetic disease. "The principal obstacle," says Cline, "is the need to control the expression of the gene."

Simply transferring the gene and finding a way to select for the cells bearing it is not enough. The gene product must also be made only in the appropriate cells,

at the right time, and in the correct amount. Bob Williamson of St. Mary's Hospital Medical School in London, writing in the News and Views section of the same issue of Nature in which the UCLA work was reported, says, "Expression in inappropriate tissue or abnormal control in the cell in which they [the transferred genes] are normally expressed could be disastrous." Unfortunately for genetic engineers, gene control in mammalian cells is one of the bigger mysteries remaining to molecular biologists.

One manipulation that might help to bring a transferred gene under appropriate control is to introduce it into the chromosome at the site where it normal-

---

> "Expression in inappropriate tissue or abnormal control in the cell in which they [the transferred genes] are normally expressed could be disastrous."

---

ly resides. At present, there is no way to direct a gene to a specific chromosomal site or to ensure that it is integrated into a chromosome at all. It is even difficult to determine whether or not a transferred gene has been integrated, and this has not yet been accomplished for the DHFR and thymidine kinase genes transferred by the UCLA group.

Cure of genetic diseases is not the only potential application of genetic engineering, however. Cline suggests that the techniques developed at UCLA might be of value in cancer chemotherapy. The harmful effects on the bone marrow of many anticancer drugs often limit the treatment received by a cancer patient. Cline's idea is to remove bone marrow cells from a patient who is about to undergo chemotherapy. After they are transformed by genes conferring resistance to whatever drug is to be used, the cells can be given back to the patient. If these transformed cells establish themselves in the patient's bone marrow, as the methotrexate-resistant cells did in the mice, then the patient might be able to tolerate higher doses of the drug or a longer course of treatment with it than might otherwise be possible. Cline suggests that an application such as this might be tested in human patients within "3 to 5 years." Time, as they say, will tell.—JEAN L. MARX

GENE MCEN 083153

Exhibit OO
Page 1494

Court of Customs and Patent Appeals

*In re Strahilevitz*

No. 81-563

Decided Jan. 15, 1982

**PATENTS**

**1. Pleading and practice in Patent Office — Rejections (§54.7)**

**Specification — Sufficiency of disclosure (§62.7)**

PTO's burden of proof in calling into question enablement of appellant's disclosure requires that PTO advance acceptable reasoning inconsistent with enablement; thereupon, burden shifts to appellant to show that one of ordinary skill in art could have practiced claimed invention without undue experimentation.

**2. Specification — Sufficiency of disclosure (§62.7)**

Although working examples are desirable in complex technologies and detailed examples can satisfy statutory enablement requirement, examples are not required to satisfy Section 112, first paragraph; therefore, examiner's statement that "nearly universal applicability" alleged for invention necessitated numerous examples was erroneous.

**3. Specification — Sufficiency of disclosure (§62.7)**

Patents that issued after filing date of applicant's parent application cannot be relied upon as evidence of enablement by applicant who wishes to retain benefit of parent application's filing date.

**4. Court of Customs and Patent Appeals — Issues determined — Ex parte patent cases (§28.203)**

On appeal to Court of Customs and Patent Appeals, Solicitor cannot raise new ground of rejection or apply new rationale to support rejection affirmed by Board of Appeals.

**Particular patents — Hapten Removal**

Strahilevitz, Immunoassay and Treatment Methods, rejection of claims 36-48 reversed.

———

Appeal from Patent and Trademark Office Board of Appeals.

Application for patent of Meir Strahilevitz, Serial No. 761,290, filed Jan.

21, 1977, continuation of application. Serial No. 255,154, filed May 19, 1972. From decision rejecting claims 36-48, applicants appeal. Reversed.

J. Philip Polster, St. Louis, Mo., for appellant.

Joseph F. Nakamura and Fred W. Sherling for Patent and Trademark Office.

Before Markey, Chief Judge, and Rich, Baldwin, Miller, and Nies, Associate Judges.

Miller, Judge.

The decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") sustaining the rejection of claims 36-48[1] as unsupported by an adequate disclosure required by 35 USC 112, first paragraph, is *reversed.*

**Background**

*Invention*

Appellant's invention relates to methods and devices for removing a hapten, antigen, or antibody from the blood of a living mammal.

A hapten is a small molecule which does not by itself produce antibodies but which, when conjugated to a carrier protein or other macro-molecular carrier, induces in a recipient animal or human the production of antibodies that are specific to the small molecule. For example, certain psychoactive drugs, such as LSD, heroin, and tetrahydrocannabinol, can function as haptens. When an antibody (a relatively large immunoprotein) contacts the hapten or antigen to which it is specific, it tightly binds the hapten or antigen. It is this specific binding property of antibodies which is used by appellant to remove haptens, antibodies, or antigens from blood. Claim 44, the broadest appealed claim, from which claims 45 and 46 depend, reads:

An immunological method for removing from a living mammal a hapten in the blood of said mammal, comprising connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising passage means for said blood; an antibody to said hapten in

———

[1] Application serial No. 761,290, for "Immunoassay and Treatment Methods, Particularly of Psychoactive Drugs," filed January 21, 1977; continuation of serial No. 255,154, filed May 19, 1972.

Richard Axel
Serial No. 124,513
Group Art Unit 172

EXHIBIT D

GENE-CEN 083154

562            *In re Strahilevitz*          212 USPQ

said device; and exposure means in said device for exposing said hapten to said antibody and for preventing said antibody from entering said circulatory system.

Appealed method claims 36-39 involve linking to a matrix an antibody to a hapten and passing blood over the matrix. The antibody removes the hapten from the blood by binding the hapten.[2] Claim 40 is directed to a method for removing an *antibody* from the blood of a living mammal which is passed over an *antigen* linked to a matrix. Claim 41 involves an antibody linked to a matrix to remove an *antigen* from blood.

Claims 42 and 43 involve a method for removing a hapten or an antigen from blood through an immunodialysis process.[3] A

---

[2] Claim 36 reads:

An immunological method for removing from a living mammal a hapten in the blood of said mammal, comprising a step of connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising inlet means and outlet means for connecting said device into said circulatory system, chamber means for defining a flow passage between said inlet means and said outlet means, a matrix in said chamber, and an antibody to said hapten linked to said matrix, said antibody binding said hapten to said matrix as said blood passes through said chamber, and a further step of separating said hapten from said antibody to regenerate said antibody for further use in said device.

[3] Claim 42 reads:

An immunological method for extracting from a living mammal a hapten in the blood of said mammal, comprising

(1) connecting in the blood circulatory system of said mammal a hapten-removing device, said device comprising a first chamber and a second chamber; a semipermeable membrane separating said first chamber from said second chamber; inlet means and outlet means for connecting said first chamber in the circulatory system of said mammal; a liquid phase containing antibodies to said hapten in said second chamber, said membrane being permeable to said hapten and being impermeable to said antibodies; and closed regenerative means connected in a fluid circuit with said second chamber, said regenerative means comprising a third chamber,

(2) drawing at least a portion of said liquid phase from said second chamber to said third chamber,

(3) changing the pH of said liquid phase in said third chamber for releasing said antibody from said hapten, and

(4) returning said antibody to said second chamber and preventing said hapten from returning to said second chamber.

semipermeable membrane, permeable to haptens or antigens and impermeable to antibodies, separates a patient's blood from a solution containing antibodies to the target molecules. Because the antibodies specifically bind target molecules that diffuse from the patient's blood through the semipermeable membrane, a gradient across the membrane is present for the molecule, which continues to diffuse from the blood to the dialysis solution as long as the solution contains antibodies which are free to bind the target molecules. Claims 47 and 48 are essentially directed to devices for practicing claims 42 and 43.

*Proceedings Below*

The examiner rejected the claims as based upon an insufficient disclosure under 35 USC 112, first paragraph, stating:

The disclosure is essentially an invitation to experiment. No specific examples are given. No human treatment (in fact no animal treatment) is described. The specification is replete with statements as to what *may* be done. No dialysis or adsorption data [have] been presented.

* * *

* * * [A]ppellant urges "nearly universal applicability" for *selectively* removing chemical species. If there is in fact universal applicability, with selectivity, appellant should have inserted numerous (50 to 100 for instance) examples into the specification.

* * *

Appellant urges that no working example is required and that instructions to a technician are not required. But it has already been pointed out that appellant believes his device has *universal applications* (and the claims are just about that broad). Admittedly, one skilled in the art is a Ph.D., but even with such a high level of skill, such a person would need detailed guidance to practice the claimed alleged *universal* invention.

The board took a somewhat different approach:

[A]ppellant admits * * * the disclosure contains no "operative example". While we recognize that specific examples are not necessary to meet the requirements of Section 112, In re Gay, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962), when present, they do provide good evidence that the disclosure is enabling and that the invention may be performed without undue experimentation. In our view, the

*[right column partially cut off]*

material ...
methods a...
in exampl...
are define...
tigens and...
system. At...
a generaliz...
7 in the ...
regeneratio...
even gener...
The claim...
complicated...
tion condit...
specifically...
antibodies t...
to find in th...
tion as to h...
made and ...
would not b...
to those of o...
Also require...
of a matrix ...
tibodies; ho...
adequate t...
even the n ...
use. The r...
even sug...
that may ...
haptens ...
would lea...
of selecting t...
for use in th...
appears that t...
a concept of ...
procedures na...
a single metho...
to leave those ...
experimentatio...
be made to ...
Here, appellan...
tive material th...
to provide a ...
manner of eit...
paratus as claim...
same. The wide...
are inherent in t...
the disclosure ...
evaluation, leads...
operation of the ...
involve an undue...
tion and we will ...
jection.

Thus, the board q...
specification enable...
tion of haptens, an...
preparation of the ...
dialysis membrane...
parameters of the d...

184

ermeable to
meable to an-
blood from a
to the target
antibodies
les that dif-
through the
a gradient
sent for the
diffuse from
on as long as
es which are
s. Claims 47
to devices for

aims as bas-
re under 35
ing:

an invitation
xamples are
(in fact no
ribed. The
tatements as
lysis or ad-
resented.

early uni-
*ively* remov-
s in fact uni-
selectivity,
d numerous
ples into the

rking exam-
uctions to a
But it has
at appellant
s *universal*
ns are just
ly, one skill-
t even with
ch a person
e to practice
invention.

different ap-

e disclosure
ple". While
xamples are
irements of
PA 725, 309
1962), when
od evidence
ng and that
med without
ur view, the

---

material most descriptive of the claimed methods and apparatus, is that presented in examples 12 and 13, wherein systems are defined for the removal of haptens, antigens and antibodies from the circulatory system. At best, the descriptive material is a generalized explanation of figures 6 and 7 in the drawings, and except for the regeneration step, provides no specific or even general guidelines for the treatment. The claimed methods • • • involve a complicated and complex series of reaction conditions that apparently require specifically related haptens, antigens and antibodies to operate effectively. We fail to find in the disclosure adequate instruction as to how these selections are to be made and in our view such selections would not be readily apparent or obvious to those of ordinary skill in the related art. Also required in various claims is the use of a matrix for use in binding the antibodies; however, we see no disclosure adequate to define such production or even the materials that are compatible in use. The specification also fails to teach or even suggest the antibodies or antigens that may be used with the appropriate haptens and we see no disclosure that would lead to or suggest a proper means of selecting the appropriate membranes for use in the removal devices. In short, it appears that the appellant has developed a concept of how a variety of prior art procedures may possibly be combined in a single method • • • and then retreated to leave those in the art with the task of experimentation to see if the method can be made to operate as set forth. • • • Here, appellant has presented no descriptive material that in our view is sufficient to provide a proper instruction in the manner of either developing the apparatus as claimed or the method of using same. The wide variety of variables that are inherent in the process, and for which the disclosure provides no basis for evaluation, leads us to the conclusion that operation of the method as claimed would involve an undue amount of experimentation and we will therefore sustain the rejection.

---

Thus, the board questioned whether the specification enabled selection and preparation of haptens, antigens, and antibodies; preparation of the matrix; selection of the dialysis membranes; and selection of parameters of the dialysis process.

---

## Opinion

*Burden of Proof*

[1] A threshold issue is whether the PTO met its burden of proof in calling into question the enablement of appellant's disclosure. This burden required that the PTO advance acceptable reasoning inconsistent with enablement. Thereupon, the burden would shift to *appellant* to show that one of ordinary skill in the art could have practiced the claimed invention without undue experimentation. In re Sichert, 566 F.2d 1154, 1161, 196 USPQ 209, 215 (CCPA 1977).

[2] The examiner reasoned that because of the breadth of the invention, a large number of examples (50 to 100) would be *required* to enable one of ordinary skill in the art to make and use the invention. 35 USC 112, first paragraph. We recognize that working examples are *desirable* in complex technologies and that detailed examples can satisfy the statutory enablement requirement. Indeed, the inclusion of such examples here might well have avoided a lengthy and, no doubt, expensive appeal. Nevertheless, as acknowledged by the board, examples are not *required* to satisfy section 112, first paragraph. See, e.g., In re Stephens, 529 F.2d 1343, 188 USPQ 659 (CCPA 1976); In re Borkowski, 57 CCPA 946, 422 F.2d 904, 164 USPQ 642 (1970); In re Gay, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962). Therefore, the examiner's statement that the "nearly universal applicability" alleged for the invention necessitated numerous examples was erroneous. Although the invention is applicable to a large variety of haptens and antigens, the examiner offered no reason why these different compounds would require different techniques or process parameters.

However, the examiner (and the board) also reasoned that enablement was not present because no dialysis or adsorption (of the antibody or antigen to the matrix) data were presented, and we are persuaded that this was sufficient to shift the burden to appellant to establish that a person of ordinary skill in the art could have practiced the invention without undue experimentation.

*Enablement*

The dispositive issue is whether appellant's disclosure, considering the level of ordinary skill in the art as of the date of appellant's application, would have enabled

---

*18*

GENE-CEN 083156

a person of such skill to make and use appellant's invention without undue experimentation.

[3] Appellant explains that his invention resides in combining the known prior art techniques of hemodialysis or hemoperfusion with immunochemical dialysis and immunochemical adsorption. He properly relies on literature citations to establish both the level of ordinary skill in the art and the fact that the techniques necessary to practice his invention were known in the art.[4] In re Eynde, 480 F.2d 1364, 178 USPQ 470 (CCPA 1973).

*A. Selection and Preparation of Haptens, Antigens, and Antibodies*

Appellant argues that methods for forming antibodies which are specific to particular haptens and antigens were well known prior to his filing date. In his specification, he states:

> Immunization of rabbits with conjugates in complete Freund's Adjuvant are carried out by a similar procedure to the one described by Strahilevitz et al, supra. The preparation of antisera and globulin fractions are also described in this reference. The antibodies may be purified by known methods such as those set out in Immunologic Methods in Steroid Determination.

He then gives a specific example of preparing an antibody to tetrahydrocannabinol, referring to a method described in Immunologic Methods in Steroid Determination (Peron & Caldwell ed. 1970) for conjugating the compound to a protein, and detailing the injection of "[r]abbits, sheep or other suitable animals" with the conjugate, giving concentration, dosage, and frequency of injection data.

Pinckard & Weir, Equilibrium Dialysis and Preparation of Hapten Conjugates in Handbook of Experimental Immunology 493 (D. Weir ed. 1967), cited in appellant's specification and made a part of the record in the parent application, details the preparation of protein-hapten conjugates, injection of the conjugates into animals, and recovery of antibodies to the haptens from the animals. It is clear from this disclosure that selection and preparation of related haptens, antigens, and antibodies involve routine and well-known techniques. Indeed, at oral argument, the Solicitor acknowledged that techniques for preparing antibodies to specific haptens and antigens were known in the art.

*B. Preparation of Matrix with Bound Antibodies*

In example 13 of appellant's specification, appears the following statement:

> As shown in Figure 7, the apparatus for this method consists of a column 26 which includes a matrix 37 to which a binding species is linked. The binding species is a hapten, antigen (including a hapten conjugated to a carrier) or antibody which reacts specifically with the species which is to be removed from the blood. The linkage of the binding species to the matrix 37 may preferably be directly to the matrix, as when the matrix is made of a synthetic polymer such as polystyrenelatex. The linkage may also be through a suitable solid phase coating on the matrix. The antibody is then linked to the coating by one of the known methods for the preparation of immunoadsorbents, for example by a modification of one of the methods of Campbell (Campbell et al, Proc. Nat. Acad. Sci., U.S.A., 37, p. 575 (1951); Malley and Campbell, J. Am. Chem. Soc. 85, p. 487 (1963)). If any chance exists that the solid phase adsorbent may break loose from the matrix 37, suitable filters are necessary in the system. The matrix may simply be the wall of the (plastic) column if the length of the column is sufficient to provide the required surface area for interaction at the blood-binding species interface.

Additionally, appellant points out that appropriate matrices and techniques for binding antigens or antibodies thereto were well known in the art, as evidenced by Weetall, U.S. Patent No. 3,652,761, cited by the examiner in support of a rejection under 35 USC 103 which was reversed by the board. Weetall discloses that it was known in the art to couple antigens to cellulose and its derivatives, polyaminopolystyrene, dextrans, and polyaminoacids to remove antibodies from serum. This patent also teaches a novel method for coupling an-

[4] Some of the patents cited by appellant to show the level of ordinary skill in the art issued after the May 19, 1972, filing date of his *parent* application. These patents, originally cited by the examiner as section 102(e)/103 prior art against the claims, cannot be relied upon as evidence of enablement if appellant wishes to retain the benefit of his parent application's filing date. See In re Gunn, 537 F.2d 1123, 190 USPQ 402 (CCPA 1976), and In re Budnick, 537 F.2d 535, 190 USPQ 422 (CCPA 1976). However, as will be developed infra, reliance upon these patents is unnecessary.

188

GENE-CEN 083157

*In re Strahilevitz*

tigens or antibodies to glass with the use of a silane coupling agent.

### C. Dialysis Membranes

The position of the board and the Solicitor is that appellant has provided no disclosure regarding selection of the dialysis membranes required to practice the subject matter of claims 42, 43, 47, and 48. However, appellant's specification states:

Such membranes, having various pore sizes, and thus which are permeable to molecules of various sizes are commercially available . . . . The semipermeable membrane is chosen to be of such a porosity and permeability as to be permeable to small molecules like the intoxicating hapten of interest, but is not permeable to large molecules present in the blood of the patient such as serum proteins.

Selection of the membranes, therefore, is based upon their porosity and the relative molecular sizes of the antibody and the hapten or antigen. Weetall, supra, teaches that antigens generally have a molecular weight of 10,000 or higher, and that antibodies have molecular weights of 160,000 to 1,000,000. Haptens are much smaller. Galletti et al., in U.S. Patent No. 3,619,423, disclose a process in which enzymes in a dialysis fluid remove undesirable substances from blood. The blood is separated from the dialysis fluid by a semipermeable membrane having a pore size which will pass compounds having a molecular weight of less than 10,000. The 100,000 molecular weight enzymes cannot cross the membrane. Thus, these references clearly indicate that selection of semipermeable membranes on the basis of pore size, as suggested by appellant's specification, was a technique known in the art prior to appellant's filing date.

### D. Dialysis

Appellant states that a person of ordinary skill in the art would know appropriate flow rates and other parameters for performing dialysis, citing Galletti et al., supra, and Rosenbaum, Kramer, Raja, & Boreyko, Resin Hemoperfusion, 284 New England J. Med. 874 (1971). Galletti et al. teach a

hemodialysis method which uses enzymes rather than antibodies to remove materials from blood. Dialysis parameters are disclosed, including a flow rate of 200 ml./min. Rosenbaum et al. teach a method in which blood is passed through a column at 300 ml./min. for three hours to remove barbiturates from the blood. These references disclose typical dialysis and related data in methods similar to those of appellant. There is no reason to believe that these parameters would not also be applicable to appellant's methods, as he contends.

[4] In view of all the foregoing, we hold that appellant's disclosure would have enabled a person of ordinary skill in the art to make and use appellant's invention without undue experimentation.[*]

The decision of the board is *reversed*.

*Reversed.*

---

Molecular size is a function of molecular weight.

For example, heroin, LSD, and tetrahydrocannabinol all have molecular weights of between 300 and 400.

---

[*] The Solicitor has not seriously attempted to refute appellant's positions on the enablement questions raised by the board and the examiner, on the proper interpretations of the references, or on the applicability of the references to the practice of the claimed invention. Instead, the Solicitor raises a new argument by challenging the *operability* of the invention in removing antigens or haptens from whole blood. However, it is well settled that, on appeal to this court, the Solicitor cannot raise a new ground of rejection or apply a new rationale to support the rejection affirmed by the board. In re Armbruster, 512 F.2d 676, 185 USPQ 152 (CCPA 1975). Even if we were to consider the Solicitor's new argument, we would have to reject it, because the Solicitor has shown no reason for doubting appellant's statements, in his specification, that the process will remove material from whole blood as stated. Indeed, the references cited by the Solicitor which show antibodies removing antigens or haptens from serum are convincing that appellant's process will operate with whole blood.

189

GENE-CEN 083

Exhibit OO
Page 1499

SCIENCE

# Curing Disease With Genes

Ever since scientists began tinkering with genes, they have promised that they would cure genetic diseases ranging from diabetes to dwarfism. Last week, they began to make good on that promise. Researchers at the University of California, Los Angeles, disclosed that they had successfully transferred genes for the first time into living animals—in this case, mice. "This technique will allow us to treat genetic diseases and insert desirable genes into plants and animals," predicts Martin J. Cline, who led the research team. "The possibilities are enormous."

The UCLA experiment exploited the technology of recombinant DNA, which enables researchers to transfer genes from one organism to another (NEWSWEEK, March 24); heretofore, it has been accomplished only in cell cultures. In the first step, biologists Cline, Howard Stang, Karen Mercola, Winston Salser and others isolated genetic material from mice, including the gene that confers resistance to an anti-cancer drug. The scientists extracted many copies of this gene and mixed them with calcium to produce tiny gene-containing crystals. The microcrystals were then mixed with bone-marrow cells from other mice. Some of the new cells engulfed the microcrystals and consequently picked up the trait of drug resistance. These hybrid cells were then injected into the veins of compatible mice. Finally, the scientists ran tests to prove that the new gene was working in the bone-marrow cells.

The first spin-off of the research will probably come in cancer therapy. Methotrexate, a common chemotherapy drug, kills tumors but also weakens the patient by destroying bone-marrow cells. Since bone marrow is responsible for producing blood cells, patients undergoing chemotherapy commonly suffer blood deficiencies. Now that scientists can perform gene therapy in mice, Cline says, they should

theoretically be able to do it in cancer patients. Patients might be given the gene for methotrexate resistance in their bone-marrow cells. Then the drug would kill cancerous tissue without harming healthy tissue or impairing blood production. "If



*Cline, Mercola: A hope for cancer therapy*

Lester Sloan—Newsweek

we could increase the resistance of cancer patients to these toxic side effects," Cline says, "we might be able to increase the use of methotrexate two- to fourfold."

More sophisticated gene therapy, however, depends on resolving some unanswered biological questions. Scientists do not know, for instance, exactly where in the bone-marrow cell the gene ends up. Does it

correctly enter the right chromosome, a string of hereditary material that contains genes, or does it simply float around in the cell? Getting it to the right place "presents numerous problems," warns Richard Axel of Columbia University, a pioneer in mammalian-gene transfer. For one thing, a free gene is easy to lose—it might simply leak out of the cell. More serious, a gene outside the chromosomes isn't subject to normal genetic regulation. Without such regulation the gene might run wild, producing a surplus of products as dangerous as a deficit. In addition, even if an inserted healthy gene winds up in the chromosome of the defective gene it is meant to replace, there is no guarantee that it will work.

**Brave New World:** The UCLA scientists are confident that such technical puzzles will be solved. When they are, two natural targets for gene therapy are sickle-cell anemia and thalassemia, blood diseases that arise from defects in single genes. Since mice have now been shown to accept foreign genes into their marrow cells, human patients with defective blood cells might do the same. Doctors would insert two genes linked together, one to correct the defect and one to confer resistance to a toxic drug. If the defective cell does not accept the genes, it would be killed by the drug. If the cell does accept the genes—thus becoming cured—it would also resist the drug. Since only these healthy cells could survive, the treatment would produce a whole population of normal blood cells. The same technique might eventually be used to insert the gene for insulin in diabetics and the gene for growth hormone in patients with dwarfism. When scientists take these steps, the brave new world of gene therapy will have arrived.

SHARON BEGLEY with bureau reports

---

TRANSITION

**EXPECTING:** Julie Nixon Eisenhower, 31, and David Eisenhower, 32, their second child and former President Nixon's third grandchild; next October. The couple now have a 1-year-old daughter, Jennie.

**DIED:** Kay Medford, 59, comic actress of stage and films, of cancer; in New York City, April 10. A critic panning a Broadway play took pains to compliment Medford as "a comedienne with the funniest drooping mien since Zasu Pitts," and indeed, the gravelly-voiced actress often received favorable notice even when the shows failed. Among her memorable roles in hits: playing Barbra Streisand's mother in "Funny

Girl" both on Broadway and in the film (the movie role won her an Oscar nomination) and Dick Van Dyke's mother in the stage version of "Bye Bye Birdie." "Sure, there's plenty of action in these mama roles," she once said. "But I've never even been a bride."

**John Collier,** 78, British-born writer, of a stroke; in Pacific Palisades, Calif., April 6. A master of the macabre, Collier was best known for his prize-winning collection of short stories, "Fancies and Goodnights." He also wrote a number of fanciful novels, major screenplays including "I Am a Camera" and "The African Queen" (for which

Richard Axel, et al.
Serial No. 124,513
Group Art Unit 172

EXHIBIT D

Malcolm Braly, 54, ex-convict and acclaimed novelist, from injuries suffered in an automobile accident; in Baltimore, April 7. Braly served a total of eighteen years in prison, mostly on charges of robbery. He took a hard, unsentimental view of prison life and wrote of the experience with gritty detail, but without a tone of self-indulgence. His book "On the Yard" was hailed by Kurt Vonnegut as "the great GENENCEN 083159 prison novel."

NEWSWEEK/APRIL 21, 1980



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/124,513 | 02/25/80 | AXEL                          R | |

JOHN P. WHITE
COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 ROCKEFELLER PLAZA
NEW YORK, NY 10020

| EXAMINER |
|---|
| KEPPLINGER, E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 172 | 9 |

DATE MAILED: 02/08/82

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined. ☑ Responsive to communication filed on _11/9/81_ ☐ This action is made final.

A shortened statutory period for response to this action is set to expire __3__ month(s), ~~days~~ from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**
1. ☑ Notice of References Cited by Examiner, PTO-892
2. ☐ Notice of Informal Patent Drawing, PTO-948
3. ☐ Notice of References Cited by Applicant, PTO-1449
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ _____

**Part II  SUMMARY OF ACTION**
1. ☑ Claims _1-9, 12-21, 23-54, 57-90, 93-116, 118, 119, 124, 125_ are pending in the application.
   Of the above, claims _43,44, 79,80, 111,112, 124, 125_ are withdrawn from consideration.
2. ☐ Claims _____ have been cancelled.
3. ☐ Claims _____ are allowed.
4. ☑ Claims _1-9,12-21,23-42, 45-54, 57-78, 81-90, 93-110, 113-116, 118 and 119_ are rejected.
5. ☐ Claims _____ are objected to.
6. ☐ Claims _____ are subject to restriction or election requirement.
7. ☐ The formal drawings filed on _____ are acceptable.
8. ☐ The drawing correction request filed on _____ has been ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has
   ☐ been received. ☐ not been received. ☐ been filed in parent application, serial no. _____
   filed on _____
10. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
11. ☐ Other

PTOL-326 (rev. 7-79)

GENE-CEN 083160

EXAMINER'S ACTION

119 are rejected under 35 USC 112, first paragraph, as based on a specification which is non-enabling for reasons of record.  Applicants urge that although recovery of β-globin is not shown, one skilled in the art would expect production of the protein based the formation of the mRNA.  That merely shows transcription, not translation and translation is not assured.  For example, a function ribosome binding site may not be present.  Production of the protein is not shown. Applicants further urge that thymidine kinase is shown to be produced and recovered.  Thymidine kinase, however, is the *coding for a selectable phenotype while the claims recite* protein produced by the DNA recovery of the protein from DNA I.  Thus, it is not shown.

Applicants point to two references, Lai et al and Graf et al, as evidence that others used applicants' method to produce protein.  Those references show the DNA mediated co-transformation of cells using the method of Wigler et al. It is not clear, however, that the use of different cells as transformants could result in protein formation in the references but not in the specification.  Moreover, it is not clear that the eucaryotic cells perform the extra steps such as glycosylation on the proteins to form interferon, for example.

13.  Claims 28-30, 67 and 70 are rejected under 35 USC 102 as fully met by either Wacker reference.  Applicants urge that the instant claims are not directed to fused cells.  The claims merely recite a eucaryotic cell which contains foreign DNA which  codes for protein and is not selectable.  That is shown by Wacker.

14.  Claims 1-9, 12-21, 23-42, 45-54, 57-78, 81-90, 93-110, 113-116, 118  and 119 are rejected under 35 USC 103 as unpatentable over Lai et al who teach the cotransformation of mouse cells with unliked ovalbumin gene



GENE-CEN 083161

Exhibit OO
Page 1502

incorporated into the chromosomal DNA with recovery of the protein formed. The use of the genes for other proteins and other selectable characteristics would be obvious. Purification and use of calcium phosphate are conventional in genetic engineering and would be obvious. This insertion of multiple copies of the foreign DNA is shown and to use multiple copies of the selectable gene would be obvious. Applicants present a declaration under 37 CFR 1.131 to remove Lai et al as a reference. The publications used as evidence of reduction to practice show in all cases that more than the instant three inventors reduced the invention to practice. They do not show that the present inventive entity made the invention and thus the declaration is insufficient. Disclaiming affidavits from all non-inventors are necessary. Moreover, none of the articles show the production of the DNA I so that aspect of the invention does not have basis in the article, and thus may have an effective date only of the filing date. In regard to the Pellicer et al article (PNAS, 77(4, 2098(1980)), it is not clear how applicants arrived at the date of December 31, 1979. January 10, 1980 is the only verified date and it is not clear when in January Lai et al was published.

14.   Claims 25-30, 65-68, 70, 81--97, 100-110 are rejected under 35 USC 103 as unpatentable over Mantei et al for reasons of record. Applicants urge that the use of linked DNA as in Mantei et al is patentably distinct from the instant claims. The cells after transformation, however, do not appear to be different regardless of whether the DNA used was linked or unlinked. Moreover, claims 81+ recite the use of linked DNA. Applicants declaration under 37 CFR 1.131 is insufficient, as set forth above, because disclaiming affidavits from the co-authors are necessary.

GENE-CEN 083162

164

Exhibit OO
Page 1503

are rejected under 35 USC 102 as anticipated by Wigler et al (w), Wigler et al (v) or Wigler et al (x). Applicants declaration under 37 CFR 1.131 is insufficient. Disclaiming affidavits fron all co-authors are required to remove the references. See MPEP 715.01(c).

16. Claims 3-8, 13, 15, 24, 30-42, 47-52, 57, 59, 69, 71-78, 115, 116 and 119 are rejected under 35 USC 103 as unpatentable over Wigler et al (w), (v) or (x) for reasons of record. Disclaiming affidavits from all co-authors are required. See MPEP 715.01(c).

17. Claims 1, 2, 9, 12, 14, 16-18, 23, 25-29, 45, 46, 53, 54, 58, 60, 61, 64-68, 70, 113, 114 and 118 are rejected under 35 USC 102 as fully met by Wold et al. Disclaiming affidavits from the co-authors who are not inventors are required. See MPEP 715.01(c).

18. Claims 3-8, 13, 15, 19-21, 24, 30-42, 47-52, 57, 59, 62, 63, 69, 71-78, 115, 116 and 119 are rejected under 35 USC 103 as unpatentable over Wold et al for reasons of record. In order to remove the reference, disclaiming affidavits from all co-authors who are not inventors are required. See MPEP 715.01(c).

19. Wahl et al, newly cited, show gene amplification by increasing concentrations of a selective agent. Miller et al show calcium phosphate treatment increases transformation efficiency.

20. The specification is objected to as non-enabling because it would not enable one to practice the invention without undue experimentation. No details or examples are given to show how to perform the invention

EKEPPLINGER:hm
703/557-3685
1/26/82

165

ESTHER M. KEPPLINGER
PRIMARY EXAMINER

GENE-CEN 083163

Exhibit OO
Page 1504

TO SET A · · · · · · AND BOTTOM EDGES, SNAP - A · · · · · CARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | SERIAL NO. 124513 | GROUP ART UNIT 172 | ATTACHMENT TO PAPER NUMBER | 9 |
|---|---|---|---|---|---|---|
| NOTICE OF REFERENCES CITED | | | APPLICANT(S) 1/22 *Axel et al.* | | | |

### U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| A | | | | | | | |
| B | | | | | | | |
| C | | | | | | | |
| D | | | | | | | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |
| I | | | | | | | |
| J | | | | | | | |
| K | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| L | | | | | | | | | |
| M | | | | | | | | | |
| N | | | | | | | | | |
| O | | | | | | | | | |
| P | | | | | | | | | |
| Q | | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | Wahl et al, J. Biol. Chem., 254(17), 8679-8689 (Sept. 10, 1979). |
| S | Anderson et al, Scientific American, 245(1), July 1981, 106-121. |
| T | Fox, C & E News, 35, 36, 42 Sept. 29, 1980. |
| | Marx, Science, 208, 386-387, April 1980. |
| U | Begley, Newsweek, 80, April 21, 1980. |
| | Miller et al, PNAS 75(7), 3346-3350 (1978). |

| EXAMINER E. M. Kepplinger | DATE 1/22/82 |
|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

GENE-CEN 083164

166



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124,513 | 2/25/80 | AXEL | |

| EXAMINER |
|---|
| E. Kepplinger |

| ART UNIT | PAPER NUMBER |
|---|---|
| 172 | 10 |

DATE MAILED:

### EXAMINER INTERVIEW SUMMARY RECORD

All participants (applicant, applicant's representative, PTO personnel):

(1) John White _____    (3) _____

(2) _____    (4) _____

Date of interview  2/23/82 and 2/27/82

Type: ☑ Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:   ☐ Yes   ☑ No.   If yes, brief description: _____

_____

Agreement   ☐ was reached with respect to some or all of the claims in question.   ☑ was not reached.

Claims discussed:  all

Identification of prior art discussed:  Lai, Mantei and Wigler (W) (V), and (x),
and Wold

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:  I indicated that
since the references co-authored by applicants and additional authors
provide evidence that others contributed to the invention, more evidence
is required to eliminate those additional people. Evidence of conception by
applicant and description of what each person did or disclaiming affidavits
from the co-authors of W, V, X and Wold who are not inventors would obviate the

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

Unless the paragraphs below have been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1—7 on the reverse side of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview.

☐ It is not necessary for applicant to provide a separate reocrd of the substance of the interview.

☐ Since the examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.

81-3679 PTOL-413 (rev. 1-81)   169   Examiner's Signature

Page 1

GENE-CEN 083165

Exhibit OO
Page 1506

D17668-A JPW

# 11

4/30/82

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:    Richard Axel, et al.

Serial No.:    124,513           Examiner:  Esther Kepplinger

Filed     :    February 25, 1980   Group Art Unit:  172

For       :    PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
               AND FOR PRODUCING PROTEINACEOUS MATERIALS

                                30 Rockefeller Plaza
                                New York, New York  10112

                                28 April 1982

Honorable Commissioner of Patents
   and Trademarks
Washington, D.C.   20231

Sir:

### FIRST REQUEST FOR A ONE MONTH EXTENSION OF TIME

It is respectfully requested that the period for filing a response to the February 8, 1982 Official Action issued in connection with the subject application, now set to expire May 8, 1982, be extended one month so as to expire June 8, 1982.

This is the first request for an extension of time for filing a response to the February 8, 1982 Official Action; it is not anticipated that another request will be submitted.

After the February 8, 1982 Official Action was received, a letter reporting on the Action, together with copies of the Official Action, was mailed to applicants.  Subsequently, applicants' undersigned attorney conferred with applicants by telephone and in person.  Moreover, on April 20, 23 and 27, applicants' undersigned attorney conferred with the Examiner handling the application in an effort to clarify certain issues.  In view of the numerous issues which exist, applicants and applicants' attorney require additional time to confer so as to be able to prepare a complete response to the Official Action.

GENE-CEN 083166

Exhibit OO
Page 1507

It is therefore requested that a one month extension of the deadline for filing a response, from May 8, 1982 to June 8, 1982, be favorably considered and granted.

Respectfully submitted,

John P. White
Reg. No. 28,678
Attorney for Applicants

(212) 977-9550

APPROVED

APR 29 1982

RUTH W. LYLES
S.P.A.

-2-

GENE-CEN 083167

Exhibit OO
Page 1508

D17668-A JPW

RECEIVED

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

JUN 7 1982
PAT. & TRADE MARK OFF.

JUN 9 1982

GROUP 170

Applicants:   Richard Axel, et al.

Serial No.:   124,513                          Examiner:  Esther M. Kepplinger

Filed     :   February 25, 1980         Group Art Unit:  172

For       :   PROCESSES FOR INSERTING DNA INTO
              EUCARYOTIC CELLS AND FOR PRODUCING
              PROTEINACEOUS MATERIALS

                                        30 Rockefeller Plaza
                                        New York, New York  10112

                                        7 June 1982

Honorable Commissioner of Patents
    and Trademarks
Washington, D.C.  20231

SIR:

                          AMENDMENT

        This Amendment is submitted in response to the
February 8, 1982 Official Action issued in connection with the
above-identified application.   A response to that Official
Action is presently due no later than June 8, 1982.  Please amend
the subject application as follows:


IN THE SPECIFICATION:

        On page 1, after the title, insert the following:

        The invention described herein was made in the
course of work under grants numbers CA-23767 and CA-76346 from
the National Institutes of Health, Department of Health and
Human Services.


IN THE CLAIMS:

        Cancel claims 28-30, 38, 67-70, 74, 115, 116 and 119.

GENE-CEN 083168

Exhibit OO
Page 1509

Further amend claim 1 as follows:

1(twice amended).  A process for inserting foreign DNA I into a suitable eucaryotic cell which comprises cotransforming said eucaryotic cell with said foreign DNA I and with unlinked foreign DNA II which codes for a selectable phenotype not expressed by said eucaryotic cell, said cotransformation being carried out under suitable [in a suitable medium and in the presence of selective] conditions permitting survival or identification of eucaryotic cells which have acquired said selectable phenotype, said foreign DNA I being incorporated into the chromosomal DNA of said eucaryotic cell.

Further amend claim 23 as follows:

28(twice amended).  A process for inserting purified foreign DNA I coding for proteinaceous material which is not associated with a selectable phenotype into a suitable eucaryotic cell which comprises cotransforming said eucaryotic cell with said foreign DNA I [coding for proteinaceous material which is not associated with a selectable phenotype] and with [physically] unlinked foreign DNA II coding for proteinaceous material which is associated with a selectable phenotype, said cotransformation being carried out under suitable [in the presence of selective] conditions permitting survival or identification of eucaryotic cells which have acquired said selectable phenotype, said foreign DNA I being incorporated into the chromosomal DNA of said eucaryotic cell.

Amend claim 35 as follows:

22
35(amended).  A process for producing a foreign proteinaceous material which comprises cotransforming a eucaryotic cell [with foreign DNA I coding for said proteinaceous

-2-

GENE-CEN 083169

Exhibit OO
Page 1510

material] in accordance with the process of Claim 1, culturing or cloning <u>said cotransformed eucaryotic cell under suitable</u> [selective] conditions to [produce] <u>yield</u> a multiplicity of eucaryotic cells <u>producing said foreign proteinaceous material</u> [derived therefrom] and recovering said proteinaceous material from [the] <u>said</u> eucaryotic cells [so produced].

Amend claim 39 as follows:

39(amended).  A process for producing proteinaceous material which is not associated with a selectable phenotype which comprises cotransforming a eucaryotic cell with foreign DNA I coding for said proteinaceous material in accordance with the process of claim 23, culturing or cloning said cotransformed eucaryotic cell <u>under suitable</u> [in the presence of said selective] conditions to produce a multiplicity of eucaryotic cells derived therefrom, and recovering said proteinaceous material from the eucaryotic cells so produced.

Amend claim 45 as follows:

45(amended).  A process for inserting a multiplicity of foreign DNA I molecules corresponding to multiple copies of a gene coding for a proteinaceous material into a <u>suitable</u> eucaryotic cell which comprises cotransforming said eucaryotic cell with said multiplicity of foreign DNA I molecules and with a multiplicity of unlinked <u>foreign</u> DNA II molecules coding for a selectable phenotype not expressed by said eucaryotic cell, said cotransformation being carried out [in a suitable medium and in the presence of an agent] <u>under suitable conditions</u> permitting survival or identification of eucaryotic cells which have acquired said multiplicity of genes coding for said selectable phenotype.

-3-

GENE-CEN 083170

Amend claim 71 as follows:

71(amended).   A  process  for  producing  a foreign proteinaceous material which comprises cotransforming a eucaryotic cell [with a multiplicity of foreign DNA I molecules coding for said proteinaceous material] in accordance with the process of claim 45, maintaining said cotransformed eucaryotic cell under suitable conditons to [enable said foreign DNA I to be transcribed to form complementary RNA and said complementary RNA so formed to be translated to] produce said foreign proteinaceous material, and recovering said proteinaceous material so produced.

Amend claim 75 as follows:

75(amended).   A process for producing proteinaceous material which comprises cotransforming a eucaryotic cell with a multiplicity of foreign DNA I molecules coding for said proteinaceous material in accordance with the process of claim 45, culturing or cloning said cotransformed eucaryotic cell under suitable conditions [in the presence of said agent] permitting survival or identification of eucaryotic cells which have acquired said multiplicity of genes coding for said selectable phenotype to produce a multiplicity of eucaryotic cells derived therefrom, and recovering said proteinaceous material from the eucaryotic cells so produced.

Amend claim 81 as follows:

Change the last four words from "in a suitable medium" to under suitable conditions.

Further amend claim 113 as follows:

113(twice amended).   A process for cotransforming a suitable eucaryotic cell which comprises transforming under

GENE-CEN 083171

Exhibit OO
Page 1512

suitable conditions said eucaryotic cell with foreign DNA I and with foreign DNA II, said DNA I and DNA II being unlinked and said DNA II coding for a selectable phenotype not expressed by said eucaryotic cell prior to cotransformation.

---

<u>REMARKS</u>

This Amendment and the accompanying SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131 annexed hereto as Exhibits A-C are submitted in response to the February 8, 1982 Official Action issued in connection with the subject application.

Before proceeding, applicants' undersigned attorney wishes to thank the Examiner for the courtesy extended during a telephone interview in which the Examiner clarified the bases for several of her rejections. Applicants herein attempt to respond to the specific comments and suggestions made by the Examiner and believe that this Amendment, together with the accompanying SUPPLEMENTAL DECLARATION, should place the application in condition for allowance.

Applicants now turn to the specific grounds for rejection set forth in the February 8 Official Action. In paragraph 12 of the Official Action, the Examiner rejected claims 31-42, 71-78, 103-110, 115, 116 and 119 under 35 U.S.C. §112, first paragraph, as allegedly based upon a non-enabling specification because only production of thymidine kinase, not protein encoded by DNA I, is shown.

-7-

GENE-CEN 083172

Exhibit OO
Page 1513

With respect to claims 35-38 and 71-74, applicants have cancelled claims 38 and 74 and have amended claims 35 and 71. As so amended, claims 35 and 71 and the claims dependent thereon, 36-37 and 72-73, respectively, do not require that the protein which is produced be encoded by DNA I. Thus, claims 35-37 and 71-73 as amended cover production and recovery of thymidine kinase which, as the Examiner acknowledged in the Official Action, is disclosed.

Applicants therefore request that the Examiner reconsider the rejection in so far as it concerns amended claims 35-37 and 71-73.

With respect to claims 31-34, 39-42, 75-78 and 103-110, applicants direct the Examiner's attention to the Lai, et al and Graf, et al references, U and WW, respectively. These references show that as of applicants' 25 February 1980 filing date, persons skilled in the art knew that protein encoded by DNA I could be produced using applicants' claimed process and had done so.

Thus, in reference U, Lai et al report "the transformation of mouse LMTK⁻ cells with the chromosomal ovalbumin gene by using this DNA-mediated gene transfer system", referring to Wigler, et al., Cell, Vol. 16, pp 777-785 (1979), reference V herein, corresponding to the "First Series of Experiments" on pages 22-35 of the specification. The Examiner's suggestion that Lai, et al used different cells is not supported by the facts. Lai, et al identify one of two strains of mouse LMTK⁻ cells used as being generously provided by R. Axel, Columbia University (see pages 244 and 248).

GENE-CEN 083173

Similarly, Graf, et al report that they used the transformation system of Wigler, et al to produce the protein hypoxanthine phosphoribosyltransferase as confirmed by enzymatic activity in extracts of transformed cells.  Graf, et al's mouse cell line LMTK⁻ was provided by S. Silverstein (see page 1032). Moreover, Graf, et al in acknowledgements on page 1043 thank Michael Wigler and Angel Pellicer for their help in the initial tk transformation experiments.

In view of the foregoing, applicants maintain that their specification would and did enable persons skilled in the art to produce and recover protein encoded by DNA I.  Applicants therefore maintain that their disclosure is enabling and request that the Examiner reconsider the rejection under 35 U.S.C. § 112, first paragraph.

In this regard, applicants direct the Examiner's attention to the recent decision of the Court of Customs and Patent Appeals in In re Strahilevitz, 212 USPQ 561 (1982).  A copy of this decision in which the pertinent portions are highlighted is annexed hereto as Exhibit D.

As clearly indicated in this decision, the Patent Office has the burden of proof in calling into question the enablement of a disclosure and must advance acceptable reasoning inconsistent with enablement.  As further indicated therein, examples are not required to satisfy section 112, first paragraph.  Finally, as stated therein, the dispositive issue is whether the disclosure, considering the level of skill in the art as of the date of the application, would have enabled a person of such skill to make and use the invention without undue

GENE-CEN 083174

experimentation. As stated on page 364 of this decision, first full paragraph, an applicant may properly rely on literature citations to establish both the level of skill in the art and the fact that the techniques necessary to practice the invention are known in the art. In view of the prior publication dates of the Lai, et al and Graf, et al references, applicants maintain that this dispositive issue must clearly be resolved in their favor since others skilled in the art had already made and used their invention without undue experimentation as of applicants' February 25, 1980 filing date.

With respect to claims 115, 116 and 119, applicants maintain that the Examiner's rejection of these claims on the ground that it is allegedly not clear that eucaryotic cells perform the extra steps such as glycosylation on the proteins to form interferon, for example, has been rendered moot. These claims have been cancelled in order to advance prosecution of the broader claims pending in this application. However, such cancellation is made without prejudice to applicants' right to present these claims at a future time in any continuation or other related application which may be filed.

In paragraph 13 of the Official Action, the Examiner rejected claims 28-30, 67 and 70 under 35 U.S.C. § 102. In response, applicants have cancelled claims 28-30 and 67-70. The cancellation of additional claims 68-69 is deemed necessary for consistency.

The Examiner, in paragraph 14 of the Official Action, rejected claims 1-9, 12-21, 23-42, 45-54, 57-78, 81-90, 93-110, 113-116, 118 and 119 under U.S.C. § 103 on the ground that

GENE-CEN 083175

the invention claimed allegedly would have been obvious when made to one skilled in the art given the teachings of Lai, et al. The Examiner referred to applicants' previously submitted Declaration Under 37 C.F.R. § 1.131, indicating that it is insufficient because the publications used as evidence of reduction to practice name coauthors in addition to applicants, and requiring that disclaiming affidavits from non-inventor, coauthors be submitted.

Based upon the telephone interview which was held between applicants' undersigned attorney and the Examiner, it is believed that agreement was reached that a sufficient declaration under 37 C.F.R. § 1.131 would be a basis for removing Lai, et al. as a reference since disclaimers are a permissible, but not mandatory, alternative to Rule 131 affidavits or declarations. Applicants therefore submit the accompanying SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131, annexed hereto as Exhibits A-C. This SUPPLEMENTAL DECLARATION explains the role of various non-inventor, coauthors and is sufficient to obviate any question concerning inventorship. Accordingly, applicants request that the Examiner remove Lai, et al as a reference and reconsider the rejection under 35 U.S.C. § 103.

In paragraph 13, the Examiner further noted that the articles relied upon to show production of protein from DNA I do not do so. Applicants have previously pointed out that the articles show production of thymidine kinase and have amended claims 35-37 and 71-73 to cover that embodiment of their invention which concerns production of protein generally. As to these claims, applicants again request reconsideration.

GENE-CEN 083176

Exhibit OO
Page 1517

As to those claims specifically directed to production of protein from DNA I, applicants' accompanying SUPPLEMENTAL DECLARATION, read in conjunction with the record in this case, shows that applicants conceived their invention prior to the January 1980 publication date of the Lai, et al article. Applicants exercised diligence from at least as early as December 1979 until the February 25, 1980 filing date of the subject application.  Accordingly, Lai, et al should also be removed as a reference as to claims directed to production of protein from DNA I.

In regard to Pellicer, et al., PNAS 77:2098-2102, April 1980, the Examiner indicated that it was not clear how Applicants arrived at the date of December 31, 1979 since January 10, 1980 was the only verified date.  In response, applicants point out that January 10, 1980 is the date the manuscript is acknowledged by the journal as having been communicated.  Since it obviously required at least 10 days to compile the experimental results and prepare the manscript, it is reasonable that the experiments were completed at least as early as December 31, 1979 and applicants have so declared pursuant to 37 C.F.R. § 1.131.  The significance of these dates or of the precise date in January when Lai, et al was published is not apparent to applicants since the protein whose production is shown in Pellicer, et al is thymidine kinase, production of which was demonstrated in earlier experiments involving selection of tk$^+$ cotransformants.

In view of the applicants' arguments and the accompanying SUPPLEMENTAL DECLARATION, they respectfully request that the Examiner remove Lai, et al as a reference and reconsider the rejection of claims over Lai, et al.



GENE-CEN 083177



Exhibit OO
Page 1518

In paragraph 14, the Examiner rejected claims 25-30, 65-68, 70, 81-97 and 100-110 under 35 U.S.C. § 103 over Mantei, et al. Once again, the Examiner required disclaiming affidavits from noninventor, coauthors. Applicants request that, in view of their accompanying SUPPLEMENTAL DECLARATION, the Examiner remove Mantei, et al as a reference and reconsider the rejection of claims over Mantei, et al.

In paragraphs 15, 16, 17 and 18, various subgroupings of claims were rejected under 35 U.S.C. § 102 or § 103 on the basis of references V, W, X or Y, each of which names applicants as coauthors.

In view of the accompanying SUPPLEMENTAL DECLARATION setting forth details concerning the roles of noninventor, coauthors and again pointing out that Y concerns transfomation, not cotransformation, applicants request that the Examiner remove V, W, X and Y as references and reconsider the rejections based upon these references.

Applicants have noted the additional references cited, but not applied, by the Examiner, including the four references which were called to the Examiner's attention in applicants' communication filed on November 11, 1981.

Applicants have also noted the Examiner's objection to the specification. For reasons set forth hereinabove and in the In re Strahilevitz case annexed hereto as Exhibit D, applicants again request that the Examiner reconsider.

-11-
18

GENE-CEN 083178

Finally, applicants, in order to more clearly, accurately and patentably define their invention, have made a number of minor amendments in various claims.  These amendments do not involve new matter, do not require a new search, and are fully supported by the specification.  Also, in order to clarify the interest of the U.S. Government in the application, an amendment for this purpose has been made at the beginning of the specification.

In conclusion, applicants maintain that the claims now pending in this application accurately and patenably define their invention and are patentably distinguishable over the prior art, particularly in view of the accompanying SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131.  Accordingly, applicants request that the Examiner reconsider the various grounds for rejection and objection set forth in the outstanding February 8, 1982  Official Action and earnestly solicit allowance of the claims now pending.

If a telephone interview would be of assistance in advancing prosecution of the application, applicants' undersigned attorney invites the Examiner to telephone him at the number provided.

No fee is deemed necessary in connection with this Amendment.  If a fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Reg. No. 28,678
Attorney for Applicants
212-977-9550

**GENE-CEN 083179**

Exhibit OO
Page 1520

D17668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:  Richard Axel, et al.

Serial No.:  124,513          Examiner:  Esther M. Kepplinger

Filed     :  February 25, 1980  Group Art Unit:  172

For       :  Processes for Inserting DNA Into Eucaryotic
             Cells and For Producing Proteinaceous Materials

Honorable Commissioner of Patents
  and Trademarks
Washington, D.C.   20231

SIR:

SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131

noted
Emk
8/20/82

        We, RICHARD AXEL, MICHAEL H. WIGLER and SAUL J.

SILVERSTEIN, declare as follows:


        1.  We are the RICHARD AXEL, MICHAEL H. WIGLER and

SAUL J. SILVERSTEIN who are named as applicants on the above-

identified patent application.


        2.  We previously submitted a DECLARATION UNDER 37

C.F.R. § 1.131 signed by us on November 2, November 1 and

November 3, 1981, respectively.


        3.  We have read the Official Action issued in

connection with the subject application on February 8, 1982. We

understand from the Official Action and from our attorney, Mr.

John P. White, that the Patent Office Examiner handling our

application requires additional information concerning the

respective roles of persons named as coauthors, including our-

selves, on certain cited references as follows:


Richard Axel
Serial No. 124,513
Group Art Unit 172

EXHIBIT A

**GENE-CEN 083180**

Exhibit OO
Page 1521

| Reference | Coauthors |
|---|---|
| V: <u>Cell</u>, Vol. 16, pp 777-785, April 1979 | Wigler, Michael<br>Sweet, Raymond<br>Sim, Gek Kee<br>Wold, Barbara<br>Pellicer, Angel<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |
| W: <u>Eucaryotic Gene Regulation, Proc. ICN-UCLA Symposium,</u> R. Axel and T. Maniatis, editors, Academic Press, pp 457-475, December 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| X: <u>PNAS</u>, Vol. 76, pp 1373-1376, March 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| Y: <u>PNAS</u>, Vol. 76, pp 5684-5688, November 1979 | Wold, Barbara<br>Wigler, Michael<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |

-2-

GENE-CEN 083181

4.   The invention described and claimed in the subject application was conceived solely by the three of us at least as early as January 8, 1979.

5.   Subsequent to and in accordance with our conception, one of us, MICHAEL H. WIGLER, personally and solely conducted the first experiments reducing the invention to practice.  These experiments which were carried out in the United States involved cotransformation of mouse Ltk⁻ cells with ΦX174 DNA and with the tk gene.  These experiments are described in reference V at pages 777-781.  The manuscript which was eventually published as reference V was received by Cell initially on January 8, 1979 and in revised form on January 29, 1979 (see page 785 of reference V).  Therefore, it is clear that an actual reduction to practice occurred at least as early as January 8, 1979.

6.   After the ΦX cotransformation experiments were performed, MR. RAYMOND SWEET, a postdoctoral student who had experience with the technique of blot hybridization, was provided samples of cotransformed cells and asked to confirm that the ΦX DNA was present in them.  MR. SWEET did so.  He later did confirmatory blot hybridizations on samples cotransformed with other DNAs.  On the basis of these blot hybridizations, MR. SWEET was named as a coauthor on references V and W.

7.   In order to confirm the generality of the cotransformation discovery, two other postdoctoral students, MS. GEK KEE SIM and MS. BARBARA WOLD, working in the laboratory and under direction of one of us, RICHARD AXEL, successfully cotransformed mouse cells with pBR322 DNA and with the rabbit β major globin

-3-

GENE-CEN 083182

Exhibit OO
Page 1523

gene, respectively.  Each used the same method as that used in the ΦX cotransformation.  MS. SIM and MS. WOLD were then named as coauthors on references V and W.

8.  During the course of the experiments subsequent to the ΦX experiments, MR. ANGEL PELLICER, another postdoctoral student in the laboratory of one of us, RICHARD AXEL, provided the persons who were actually conducting the experiments with practical advice concerning certain of the laboratory techniques employed.  MR. PELLICER was named as a coauthor on references V, W and X.

9.  In order to carry out experiments with the globin gene, we obtained the gene from MS. ELIZABETH LACY and MR. TOM MANIATIS.  MR. MANIATIS was a professor at the California Institute of Technology and MS. LACY was working in his laboratory.  Because MS. LACY and MR. MANIATIS provided the globin gene, they were named as coauthors on references V, W and Y.

10. In order to confirm the generality of the earlier work involving transformation, not cotransformation, experiments were carried out using the aprt gene as the selectable marker.  Assays to confirm the presence of the enzyme aprt in transformed cells were carried out in the laboratory of MR. LAWRENCE CHASIN by MS. GAIL URLAUB.  MR. CHASIN and MS. URLAUB were then named as coauthors on reference X.  However, as stated in paragraph 10 of our previous DECLARATION, these experiments are not described in the subject application and do not relate to cotransformation.



GENE-CEN 083183

Exhibit OO
Page 1524

11. With respect to the four references cited by the Examiner, V, W, X and Y, we, RICHARD AXEL, MICHAEL H. WIGLER, and SAUL J. SILVERSTEIN, are the only persons named as coauthors on all the references.

12. In summary, we alone conceived the invention described and claimed in the subject application at least as early as January 8, 1979. Subsequently, one of us, MICHAEL H. WIGLER, successfully cotransformed eucaryotic cells in the United States.  We then actually showed that the cotransformed cells produced protein (thymidine kinase).  Others [Mantei, et al. (reference T) and Lai, et al. (reference U)] actually showed that cells cotransformed by our method produced protein encoded by the cotransforming DNA not associated with the selectable marker; and we constructively did so by filing the subject patent applicaton.

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any patent issuing thereon.

_____6/4/82_____
Date

_____Richard Axel_____
RICHARD AXEL

_____
Date

_____
MICHAEL H. WIGLER

_____
Date

SAUL J. SILVER GENE·CEN 083184

-5- 208

Exhibit OO
Page 1525

D17668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:  Richard Axel, et al.

Serial No.:  124,513          Examiner:  Esther M. Kepplinger

Filed     :  February 25, 1980  Group Art Unit:  172

For       :  Processes for Inserting DNA Into Eucaryotic
             Cells and For Producing Proteinaceous Materials

Honorable Commissioner of Patents
   and Trademarks
Washington, D.C.  20231

SIR:

<u>SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131</u>

          We, RICHARD AXEL, MICHAEL H. WIGLER and SAUL J. SILVERSTEIN, declare as follows:


          1.  We are the RICHARD AXEL, MICHAEL H. WIGLER and SAUL J. SILVERSTEIN who are named as applicants on the above-identified patent application.


          2.  We previously submitted a DECLARATION UNDER 37 C.F.R. § 1.131 signed by us on November 2, November 1 and November 3, 1981, respectively.


          3.  We have read the Official Action issued in connection with the subject application on February 8, 1982. We understand from the Official Action and from our attorney, Mr. John P. White, that the Patent Office Examiner handling our application requires additional information concerning the respective roles of persons named as coauthors, including our-selves, on certain cited references as follows:


          Richard Axel
          Serial No. 124,513
          Group Art Unit 172

          <u>EXHIBIT B</u>

GENE-CEN 083185

Exhibit OO
Page 1526

| Reference | Coauthors |
|---|---|
| V: *Cell*, Vol. 16, pp 777-785, April 1979 | Wigler, Michael<br>Sweet, Raymond<br>Sim, Gek Kee<br>Wold, Barbara<br>Pellicer, Angel<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |
| W: Eucaryotic Gene Regulation, Proc. ICN-UCLA Symposium, R. Axel and T. Maniatis, editors, Academic Press, pp 457-475, December 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| X: *PNAS*, Vol. 76, pp 1373-1376, March 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| Y: *PNAS*, Vol. 76, pp 5684-5688, November 1979 | Wold, Barbara<br>Wigler, Michael<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |

-2-

GENE-CEN 083186

4.   The invention described and claimed in the subject application was conceived solely by the three of us at least as early as January 8, 1979.

5.   Subsequent to and in accordance with our conception, one of us, MICHAEL H. WIGLER, personally and solely conducted the first experiments reducing the invention to practice.  These experiments which were carried out in the United States involved cotransformation of mouse Ltk⁻ cells with $\phi$X174 DNA and with the tk gene.  These experiments are described in reference V at pages 777-781.  The manuscript which was eventually published as reference V was received by Cell initially on January 8, 1979 and in revised form on January 29, 1979 (see page 785 of reference V).  Therefore, it is clear that an actual reduction to practice occurred at least as early as January 8, 1979.

6.   After the $\phi$X cotransformation experiments were performed, MR. RAYMOND SWEET, a postdoctoral student who had experience with the technique of blot hybridization, was provided samples of cotransformed cells and asked to confirm that the $\phi$X DNA was present in them.  MR. SWEET did so.  He later did confirmatory blot hybridizations on samples cotransformed with other DNAs.  On the basis of these blot hybridizations, MR. SWEET was named as a coauthor on references V and W.

7.   In order to confirm the generality of the cotransformation discovery, two other postdoctoral students, MS. GEK KEE SIM and MS. BARBARA WOLD, working in the laboratory and under direction of one of us, RICHARD AXEL, successfully cotransformed mouse cells with pBR322 DNA and with the rabbit β major globin

-3-

GENE-CEN 083187

gene, respectively. Each used the same method as that used in the ΦX cotransformation. MS. SIM and MS. WOLD were then named as coauthors on references V̲ and W̲.

8.   During the course of the experiments subsequent to the ΦX experiments, MR. ANGEL PELLICER, another postdoctoral student in the laboratory of one of us, RICHARD AXEL, provided the persons who were actually conducting the experiments with practical advice concerning certain of the laboratory techniques employed. MR. PELLICER was named as a coauthor on references V̲, W̲ and X̲.

9.   In order to carry out experiments with the globin gene, we obtained the gene from MS. ELIZABETH LACY and MR. TOM MANIATIS. MR. MANIATIS was a professor at the California Institute of Technology and MS. LACY was working in his laboratory. Because MS. LACY and MR. MANIATIS provided the globin gene, they were named as coauthors on references V̲, W̲ and Y̲.

10. In order to confirm the generality of the earlier work involving transformation, not cotransformation, experiments were carried out using the aprt gene as the selectable marker. Assays to confirm the presence of the enzyme aprt in transformed cells were carried out in the laboratory of MR. LAWRENCE CHASIN by MS. GAIL URLAUB. MR. CHASIN and MS. URLAUB were then named as coauthors on reference X̲. However, as stated in paragraph 10 of our previous DECLARATION, these experiments are not described in the subject application and do not relate to cotransformation.

-4-



GENE-CEN 083188

Exhibit OO
Page 1529

11. With respect to the four references cited by the Examiner, <u>V</u>, <u>W</u>, <u>X</u> and <u>Y</u>, we, RICHARD AXEL, MICHAEL H. WIGLER, and SAUL J. SILVERSTEIN, are the only persons named as coauthors on all the references.

12. In summary, we alone conceived the invention described and claimed in the subject application at least as early as January 8, 1979. Subsequently, one of us, MICHAEL H. WIGLER, successfully cotransformed eucaryotic cells in the United States.  We then actually showed that the cotransformed cells produced protein (thymidine kinase).  Others [Mantei, et al. (reference <u>T</u>) and Lai, et al. (reference <u>U</u>)] actually showed that cells cotransformed by our method produced protein encoded by the cotransforming DNA not associated with the selectable marker; and we constructively did so by filing the subject patent applicaton.

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any patent issuing thereon.

_____          _____
         Date                              RICHARD AXEL


_____          _____
         Date                            MICHAEL H. WIGLER


*06.02.82*
_____          _____
         Date                            SAUL J. SILVERSTEIN

GENE.CEN 083189

D17668-A JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:  Richard Axel, et al.

Serial No.:  124,513          Examiner:  Esther M. Kepplinger

Filed    :  February 25, 1980  Group Art Unit:  172

For      :  Processes for Inserting DNA Into Eucaryotic
            Cells and For Producing Proteinaceous Materials

Honorable Commissioner of Patents
   and Trademarks
Washington, D.C.   20231

*noted*
*Emk*
*8/20/82*

SIR:

SUPPLEMENTAL DECLARATION UNDER 37 C.F.R. § 1.131

     We, RICHARD AXEL, MICHAEL H. WIGLER and SAUL J.
SILVERSTEIN, declare as follows:


     1.  We are the RICHARD AXEL, MICHAEL H. WIGLER and
SAUL J. SILVERSTEIN who are named as applicants on the above-
identified patent application.


     2.  We previously submitted a DECLARATION UNDER 37
C.F.R. § 1.131 signed by us on November 2, November 1 and
November 3, 1981, respectively.


     3.  We have read the Official Action issued in
connection with the subject application on February 8, 1982. We
understand from the Official Action and from our attorney, Mr.
John P. White, that the Patent Office Examiner handling our
application requires additional information concerning the
respective roles of persons named as coauthors, including our-
selves, on certain cited references as follows:


          Richard Axel
          Serial No. 124,513
          Group Art Unit 172

          EXHIBIT C

GENE-CEN 083190

Exhibit OO
Page 1531

 

| Reference | Coauthors |
|---|---|
| **V:** <u>Cell</u>, Vol. 16, pp 777-785, April 1979 | Wigler, Michael<br>Sweet, Raymond<br>Sim, Gek Kee<br>Wold, Barbara<br>Pellicer, Angel<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |
| **W:** <u>Eucaryotic Gene Regulation, Proc. ICN-UCLA Symposium,</u> R. Axel and T. Maniatis, editors, Academic Press, pp 457-475, December 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| **X:** <u>PNAS</u>, Vol. 76, pp 1373-1376, March 1979 | Wigler, Michael<br>Pellicer, Angel<br>Silverstein, Saul<br>Axel, Richard<br>Urlaub, Gail<br>Chasin, Lawrence |
| **Y:** <u>PNAS</u>, Vol. 76, pp 5684-5688, November 1979 | Wold, Barbara<br>Wigler, Michael<br>Lacy, Elizabeth<br>Maniatis, Tom<br>Silverstein, Saul<br>Axel, Richard |

-2-

**GENE-CEN 083191**

4.    The invention described and claimed in the subject application was conceived solely by the three of us at least as early as January 8, 1979.

5.    Subsequent to and in accordance with our conception, one of us, MICHAEL H. WIGLER, personally and solely conducted the first experiments reducing the invention to practice.   These experiments which were carried out in the United States involved cotransformation of mouse Ltk⁻ cells with ΦX174 DNA and with the tk gene.   These experiments are described in reference V at pages 777-781.   The manuscript which was eventually published as reference V was received by Cell initially on January 8, 1979 and in revised form on January 29, 1979 (see page 785 of reference V).   Therefore, it is clear that an actual reduction to practice occurred at least as early as January 8, 1979.

6.    After the ΦX cotransformation experiments were performed, MR. RAYMOND SWEET, a postdoctoral student who had experience with the technique of blot hybridization, was provided samples of cotransformed cells and asked to confirm that the ΦX DNA was present in them.   MR. SWEET did so.   He later did confirmatory blot hybridizations on samples cotransformed with other DNAs.   On the basis of these blot hybridizations, MR. SWEET was named as a coauthor on references V and W.

7.    In order to confirm the generality of the cotransformation discovery, two other postdoctoral students, MS. GEK KEE SIM and MS. BARBARA WOLD, working in the laboratory and under direction of one of us, RICHARD AXEL, successfully cotransformed mouse cells with pBR322 DNA and with the rabbit β major globin

-3-

GENE-CEN 083192

Exhibit OO
Page 1533

gene, respectively.  Each used the same method as that used in the  ΦX cotransformation.  MS. SIM and MS. WOLD were then named as coauthors on references V and W.

8.  During the course of the experiments subsequent to the ΦX experiments, MR. ANGEL PELLICER, another postdoctoral student in the laboratory of one of us, RICHARD AXEL, provided the persons who were actually conducting the experiments with practical advice concerning certain of the laboratory techniques employed.  MR. PELLICER was named as a coauthor on references V, W and X.

9.  In order to carry out experiments with the globin gene, we obtained the gene from MS. ELIZABETH LACY and MR. TOM MANIATIS.  MR. MANIATIS was a professor at the California Institute of Technology and MS. LACY was working in his laboratory.  Because MS. LACY and MR. MANIATIS provided the globin gene, they were named as coauthors on references V, W and Y.

10. In order to confirm the generality of the earlier work involving transformation, not cotransformation, experiments were carried out using the aprt gene as the selectable marker.  Assays to confirm the presence of the enzyme aprt in transformed cells were carried out in the laboratory of MR. LAWRENCE CHASIN by MS. GAIL URLAUB.  MR. CHASIN and MS. URLAUB were then named as coauthors on reference X.  However, as stated in paragraph 10 of our previous DECLARATION, these experiments are not described in the subject application and do not relate to cotransformation.



GENE-CEN 083193

Exhibit OO
Page 1534

11. With respect to the four references cited by the Examiner, <u>V</u>, <u>W</u>, <u>X</u> and <u>Y</u>, we, RICHARD AXEL, MICHAEL H. WIGLER, and SAUL J. SILVERSTEIN, are the only persons named as coauthors on all the references.

12. In summary, we alone conceived the invention described and claimed in the subject application at least as early as January 8, 1979. Subsequently, one of us, MICHAEL H. WIGLER, successfully cotransformed eucaryotic cells in the United States. We then actually showed that the cotransformed cells produced protein (thymidine kinase). Others [Mantei, et al. (reference <u>T</u>) and Lai, et al. (reference <u>U</u>)] actually showed that cells cotransformed by our method produced protein encoded by the cotransforming DNA not associated with the selectable marker; and we constructively did so by filing the subject patent applicaton.

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the application or any patent issuing thereon.

---

Date                       RICHARD AXEL

June 3 1982
Date                       MICHAEL H. WIGLER

Date                       SAUL J. SILVERSTEIN

GENE-CEN 083194

-5-

Exhibit OO
Page 1535

File No. D17...   Client Columb... University



**IN THE UNITED STATES PATENT OFFICE**

RECEIVED

JUN 9 1982

In re application of:  Richard Axel et al.

Serial No.: 124,513                    Examiner: Esther Kepplinger

Filed: February 25, 1980               Group Art Unit: 172

For: PROCESSES FOR INSERTING DNA INTO
EUCARYOTIC CELLS AND FOR PRODUCING
PROTEINACEOUS MATERIALS

The Commissioner of Patents,                    7 June 1982
Washington, D. C. 20231.

Sirs:

Transmitted herewith is an amendment in the above-identified application.

☐ No additional fee is enclosed because this application was filed prior to October 25, 1965
(effective date of Public Law 89-83).

☒ No additional fee is required.

The fee has been calculated as shown below.

Claims as Amended

| (1) | (2) Claims remaining after amendment | (3) | (4) Highest number previously paid for | (5) Present extra | (6) Rate | (7) Additional fee |
|---|---|---|---|---|---|---|
| Total claims | * 101 | Minus | ** 125 | 0 | × $2 | = 0.00 |
| Independent claims | * 8 | Minus | 11 | 0 | × 10 | = 0.00 |
| | | | Total additional fee for this amendment ➡ | | | $ 0.00 |

\* If the entry in Column 2 is less than the entry in Column 4, write "0" in Column 5.

\*\* If the "Highest Number Previously Paid For" in this space is less than 10, write "10" in this space.

☐ A check in the amount of $ .................. is attached.

☐ Charge $ . . . . . . . . . . to Deposit Account No. 03-3125. A duplicate copy of this sheet is enclosed.

☒ Please charge any additional fees or credit overpayment to Deposit Account of
Cooper, Dunham, Clark, Griffin & Moran   No. 03-3125,
and notify the undersigned attorney of the amount so charged. A duplicate copy of this sheet is
enclosed.

Respectfully,

John P White

Attorney for Applicant
John P. White, Reg. No. 28,678
c/o COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 Rockefeller Plaza                    New York, N. Y. 10020
(212) 977-9550

**GENE-CEN 083195**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/ 5 | 02/25/80 | N | |

JOHN P. WHITE
COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 ROCKEFELLER PLAZA
NEW YORK, NY 10020

| EXAMINER |
|---|
| KIPPLINGER, E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 172 | 13 |

DATE MAILED 7/13/82

This is a communication from the examiner in charge of your application.

**COMMISSIONER OF PATENTS AND TRADEMARKS**

☐ This application has been examined.   ☑ Responsive to communication filed on **6/7/82**   ☑ This action is made final

A shortened statutory period for response to this action is set to expire **3** month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.   35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892   2. ☐ Notice of Informal Patent Drawing, PTO-948
3. ☐ Notice of References Cited by Applicant, PTO-1449   4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☑ Claims _1-9, 12-21, 23-27, 31-37, 39-54, 57-66, 71-73, 75-90, 93-114, 118, 124 and_ are pending in the application.

   Of the above, claims _43, 44, 79, 80, 111, 112, 124 and 125_ are withdrawn from consideration

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _45-54    81-90_ are allowed.

4. ☑ Claims _1-9, 12-21, 23-27, 31-37, 39-43, 57-66, 71-73, 75-98, 93-114, 118_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement

7. ☐ The formal drawings filed on _____ are acceptable.

8. ☐ The drawing correction request filed on _____ has been ☐ approved.   ☐ disapproved.

9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has
   ☐ been received.   ☐ not been received.   ☐ been filed in parent application, serial no. _____.
   filed on _____.

10. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

11. ☐ Other

_190_

**GENE-CEN 083196**

Serial No. 124,513                           -2-
Art Unit 172

     The disclosure is objected to as failing to
provide an adequate disclosure of the claimed invention as
required by the first paragraph of 35 U.S.C. 112.  This
paragraph of the statute, requires that the
specification shall contain a written description of
the invention, and of the manner and process of making
and using it, in such full, clear, concise and exact
terms as to enable any person skilled in the art to
which it pertains, or with which it is most nearly
connected, to make and use the same, and shall set
forth the best mode contemplated by the inventor of
carrying out his invention.  The claims are non-enabling for
reasons of record.  Applicants urge that claims 35-37 and
71-73 do not require that the protein from DNA I be
produced.  The claims recite "foreign" protein and thymidine
kinase cannot be considered foreign.  Thus, there is no
enablement in the specification.

     Applicants point to Lai et al and Graf et al as
evidence that as of applicants' filing date others could use
applicants' process to produce protein.  It does not appear
that Graf et al produced other protein.  Moreover, although
the references state that they used the transformation
method of Wigler and Lai et al used cells from Wigler, the
references may have require various manipulations to produce
protein.  Applicants cannot rely on another's ability to
produce protein as evidence that anyone could have.

GENE-CEN 083197

Exhibit OO
Page 1538

Serial No. 124,513                                        -3-
Art Unit 172

        Applicants cite <u>In re Strahilevitz</u> and urge that

the Examiner must provide reasons why one would not expect

protein production.  Applicants admit on pages 44 and 45 of

their specification that β-globin had not been detected and

that might stem from the absence of a functional ribosomal

binding site.  There are numerous factors involved in

providing a functioning system, such as choosing genetic

material which contains all the elements for transcription and

translation, choosing a compatible plasmid and restriction

enzyme.  It is the Examiner's position that an undue amount

of experimentation would be required given applicants'

disclosure to produce protein.

        Claims 31-37, 39-42, 71-73, 75-78, and 103-110 are

rejected under 35 U.S.C. 112, first paragraph, for the

reasons set forth in the preceding paragraph(s).

        Claims 1-9, 12-21, 23-27, 31-37, 39-42, 45-54,

57-66, 71-73, 75-78, 81-90, 93-110, 113, 114 and 118 are

rejected under 35 U.S.C. 103 as being unpatentable over Lai

et al for reasons of record.  Although, the invention is not

identically disclosed or described as set forth in section

102 of Title 35 U.S.C., the differences between the subject

matter sought to be patented and the prior art are such that

the subject matter as a whole would have been obvious at the

time the invention was made to a person having ordinary

skill in the art to which said subject matter pertains.

        Applicants' declarations under 37 CFR 1.131 are

noted but as indicated during the telephone interviews of

GENE-CEN 083198

Serial No. 124,513                              -4-

Art Unit 172


February 23 and 27, 1982, evidence of conception by

applicants is required.  Mere statements by applicants are

insufficient.  See MPEP 715.07.

    Moreover, the evidence provided cannot be relied

upon to show evidence of production of protein.  Claims

35-37 and 71-73 recite "foreign" protein and thymidine

kinase is not foreign to the cells producing it.

    Applicants argument concerning conception of their

invention prior to the publication of Lai is not persuasive

since applicants have not provided any evidence of such

conception.

    Claims 25-27, 65, 66, 70, 81-90, 93-97 and 100-110

are rejected under 35 U.S.C. 103 as being unpatentable over

Mantei et al for reasons of record.  Although, the invention

is not identically disclosed or described as set forth in

section 102 of Title 35 U.S.C., the differences between the

subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been

obvious at the time the invention was made to a person

having ordinary skill in the art to which said subject

matter pertains.  The declarations under 37 CFR 1.131 are

insufficient because applicants have not provided evidence

of conception by applicants.

    Claims 1, 2, 9, 12, 14, 16-21, 23, 25-27, 45, 46,

53, 54, 58, 60-66, 113, 114 and 118 are rejected under 35

U.S.C. 102(a) as clearly anticipated by Wigler et al W, V or

GENE-CEN 083199

Serial No. 124,513                                    -5-

Art Unit 172

X for reasons of record because the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country before the invention thereof by the applicant for patent.  The declarations under 37 CFR 1.131 are insufficient because applicant have not provided evidence of conception by applicants.

Claims 3-8, 13, 15, 24, 31-37, 39-42, 47-52, 57, 59, 113, 114 and 118 are rejected under 35 U.S.C. 103 as being unpatentable over Wigler W, V or X for reasons of record.  Although, the invention is not identically disclosed or described as set forth in section 102 of Title 35 U.S.C., the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  The declarations under 37 CFR 1.131 are insufficient.  See above.

Claims 1, 2, 9, 12, 14, 16-18, 23, 25-27, 45, 46, 53, 54, 58, 60, 61, 64-66, 113, 114 and 118 are rejected under 35 U.S.C. 102(a) as clearly anticipated by Wold et al because the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country before the invention thereof by the applicant for patent.  The declarations under 37 CFR 1.131 are insufficient.  See above.

GENE-CEN 083200

Serial No. 124,513                                    -6-

Art Unit 172


        Applicants urge that Wold et al teach

transformation, not cotransformation.  In the Results

section, however, Wold et al clearly talk about

cotransformation and transform with tk gene and additional

DNA containing β-globin gene.

        Claims 3-8, 13, 15, 19-21, 24, 30-37, 39-42,

47-52, 57, 59, 62, 63, 71-73 and 75-78 are rejected under 35

U.S.C. 103 as being unpatentable over Wold et al for reasons

of record.  Although, the invention is not identically

disclosed or described as set forth in section 102 of Title

35 U.S.C., the differences between the subject matter sought

to be patented and the prior art are such that the subject

matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the

art to which said subject matter pertains.

        Applicants arguments are answered in the preceding

paragraph.

        THIS ACTION IS MADE FINAL.


Kepplinger:sab

(703)557-3685

08-28-82

                                    ESTHER M. KEPPLINGER
                                    PRIMARY EXAMINER


**GENE-CEN 083201**

Exhibit OO

Page 1542

 

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124513 | 2/25/80 | Axel et al | 16668A |

| EXAMINER |
|---|
| E. M. Kepplinger |

| ART UNIT | PAPER NUMBER |
|---|---|
| 172 | 14 |

DATE MAILED:

## EXAMINER INTERVIEW SUMMARY RECORD

All participants (applicant, applicant's representative, PTO personnel):

(1) John White

(3) _____

(2) _____

(4) _____

Date of interview  10/6/82

Type:  ☑ Telephonic   ☑ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:  ☑ Yes   ☐ No.   If yes, brief description: Copy of In re Katz

Agreement   ☐ was reached with respect to some or all of the claims in question.   ☑ was not reached.

Claims discussed:  all

Identification of prior art discussed: _____

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: Mr. White urged that the tk gene inserted and produced is foreign to the transformed cells. He will present this argument in his response. It is probably sufficient. Mr. White will cancel claims to producing protein from DNAI + refile. Mr. White provided In re Katz which appears to be on point and state that an affidavit by the inventors that they are the sole inventors and that the other authors worked under their direction is sufficient evidence to eliminate those references.

(A fuller description, if necessary, and a copy of the amendments if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

Unless the paragraphs below have been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1—7 on the reverse side of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview.

☐ It is not necessary for applicant to provide a separate reocrd of the substance of the interview.

☐ Since the examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.

81-3679 PTOL-413 (rev. 1-81)

Examiner's Signature  Esther M. Kepplinger

GENE-CEN 083202

**ORIGINAL FOR INSERTION IN RIGHT HAND FLAP OF FILE WRAPPER**

17668-A  JPW

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:  Richard Axel, et al.

Serial No.:  124,513          Examiner:  Esther M. Kepplinger

Filed     :  February 25, 1980   Group Art Unit:  172

For       :  PROCESSES FOR INSERTING DNA INTO
             EUCARYOTIC CELLS AND FOR PRODUCING
             PROTEINACEOUS MATERIALS

DO NOT ENTER

OK TO ENTER

OK AS ENTERED

30 Rockefeller Plaza
New York, New York  10112

12 January 1983

Honorable Commissioner of Patents
  and Trademarks
Washington, D. C.  20231

SIR:

AMENDMENT AND

REQUEST FOR ONE MONTH EXTENSION

        This Amendment is submitted in response to the out-
standing Office Action issued in connection with the above-
identified application on September 13, 1982.  A response to that
Office Action was due December 13, 1982.  Applicants hereby request
that the period for filing a response be extended one month to
January 13, 1983, the date upon which this response is being filed.
A check in the amount of $50. is enclosed as payment of the
statutory fee for a one month extension of the time for filing a
response.

        Please amend the subject application as follows:

IN THE CLAIMS

        Cancel claims 31-34; 39-42; 75-78 and 103-110.

01/26/83 124513                   3 115        50.00 CK

REMARKS

        In the September 13, 1982 Office Action the Examiner
finally rejected claims 1-9; 12-21; 23-27; 31-37; 39-42; 45-54;

**GENE-CEN 083203**

Exhibit OO
Page 1544

-2-

57-66; 71-73; 75-78; 81-90; 93-110; 114 and 118.   In order to advance prosecution of the subject application applicants have hereinabove cancelled certain additional claims without prejudice to their right to reassert such claims at a later date. As a result of this Amendment the claims now pending in the subject application are the following: 1-9; 12-21; 23-27; 35-37; 45-54; 57-66; 71-73; 81-90; 93-102; 114 and 118.

Initially, applicants' undersigned attorney wishes to thank the Examiner for the courtesy of the interview held on October 6, 1982.  Applicants' attorney thinks this interview was most helpful in clarifying the issues in the subject application.

In order to advance prosecution of this application applicants have cancelled claims 31-34; 39-42; 75-78 and 103-110 without prejudice to their right to present these claims in a subsequent application.  By cancelling these claims applicants have eliminated all claims directed to the production of protein except claims 35-37 and 71-73.  Claims 35-37 and 71-73 are broadly directed to the production of foreign protein by eucaryotic cells cotransformed by the processes to which the other pending claims are directed.  As discussed during the interview, applicants understand that the Examiner's rejection of these claims was based upon her understanding that thymidine kinase is not foreign to the cotransformed cells.  As pointed out during the interview, the thymidine kinase produced is foreign for two reasons.  First, the thymidine kinase is produced from a gene obtained by herpes simplex virus (HSV) not from a gene obtained from the chromosonal DNA of a eucaryotic cell.  Second, the cell being cotransformed is a tk$^-$ cell, that is, a cell deficient in thymidine kinase.  The first point finds support in the specification at numerous locations, e.g. page 13, lines 5-6 and page 22, lines 26-27.  Likewise, the second point finds support in the specification at, <u>inter alia</u>,

19.6

GENE-CEN 083204

-3-

page 18, lines 2-3; page 22, lines 27-28 and page 32, lines 20-21.

During the interview the Examiner suggested applicants' argument concerning the fact that the tk gene and the thymidine kinase produced from it are foreign was probably sufficient to overcome the rejection. However, the Examiner did question whether there was an example in the application showing recovery of the thymidine kinase. In this regard, applicants direct the Examiner's attention to page 65, lines 27-34. As set forth there, cell extracts from cotransformed tk$^+$ cells were subjected to electrophoresis whereby the herpes simplex virus (HSV) thymidine kinase (tk) enzyme was separated from other components of the extract and characterized by its migration with an Rf value of 0.45. Thus, the foreign thymidine kinase was recovered.

From the interview, applicants understand that the Examiner's objection to the specification as non-enabling was based upon the lack of actual working examples of foreign protein production by cotransformed cells. As the preceding comments and the discussion during the interview indicated, this objection should not pertain to the claims remaining in the application since the thymidine kinase is foreign and since its production clearly is exemplified in the specification. In so far as the objection is directed to the production of proteins from DNA I, the ground for objection should be rendered moot by applicants' cancellation of such claims.

In view of the foregoing, applicants request that the Examiner reconsider and withdraw the grounds for rejection of claims 35-37 and 71-73 and for objection to the specification.

The second principal issue discussed during the inter view was the Examiner's continued rejection of claims as allegedly unpatentable over publications coauthored by appicants, namely, references W, V, X and Y. The Examiner reiterated her position

*199*

GENE-CEN 083205

Exhibit OO
Page 1546

-4-

that applicants must provide evidence that they alone conceived the invention and not the coauthors on the publications who are not named as coinventors on the subject application.

In response to the Examiner's position, applicants' undersigned attorney provided to the Examiner an unpublished copy of a recent decision of the Court of Customs and Patent Appeals, In re Katz. At this time applicants submit as Exhibit A hereto a copy of the published decision in In re Katz, 215 U.S.P.Q. 14 (1982) on which the most pertinent portions of the decision have been highlighted.

The decision in In re Katz is clearly on point concerning the extent to which a coauthor, patent applicant is required to show that a coauthor, non-applicant is not a coinventor. In the Katz decision the Court of Customs and Patent Appeals held that coinventorship cannot be presumed from coauthorship; that a requirement for disclaimers from coauthors who are not coinventors was erroneous; that an applicant's further oath or declaration stating that he is sole inventor of subject matter disclosed in a coauthored article and disclosed and claimed in a patent application and stating that other coauthors on the publication worked under his direction and supervision is sufficient to terminate inquiry by the Patent Office into inventorship; and finally that joint inventorship cannot be inferred in the presence of sworn statements to the contrary.

In the subject application applicants submitted declaration on November 9, 1981 and on June 7, 1982. In these declarations applicants declared, inter alia, the following:

1.  They solely conceived the        11/9: ¶2&3
    invention disclosed and           6/7 : ¶4
    claimed in the application.

GENE-CEN 083206

Exhibit OO
Page 1547

-5-

2.  They are coauthors of the        11/9 : ¶11
    articles cited as references.     6/7 : ¶3

3.  They solely or through           11/9 :¶4
    persons acting upon their         6/7 : ¶6-10
    supervision and direction
    reduced the invention to
    practice.

4.  The invention disclosed          11/9 : ¶5-9
    and claimed in the applica-
    tion is the same as that
    disclosed in the articles.

Thus, applicants have provided a reasonable explanation for the fact that certain persons are named as coauthors but not coinventors and have reaverred that they alone made the invention disclosed and claimed in the application. Accordingly, applicants request that the Examiner reconsider and withdraw the various rejections based upon coauthored references W, V, X and Y.

The remaining rejections were based upon the teachings of Lai et al. and Mantei et al. From the interview applicants understand that these rejections will be reconsidered in view of applicants' previous declarations pursuant to 37 C.F.R. § 1.131, particularly in view of the following:

1.  Claims directed to production of protein from DNA I have been cancelled at this time.

2.  Applicants actually reduced to practice claimed embodiments of their invention prior to the effective date of the Mantei et al. article (Sept. 6, 1979) or the Lai et al. article (January 1980).

3.  Mantei et al. concerned cotransformation with linked DNA I and DNA II, not unlinked DNAs.

GENE-CEN 083207

-6-

Accordingly, applicants request that the Examiner reconsider and withdraw the rejections based upon the alleged teachings of Mantei et al. or Lai et al.

In summary, applicants in a sincere effort to place this application in condition for allowance have cancelled claims directed to production of protein from DNA I. The remaining claims pending in the subject application are the following: 1-9; 12-21; 23-17; 35-37; 45-54; 57-66; 71-73; 81-90; 93-102; 114 and 118. Applicants maintain that these claims are now in condition for allowance and earnestly solicit their allowance. The major outstanding issues are believed to have been resolved as follows:

1.   Thymidine kinase is foreign to the cotransformed cells producing it from foreign DNA.

2.   Coauthors are not presumed to be coinventors and sworn statements by applicants providing a reasonable explanation for coauthors not being coinventors is a sufficient basis for removing the coauthored articles as references.

3.   Separate evidence of conception is not required to remove as references the publications which applicants coauthored.

4.   Separate evidence of conception is not required to remove as references the Mantei et al. or Lai et al. articles. Applicants' Rule 131 declarations are sufficient and establish actual reduction to practice prior to the effective dates of the references.

If a telephone interview would be of assistance in advancing prosecution of the application, applicants' undersigned attorney invites the Examiner to telephone him at the number provided.

GENE-CEN 083208

Exhibit OO
Page 1549

-7-

No fee, other than the $50 fee for a one month extension of time, is deemed necessary in connection with this Amendment.  If a fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

John P White

John P. White
Reg. No. 28678
Attorney for Applicants
212-977-9550



GENE-CEN 083209

Exhibit OO
Page 1550

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124513 | | HAEL | |

JOHN P. KITE
CURTIS, MORRIS, CLARK, GRIFFIN & ROGAN
30 ROCKEFELLER PLAZA
NEW YORK, NY 10020

EXAMINER

ART UNIT | PAPER NUMBER
DATE MAILED:

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

1. ☑ THIS IS AN ATTACHMENT TO THE NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE, PTOL 85.
2. ☑ All the claims being allowable, PROSECUTION ON THE MERITS IS CLOSED in this application. If not attached hereto, a Notice of Allowance or other appropriate communication will be sent in due course.

C. ☑ The claims are allowed in view of:
   a. ☑ Applicant's communication filed 1/17
   b. ☑ The interview summarized on the attached EXAMINER INTERVIEW SUMMARY RECORD, PTOL-413.
   c. ☑ The attached Examiner's Amendment.
   d. ☐ An Examiner's Amendment which will follow in due course.
   
   113, 114, 118
   D. ☑ The allowed claims are 1-9, 12-21, 23-27, 35-37, 45-54, 57-66, 71-73, 81-90, 93-102

**GENE-CEN 083210**

PTOL - 37  (Rev. 8 - 82)                NOTICE OF ALLOWABILITY

Exhibit OO
Page 1551

SERIAL NO.    124,513
ART UNIT      172                              -2-


    On page 37, line 3, corrected the spelling of
--nitrocellulose--.

    On page 39, line 31, corrected --nuclease--.

    On page 52, line 28, corrected
--expression--.

    On page 64, line 13, corrected
--demonstrated--.

    Cancelled claims 43, 44, 79, 80, 112, 124 and
125 as non-elected claims.

    In claim 118, line 1, corrected --foreign--.

    The above changes were authorized by
applicants' attorney, John White, in a telephone
interview on February 4, 1983.


EMKEPPLINGER:hm

703-557-3685

2/7/83


ESTHER M. KEPPLINGER
PRIMARY EXAMINER

GENE-CEN 083211

Exhibit OO
Page 1552



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124513 | 2/25/80 | Axel et al | 17668 -A |

| EXAMINER | |
|---|---|
| E. M. Kepplinger | |
| ART UNIT | PAPER NUMBER |
| 172 | 16 |

DATE MAILED:

### EXAMINER INTERVIEW SUMMARY RECORD

All participants (applicant, applicant's representative, PTO personnel):

(1) Mr. John White

(3)

(2)

(4)

Date of interview   2/4/83

Type:  ☑ Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☑ applicant's representative).

Exhibit shown or demonstration conducted:  ☐ Yes   ☑ No.   If yes, brief description:

Agreement  ☑ was reached with respect to some or all of the claims in question.   ☐ was not reached.

Claims discussed:  43, 44, 79, 80, 111, 112, 124 &, 125 and 118

Identification of prior art discussed:

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: We agreed to cancel claims which were non-elected and also to spelling corrections. See Examiner's Amendment.

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

Unless the paragraphs below have been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1–7 on the reverse side of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview

☐ It is not necessary for applicant to provide a separate record of the substance of the interview.

☐ Since the examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.

Esther M. Kepplinger
Examiner's Signature

GENE-GEN 083212

81-3679 PTOL-413 (rev. 1-81)

85 (Rev. 8-82)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

# NOTICE OF ALLOWANCE
# AND ISSUE FEE DUE

JOHN P. WHITE
COOPER, DUNHAM, CLARK, GRIFFIN & MORAN
30 ROCKEFELLER PLAZA
NEW YORK, NY 10020

All communications regarding this application should give the serial number, date of filing, name of applicant, and batch number.

Please direct all communications to the Attention of "OFFICE OF PUBLICATIONS" unless advised to the contrary.

The application identified below has been examined and found allowable for issuance of Letters Patent. PROSECUTION ON THE MERITS IS CLOSED.

| SC/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 06/124,513 | 02/25/80 | 073 | KEPPLINGER, E | 172 | 02/14/83 |

| First named applicant | AXEL, | RICHARD |
|---|---|---|

| TITLE OF INVENTION | PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS |
|---|---|

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| | 435-006,000 | 083 | UTILITY | NO | $500.00 | 05/16/83 |

The amount of the issue fee is specified by 37 C.F.R. 1.18 as follows: for an original or reissue patent, except for a design or plant patent, $500; for a design patent, $175; and for a plant patent, $250. If the applicant qualifies for and has filed a verified statement of small entity status in accordance with 37 C.F.R. 1.27, the issue fee is one-half the respective amount aforementioned. The issue fee due printed above reflects applicant's status as of the time of mailing this notice. A verified statement of small entity status may be filed prior to or with payment of the issue fee. However, in accordance with 37 C.F.R. 1.28, failure to establish status as a small entity prior to or with payment of the issue fee precludes payment of the issue fee in the amount so established for small entities and precludes a refund of any portion thereof paid prior to establishing status as a small entity.

THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE as indicated above. The application shall otherwise be regarded as ABANDONED. The issue fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office. Where an authorization to charge the issue fee to a deposit account has been filed before the mailing of the notice of allowance, the issue fee is charged to the deposit account at the time of mailing of this notice in accordance with 37 C.F.R. 1.311. If the issue fee has been so charged, it is indicated above.

In order to minimize delays in the issuance of a patent based on this application, this Notice may have been mailed prior to completion of final processing. The nature and/or extent of the remaining revision or processing requirements may cause slight delays of the patent. In addition, if prosecution is to be reopened, this Notice of Allowance will be vacated and the appropriate Office action will follow in due course. If the issue fee has already been paid and prosecution is reopened, the applicant may request a refund or request that the fee be credited to a Deposit Account. However, applicant may wait until the application is either found allowable or held abandoned. If allowed, upon receipt of a new Notice of Allowance, applicant may request that the previously submitted issue fee be applied. If abandoned, applicant may request refund or credit to a Deposit Account.

In the case of each patent issuing without an assignment, the complete post office address of the inventor(s) will be printed in the patent heading and in the Official Gazette. If the inventor's address is now different from the address which appears in the application, please fill in the information in the spaces provided on PTOL-85b enclosed. If there are address changes for more than two inventors, enter the additional addresses on the reverse side of the PTOL-85b.

The appropriate spaces in the ASSIGNMENT DATA section of PTOL-85b must be completed in all cases. If it is desired to have the patent issue to an assignee, an assignment must have been previously submitted to the Patent and Trademark Office or must be submitted not later than the date of payment of the issue fee as required by 37 C.F.R. 1.334. Where there is an assignment, the assignee's name and address must be provided on the PTOL-85b to ensure its inclusion in the printed patent.

Advance orders for 10 or more printed copies of the prospective patent can be made by completing the information in Section 4 of PTOL-85b and submitting payment therewith. If use of a Deposit Account is being requested for payment, PTOL-85c should also be forwarded. The order must be for at least 10 copies and must accompany the issue fee. The copies ordered will be sent only to the address specified in section 1 or 1A of PTOL-85b.

☐ Note attached communication from Examiner.

☐ This notice is issued in view of applicant's communication filed _____

**IMPORTANT**

ATTENTION IS DIRECTED TO 37 C.F.R. 1.31.

THE PATENT WILL ISSUE TO APPLICANT UNLESS AN ASSIGNEE IS SHOWN IN

CEN-CEN 083213



Exhibit OO
Page 1554

PTOL-85b (Rev. 8-82)

**ISSUE FEE TRANSMITTAL**

$ 250.00-242.

U.S. Department of Commerce
Patent and Trademark Office

This form is provided in lieu of a formal transmittal and should be used for transmitting the Issue Fee. Sections 1A through 4 must be completed as appropriate.

| INVENTOR(S) ADDRESS CHANGE | SC/SERIAL NO. | MAILING INSTRUCTIONS |
|---|---|

INVENTOR'S NAME

Street Address

City, State and Zip Code

CO-INVENTOR'S NAME

Street Address

City, State and Zip Code

☐ Check if additional changes are on reverse side.

MAILING INSTRUCTIONS
All further correspondence including the Issue Fee Receipt, the Patent, and advanced orders will be mailed to the addressee entered in section 1 on PTOL-85c, unless you direct otherwise by specifying the appropriate name and address in 1A below.

2A. The COMMISSIONER OF PATENTS AND TRADE-MARKS is requested to apply the Issue Fee to the application identified below.

(Signature of party in interest of record)   (Date)
John P. White
Reg. No. 28,678                           5/16/8

Note: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

| SC/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | DATE MAILED |
|---|---|---|---|---|
| 06/124,513 | 02/25/80 | 073 | KEPPLINGER, E          172 | 02/14/83 |

First Named Applicant: AXEL, RICHARD

TITLE OF INVENTION: PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS MATERIALS

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
|  | 435-006.000 | 083 | UTILITY | -NO- Yes* | $500.00 $250.00 | 05/16/83 |

1A. Further correspondence to be mailed to the following:

John P. White, Esq.
Cooper, Dunham, Clark, Griffin & Moran
30 Rockefeller Plaza
New York, New York 10112

2B. For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed.

1  John P. White
2
3

DO NOT USE THIS SPACE

05/23/83 124513        2 242        250.00 CK

S0400 05/23/83 124513        03-3125 1 501        33.00CH

3. ASSIGNMENT DATA (print or type)

A. (1) ☐ This application is NOT assigned.
   (2) ☒ Assignment previously submitted to the Patent and Trademark Office.
   (3) ☐ Assignment submitted herewith.

B. For Printing On The Patent: (Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data below is only appropriate when an assignment has been previously submitted to the PTO or is submitted herewith. Completion of this form is NOT a substitute for filing of an assignment as required by 37 C.F.R. 1.334).

(1) NAME OF ASSIGNEE: THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

(2) ADDRESS: (City & State or Country)
New York, New York

(3) STATE OF INCORPORATION, IF ASSIGNEE IS A CORPORATION:
New York

4. The following fees are enclose:
☒ Issue fee   ☐ Advanced order   ☐ Assignment recording

The following fees should be charged to deposit acc. no.   03-3125
(PTOL-85c or additional copy of PTOL-85b must be enclosed)

☐ Issue fee
☒ Advanced order
☐ Assignment recording

Number of advanced order copies requested.   33
(must be for 10 or more copies)

*small entity form enclosed

GENE-CEN 083214

TRANSMIT THIS FORM WITH FEE

Applicant or Patentee:    AXEL, ET AL.
Serial or Patent No.:
Filed or Issued:    February 25, 1980
For:    PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS
FOR PRODUCING PROTEINACEOUS MATERIALS

Attorney's
Docket No: 17658-

**VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY STATUS**
**(37 CFR 1.9(f) and 1.27(d)) - NONPROFIT ORGANIZATION**

I hereby declare that I am an official empowered to act on behalf of the nonprofit
organization identified below:

NAME OF ORGANIZATION THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK
ADDRESS OF ORGANIZATION   Broadway & West 116th Street
New York, New York 10027

TYPE OF ORGANIZATION

[x] UNIVERSITY OR OTHER INSTITUTION OF HIGHER EDUCATION
[ ] TAX EXEMPT UNDER INTERNAL REVENUE SERVICE CODE (26 USC 501(a) and 501(c)(3))
[ ] NONPROFIT SCIENTIFIC OR EDUCATIONAL UNDER STATUTE OF STATE OF THE UNITED STATES
OF AMERICA
(NAME OF STATE _____
(CITATION OF STATUTE _____)
[ ] WOULD QUALIFY AS TAX EXEMPT UNDER INTERNAL REVENUE SERVICE CODE (26 USC 501(a)
and 501(c)(3)) IF LOCATED IN THE UNITED STATES OF AMERICA
[ ] WOULD QUALIFY AS NONPROFIT SCIENTIFIC OR EDUCATIONAL UNDER STATUTE OF STATE OF
THE UNITED STATES OF AMERICA IF LOCATED IN THE UNITED STATES OF AMERICA
(NAME OF STATE _____
(CITATION OF STATUTE _____)

I hereby declare that the nonprofit organization identified above qualifies as a
nonprofit organization as defined in 37 CFR 1.9(e) for purposes of paying reduced fees
under section 41(a) and (b) of Title 35, United States Code with regard to the invention
entitled PROCESSES FOR INSERTING DNA INTO EUCARYOTIC CELLS AND FOR PRODUCING PROTEINACEOUS
MATERIALS by inventors Richard Axel, Michael H. Wigler and Saul J. Silverstein described in

[ ] the specification filed herewith
[x] application serial no. 124,513    , filed February 25, 1980
[ ] patent no. _____, issued _____

I hereby declare that rights under contract or law have been conveyed to and remain with
the nonprofit organization with regard to the above identified invention.

If the rights held by the nonprofit organization are not exclusive, each individual,
concern or organization having rights to the invention is listed below* and no rights to
the invention are held by any person, other than the inventor, who could not qualify as a
small business concern under 37 CFR 1.9(d) or by any concern which would not qualify as a
small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR
1.9(e). *NOTE: Separate verified statements are required from each named person, concern
or organization having rights to the invention averring to their status as small entities.
(37 CFR 1.27)

NAME   N/A
ADDRESS
[ ] INDIVIDUAL    [ ] SMALL BUSINESS CONCERN    [ ] NONPROFIT ORGANIZATION

NAME
ADDRESS
[ ] INDIVIDUAL    [ ] SMALL BUSINESS CONCERN    [ ] NONPROFIT ORGANIZATION

I acknowledge the duty to file, in this application or patent, notification of any change
in status resulting in loss of entitlement to small entity status prior to paying, or at
the time of paying, the earliest of the issue fee or any maintenance fee due after the
date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all
statements made on information and belief are believed to be true; and further that these
statements were made with the knowledge that willful false statements and the like so made
are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the
United States Code, and that such willful false statements may jeopardize the validity of
the application, any patent issuing thereon, or any patent to which this verified
statement is directed.

GENENTECH 083215

**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 124,513 | 02-25-80 | Richard Axel, et al | 17668A |

John P. White
Cooper, Dunham, Clark, Griffin & Moran
30 Rockefeller Plaza
New York, NY   10020

**MAILED**

JUL 5 1983

| EXAMINER | |
|---|---|
| E. Kepplinger | |
| ART UNIT | PAPER NUMBER |
| 174 | 18/6 |

DATE MAILED: ext. 6 L 30-8

B.H.

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS                **GROUP 170**

1. [ ] THIS IS AN ATTACHMENT TO THE NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE, PTOL 85.
2. [ ] All the claims being allowable, PROSECUTION ON THE MERITS IS CLOSED in this application. If not attached hereto, a Notice of Allowance or other appropriate communication will be sent in due course.

   A. [ ] Note the attached PTO-152, Notice of Informality, which indicates that the declaration (or oath) is deficient and that a substitute is required. The substitute declaration (or oath) MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85), preferably with and attached to the base issue fee. Note that the statute does not permit extension of the three month period set for payment of the base issue fee. Failure to timely file the substitute declaration (or oath) will result in ABANDONMENT of the application. The transmittal letter accompanying the declaration (or oath) should indicate the following in the upper right hand corner:
   Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

   B. [ ] Formal drawings are now required and MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85). Note that the statute does not permit extension of the three month period set to pay the base issue fee. Failure to timely submit the drawings will result in ABANDONMENT of the application. The drawings should be submitted as a separate paper with a transmittal letter which is addressed to the Official Draftsman and which indicates the following in the upper right hand corner:
   Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

   C. [✓] The claims are allowed in view of: NOTE
      a. [ ] Applicant's communication filed _____
      b. [ ] The interview summarized on the attached EXAMINER INTERVIEW SUMMARY RECORD, PTOL-413.
      c. [✓] The attached Examiner's Amendment.

      d. [ ] An Examiner's Amendment which will follow in due course.

   D. [ ] The allowed claims are _____

3. [ ] Note the attached Examiner's Statement of Reasons for Allowance.

4. [ ] Note attached NOTICE OF REFERENCES CITED, PTO-892, which is part of this communication. The listed references are considered to be pertinent to the claimed invention, but the claims are deemed to be patentable thereover.

5. [ ] Note attached LIST OF ART CITED BY APPLICANT, PTO-1449.

6. [ ] The drawings filed on _____ [ ] are acceptable as filed. [ ] are acceptable subject to correction as indicated on the attached Notice re Drawings, PTO-948. In order to avoid ABANDONMENT of this application, correction is required. Corrections can only be made in accordance with the instructions set forth in the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

7. [ ] The [ ] proposed drawing correction and/or the [ ] proposed additional or substitute sheet(s) of drawings filed on _____ has (have) been approved by the examiner. Applicant is reminded that in order to avoid abandonment of this applicant, execution of the proposed changes or submission of additional or substitute drawings MUST be made in accordance with the instructions set forth in the letter, "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to Paper No. _____

8. [ ] The proposed drawing correction, filed _____ has been approved. However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections are required and MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

9. [ ] In order to avoid ABANDONMENT, the drawing informalities noted on the Notice re Drawing, PTO-948, attached to Paper No. _____ must now be corrected. Applicant is reminded that the corrections can only be made in accordance with the instructions set forth in the letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to the PTO-948.

10. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has; [ ] been received. [ ] not been received.

    [ ] been filed in parent application, Serial No. _____ filed on _____

PTOL - 37 (Rev. 8 - 82)                   **NOTICE OF ALLOWABILITY**

GENE-CEN 083216

Art Unit      174
Serial No.    124,513                        -2-


    On page 1 of the abstract, cancelled lines 15-21.

    On page 1 of the abstract, line 25, deleted "which includes" and inserted --including--.

    In line 26, after "materials" deleted the period and the remainder of the line.

    In line 27, delete "genes is accomplished".

    On page 2 of the abstract, line 5, deleted "Eucaryotic Cells into which".

    On page 2 of the abstract, deleted lines 6-11.


E.KEPPLINDER:vb

703-557-3032

5/30/83


Esther M. Kepplinger
ESTHER M. KEPPLINGER
PRIMARY EXAMINER

GENE-CEN 083217

Exhibit OO
Page 1558



1-7668-A JPW

PATENT & TRADEMARK OFFICE
APR 24 1984
CERTIFICATE OF CORRECTION BR.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants    :  Richard Axel, et al.

Serial No.    :  124,513                    Group Art Unit 175
                                            Examiner:  E. Kepplinger
Filed         :  February 25, 1980

For           :  PROCESSES FOR INSERTING
                 DNA INTO EUCARYOTIC CELLS
                 AND FOR PRODUCING
                 PROTEINACEOUS MATERIALS

PATENT NO.    :  4,399,216

DATED         :  August 16, 1983


                                    30 Rockefeller Plaza
                                    New York, New York 10112

                                    March 20, 1984

                                    APPROVED
                                    AS INDICATED

Hon. Commissioner of Patents
  and Trademarks
Washington, D.C. 20231                 FEB 11 1985
                                     R.C. Mason
Sir:                               FOR THE COMMISSIONER OF
                                    PATENTS & TRADEMARKS

            REQUEST FOR CERTIFICATE OF
          CORRECTION UNDER 37 C.F.R. § 1.322

Attached please find one page of Patent Office Form PTO-1050

indicating errors noted in proofreading the above-identified

patent.  These errors were introduced by the Patent Office in

the course of printing the patent.  The corrections are as

indicated in the originally filed application.


The enclosed Certificate of Correction was not necessitated by

error on Applicants' behalf.  It is, therefore, requested that

GENE-CEN 083218

2 3 5

Exhibit OO
Page 1559

- 2 -

a Certificate of Correction be issued in accordance with the provisions of 37 C.F.R. § 1.322.

No fee is deemed necessary in connection with issuance of this Certificate of Correction.  If a fee is necessary, authorization is hereby given to charge Deposit Account No. 03-3125 with the amount of any such fee.

Respectfully submitted,

John P. White, Reg. No. 28,678
Attorney for Applicants

(212) 977-9550

GENE-CEN 083219

Exhibit OO
Page 1560

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. :  4,399,216                          Page 1 of 2

DATED     :  August 16, 1983

INVENTOR(S) :  Richard Axel, Michael H. Wigler,
               Saul J. Silverstein

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 3, line 35, after "hormones" insert a comma --(,)--.

Col. 8, line 51, after "pBR" insert --322--.

Col. 10, line 26, after "φ" insert --X--.

Col. 12, line 60, "transforments" should read --transformants--.

Col. 15, line 21, "ribbit" should read --rabbit--.

Col. 17, line 68, "therefor" should read --therefore--.

Col. 18, line 58, "exceding" should read --exceeding--.

Col. 22, line 20, "tk$^{30}$" should read --tk$^{+}$--.

Col. 23, line 57, "=P" should read --$^{32}$p--.

Col. 30, line 15, "μ/ml" should read --μg/ml--.

Col. 30, line 52, "μ/ml" should read --μg/ml--.

Col. 34, line 57, "Bgl/32" should read --Bgl--.

Col. 34, line 59, "P-labeled" should read --$^{32}$p-labeled--.

Col. 35, line 21, "anenue" should read --avenue--.

GENE-CEN 083220

Exhibit OO
Page 1561

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.  :   4,399,216                                Page 2 of 2
DATED       :   August 16, 1983
INVENTOR(S) :   Richard Axel, Michael H. Wigler,
                Saul J. Silverstein

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 37, line 57, "ffrom" should read --from--.
Col. 38, line 60, after "A29" insert --DNA--.


Col. 44, line 68, "does" should read --codes--.

Signed and Sealed this

Twenty-sixth  Day of  March 1985

[SEAL]

Attest:


DONALD J. QUIGG

Attesting Officer        Acting Commissioner of Patents and Trademarks

| PATENT NO. | PATENT DATE | | U.S. DEPARTMENT OF COMMERCE |
|---|---|---|---|
| 4,399,216 | 08-16-83 | | Patent and Trademark Office |
| PATENTEE | | | Address : COMMISSIONER OF PATENTS AND TRADEMARKS |
| Richard Axel, et al | | | Washington, D.C. 20231 |

• John P. White
Cooper, Dunham et al
30 Rockefeller Plaza
New York, NY 10112

MAILING DATE

JUN 11 1984

*20*

### NOTIFICATION OF APPROVAL IN–PART OF CERTIFICATE OF CORRECTION

The Certificate of Correction requested in the patent identified above has been APPROVED with the exceptions indicated below. The remaining errors will be corrected as requested. The Certificate, so modified, will be issued on **SEP 11 1984**

A. [X] THE CHANGES BELOW CANNOT BE INCLUDED IN THE CERTIFICATE SINCE THE REQUEST WAS FILED UNDER RULE 322.

1. [X] Column __44__ , line __17__ , is printed in accordance with the record.

   (a) ☐ The change referred to was initialed and dated by applicant before execution of the application papers.

2. ☐ In column _____ , line _____ , the error resulted from applicant's failure to comply with Rule 121(a), in that the precise point of entry of the amendment was omitted.

3. ☐ In column _____ , line _____ , the alleged error is due to applicant's failure to comply with Rule 121(b), wherein provision is made for use of brackets, instead of parentheses, to cancel subject matter and for the use of interlineations to indicate new subject matter.

4. ☐ Omission of the priority data from the patent resulted from applicant's failure to fully comply with 35 U.S.C. 119, in that:

   (a) ☐ The priority data was omitted from the oath, or declaration.

   (b) ☐ The claim for priority was not included in the application papers.

   (c) ☐ The certified copy of the foreign application was not filed.

5. ☐ The assignment data is printed in the patent in accordance with PTO 76-130 submitted by applicant at time of payment of the base issue fee, as follows:

6. ☐ In column _____ , line _____ , the error arose because Rule 52(b) was not complied with. Consequently, words on top of certain pages were obliterated where those pages were placed in the file jacket, causing the Office to provide what appeared to be the proper words.

B. ☐ THE REQUEST HAS BEEN CHANGED AS SHOWN BELOW TO COMPLY WITH THE RECORD:

1. ☐ Since it is not normally the practice of the Office to reprint figures of the drawings, the following narrative description of Fig(s). _____ as suggested by the examiner, will be included:

Form PTOL-404 (rev. 10/80)          (over)

GENE-CEN 083222

NOTICE RE:  CERTIFICATES OF CORRECTION                      Paper No. *19 ½*

DATE: *9-24-84*

TO    :  Director, Group _*170*_

SUBJECT:  Certificate of Correction Request in Patent No. *4399216*

A response to the following question(s) is requested with respect to the accompanying request for a certificate of correction.

*Atty's Error*

1. ☒  Would the change(s) requested under 37 CFR 1.323 constitute new matter or require reexamination of the application?

2. ☐  Applicant disagrees with change(s) initialed and dated by Examiner in lieu of an Examiner's Amendment.  Should the change request be granted?

3. ☐  With respect to the change(s) requested should the patent read as shown in the certificate of correction?

4. ☐  If the amendment filed _____ had been considered by the Examiner, would the amendment have been entered?

*PLEASE RESPOND WITHIN 7 DAYS AND RETURN THE FILE TO ROOM 2-10C26.*

Patent Assistant

---

TO: CERTIFICATES OF CORRECTION BRANCH              DATE:  October 18, 1984

The decision regarding the change(s) requested in the certificate of correction is shown below.

1. ☒ Yes   ☐ No   ☒ Comments below

2. ☐ Yes   ☐ No   ☐ Comments below

3. ☐ Yes   ☐ No   ☐ Comments below

4. ☐ Yes   ☐ No   ☐ Comments below

☒ Comments   Proposed change to Col. 44, line 17 would make claim 30 a duplicate of claim 20.

Director                                          Group

**GENE-CEN 083223**

PTOL-306 (rev. 5/78)                    U.S. DEPARTMENT of COMMERCE-Patent and Trademark Office

Exhibit OO
Page 1564



**UNITED STATES DEPARTMENT OF COMME**
Patent and Trademark Office

Address : COMMISSIONER OF PATENTS AND TRADEMAR
Washington, D.C. 20231

FEB 11 1985

Patent No. 4,399,216
Richard Axel, et al.
Issued:  August 16, 1983
Processes for inserting DNA into eucaryotic cells and, etc.

Re:  Request for Certificate of Correction

Consideration has been given your request for the issuance of a certificate of correction in the above-identified patent under Rule 322.

A certificate of correction will be issued to correct the errors noted in your request, except for the alleged error in column 44, line 17.

Respecting the alleged error in column 44, line 17, your request was referred to the Group Director who reports as follows:

"Proposed change to Col. 44, line 17 would make claim 30 a duplicate of claim 20."

*Ruth C. Mason*
Ruth C. Mason
Manager, Publishing Division
Certificates of Correction Branch
(703) 557-0709

John P. White
Cooper, Dunham, et al.
30 Rockefeller Plaza
New York, New York  10112

242

G      N 083224

Correction Certificate

PAGE 1 of 2

MISSING

GENE-CEN 083225

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. :   4,399,216                                Page 2 of 2

DATED       :   August 16, 1983

INVENTOR(S) :   Richard Axel, Michael H. Wigler,
                Saul J. Silverstein

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 37, line 57, "ffrom" should read --from--.

Col. 38, line 60, after "A29" insert --DNA--.

Col. 44, line 68, "does" should read --codes--.

*Signed and Sealed this*

*Twenty-sixth* **Day of** *March 1985*

[SEAL]

*Attest:*

**DONALD J. QUIGG**

*Attesting Officer*        *Acting Commissioner of Patents and Trademarks*

24 b

GENE___N 083226

(3/85)

**SOLICITOR**

NOV 2 9 1990

S. PATENT & TRADEMARK OFFICE

Commissioner of Patents and Trademarks
Washington, D.C. 20231

**REPORT ON THE
FILING OR DETERMINATION OF AN
ACTION REGARDING A PATENT**

In compliance with the Act of July 19, 1952 (66 Stat. 814; 35 U.S.C. 290) you are hereby advised that a court action has been filed on the following patent(s) in the U.S. District Court:

| DOCKET NO. | DATE FILED | U.S. DISTRICT COURT |
|---|---|---|
| 90-677 | 11/20/90 | DELAWARE |

| PLAINTIFF | DEFENDANT |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK | GENETICS INSTITUTE, INC |

| | PATENT NO. | DATE OF PATENT | PATENTEE |
|---|---|---|---|
| 1 | 4,399,216 | 8/16/83 | The Trustees of Columbia University |
| 2 | 4,634,665 | 1/6/87 | The Trustees of Columbia University in the City of New York |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above-entitled case, the following patent(s) have been included:

| | INCLUDED BY | ☐ Amendment   ☐ Answer   ☐ Cross Bill   ☐ Other Pleading |
|---|---|---|
| | DATE OF PATENT | PATENTEE |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following decision has been rendered or judgment issued:

| DECISION/JUDGMENT | |
|---|---|
| | |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| John R. McAllister, Jr., | *Brian K Blackwell* | 11/26/90 |

Copy 1 — Upon initiation of action, mail this copy to Commissioner

GENE-CEN 083227

Exhibit OO
Page 1568