UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


CENTOCOR ORTHO BIOTECH, INC.,        )
                                     )
                    Plaintiff,       )   No. CV 08-3573 MRP
                                     )
          v.                         )
                                     )
GENENTECH, INC., et al.,             )
                                     )
                    Defendants.      )


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE MARIANA R. PFAELZER

SENIOR U.S. DISTRICT JUDGE PRESIDING

LOS ANGELES, CALIFORNIA

AUGUST 17, 2010


MOTIONS HEARING


BRIDGET R. MONTERO, CSR 10020, RMR, CRR
United States Courthouse
312 North Spring Street, Room 435
Los Angeles, California 90012
www.bridgetmontero.com
Internal File No. 10061

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4

 5   Akin Gump Strauss Hauer & Feld LLP
     BY:  DIANNE B. ELDERKIN
 6   BY:  STEVEN D. MASLOWSKI
     BY:  BARBARA L. MULLIN
 7   Two Commerce Square
     2001 Market Street, Suite 4100
 8   Philadelphia, PA 19103

 9

10

11   For the Defendants:

12

13   Durie Tangri LLP
     BY:  DARALYN J. DURIE
14   217 Leidesdorff Street
     San Francisco, CA 94111
15

16

17   Kirkland & Ellis LLP
     BY:  MARK A. PALS
18   300 North LaSalle Street
     Chicago, IL 60654
19

20

21   Irell & Manella LLP
     BY:  DAVID I. GINDLER
22   BY:  JOSEPH M. LIPNER
     1800 Avenue of the Stars, Suite 900
23   Los Angeles, CA 90067

24

25                       - - - - -
```

```
 1              TUESDAY, AUGUST 17, 2010; 11:00 A.M.

 2                        - - - - -

 3

 4              THE CLERK:  In the matter of Calendar Item No. 1,

 5    Case No. CV 08-3573, Centocor Ortho Biotech, Inc. v.

 6    Genentech, Inc.

 7              Counsel, please state your appearances for the

 8    record.

 9              MS. ELDERKIN:  Good morning.  Your Honor.  Dianne

10    Elderkin on behalf of Centocor Ortho Biotech and the

11    counterclaim defendants.  And here with me are my partners,

12    Barbara Mullin and Steve Maslowski, and we'll be sharing

13    duties today on handling the arguments.

14              MS. DURIE:  Good morning, Your Honor.  Daralyn

15    Durie appearing on behalf of Genentech.  Also present are

16    Mark Pals and Adam Brausa from Kirkland & Ellis --

17              THE COURT:  Yes.

18              MS. DURIE:  -- also appearing on behalf of

19    Genentech.  Present, also, are Gary Loeb and Laura Storto

20    from Genentech.

21              MR. GINDLER:  David Gindler and Joseph Lipner of

22    Irell & Manella on behalf of City of Hope.

23              MR. LIPNER:  Good morning.

24              THE COURT:  We're going to start with this motion

25    that you made, Ms. Durie, about Dr. Wall.  Shall we do that?
```

```
 1          MS. DURIE:  Yes.

 2          THE COURT:  Before you get started, let me say --

 3     and this has no -- this doesn't favor either side.  I'm

 4     just -- I'd just like to observe that I have tried hard to

 5     understand the points that Dr. Wall was apparently making,

 6     and I have tried hard to see how they relate to particular

 7     issues, but because they came in the way in which they did,

 8     I'm not positive that I have a total fix on it.

 9          So in the course of your talking about this, let's

10     see what you think the testimony would be used for.  It is

11     quite -- it has been quite hard for me to answer the

12     question, what is that paragraph -- what issue that

13     paragraph of what he says is pointed at.  I can't do better

14     than that.

15          MS. DURIE:  Okay.  Thank you, Your Honor.  And I

16     appreciate that guidance.

17          Let me start by making one global observation that

18     I think cuts across many of the opinions that Dr. Wall has

19     rendered.  Centocor's primary complaint in its opposition to

20     this motion appeared to be that we had taken Dr. Wall's

21     deposition testimony out of context, and that based on what

22     I characterized as those snippets of deposition testimony,

23     that the Court was not in a position to evaluate the

24     significance of Dr. Wall's testimony as a whole.

25          Now, as this Court is well aware, we did in fact
```

1    provide the entirety of Dr. Wall's deposition transcript to

2    the Court.

3              THE COURT:  And I read it.  I read it twice.

4              MS. DURIE:  Understood, Your Honor.

5              And, therefore, the Court did have an opportunity

6    to assess Dr. Wall's testimony in toto.

7              THE COURT:  Let me interrupt you now and remind

8    you of what I said at the beginning.  I now have some

9    testimony by way of declaration or report which doesn't

10   exactly fit into the deposition testimony.  Isn't it in

11   addition to what -- I should put it directly.

12             Did you know exactly what he was going to say in

13   toto when you took his deposition?

14             MS. DURIE:  No.  And certainly I did not know that

15   I would be unable effectively to cross-examine him with

16   respect to the bases for some of his opinions --

17             THE COURT:  Yes.

18             MS. DURIE:  -- or the significance of statements

19   that were included in documents cited and discussed in his

20   expert report because Dr. Wall had failed to review those

21   documents.

22             And the reason that I started where I did, I

23   thought it was an interesting observation on Centocor's

24   side, because in fact the precise problem with Dr. Wall's

25   testimony as a whole is that he did not have the opportunity

1    that this Court had to review the underlying record about

2    which he was opining in its totality.

3              He was, instead, merely provided with selected

4    excerpts from depositions and was not able in evaluating the

5    significance of that testimony to view it in context.  And

6    that is the most fundamental problem with Dr. Wall's

7    testimony.

8              It's one thing if the issue is whether the expert

9    in selecting the facts upon which that expert will rely

10   decides to ignore certain facts or that certain facts are

11   not germane to his analysis.  In that situation there is a

12   methodology that can be critiqued and that can be

13   cross-examined.  But the fundamental problem here is that

14   the process was backwards.

15             Rather than being presented with documents to

16   review where he could weigh the significance of the evidence

17   and select that evidence which he deemed germane to his

18   analysis, Dr. Wall was essentially presented with a fait

19   accompli, and it is -- it is that that the courts have

20   refused to countenance.

21             So in Atenol (ph), for example, the Court excluded

22   testimony where the expert had not surveyed the field in

23   order to reach his own opinions but was just relying on his

24   own unrefreshed recollection.  We pointed the Court to the

25   *Rockwell* case where the expert relied on digests of medical

1    histories rather than reviewing the underlying medical

2    histories themselves.

3            And as the Court said in *Rockwell*, a proffered

4    expert has to bring more to the jury than the lawyers can

5    offer in argument, and that, I think, Your Honor, is the --

6    is the common thread that underlies each of the opinions

7    that Dr. Wall has proffered.

8            The fact that he has even exemplary qualifications

9    and that he is a very experienced witness --

10           THE COURT:  He certainly has qualifications.

11           MS. DURIE:  He does, and he is very experienced,

12    and he's well-familiar with this process, but that is not a

13    substitute for his performing his own analysis.

14           Now, with respect to the specific opinions that

15    Dr. Wall has offered, first, he does offer an opinion on

16    claim construction --

17           THE COURT:  Yes, he does.

18           MS. DURIE:  -- and on what he considers the

19    appropriate scope of the claim to be.  However, he did not

20    review the file history in reaching that conclusion, nor did

21    he review the record of the reexamination, nor did he

22    understand the issues to which the reexamination was

23    addressed.

24           And for that reason alone, in addition to all of

25    the various reasons for which expert testimony is disfavored

1    in the claim construction process more generally, Dr. Wall

2    should not be permitted to offer either to this Court or to

3    a jury any opinion with respect to the meaning of the

4    claims.

5            Now, Dr. Wall also has a set of opinions on the

6    subject of obviousness-type double-patenting, and here the

7    fundamental -- there is one problem that stems from the

8    report and there is a different problem that stems from the

9    deposition.

10           The problem that stems from the report is that the

11   standard for obviousness-type double-patenting that Dr. Wall

12   purported to apply in the report is wrong.  In other words,

13   the obviousness-type or nonstatutory double-patenting

14   inquiry looks to comparing the scope of two claims and

15   whether one is an obvious variant of the other.  It is not

16   an unbounded exercise in surveying the prior art.

17           We are aware of no court that has adopted the type

18   of obviousness-type double-patenting test that Centocor is

19   proposing in Dr. Wall's report.  And, logically, there's a

20   good reason why that can't be the correct test.  Because if

21   it were possible simply to take the claims of the earlier

22   patent and combine them with all of the various prior art

23   references that are otherwise in play for purposes of a

24   conventional obviousness analysis and label that as

25   obviousness-type double-patenting, without focusing

1    specifically on the scope of the claim, then in every case

2    where there was a prior patent, the defendant would be able

3    to transform an obviousness case into an obviousness-type

4    double-patenting case simply by adding the prior claims into

5    the equation.

6           And the consequence of that would be, among other

7    things, that the defendant would argue that secondary

8    considerations of nonobviousness, for example, were no

9    longer in play.

10          That -- that cannot be correct.  And that is why

11   in the context of nonstatutory double-patenting the courts

12   have always focused very carefully on claim scope and not

13   simply on a traditional prior-art-based obviousness

14   analysis.  And yet in his report, Dr. Wall does not

15   specifically compare the scope of the claims.

16          Now, this became even more apparent at his

17   deposition where Dr. Wall admitted that he had no opinion as

18   to whether, for example, one could infringe the claim of the

19   '567 patent without infringing the claim of the '415 patent

20   or vice versa, and I think that right there is a sufficient

21   reason for the Court to preclude Dr. Wall from offering the

22   obviousness-type double-patenting opinion that is set forth

23   in his report.

24          Now, there was a second problem that became

25   apparent only at his deposition which is that Dr. Wall did

```
 1   not understand the obviousness-type double-patenting opinion

 2   that had been set forth in his report.  And when I

 3   endeavored to cross-examine him about the significance of

 4   the prior art in that context, he in fact indicated that, so

 5   far as he knew, the double -- the prior art was not even

 6   relevant to his opinion, and -- and therefore he was unable

 7   to be effectively cross-examined even with respect to the

 8   opinion that was set forth in his report.

 9          So I think for each of those reasons, both the

10   problem with the legal standard in the report and the fact

11   that Dr. Wall was unable at his deposition even to

12   articulate what it was that he had supposedly said in his

13   report --

14          THE COURT:  Well, it was not a satisfactory

15   deposition, but let me ask you this -- I agree about that.

16   What about infringement?

17          MS. DURIE:  So I think there is a predicate

18   problem with respect to Dr. Wall's opinion on infringement,

19   which is the claim construction question --

20          THE COURT:  Yes.

21          MS. DURIE:  -- that we will be addressing.  And I

22   don't think Dr. Wall should be permitted to offer any

23   testimony on that claim construction issue to the extent

24   that that is embedded in and a predicate for, which I think

25   it is, his ultimate conclusions with respect to
```

```
 1   infringement.

 2           THE COURT:  There is a further problem which is

 3   that the file history of the patent is relatively clear

 4   about that term.

 5           MS. DURIE:  I think that's right, Your Honor.

 6           THE COURT:  The term that he's talking about.

 7           MS. DURIE:  That's right.  Dr. Wall -- in offering

 8   his noninfringement opinion, Dr. Wall is focused on the

 9   limitation of -- that the molecules must be produced as

10   separate molecules.

11           THE COURT:  Yes.

12           MS. DURIE:  Now, we're going to discuss in the

13   context of Centocor's summary judgment motion, I expect, the

14   significance of that language, but the Court is correct that

15   that language cannot be understood divorced from the file

16   history of the patent, which is lengthy.

17           THE COURT:  Almost nothing can be understood

18   without looking at the file history.

19           MS. DURIE:  That --

20           THE COURT:  It is a daunting job, but you have to

21   do it.

22           MS. DURIE:  That is absolutely correct, and that

23   is, Your Honor, why I began this morning where I began,

24   which is that Dr. Wall's failure to have reviewed the file

25   history infects his ability to offer well-thought-out and
```

1    methodologically sound opinions across such a range of

2    topics because he has been deprived or chosen not to avail

3    himself of critical information in formulating those

4    opinions.

5           Now, with respect to written description, we have

6    some of the same concerns that are at play in

7    obviousness-type double-patenting, and some additional

8    concerns as well.

9           First, here, too, of course, Dr. Wall failed to

10   review the file history in order to understand the way that

11   the patent office interpreted the claims and what the patent

12   office understood to be disclosed.

13          Dr. Wall also applied an incorrect standard for

14   what constitutes written description.  This is one of the

15   places where Centocor complains that we were unfair to

16   Dr. Wall in our selection of his testimony.  But the Court

17   has had the opportunity to see the back-and-forth exchange

18   with respect to Dr. Wall's understanding of written

19   description, and I think it is apparent from the entirety of

20   that exchange that Dr. Wall did believe that in order to

21   satisfy the written description requirement, the inventors

22   had to demonstrate that they had actually reduced the

23   invention to practice.

24          Now, in this case they had, but that sort of

25   fundamental error of what is the correct standard then

1    infected Dr. Wall's ability to evaluate the significance of

2    other disclosures in the patent.

3           The other problem with Dr. Wall's analysis of

4    written description is that he purports to rely on

5    deposition testimony, on excerpts from the reexamination

6    record, and on portions of documents that Dr. Wall freely

7    admitted that he never read.  Precisely because his failure

8    to have read those documents means that he cannot have

9    evaluated that testimony in context and therefore cannot

10   meaningfully be cross-examined about it, he should not be

11   permitted to offer an opinion that relies on those sources

12   of evidence.

13          And -- and, you know, there are a number of

14   examples of this.  One example is his reliance specifically

15   in the context of written description on three lines from

16   Dr. Riggs's deposition, admitting that he was not even aware

17   that the testimony had been given in a different case and

18   did not have the opportunity to see Dr. Riggs's explanation

19   of that testimony in this case.

20          Another example his is reliance on Dr. Holmes's

21   deposition testimony where the report contains a

22   parenthetical characterizing that deposition testimony, but

23   Dr. Wall admitted he didn't even know who Mr. Holmes was.

24          It's -- the problem here is twofold.  It is the

25   fact that Dr. Wall did not do the work of an expert in

1    selecting that testimony and making a determination reading

2    through the record that these were the things that supported

3    his opinion and that his opinion was justified on the basis

4    of the record as a whole, and therefore he did not do the

5    work of an expert, and, secondly, that the consequence of

6    Dr. Wall having simply been fed these excerpts of record

7    rather than having reviewed the record himself is that it

8    precludes the ability effectively to cross-examine him.

9         Now, the next sort of category of opinions that

10   Dr. Wall has to offer have to do with the prior art and the

11   significance of that prior art, be it in the context of

12   anticipation or be it in the context of obviousness.  And

13   here, too, the problem is what Your Honor previously

14   identified sort of in a nutshell, that Dr. Wall did not

15   review the file history and he did not review the

16   reexamination record, and he therefore has not grappled with

17   the way that the PTO assessed the significance of that prior

18   art and why it is, either in the first instance or in the

19   second instance at the conclusion of the reexamination, that

20   the patent office made a determination based on this same

21   prior art upon which Dr. Wall is relying that the claims of

22   the patent should issue.

23        And that is important because each of the

24   references here, whether it's Rice and Baltimore, Oy (ph),

25   Ochi, Axel, are references that were before the Patent and

1    Trademark Office, and Dr. Wall should not be permitted to

2    insulate himself from examination with respect to the PTO's

3    determination of those references by failing to review the

4    record.

5          Certainly Dr. Wall should not be able to offer an

6    opinion, as he does in his report, that the Patent and

7    Trademark Office did not consider whether Axel anticipates

8    the claims of the '415 patent both because that is incorrect

9    as a matter of law, since Axel was before the office and

10   they, therefore, did have an obligation to consider whether

11   that art was anticipatory, but also because Dr. Wall cannot

12   possibly have any basis for expressing that view having

13   failed to read those underlying documents.

14         And so I think, Your Honor, in each case we come

15   back to what is at its core the same fundamental two

16   problems, either that the legal standard that Dr. Wall was

17   endeavoring to apply was wrong or that his understanding of

18   it was wrong; or, and I think even more problematically,

19   that Dr. Wall simply did not have the opportunity to do what

20   experts are supposed to do, which is not to receive a report

21   that has been written with evidence cited in it and sign off

22   on it, but rather to review that evidence in the first

23   instance and select from it those facts that are germane to

24   the expert's opinion.

25         Weighing the evidence pro and con, that is the

```
 1   essence of the expert task.  That is what ensures at least

 2   some level of methodological rigor.  That is what affords

 3   the opportunity to cross-examine an adverse witness, and

 4   that was what was not present here.

 5              THE COURT:  Thank you.

 6              MS. DURIE:  Thank you.

 7              THE COURT:  Please.

 8              MS. MULLIN:  Thank you, Your Honor.

 9              Defendants' motion here was made under Daubert,

10   and what Daubert really talks about is the requirement that

11   expert testimony is reliable and relevant.  And the

12   reliability is established when the expert's testimony

13   relates to scientific knowledge.  And defendants have not

14   challenged the scientific validity of Dr. Wall's opinions.

15              He has given opinions about the substance of what

16   Axel discloses.  He has given opinions about the substance

17   of what the other prior art references disclose; Rice, Oy,

18   Ochi.  He's given a description of the --

19              (Interruption by reporter.)

20              MS. MULLIN:  He has given a description of the

21   prior art references.

22              MS. DURIE:  He's given an opinion of the substance

23   of the --

24              THE COURT:  And then you were on Ochi.

25              MS. MULLIN:  Okay.  Do you want me to try again?
```

```
 1              THE COURT:  Yes.

 2              MS. MULLIN:  So when you look up at the scientific

 3     substance of Dr. Wall's opinions, what underlies opinions on

 4     anticipation, what underlies opinions on obviousness or

 5     obviousness-type double-patenting on written description and

 6     on noninfringement, the scientific substance of Dr. Wall's

 7     opinions about what each of those references discloses about

 8     how that compares to the claims that are issued here, viewed

 9     in the context of the Court's claim construction order, is

10     given an analysis of the written description or lack thereof

11     in the Cabilly patent for the use of genomic DNA in the

12     claim -- in the asserted claims here.  And he's given

13     opinions on noninfringement.  And the scientific substance

14     of those opinions has not been challenged by defendants.

15              THE COURT:  Well, he's qualified, all right.

16     There's no doubt about that.  He's qualified to give

17     opinions.

18              The problem was -- is the opinion -- does the

19     opinion have to take into consideration the other -- any

20     contrary facts that are in the file history.  This file

21     history is replete with argument, views that later on

22     change.  It's a very unusual --

23              MS. MULLIN:  That's right.

24              THE COURT:  -- file history.

25              MS. MULLIN:  And if there's something in the file
```

```
 1    history or if there's something in the deposition testimony

 2    that somehow undermines or contradicts what Dr. Wall says,

 3    that's appropriately the subject of cross-examination.

 4          They are free to point to the 40 or 50 or whatever

 5    boxes of documents it is that includes the file history and

 6    say, Dr. Wall, when you said that Axel discloses X, did you

 7    know that at page 9,957 of the reexam file history the

 8    Patent and Trademark Office said why.  But that's

 9    cross-examination.  That's not a basis for precluding an

10    expert from giving opinion testimony.

11          THE COURT:  Well, here's the point.  At the

12    deposition you're getting ready to do that at a trial.  In

13    other words, the deposition, one of the reasons you take it

14    is you want to see what the witness will answer when you put

15    that to them.  And he couldn't answer because he hadn't read

16    the file history.  And what you're saying is, so ask him

17    that in the presence of the jury and you can read the

18    answer.

19          MS. MULLIN:  That's right.

20          THE COURT:  But by that time, you'll be ready, and

21    you don't know what his answer will be.

22          MS. MULLIN:  Well, I don't know how ready anybody

23    can be with 40 or whatever boxes of documents on these

24    issues, but I also don't know how relevant they are to

25    the -- as you note in their papers, they don't say, Look,
```

```
 1    here's something in the file history that proves that what

 2    Dr. Wall said is so scientifically flawed that no reasonable

 3    jury could return a verdict in his favor, or here's

 4    something in the reexamination record or the interference

 5    that proves that Dr. Wall's opinion is totally without

 6    merit.

 7            Even on the issue of written description, when

 8    they say, Oh, he hasn't looked at the entire file history,

 9    if there's something in the file history that contradicts

10    his opinions, they can point it out to him, and they can go

11    back to his deposition and say, And when we asked you this

12    question at your deposition, you said you hadn't considered

13    that, and the jury can consider that as one of the facts in

14    weighing the credibility of Dr. Wall's opinions.

15            But that's not a basis for precluding him from

16    testifying when his opinions are scientifically reliable and

17    would be helpful to a jury.

18            THE COURT:  Now, could I ask you what I do about

19    the infringement testimony?

20            MS. MULLIN:  Well, there was a claim construction

21    for the "produced as separate molecules" element.

22            THE COURT:  Yes, right.

23            MS. MULLIN:  The Court said give it its plain

24    meaning, and that's what he did.  So I'm not sure the basis

25    for precluding him from testifying based on following the
```

1    Court's instruction.

2            Obviously, if the Court issues some subsequent

3    claim construction ruling that changes its earlier opinion,

4    then we may ask for leave to --

5            THE COURT:  We'll get -- we'll get to that.

6            I take your point.  No reason to exclude him.

7    Yes.

8            MS. MULLIN:  And a lot of this seems to be that

9    there were -- there were questions at the deposition that

10   were phrased in a way that fell within this stipulated

11   provision in the protective order that protects certain

12   communications and drafts, et cetera, with expert reports.

13           But what they never asked Dr. Wall, and what

14   they're asking the Court to infer a negative answer to, is

15   the question:  Are these your opinions?  Did you review

16   Axel?  Did you understand what was going on in the field at

17   the time?  Is this opinion based on your scientific

18   knowledge?

19           They never asked him that question -- or those

20   questions, and now they want the Court to infer that the

21   answer to those is no and not allow him to testify at all.

22   I would welcome them to ask Dr. Wall on the stand if they're

23   his opinions.

24           Let me address a few of the other points.  On the

25   issue of obviousness-type double-patenting, we can look at

```
 1    Dr. Wall's report where he clearly talks about the claims of

 2    the '567 patent.

 3              THE COURT:  I did.  I looked at them.

 4              MS. MULLIN:  He does the comparison.  I

 5    understand, you know, during his deposition he was asked, Is

 6    there a difference between obviousness-type double-patenting

 7    and obviousness, and he said, Yes.  I'm not actually quite

 8    sure what the issue is here.  He did use the Cabilly I

 9    patent claims as a baseline for --

10              THE COURT:  Well, he technically -- this is a

11    question of legal definition, and he did, in the Court's

12    opinion, not have the right definition in mind.  That's all

13    I can say about it.

14              MS. MULLIN:  What will happen at trial is he can

15    give -- he can say, Here's what the Cabilly I claims say,

16    here's what the Cabilly II claims say, here's my opinion as

17    to why they're not patentably distinct.  The Court is going

18    to instruct the jury on the law anyway.  I can't imagine

19    Mr. --

20              THE COURT:  In this particular instance, this is a

21    very tough question, the issue he was dealing with.

22              MS. MULLIN:  It is a tough legal question, you're

23    right.

24              THE COURT:  Tough, tough issue.

25              MS. MULLIN:  And he was not very facile in
```

1   explaining the law.

2           THE COURT:  No.

3           MS. MULLIN:  But he's not going to be explaining

4   the law to the jury.  He can give, Here's what Cabilly I

5   claims are.  Here's my opinion as to whether or not they're

6   patentably distinct from the Cabilly II asserted patent

7   claims here.  The Court is going to instruct on the law

8   anyway, and then the jury can go back, and they -- they're

9   ultimately going to decide anyway for all of these issues

10  whether the scientific basis for his opinion matches the

11  opinion in view of the law that the Court instructs.

12          On the issue of written description, he did have

13  the law correct there.  He was asked, Do you have to have an

14  example to satisfy the written description requirement, and

15  he said, No.  He was asked, Does there have to be an actual

16  reduction to practice, and he said, No.

17          But then he was asked, So what kinds of things

18  would be good evidence of the applicant's having possession

19  of the invention, and he gave some explanations as to that.

20  That's different than saying he misunderstood the law.

21          And, again, if they want to cross-examine him

22  about -- bless you -- about the bases for his opinions,

23  they're free to do so, and the Court will instruct on the

24  law, and the jury can sort it all out.

25          The same issue on written description where they

```
 1   say, He didn't look at the entire record of this deposition

 2   testimony.  I mean, there's a voluminous record in this

 3   case.  But they haven't pointed to anything in the

 4   deposition testimony that he didn't consider that would

 5   undermine the scientific reliability of his opinions.  And

 6   if they want to do that, again, during trial, they can do

 7   it.  They can cross-examine him on that subject matter.

 8           Finally, I think there was an issue with respect

 9   to the way the PTO made certain determinations about Axel.

10   There seems to be an argument that Dr. Wall should not be

11   able to testify about Axel anticipating -- I guess it's

12   anticipating the claims here because the PTO considered Axel

13   in the context of some other rejections in the patent office

14   during the reexam.  Well, that -- of course, Dr. Wall is

15   free to disagree with the PTO.

16           We wouldn't have district courts and juries

17   considering validity after a patent issued if experts were

18   not free to disregard -- or disagree with the examiner's

19   assessment of what was disclosed by a prior art reference or

20   how it applied.

21           Particular statements at issue here that Dr. Wall

22   made were that there were no arguments about anticipation

23   made during the reexam proceeding.  Defendants have conceded

24   that's true.  They're now arguing that his opinion should

25   nonetheless be disregarded because somehow he should have
```

```
 1    known that the PTO has some regulation in 37 CFR that talks

 2    about completely considering all bases of patentability and

 3    he didn't know about that.  And, again, if that's really

 4    critical to his opinion, then they should cross-examine him

 5    on it.

 6            But, frankly, it doesn't make what he said in his

 7    report wrong, and it doesn't undermine the scientific

 8    validity of his opinions.

 9            So I think the one other issue is this issue about

10    claim construction and the opinion that Dr. -- Dr. Wall gave

11    in his opening report, which would have been the report

12    where he talked about issues on which we have the burden of

13    proof, was that the Cabilly II patent does not provide a

14    written description for an invention where genomic DNA is

15    used.

16            There is an express statement in the Cabilly

17    specification that says that when you're making the

18    antibodies in the present invention, that the DNA that you

19    use is cDNA, and on that basis, if the claims are such that

20    they encompass cDNA as well as genomic DNA, those claims are

21    invalid because the Cabilly II specification does not

22    provide written description for that.

23            Now --

24            THE COURT:  When -- when did that enter the case?

25            MS. MULLIN:  Well --
```

```
 1              THE COURT:  Because I've never seen that before.

 2    I know that it's in there now.  I know what he said about

 3    it.  I am somewhat baffled by the issue because I have

 4    not -- I understand generally how he sees it, but I've never

 5    thoroughly gotten into that.

 6              MS. MULLIN:  Well, there is a phrase in each one

 7    of the asserted claims here, DNA sequence and coding, and

 8    the question is what does that mean.  And during the claim

 9    construction process early in the case, nobody brought it

10    up, and, obviously, we hadn't appreciated that there might

11    be an issue at that time.

12              THE COURT:  I should say nobody brought it up.

13              MS. MULLIN:  I know.  But we recognize now that

14    Dr. Wall, having given his opinion -- that there's a lack of

15    written description for genomic DNA, and that some of this

16    might revolve around the construction of that phrase, DNA

17    sequence and coding; that either the defendants could ask or

18    the Court could decide that it's appropriate to have claim

19    construction of that term now.

20              And so in the event that's going to happen,

21    Dr. Wall did provide some information in his report that

22    might be helpful to the Court.

23              THE COURT:  It -- if it had come up sooner, if the

24    Court had been given an opportunity to look at this issue, I

25    might be able to tell you how I feel about it.  It's just
```

```
 1   actually right out of the blue.  I have not seen that

 2   argument before, and I thought I really had seen every

 3   argument that could be made about it in one way or another;

 4   not necessarily in this case, but I've seen almost all the

 5   arguments, and I have read the file history on more than one

 6   occasion, and I've never seen this issue.

 7          MS. MULLIN:  And, actually, that's one of the

 8   reasons why Dr. Wall provided it in his report, an

 9   explanation that maybe isn't so apparent to me, but when you

10   understand the science and understand what the Cabilly

11   applicants were arguing to distinguish over prior art

12   references, you understand that one of the ways they were

13   distinguishing their invention was by saying, Look, prior

14   art used genomic DNA.  We used cDNA.  And that was some of

15   the basis for some of their arguments during prosecution.

16          THE COURT:  You may believe me when I reiterate to

17   you that I didn't think there was something that I had

18   missed in Cabilly.  I don't believe that I have seen this

19   argument before.  I don't know what to do with it.

20          MS. MULLIN:  Well, the issue of claim construction

21   can be one that's resolved later, but regardless of how that

22   is resolved, there's no basis for precluding Dr. Wall from

23   testifying that what the Cabilly specification says is that

24   the present invention is made using cDNA.  That's what it

25   says.  And when he reads that as someone who's skilled in
```

```
 1   the art, he does not believe that the Cabilly applicants

 2   have conveyed that they were in possession of an invention

 3   that utilized genomic DNA.  And it really makes sense,

 4   because the Cabilly specifications talk about using E.coli,

 5   and you can't use genomic DNA in E.coli.

 6           THE COURT:  So he says.

 7           MS. MULLIN:  So that opinion stands alone and is

 8   completely separate from --

 9           THE COURT:  I'll say it's -- I should say it does.

10           I don't know what to say about this right at the

11   moment.  I've said everything I can say.  I have been

12   puzzling over it.  That is the one thing that I particularly

13   wanted to deal with.

14           Fine.  Is there anything else?

15           MS. MULLIN:  No.  I'll just close by saying if

16   Dr. Wall's opinions were so scientifically flawed, we would

17   be here defending against a number of summary judgment

18   motions, but we're not because it's not the scientific

19   substance of Dr. Wall's opinions that are being challenged.

20   They're reliable and they're relevant, and therefore under

21   Daubert and the factors articulated by the Ninth Circuit,

22   they're admissible.

23           THE COURT:  All right.  Now, I just want to ask

24   you, please, to comment on the last thing that we were

25   talking about because I was -- I was reading along, and
```

```
 1  there is something that hasn't come up before.

 2              MS. DURIE:  The Court is correct.  That is not

 3  something that has come up before.

 4              THE COURT:  Now, I mean in other cases even.

 5              MS. DURIE:  Correct.  This is an entirely new

 6  issue that was raised in this case well after the claim

 7  construction process.

 8              THE COURT:  That's quite so.

 9              MS. DURIE:  In which Dr. Wall offers the opinion

10  that the term "DNA sequence" would be understood to be

11  limited to cDNA and that it would not encompass genomic DNA.

12              THE COURT:  That's right.

13              MS. DURIE:  Notwithstanding that there is no such

14  limitation in the claims of the patent.

15              THE COURT:  No, there isn't.

16              MS. DURIE:  Notwithstanding that there is a

17  discussion in the specification of the patent relating to

18  practicing the invention in mammalian cells.

19  Notwithstanding that our expert has proffered an opinion

20  that in reading the specification and the discussion of

21  mammalian host cells, there are references that a person of

22  skill in the art would understand to be references to

23  genomic DNA.

24              Now, of course, Dr. Wall has not read that, and

25  so, therefore, could not be examined about it.  This is --
```

1    this is a new issue.  He brings it both as a claim

2    construction issue and as a written description issue.

3             THE COURT:  Yes.

4             MS. DURIE:  But in neither case has he done the

5    work that would be required for him to render a competent

6    opinion because both claim construction and an evaluation of

7    the written description issue would require Dr. Wall to have

8    read the record.

9             For purposes of written description, here is where

10   he is relying on testimony from Art Riggs, admitting that he

11   has not read that testimony in context.  That is where he is

12   relying purportedly on the testimony of one of the inventors

13   whose deposition apparently he hadn't read at all.

14            The -- what *Daubert* -- *Daubert* is not simply

15   directed to whether an expert's opinions are couched in

16   terms of science.  There are three requirements for *Daubert*:

17   7021, the expert must identify and assemble the relevant

18   facts; 7022, the expert must understand the applicable legal

19   principles; and 7023, the expert must apply those principles

20   and appropriate scientific methods reliably to the facts of

21   this case.

22            The problem here is not whether the substance of

23   Dr. Wall's testimony is directed to issues of science.  The

24   problem is that there is no scientifically reliable

25   methodology underlying his opinions, and that is equally

1    true with respect to his opinions directed to genomic DNA.

2         And it is not a sufficient answer to say that

3    Dr. Wall can be cross-examined on the universe of things

4    that he failed to consider in front of the jury because

5    *Daubert* places responsibility in the courts to exercise the

6    gatekeeping function and ensure that testimony that lacks

7    methodological rigor, where the expert has not worked in the

8    same way that he works in the field in order to present

9    opinions to the jury, and there is no universe in which the

10   normal way that a scientist such as Dr. Wall formulates

11   opinions is to rely on excerpts of records selected by

12   counsel.

13        That's why in the *Rockwell* case the Court did not

14   undertake any inquiry into whether the expert's opinions

15   were correct, whether they were scientifically valid,

16   whether he had made mistakes in -- in analyzing the

17   significance of the evidence.  The Court instead pointed to

18   a much more fundamental problem which was that the expert

19   was relying on digests of testimony prepared by counsel, and

20   that methodological error was sort of in and of itself

21   sufficient to exclude the expert's testimony.

22        That is the case here.  Dr. Wall has simply failed

23   to do the work of an independent expert with respect to each

24   of these issues.

25        THE COURT:  Now, we didn't have that opinion at

1    the time you took his deposition, did we?

2             MS. DURIE:  *Rockwell*, I believe -- I don't

3    remember when the Rockwell opinion came down, but there

4    are -- if that's what the Court is referring to, but there

5    are a number of opinions that are along the same lines and

6    that make clear that the -- the task is not -- the task

7    here -- the predicate task here is to assess whether the

8    expert has selected the facts, analyzed some universe of

9    evidence, and made decisions with respect to what evidence

10   does and does not support the expert's position.

11            And here, it is not simply the case that Dr. Wall

12   made decisions that certain pieces of evidence were not

13   germane to his analysis and could be cross-examined about

14   that; he is ignorant.

15            Counsel's correct.  It would be very difficult to

16   cross-examine Dr. Wall with respect to the 40 pages -- 40

17   boxes of the reexamination record and associated file

18   history if he hasn't read any of it and, therefore, to

19   elicit from him any intelligent opinions as to the

20   significance of that evidence, and that's why the courts

21   require experts to engage in the work of an expert

22   themselves and not simply to recite opinions based upon

23   evidence, all of which has been generated by counsel.

24            THE COURT:  Thank you.

25            MS. DURIE:  Thank you.

```
 1              THE COURT:  All right.  Now let's go on to no

 2    willfulness.

 3              MS. MULLIN:  Your Honor, if I may make just one or

 4    two comments?

 5              THE COURT:  Yes.

 6              MS. MULLIN:  Written description is assessed based

 7    on the four corners of the specification, period.  That's

 8    the law.  All this argument about, you know, Dr. Wall should

 9    be precluded from giving testimony about his written

10    description opinion because he didn't consider 40 boxes of

11    reexamination prosecution history is a complete red herring.

12    Written description is reading the specification to someone

13    skilled in the art, appreciate that it conveys that the

14    applicants possess the invention.

15              THE COURT:  Thank you.

16              MS. MULLIN:  Thank you.

17              THE COURT:  Now let's go on.  And you've got four

18    motions here, and you can address them all at the same time,

19    if you want to, or you can do whatever you like.

20              MR. MASLOWSKI:  Your Honor, I think I will just

21    address the first one.

22              Your Honor, we've prepared a slide presentation

23    for all of our motions, and we've also printed out the

24    slides, so with your permission, I'll hand up a couple of

25    copies.
```

```
 1            THE COURT:  Certainly.

 2            MR. MASLOWSKI:  Good morning, Your Honor.  I'll be

 3  addressing, as I mentioned, Centocor motion number one.

 4            Centocor has moved for summary judgment of no

 5  willful infringement.  And with your indulgence, I'll just

 6  take two minutes to kind of set the stage for this motion.

 7            The Seagate test out of the federal circuit was a

 8  two-prong test for willful infringement.  Just generally,

 9  the first prong of the test is an objective analysis, and

10  the second part is a subjective analysis.

11            THE COURT:  I know.

12            MR. MASLOWSKI:  Our motion focuses solely on the

13  objective portion.  There are three tidbits of law that are

14  primarily relevant to our motion.

15            The first is the state of mind of Centocor is

16  completely irrelevant to Centocor's motion, as is any

17  evidence related to the issue.  The second point is the

18  reexamination of the PTO is a factor that may weigh against

19  a finding of objective recklessness.  And the third point is

20  that legitimate defenses to infringement and credible

21  invalidity arguments also weigh against objective

22  recklessness.

23            THE COURT:  What's the time period we're looking

24  at here now?

25            MR. MASLOWSKI:  Very good question, Your Honor.
```

1    I'll go to my slide here that I created as a timeline.

2              THE COURT:  Oh, yes.

3              MR. MASLOWSKI:  I will say for the record that I

4    did do this all by myself.

5              So the time period that we're focusing on, really,

6    for purposes of willfulness, is the first point of

7    infringement which would be Remicade in October of 2008.

8              Obviously, we have to look a little bit back in

9    time.  So working left to right on the timeline, the PTO

10   granted the reexamination in July of 2005, and then

11   critically -- the critical point to this motion is Centocor

12   filed a lawsuit in May of 2008 where it, as plaintiff,

13   asserted claims seeking to invalidate the Cabilly II patent,

14   seeking to have it declared unenforceable and also seeking a

15   finding of noninfringement.

16             After that time period, as the reexamination

17   continued, Centocor terminated its license to Celltech, and

18   in October of 2008, the first alleged Remicade infringement

19   occurred.

20             Shortly after that time frame -- I shouldn't say

21   "shortly after that time frame."  Months after that time

22   frame, the PTO issued its notice of intent to issue the

23   reexamination certificate.  Then after that time frame,

24   Simponi, another accused product in this case, launched, and

25   then a month or so after that, the reexamination certificate

 1   issued from the PTO officially ending the reexamination.

 2          Now, defendants make a -- or attempt to make a

 3   big -- or make an argument about that, that the termination

 4   of the reexamination should be dispositive in their favor.

 5   That ignores one big factor.  That factor is that by the

 6   time the reexamination had terminated, we were months and

 7   months and months into this lawsuit, and the law says that

 8   credible invalidity and noninfringement arguments is

 9   evidence of lack of objective recklessness.

10          So by the time the reexamination terminated in May

11   of 2009, it said, We are a year into this lawsuit, and, has

12   just been discussed, for example, in the last motion, it's

13   clear that Centocor has credible invalidity arguments, for

14   example, with respect to the written description issue.

15          So after the reexamination certificate issues,

16   Stelara, another accused product, launches and brings us

17   forward to today.

18          So to touch on a couple of points that defendants

19   made in their motion, again, the Centocor-Celltech license

20   is completely irrelevant to this motion.  The law is clear

21   that Centocor's subjective state of mind has no bearing on

22   the objective prong, and that's where their arguments are

23   directed at; that somehow Centocor's subjective state of

24   mind with respect to its termination, the valid termination,

25   of that license is somehow evidence of objective

1    recklessness.

2          That is in fact not true.  Centocor is entirely

3    permitted to terminate that license.  And even if wasn't,

4    even if there was the chicanery the defendants seemed to

5    have drummed up in their opposition motion, the bottom line

6    is, it is totally irrelevant to this motion.  This motion

7    focuses on the objective prong.  So Centocor's subjective

8    state of mind has no bearing whatsoever.

9          In addition, defendants allege that somehow our

10   continued payment under the ReaPro license, another Cabilly

11   license for the product ReaPro sells, is also somehow

12   evidence of objective recklessness.  Again, two points, the

13   first being the most important:  Centocor's subjective state

14   of mind with respect to what it is doing with respect to its

15   ReaPro license is totally irrelevant to the objective prong;

16   the second point is it makes complete business sense for

17   Centocor to continue to pay on its ReaPro license.

18         As this Court will recall, there was extensive

19   briefing and a summary judgment hearing on the covenant not

20   to sue that's contained in that ReaPro license.  The Court

21   determined that at least as far as Centocor Ortho Biotech,

22   Inc., in the product Remicade, Centocor Ortho Biotech, Inc.,

23   has a covenant not to sue from defendants for that product.

24         Obviously, if Centocor were to terminate the

25   ReaPro license, defendants would allege that that covenant

```
 1   was extinguished as well.  So it makes perfect sense for

 2   Centocor to continue to pay for the ReaPro license.

 3           Again, going back to the primary point, whatever

 4   Centocor is doing with respect to its ReaPro license is

 5   irrelevant to the objective prong.

 6           So, in sum, the defendants make -- or attempt to

 7   make points about the -- about Centocor's defenses and say

 8   that they lack merit; that, for example, Dr. Wall, which

 9   we've already been through -- that somehow Dr. Wall's

10   opinions show that Centocor does not have credible and

11   legitimate defenses in this case, but, as my colleague,

12   Ms. Mullin, said, it's interesting that defendants have

13   filed no summary judgment motions on their own.

14           If our defenses -- our noninfringement defenses,

15   if our invalidity defenses, our enforceability defenses were

16   as weak as they might suggest, it's likely we would have

17   seen summary judgment motions in some fashion from them, but

18   we have not.

19           It's also important to note that we don't have to

20   prove that our defenses would win.  The law is clear that

21   they just need to be legitimate defenses.  They need to be

22   close calls.  We do not have to show for our motion that we

23   would actually prevail.

24           So, as I mentioned previously, it seems as if the

25   written description motion is certainly, at a minimum, a
```

```
 1    close call, although Centocor suggests that it's obviously

 2    in their favor, but at a minimum, I think all parties will

 3    agree that it's a close call.  So that alone is a sufficient

 4    defense, a credible defense, that supports a lack of

 5    objective recklessness.

 6            And again, just briefly, a point made in our

 7    briefing relates to the claim construction arguments.  We

 8    had claim construction arguments that we set forth but

 9    failed.  If those claim construction arguments would have

10    prevailed, we would have had additional noninfringement

11    positions.  That evidence, too, weighs in favor of a lack of

12    objective recklessness.

13            In sum, the two primary events that we focus on in

14    our brief and in our motion are the reexamination proceeding

15    and our credible and legitimate defenses.

16            And I should point out that it seems that

17    defendants do not dispute that at least up until the time of

18    the conclusion of the reexamination, there can be no

19    objective recklessness.  They don't seem to counter that

20    point in their brief at all.  So at a minimum, up until May

21    of 2009, there can be no objective recklessness.

22            Their brief, however, as I mentioned, fails to

23    acknowledge that our lawsuit at that time was pending, and

24    we had our legitimate defenses in place such that our motion

25    should be granted not only until up until the end of the
```

```
 1   reexamination period but through the entire case.

 2         My last point that I will raise relates to

 3   defendants' allegations in their opposition brief that

 4   somehow there are documents out there that have not been

 5   produced related to this issue.  Again, as with all their

 6   other arguments, the documents that they're complaining

 7   about relate to Centocor's state of mind with respect to its

 8   Celltech license.  Again, that issue is completely

 9   irrelevant to their motion.

10         The second point is, we've produced everything

11   that they've asked for.  There was testimony in April of

12   this year where a Centocor witness indicated that Centocor

13   stopped paying its Celltech royalties because they believed

14   the patent was invalid.  Lawyers for the defendants sent a

15   letter to Centocor and said, Your witness just waived on the

16   issue of validity of the patent, the Cabilly II patent.  We

17   want all documents on that issue.  We said okay, and we

18   produced those documents.

19         It was at that time, after we agreed to produce

20   those documents, that they then sought to broaden the scope

21   well beyond just the validity of the Cabilly II patents.

22   They wanted all --

23         THE COURT:  I'm not sure I understand the point

24   you're making.

25         MR. MASLOWSKI:  I'm countering their argument that
```

```
 1    somehow they say that there are documents that need to be

 2    produced that are relevant to this issue.

 3              THE COURT:  Oh, I see.

 4              MR. MASLOWSKI:  The first point is, they're just

 5    not relevant to the disposition of this motion.  The second

 6    thing -- the second point I'll just make in closing, is all

 7    the documents have been produced.

 8              THE COURT:  Now, how are we going to proceed?  Are

 9    you going to oppose this right now?

10              MR. LIPNER:  Whatever Your Honor wishes.  I would

11    be happy to address these arguments.

12              THE COURT:  Please.

13              MR. LIPNER:  Joseph Lipner of Irell & Manella for

14    City of Hope, Your Honor.

15              THE COURT:  Yes.  Good morning.

16              MR. LIPNER:  Good morning.

17              May I ask for -- may I place slide 6 from

18    Centocor --

19              MR. MASLOWSKI:  Just the back arrow.

20              MR. LIPNER:  Just the back arrow?  Page up?

21              THE COURT:  Slide 6.

22              MR. LIPNER:  Your Honor started with a very

23    pertinent question to counsel for Centocor, and that is,

24    what time period are we talking about in connection with the

25    claim of willfulness in this case.  We have in -- under the
```

1    facts in this record some classic willfulness facts which,

2    in our view, not only overcome the request for summary

3    judgment but make this a particularly compelling case for a

4    finding of willfulness, and that can be seen from the very

5    timeline of events in this case.

6            There is no question that in February of 2009 the

7    patent office, as Your Honor is well aware, issued its

8    notice of intent to issue the reexamination certificate, and

9    we have testimony from Centocor's chief executive officer

10   and designee on willfulness issues, Robert Baysmore (ph),

11   that notwithstanding the issuance of the NIRC, Centocor took

12   no other action to ensure that it was respecting Genentech

13   and City of Hope's patent rights.

14           Mr. Baysmore also testified, in his capacity as

15   designee for Centocor, that it was Centocor's hope and

16   position that the reexamination would be successful in

17   invalidating the Cabilly patent and that that would be the

18   basis for not paying royalties further on the Cabilly

19   patent.

20           Notwithstanding that hope, notwithstanding the

21   testimony of Mr. Baysmore, that Centocor was following the

22   reexamination closely, Centocor didn't do any further due

23   diligence after the time that the NIRC issued.

24           And if we look at the timeline provided by

25   Centocor, you can see that the first Remicade infringement

1  took place only a few months before the NIRC issues in

2  October of 2008, a matter of three or four months before the

3  NIRC issues, and Simponi, another accused product in this

4  case, launched several months after the NIRC issued in April

5  of 2009, and Stelara launched yet a number of months after

6  that.

7        So at a time when the patent office had issued its

8  NIRC and, in the case of Stelara, at a time after the patent

9  office had reaffirmed the validity of the Cabilly patent,

10 Centocor was nevertheless proceeding with its plan to

11 infringe with respect to Remicade and was beginning its

12 infringement with respect to both Simponi and Stelara.

13       Now, cases, such as the *Ultra Tech* case out of the

14 Middle District of Florida and the -- the *Palm* and

15 *Matsushita* cases out of the District of Delaware where the

16 plaintiff was *St. Clair* in both cases, have held that a

17 decision to continue with infringement after the time the

18 reexamination ends appropriately with a finding that the

19 patent is valid can be considered objectively reckless under

20 the first prong of the *Seagate* test.

21       So we have that basic fact of the end of the

22 PTO reexamination and Centocor's failure to do any due

23 diligence and its proceeding with its firm plan to infringe

24 patents with respect to Remicade, Stelara, and Simponi.  All

25 of the other facts, some of which are eyebrow raising,

```
 1   really relate to this issue of Centocor's failed gamble that

 2   the PTO would relieve them of the obligation to pay

 3   royalties.

 4          Mr. Baysmore's testimony makes clear that that is

 5   exactly what Centocor was doing.  And so when Centocor works

 6   for four months with Celltech to unwind the license

 7   agreement in a way that rewrites the entire relationship

 8   between Centocor and Celltech, with one notable exception,

 9   and that is that it cuts Genentech out of receiving any

10   royalties and ends the license to the Cabilly patent, that

11   is part of this gamble taking place as it did during the

12   time when the claim stood rejected in the patent office.

13          Same thing with Centocor's explanation of its

14   claim -- of its continued payment on ReaPro.  Centocor says

15   that it wants to keep the benefits of section 2.02 of the

16   ReaPro agreement, which Your Honor has studied very

17   carefully, a limited agreement not to sue Centocor in

18   connection with certain product -- a certain product.

19          Centocor's explanation, given for the first time

20   in its reply brief, is that it wants to keep the benefits of

21   that as a, quote/unquote, insurance policy in case its

22   gamble doesn't pay off.  It has nothing to do with whether

23   they're infringing or not infringing a valid patent.  It's

24   all part of this gamble to try to stop paying royalties,

25   notwithstanding what the patent office said, notwithstanding
```

```
 1    what happened in the reexamination.

 2            And Centocor is a sophisticated company.  It took

 3    that gamble with its eyes wide open.  It thought it would

 4    enure to Centocor's benefit, and when it didn't and the

 5    Centocor plan did not work out and the patent office

 6    reaffirmed the validity of the Cabilly patent, Centocor

 7    should have to bear the consequences, and that is to defend

 8    against a claim of willfulness because it leaves them

 9    somewhat naked in connection with this matter.

10            Now, Centocor has also addressed the issue of its

11    defenses in this litigation.

12            THE COURT:  Yes, right.

13            MR. LIPNER:  So there are a number of things that

14    need to be discussed about this.  Unfortunately for Your

15    Honor, the Seagate -- application of the Seagate test is

16    still developing through the court system.

17            THE COURT:  Don't worry about it.  That's what

18    lots of patent law is presently developing.

19            MR. LIPNER:  Absolutely, Your Honor.

20            And Seagate itself stated that -- when it

21    announced its new standard, that they announced a broad

22    standard, and they left it to courts to decide how to apply

23    the standard in a case-by-case basis.  As Your Honor stated,

24    Seagate said, The Federal Circuit said we leave it to future

25    cases to further develop the application of the standard.
```

```
 1   And, as Your Honor said, district courts, like Your Honor,

 2   are very well-versed in figuring out how to do that step by

 3   step.

 4          Let me talk about what's clear under the law,

 5   under Seagate, about Centocor's defenses and then where

 6   there's a conflict in the law currently.  What's clear is

 7   that it is definitely not enough for Centocor to simply have

 8   defenses to Genentech and City of Hope's claims for

 9   infringement, defenses that they could present at trial and

10   make an argument.

11          There is no question that the defenses, in order

12   to provide them to a -- provide them with a defense to

13   willfulness, must be a close question that gives the Court,

14   and perhaps the jury, some pause about which way it should

15   come out.

16          The Federal Circuit in the i4i Limited Partnership

17   case said -- Microsoft was the accused infringer there, and

18   it said the fact that the Microsoft presented several

19   defenses at trial, including noninfringement and invalidity,

20   does not mean that the jury's willfulness finding lacks a

21   sufficient basis.

22          A nice example of this can be seen from the Safoco

23   case that is briefed by both Centocor and City of Hope and

24   Genentech, out of Texas.  And in Safoco there were two

25   patents at issue.  With one of the patents there were
```

 1    clearly legitimate invalidity arguments, but the Court did

 2    not consider it a particularly close call, and, therefore,

 3    denied summary judgment of willfulness on that patent.

 4            So the question is not merely whether defenses

 5    exist but whether they're a close call.  And, quite

 6    importantly, it's not only that they be a close call as to

 7    some issues in the case, but they have to resolve the entire

 8    case in Centocor's favor.

 9            And it's quite significant, to that end, to note

10    that all of the summary judgment issues that we are

11    discussing this morning brought by Centocor relate only to

12    claim 33 and not to claim 18 and 20.  For Centocor to make

13    this close-call argument, it would have to convince the

14    Court that it had close arguments on all of the asserted

15    claims in the case, and we don't believe it has done that.

16            Indeed, I hope we've demonstrated to Your Honor

17    through our briefing and through the further arguments that

18    you'll hear this morning that we do not consider the

19    arguments raised by Centocor to be the kind of close call

20    that the courts are talking about post *Seagate* that provide

21    a defense to willfulness.

22            Now, before I leave this issue of defenses and

23    what their effect is on the willfulness analysis, I do want

24    to bring to Your Honor's attention where the law is

25    currently unclear.

1          Centocor is making an argument as though the

2     existence of a close question in the abstract, just floating

3     out there, by the time they get to trial in and of itself

4     defeats a claim of willfulness.  Well, there are different

5     analyses in the courts about this important issue.

6          And so there are cases such as the district court

7     decision in the *i4i Limited Partnership* case, which was

8     later affirmed by the Federal Circuit, which say that is not

9     the test at all.  To quote from *i4i Limited*, they stated, As

10    a consequence, the number of creative defenses that

11    Microsoft is able to muster in an infringement action after

12    years of litigation and substantial discovery is irrelevant

13    to the objective prong of the *Seagate* test.  Rather the

14    correct analysis focuses on whether, given the facts and

15    circumstances prior to Microsoft's infringing actions, a

16    reasonable person would have appreciated a high likelihood

17    that acting would infringe a valid patent.

18         And another case that held similarly, that you

19    look at what arguments were available not at the time of

20    trial but at the time of first infringement and at each

21    relevant stage thereafter, is the case called *Krippelz*,

22    K-R-I-P-P-E-L-Z, out of the Northern District of Illinois.

23    They do the analysis exactly the same way.

24         In fairness, Your Honor, there are cases that

25    support Centocor's view that you don't look at it in a

```
1    time-bound way.  There's the case that they rely upon.  I

2    think it's called Hepscomb (ph) out of Michigan.  And that

3    disagreed with the two cases that I mentioned, although

4    Hepscomb, if I'm saying the case correctly, came out

5    criticizing the i4i district court decision before it was

6    affirmed by the federal circuit this year.

7          So, Your Honor, under that analysis you don't even

8    get to the question of looking at what Centocor's current

9    defenses are.  But they have to make a demonstration of what

10   the defenses were that were allegedly close questions at the

11   time they began infringing.  And you can look, Your Honor,

12   at their interrogatory responses, which are Exhibit QQ to

13   the Pals's declaration, in which they gave the state of

14   their thinking back in April of 2009 where the arguments

15   presented are quite sketchy and skimpy, except to the extent

16   that they parrot the reexamination arguments on which they

17   were gambling.

18         So that's the state of the law on this close

19   question.  There's some ambiguity in the law.  But even if

20   the Court is going to consider it, it has to be a close

21   question that causes substantial doubt, and it has to relate

22   to all of the claims in the case.

23         Finally, we get to the issue that caused Your

24   Honor to -- Your Honor's last question about what is going

25   on with the documents relating to willfulness.  And the
```

1    bottom line is, we are defending this particular motion at a

2    time when Centocor has not finished its relevant document

3    production that relates to a claim of willfulness, and, that

4    is, Centocor has produced a handful of previously privileged

5    documents during the course of the parties' meet and confer,

6    but there are three things that remain open with respect to

7    the document production.

8           First of all, as Your Honor will see, if you look

9    at Exhibit M to the Pals's declaration, for months we've

10   been asking Centocor as to whether they have completed their

11   further search for all documents that they intend to

12   produce.  Even in the reply brief we haven't gotten an

13   answer that that search is complete.

14          Second of all, we've asked Centocor for the answer

15   to the simple question about whether they are waiving

16   privilege because they are relying on advice of counsel.

17   They've provided some deposition testimony that's about

18   discussions with counsel.  They've provided a handful of

19   documents.  But when we've asked them, Are you waiving

20   privilege in order to rely on advice of counsel, they have

21   refused to answer, saying, It's not ripe yet.  So we don't

22   know the answer to that fundamental question.

23          And, finally, and most substantively, Centocor

24   appears to be producing, apparently to defend against a

25   claim of willfulness, only documents that touch on the

```
 1    question of the validity of the Cabilly patent.  Their

 2    designee and chief financial officer, Joseph Woke (ph),

 3    testified that that was the reason they stopped paying on

 4    Remicade.  We've asked them to produce other previously

 5    priveledged documents that would allow us to test that

 6    proposition, and so far they've refused.

 7            They haven't produced any previously privileged

 8    documents that show other reasons for failing to pay royalty

 9    on Remicade, nor have they said that they would produce

10    those documents.  They've only selected the previously

11    privileged documents that they want to produce using the

12    privilege as a sword and not a shield -- as a sword and a

13    shield at the same time.

14            And so in defend -- it's relevant to this motion

15    and it should not be lost that we are defending this on an

16    incomplete record, they argue that it -- those relate to the

17    second prong of the Seagate test.  They certainly relate to

18    the second prong of the Seagate test.  But what the cases

19    clearly show is that when you look at objective

20    recklessness, you have to look at it in light of the facts

21    and circumstances surrounding the infringer's infringement.

22    And so those documents would be relevant to that issue, as

23    well.

24            Thank you, Your Honor.

25            THE COURT:  Please.
```

1          MR. MASLOWSKI:  Just a couple of quick points,

2     Your Honor.

3          First, with respect to -- on the timeline, the

4     issuance of what they're referring to as the NIRC, they're

5     indicating that we should have done something else.

6     Centocor should have taken additional steps.  That ignores

7     the fact that we already took additional steps.  We're

8     already in the middle of a lawsuit that we had filed many

9     months before where we asserted defenses of invalidity,

10     unenforceability, and noninfringement.

11          I'm not sure what else we were supposed to do

12     other than continuing our lawsuit where in fact we're

13     asserting defenses that -- some of which which had not been

14     considered by the patent office.

15          Second, with respect to the state of the law, the

16     following is a quote from *Seagate*:  A substantial question

17     about invalidity or infringement is likely sufficient not

18     only to avoid a preliminary injunction but also a charge of

19     willfulness based on post-filing conduct.  I'm not sure it

20     can be any more clear than that, Your Honor.  That's the

21     law.

22          The law is, if there is a substantial question

23     about invalidity or infringement, that weighs in favor of

24     non-willfulness.  That's the basis of our motion.  There can

25     be no dispute about that law.

```
 1              Third, with respect to the fact that we're only

 2   here today to argue about claims or motions related to

 3   claims or just claim 33, that also ignores, one, that we did

 4   file motions related to claims 18 and 20, and it also

 5   ignores the point that I attempted to make in my opening

 6   argument which is our claim construction positions with

 7   respect to claims 18 and 20, which were that the Medimmune

 8   claim construction -- or rulings from Your Honor should have

 9   been adopted, that would have given us a noninfringement

10   argument for claims 18 and 20.

11              If you recall, Your Honor made a change to the

12   Medimmune ruling which prevented Centocor from having

13   additional noninfringement argument.  That claim

14   construction argument that Centocor made in this case, which

15   was adopted by Your Honor in the Medimmune case, obviously

16   is a close noninfringement position or a close

17   noninfringement argument.  It's a reasonable position.  Your

18   Honor adopted that position in the last case but changed it

19   here.

20              The only argument that defendants could raise in

21   opposition to that point, which we made in our opening

22   brief, was that we hadn't spelled out the noninfringement

23   argument.  That's not true.  The evidence we cited to in our

24   opening brief provided how under Your Honor's previous claim

25   construction position we didn't infringe.
```

     1          And then, lastly, with respect to the documents

     2   and the issues related to whether or not they relate to the

     3   objective prong, the bottom line is, defendants could have

     4   made a motion to compel.  They didn't.  They've known for

     5   months that we did not view the waiver as broadly as they

     6   viewed it.  They could have made a motion months ago.  They

     7   didn't.

     8          In fact, they make a weak attempt with respect to

     9   Rule 56(f), I believe, in this case to try to prevent the

    10   grant of summary judgment, but there's no 56(f) declaration

    11   with its motion.  They haven't followed the rule with

    12   respect to Rule 56(f).

    13          So the entire red herring argument should be

    14   ignored, and Centocor's motion should be granted.

    15          THE COURT:  Thank you.

    16          MR. MASLOWSKI:  Thank you.

    17          THE COURT:  Let's go on to the next one.

    18          MS. ELDERKIN:  Good morning, Your Honor.  Dianne

    19   Elderkin for Centocor, and I'm going to talk, briefly, I

    20   hope, since we're using up our time --

    21          THE COURT:  No, no.  You are not using up your

    22   time.  Let's get it over -- you know that I am accustomed to

    23   Cabilly and all the arguments that can be made about it, and

    24   so go ahead.

    25          MS. ELDERKIN:  Okay.  I appreciate that, Your

1   Honor.

2          What I'm going to talk about is our renewed

3   request that the Court construe the claim term

4   immunoglobulin --

5          THE COURT:  Yes.

6          MS. ELDERKIN:  -- and immunoglobulin molecule.  So

7   I'm going to talk about how the patent office arrived at its

8   construction, why it's wrong, and why it's important for us

9   to have the Court's construction before we go to trial.

10          As you'll recall, as you know, as you've heard

11   several times this morning already, the claims were under

12   rejection at the patent office in the reexam for many years.

13   It got to the point where Genentech -- and I'll use that

14   term collectively for Genentech and City of Hope --

15   Genentech had filed its appeal brief to the board of appeals

16   at the patent office because the claims were under final

17   rejection.

18          After several months after the appeal brief was

19   filed, Genentech's counsel handling the reexam got a call

20   from the examiner who said, We'd like to have a interview.

21   Will you come in.

22          They came in.  There's an interview.  And one of

23   the few things that counsel could recall was discussed at

24   that interview was the meaning of the term "immunoglobulin

25   molecule" in claim 33.

```
 1              THE COURT:  Who said this?

 2              MS. ELDERKIN:  Genentech's counsel who was

 3     handling the reexam.

 4              THE COURT:  What's his name?

 5              MS. ELDERKIN:  Mr. Kushan, K-U-S-H-A-N.

 6              THE COURT:  Yes.

 7              MS. ELDERKIN:  And Mr. Kushan remembers the

 8     examiner asking, Would it be fair to construe

 9     "immunoglobulin molecule" as molecules that bind to antigen.

10     The examiner asked that.  He claimed that he said, Yes, we

11     think that would be reasonable.

12              The interview ended.  There probably was more

13     discussed.  We don't have much record of it.

14              The next thing that happened was the examiner, as

15     he's required by the rules, issued an interview summary that

16     had three sentences.  And I've reproduced those three

17     sentences on this slide, slide 10.

18              So the things that the examiner thought were

19     important enough from that interview to put into the

20     three-sentence summary are on this slide, and, as you can

21     see, the examiner said, Discussed the term immunoglobulin

22     molecule in claims 1 and 33.  Based on the prosecution

23     history, declarations presented in the present case, and

24     interference record of the present Cabilly patent, the

25     immunoglobulin molecule is considered to be an
```

 1   immunoglogically functional immunoglobulin molecule.

 2          THE COURT:  I just looked at that yesterday.

 3          MS. ELDERKIN:  And the last sentence there has to

 4   do with another claim and isn't relevant to this motion.

 5          But, clearly, the examiner came out of that

 6   interview thinking that was an important point.  Not long

 7   after that the NIRC is issued, and in the NIRC the examiner

 8   says -- and it's not on this slide, but the examiner says

 9   that "immunoglobulin molecule" means a molecule that is

10   immunologically functional and binds to a known antigen.

11   That is on the first page of the comments in the NIRC.

12          The examiner then went on to explain some of the

13   prior art.  And then in his statements for patentability --

14   so in the summary at the end of the NIRC, when he's giving

15   his reasons for why he's going to now say that these claims

16   have been rejected for so long are all of a sudden

17   patentable, he again refers to the fact that the

18   immunoglobulin molecule is immunologically functional.

19          And, again, that's on this slide here, taken right

20   from the NIRC.  He says that the combination of the

21   Cabilly I patent claims and the teaching of all these prior

22   art references do not suggest or contain an enabling

23   disclosure of a method to produce an immunologically

24   functional immunoglobulin molecule.

25          So, in our view, it could not be clearer that it

1    was important to the patent office, to the examiners, that

2    the immunoglobulin molecule that is recited in claim 33 be a

3    functional molecule; in other words, an immunoglobulin that

4    will bind to an antigen.  That was important to them in

5    deciding to reverse all those years of rejections and allow

6    the patent.

7          Now, when we briefed this to Your Honor last year

8    during the Markman proceedings, Centocor asked for a

9    construction of "immunoglobulin" that recited that -- well,

10   the parties agreed on the structure of "immunoglobulin,"

11   that it's a tetrameric structure with heavy chains and light

12   chains.

13         But Centocor wanted a construction that also said

14   that whether -- included in the -- in the recitation that

15   whether or not specific immunoreactivity is a proper -- is a

16   property.  And we take that language right out of the

17   patent.  But, in essence, we asked for a construction that

18   said the immunoglobulin molecule that is recited in claim 33

19   includes immunoglobulins that bind to antigen and includes

20   those that don't bind to antigen.

21         Genentech at the time asked for a construction --

22   if it were going to be construed at all, asked for a

23   construction that said that the molecule was capable of

24   binding to a known antigen.  I think that the construction

25   that they would seek now is maybe a little bit different,

```
 1    but I'm sure they're going to clarify that.

 2            And why we believe the construction that Centocor

 3    requested last year and request -- that we request again is

 4    appropriate is because the term "immunoglobulin" is

 5    expressly defined in the patent specification.  And the law

 6    is very clear that when an expressed definition is provided

 7    in the specification, you really need to look no farther.

 8            You look farther, perhaps, to see if there's been

 9    an expressed disavowal, but when there is a clear definition

10    in the patent, the cases are quite clear that that is the

11    definition to apply.  And the definition in the patent in

12    column 1 says that immunoglobulins include both antibodies

13    and protein substances which lack antigen specificity; in

14    other words, which do not bind to antigens.

15            And the patent even says, you know, there are

16    advantages to some of these immunoglobulins that don't bind

17    to antigens.  There are -- they can be used therapeutically.

18    So the patent has an expressed disclosure and even says

19    there are advantages to this one group of immunoglobulins

20    that don't bind.  So the definition is as clear as can be

21    from the specification.

22            Now, if Genentech wanted to claim immunologically

23    functional immunoglobulins, it would have been very easy to

24    put those words in the claim.  It did so in claim 9, another

25    claim in the patent where they expressly modified
```

```
 1    immunoglobulin molecule by calling it immunologically

 2    functional.  So that would have been easy to do.  They did

 3    not do that in claim 33.

 4         If they wanted to claim only immunoglobulins that

 5    bind to a known antigen, they could have done so.  They did

 6    that in claim 21 where they said that said immunoglobulin is

 7    capable of binding to a known antigen.  They did not do that

 8    in claim 33.

 9         So the plain meaning -- the plain words in the

10    claim and the definition in the specification could not be

11    clearer that immunoglobulin molecule encompasses

12    immunoglobulins which bind to antigens and those which do

13    not bind to antigens.

14         Now, why is that important here?  It is true that

15    it is the case that none of our noninfringement or

16    invalidity positions, as have been presented through our

17    experts, rely on this particular definition.  I want to make

18    that perfectly clear.

19         THE COURT:  I know that.

20         MS. ELDERKIN:  Okay.  But it is still very

21    important, because it's very clear to us -- now, Genentech

22    will disagree with this, and they'll present their

23    arguments, but there is a great body of evidence that shows

24    that that definition was important to the patent office in

25    reversing two and a half years of rejections of the claims.
```

```
 1              As we've heard this morning, it is clear that
 2    Genentech intends to wrap itself in that reexamination at
 3    trial.
 4              THE COURT:  I would.  Wouldn't you?
 5              MS. ELDERKIN:  I probably would, Your Honor, but I
 6    would do it cautiously, because I think it's quite clear
 7    from the record that the patent office got it wrong, and one
 8    of the reasons they got it wrong is they misled themselves
 9    on what the proper construction of the terms in the claims
10    are.
11              THE COURT:  They certainly worked on it long
12    enough.
13              MS. ELDERKIN:  They did.  They did.  And they got
14    it wrong, Your Honor, which frequently happens.
15              We should be entitled to make that argument, and
16    we are not going be able to make that argument if we don't
17    have a construction from the Court on what the proper
18    construction of immunoglobulin molecule is.
19              Another reason why it's relevant and why we need
20    the construction is that Genentech has proffered evidence of
21    alleged commercial success to rebut our obviousness
22    arguments.
23              THE COURT:  Could you -- could you possibly
24    counter their commercial success?
25              MS. ELDERKIN:  Well, certainly, in terms of the
```

 1    scope of the claim, yes.  Their commercial success has to do

 2    with their licensing success.

 3            THE COURT:  Of course.

 4            MS. ELDERKIN:  Of course.  And while there are

 5    several things there, we all know lots of times companies

 6    will take a license to avoid litigation.  It's not

 7    necessarily dealing down to the patent and how wonderful an

 8    invention it is.  So there's that point to begin with.

 9            But the second point is, if the claims are

10    construed, as we believe they must be, in view of the

11    definition of the specification to include not only

12    immunologically functional antibodies such as those that

13    have been licensed but those immunoglobulins that are not

14    functional, then their evidence of commercial success is not

15    commensurate in scope with the claims, and that's a real

16    issue for whether that evidence should even be admissible or

17    how relevant it is because the law is quite clear that

18    commercial-success evidence has to be commensurate in scope

19    with the claim, the scope of the claim.

20            So those are two reasons why we ask Your Honor to

21    construe the term "immunoglobulin molecule."  And, of

22    course, the term "immunoglobulin," which is used in claims

23    18 and 20 to modify the heavy and light chain, we believe

24    should have the same meaning.  And that's what we request,

25    Your Honor.

```
 1              THE COURT:  Please.

 2              MS. DURIE:  Your Honor, nothing has changed since

 3    this Court previously concluded that there was no reason to

 4    construe the term "immunoglobulin molecule" with respect to

 5    the necessity for such a construction.

 6              The Court had appropriately determined that it

 7    would wait to see whether there was any substantive issue in

 8    the case that turns on that construction, and we now know

 9    that the answer to that question is no.  Because as

10    Centocor's counsel has admitted, not a single one of the

11    opinions proffered by their experts on infringement or on

12    validity hinges in any way on the answer to this question.

13              Centocor asks the Court to construe the term

14    "immunoglobulin molecule" solely as part of its effort to

15    discredit the results of the reexamination, but because

16    Centocor has no argument for how the construction of the

17    term "immunoglobulin molecule" could have mattered to any

18    issue that was actually in front of the PTO in connection

19    with the reexamination or why the faulty construction -- the

20    supposedly faulty construction of "immunoglobulin molecule"

21    actually would have made a difference, Centocor is simply

22    inviting the jury to speculate, without any basis for

23    reaching an informed decision, as to whether this made a

24    difference.

25              And how -- can I go back?
```

```
 1              THE COURT:  What?

 2              MS. DURIE:  I'm sorry.  I wanted to go back to

 3    slide 11 in Centocor's presentation where they pointed to

 4    the statement of reasons for patentability and/or

 5    confirmation.

 6              But what we see here is that the patent office

 7    said that the combination of the Cabilly I claims and the

 8    teaching of these various prior art references do not

 9    suggest or contain an enabling disclosure of a method to

10    produce an immunologically functional immunoglobulin

11    molecule by independently expressing immunoglobulin heavy

12    chains --

13              THE COURT:  That is what it says.

14              MS. DURIE:  -- and light chains in a single

15    transformed host cell.

16              The underlining is that of Centocor's, not that of

17    the Patent and Trademark Office, and there is no reason for

18    privileging that particular phrase over any other.

19              It is a consequence of the way that the system is

20    set up that the Patent and Trademark Office is a little bit

21    of a black box, as this Court previously has recognized.  We

22    cannot know what was in the mind of each of the many people

23    who were involved in the reexamination process.

24              Instead what we have is the result of the

25    reexamination which serves, in a way, to implement the
```

```
 1   presumption of validity and the fact that we give what

 2   amounts to administrative deference to the actions of the

 3   Patent and Trademark Office, but it is not an invitation to

 4   have sort of a second trial within a trial as to what

 5   various arguments might have been adduced with respect to

 6   the significance of this limitation and whether it might or

 7   might not have changed the analysis.

 8           In short, Your Honor, had Centocor come forward

 9   with a reason that the term "immunologically functional"

10   made a difference with respect to a particular invalidity

11   argument, then we would be in a very different position, but

12   they did not, and for that reason the Court appropriately

13   should, once again, decline Centocor's invitation to

14   construe this term.

15           Now, Centocor's other argument for why the Court

16   should proffer a construction now has to do with the

17   evidence of commercial success.  The problem here, Your

18   Honor, is that by its nature, evidence of commercial success

19   is always tied to particular products that embody the

20   invention.  That is what we have in the case here.  There is

21   extensive evidence of commercial success, not merely sort of

22   with respect to licensing in the abstract but with respect

23   to many products that have come to market, both products

24   made by Genentech and products made by third parties, that

25   embody the claims of the Cabilly patent.
```

```
 1              THE COURT:  I don't think there's any question
 2    about that.
 3              MS. DURIE:  And it is, of course, always the case
 4    that evidence of commercial success pertains to evidence
 5    that some particular embodiment of the invention is
 6    successful.  And the reason that that evidence is powerful
 7    evidence of nonobviousness is that the proposition is that
 8    if there were ways to be successful practicing the
 9    invention, others would have done it before.
10              But it cannot be the case, as Centocor proposes,
11    that the fact that there might be some embodiments of the
12    invention that would be less commercially successful means
13    that it is impossible to support the nonobviousness of the
14    invention with evidence of commercial success, and that is
15    what we have here.  We have a wide range of products
16    embodying the invention that are commercially successful.
17              Now, again, I think the Court does not need to
18    reach the issue of what is the proper construction of
19    "immunoglobulin molecule," but were the Court to reach that
20    question, I think it is important to note that it has to be
21    understood in view of the unique history of this patent and
22    the fact that we have such an extensive record going back to
23    the fact that the claims originally did arise out of an
24    interference where we had the Boss patent using the term
25    "immunoglobulin molecule" and the Cabilly specification
```

1    using the term "immunoglobulin," that we then had a record

2    arising out of that interference and the section 146 action

3    in which, as the Patent and Trademark Office observed, the

4    parties understood the claim term at issue here to require

5    that the molecule be immunologically functional, and that

6    when the Patent and Trademark Office considered this

7    question of what was an appropriate claim construction, it

8    was looking at that very long and extensive history.

9            And, of course, for this Court in making the

10   determination of what is the proper construction, it is not

11   simply the case that the Court substitute its judgment for

12   that of the Patent and Trademark Office, because the PTO's

13   determination in the reexamination is now part of the record

14   on which this Court must base its conclusion.

15           We have a statement by the examiner as to what

16   would be a reasonable construction.  We have Genentech and

17   City of Hope's acquiescence in that construction.  And I

18   think it's important to note that if Centocor were in here

19   arguing for a broader construction of the term, it would be

20   very hard indeed for Genentech and City of Hope to argue

21   against that.

22           And yet the proper claim construction does not

23   turn on the party advancing the argument, precisely because

24   it is a question of law.  Does not matter which side is

25   arguing for which construction.

```
 1              And -- and I would simply submit that if we were

 2    here asking the Court that the construction of the term

 3    "immunoglobulin molecule" should include nonspecific

 4    immunoglobulins or immunoglobulins that do not demonstrate

 5    functional binding, that would be, in light of the extensive

 6    prosecution history in this case, an untenable position.

 7              THE COURT:  All right.

 8              MS. DURIE:  Thank you.

 9              THE COURT:  Now, I've given a great deal of

10    thought to this next one, so you go ahead.  This is on

11    claim 33.  Yes?

12              MS. ELDERKIN:  Yes, Your Honor.

13              Centocor's motion No. 3 seeks summary judgment of

14    no infringement of that claim based on the "produced as

15    separate molecules" language.  And I'd like to explain why

16    under the plain meaning of that language, which is what the

17    Court has twice said, applies, Genentech simply cannot meet

18    its burden of proving infringement.

19              Again, the language in claim 33 talks about the

20    immunoglobulin heavy and light chains being produced as

21    separate molecules in the host cell.

22              And prior claim construction proceedings, both in

23    this case and in the Medimmune case, as Your Honor will

24    recall, the focus on this particular claim language had to

25    do with how long the heavy and light chains had to remain as
```

1    separate molecules.  Could they combine into immunoglobulin

2    or fragment while still in the host cell, or did they have

3    to remain as separate heavy and light chain molecules until

4    they were either expelled from the cell or the cell was

5    lysed and the contents of the cell retrieved?

6           That was the focus of the argument both in

7    Medimmune and in our *Markman* proceedings in this case last

8    year, but there was never any argument suggesting that the

9    heavy and light chains did not have to be produced and exist

10   as separate molecules at at least one point in time in the

11   host cell.

12          This is -- in slide 19 we produced a statement

13   from your claim construction order in the Medimmune case

14   where you, again, concluded that the claim language

15   "produced as separate molecules in said transformed host

16   cell" is clear on its face.  It requires that something be

17   created, describes the form of that thing at the moment of

18   its creation, and specifies where creation must occur at the

19   moment at which it does.

20          The language requires nothing more, and the Court

21   offers no further construction.  Centocor would agree that

22   that is the plain meaning of this claim language.  There has

23   to be a heavy chain produced as a molecule, there has to be

24   a light chain produced as a molecule, and they have to be

25   separate molecules at least for a moment.

1            Now, Genentech has offered, at the late stage

2    expert reports, a new construction for this, a tripartide

3    construction for "produced as separate molecules," and they

4    said that you have to look at this in the context of the

5    entire claim phrase, which we don't disagree with, but they

6    say you have to look at the "independently expressing"

7    language so that the heavy and light chains are produced as

8    separate molecules

9            And what do they say?  They say, Well, this means

10   three things.  It has -- it requires that there be separate

11   mRNAs be produced for the heavy and light chains.  That's

12   the requirement for produced as separate molecules.  But

13   their expert, Dr. Dolnick, conceded at his deposition -- he

14   was asked, Are heavy and light chain proteins ever encoded

15   by a single messenger mRNA?  Answer:  No, I can't think of a

16   single instance where that would happen.

17           So to define something in terms of not being

18   something that never happens anyway simply doesn't make any

19   sense.

20           THE COURT:  Do it again.

21           MS. ELDERKIN:  Sure.  They say that "produced as

22   separate" -- the way you determine whether something is

23   produced as separate molecules is that separate mRNAs --

24           THE COURT:  They do say that.

25           MS. ELDERKIN:  -- are produced for the heavy and

 1   light chains.

 2          THE COURT:  Yes.

 3          MS. ELDERKIN:  Okay.  But their expert concedes

 4   that that's always the case when you're making an antibody.

 5   Are heavy and light chain proteins ever encoded by a single

 6   mRNA?  No, I can't think of a single instance where that

 7   would happen.

 8          So to say that "produced as separate molecules"

 9   means you have separate mRNAs is like saying nothing,

10   because that's always the case.  You could never have heavy

11   and light chains that are not produced by separate mRNA

12   molecules.

13          THE COURT:  I'm slow.

14          MS. ELDERKIN:  So that cannot be what this means.

15   You cannot -- you cannot say that "produced as separate

16   molecules" means something that must always exist anyway.

17   That doesn't distinguish -- it -- it makes the language

18   perfectly meaningless.

19          If you're always expressing heavy and light chains

20   with separate mRNAs, then the "produced as separate

21   molecules" language in the claim would be completely

22   superfluous if it means, oh, they're produced by separate

23   mRNAs, because that's always the case.

24          They set something up that is always the case and

25   say, oh, that's what it means, but that doesn't help any --

 1   in any way in explaining or limiting the claim.

 2           THE COURT:  Please, go on.

 3           MS. ELDERKIN:  And the next thing that they say is

 4   very similar.  They say it requires that the heavy and light

 5   chains not be linked to one another by a peptide bond.

 6           Now, if you remember the chemistry of these

 7   things, the heavy and light chains are polypeptides.  They

 8   are amino acids that are bounded -- binded to one another in

 9   the chain by peptide bonds.  So then the chains, the heavy

10   and the light chains, are assembled into an antibody by

11   disulfide bonds, a different kind of bond.

12           But what they're saying is, oh, it's produced as

13   separate molecules if the heavy and light chains are not

14   linked to one another by a peptide bond.  Well, again, their

15   expert conceded that peptide bonds never naturally form

16   between heavy and light chains.  That never happens anyway.

17           So what are you saying about "produced as separate

18   molecules"?  You're saying, Well, this is something that

19   never happens anyway.  And that's what this means.  It's not

20   offering any definition whatsoever.

21           Now, their expert didn't say this in his

22   deposition, but their counsel, later on in briefing, points

23   to an article that was published many years after Cabilly

24   was filed that purports to discuss a single chain

25   polypeptide; in other words, heavy chains -- heavy and light

1    chains that might be linked together with one another --

2            THE COURT:  Yes.

3            MS. ELDERKIN:  -- by a peptide bond.  But that was

4    published long after Cabilly, and we have to construe the

5    Cabilly claims based on the knowledge at the time Cabilly

6    was filed.  So that article does not help them at all.  So

7    that second prong of that tripartide construction simply

8    makes no sense.

9            Then they say, okay, what this means -- what does

10   "produced as separate molecules" mean?  Separate regulatory

11   sequences control the expression of heavy and light chains.

12   Their expert also conceded that when have you independent

13   expression, which is also required in this claim here, you

14   have separate regulatory sequences.

15           So maybe the claim does require separate

16   regulatory sequences to control expression so that you have

17   independent expression, but that doesn't mean that that's

18   defining "produced as separate molecules."

19           None of the constructions that Genentech has

20   offered makes sense, and certainly none of them reflect the

21   plain meaning of "produced as separate molecules."  When you

22   consider the specification and what's really disclosed in

23   the specification, it's quite clear that what the Cabilly

24   inventors meant when they used this language "produced as

25   separate molecules" was just that, that you have a heavy

1    chain and it's a separate molecule and you have a light

2    chain and it's a separate molecule.

3         And the reason that's clear from the specification

4    is that's all they tried to do in the specification.  You

5    remember, the only real disclosure in that specification is

6    of an example that purports to create immunoglobulin in an

7    in vitro method -- am I still on?  All of a sudden I heard

8    something -- in an in vitro method where the heavy chains

9    and light chains were produced in the cell, the cell was

10   lysed, you removed all the other protein stuff, and then you

11   allowed them to combine.  But it was very, very clear that

12   heavy and light chains were produced as separate molecules.

13        There's even a chart in the patent where they

14   measured how much heavy chain was produced and how much

15   light chain was produced.  That's what they did.  That's the

16   only disclosure in the specification other than their

17   wishful thinking about, gee, an in vivo method might work

18   some day.  And that's what we have to base our understanding

19   and our construction of "separate molecules" on.

20        Genentech also argues in its brief, well, gee,

21   that -- the construction that Centocor is now propounding,

22   which, of course, is the plain-meaning construction, that

23   doesn't align with what our purpose of our invention was.

24   But they don't cite a single case that suggests that the

25   plain meaning of a claim term can be ignored based on some

```
 1    alleged purpose that a patentee might say either in his

 2    specification or in the prosecution history.

 3            So the plain meaning of "produced as separate

 4    molecules" is, as I've discussed, a heavy chain has to be

 5    produced.  It has to be a separate molecule at some point in

 6    time.  A light chain has to be produced.  It has to be a

 7    separate molecule at some point in time.  We know from your

 8    earlier construction, they can start to combine while still

 9    in the cell, but they still at some moment in time have to

10    exist as separate molecules.

11            That's the language they used in the claim.  If

12    they didn't want their claim to be so limited, they didn't

13    have to use that language, but that's what they did, and

14    that's what Centocor and the public are entitled to rely

15    upon.

16            So --

17            THE COURT:  And Centocor doesn't do that?

18            MS. ELDERKIN:  Centocor -- we contend that they

19    cannot prove, they have no proof that that is what Centocor

20    does.  And that's where I will go now.

21            We know that there are several different pathways

22    to antibody assembly in a cell.  This particular chart that

23    I have on slide 21 is from -- oops, sorry -- on slide 21 is

24    from Exhibit 30, which is the Baychock (ph) article.

25            Baychock discussed several different ways in which
```

1    heavy chains and light chains can combine in a cell to form

2    an immunoglobulin.  And the first one of the pathways that's

3    illustrated here -- and we've circled it in the red box on

4    the slide -- is called the HL pathway.

5            The HL pathway is one in which the heavy chain --

6    a heavy chain and a light chain combine to form an

7    intermediate called HL.  And, at least as shown in this

8    particular graphic, that HL entity can then meet up with

9    another HL entity to form the tetra -- the full molecule.

10           What we also know from the literature -- and on

11   slide 22 we show a figure from example -- Exhibit 31, which

12   is the Bergman article.  We know that for some antibodies

13   where the HL pathway is followed -- the HL pathway is for

14   assembly -- sometimes light chains start to bond to the

15   heavy chains before the heavy chains are fully produced.

16           And what this figure -- this is figure A from the

17   article -- is trying to show, the -- at the bottom of the

18   figure here is the endoplasmic reticulum where the light

19   chains and the heavy chains are being produced.  And what's

20   shown here is a heavy chain being produced.  It's getting

21   longer and longer as more amino acids are being added to the

22   chain.

23           So this is one heavy chain that's just being shown

24   at different points in time as it's being produced.  But as

25   you can see, about two-thirds of the way over towards the

1   right, you have a heavy chain that's still in production,

2   but it has started -- because it's already bound to a

3   disulfide bond, to a completed light chain.  The light chain

4   is shown by that heavy vertical bar.

5        So before the heavy chain is fully produced as a

6   heavy chain separate molecule, it has already bonded to a

7   light chain.  That heavy chain will never exist as a

8   separate molecule.

9        And why that is important is because for the

10  Centocor antibodies, there's evidence that Genentech cannot

11  dispute that they are antibodies of the type, I-G-G-Y

12  antibodies, that form by the HL pathway, the one I just

13  showed you, which involves heavy chains able to bond to

14  light chains before the heavy chain is completely produced

15  as a separate molecule.

16       And what we have is, Genentech's infringement

17  expert conceded that for the accused Centocor products,

18  disulfide bond formation occurs between heavy and light

19  chains before the heavy chain is fully translated.  Now, he

20  wouldn't concede all the time, but he said at least some of

21  the time that happens.  At least some of the time in the

22  Centocor products heavy chains bond to light chains before

23  the heavy chain is fully produced as a separate molecule.

24       Further, he conceded that he has no evidence in

25  his report to show that heavy and light chain proteins for

```
 1    the accused products are not chemically bonded together
 2    until after they are fully translated.  And that's an
 3    excerpt from his deposition that I show on this slide.  He
 4    says, No, I don't have any evidence in the report.  I just
 5    cite literature.
 6          So where does Genentech go with this?  They have
 7    their expert admitting that at least some of the time heavy
 8    chains are bonded to light chains before they are produced
 9    as separate molecules in the Centocor accused processes.
10          So what do they do?  They say, Well, some of the
11    time we -- you infringe because the literature suggests that
12    some of the time, even if you have that HL pathway, that HL
13    intermediate might then bond up with a fully formed heavy
14    chain.  So some of your heavy chains might form as separate
15    molecules before they bind up.
16          Well, there are problems with that argument.
17    First of all, there's a problem with the law.  They cite one
18    case, the Bell Communications case which only addresses this
19    part-time infringement issue in dicta.  It's also a case
20    where it was not a method-of-making claim, like ours.  It's
21    was a method-of-using claim.
22          The accused infringers sold the device which
23    sometimes, when it was used by customers, could follow the
24    patent claim, the method-of-using claim, but sometimes it
25    would not.  And in dicta, the Court suggested that that was
```

```
 1    something that could be looked at on remand.
 2            But there you had a device, and you could go and
 3    you could see what -- what customers were doing.  You could
 4    see was that device being used according to the claim or
 5    not.  A yes or no answer was possible.  Here there's a total
 6    absence of proof that any Centocor process follows anything
 7    but the preferred HL pathway, the one I've been discussing,
 8    all the time.
 9            Now, the Genentech expert says the HL pathway is
10    not obligate, but he admits it's preferred, and yet he
11    doesn't have any data whatsoever to prove that the Centocor
12    processes do not use the HL pathway all the time.  He has
13    only speculation.
14            He even said in his deposition, Well, there are
15    tests that one could have done.  You could done a Western
16    blot test to determine if there were separately produced
17    heavy chains and light chains.  He didn't do those tests.
18    All he does is speculate.
19            And you'll recall from the briefing, his
20    speculation is all over the place.  At one point he says,
21    Well, it could be as little as 1 percent of the heavy and
22    light chains that are produced as separate molecules.  And
23    then he says, But it could be 90 percent.  He simply doesn't
24    know.  He has no evidence.  They cannot go to the jury with
25    no evidence.
```

1          Again, he could not even quantify this alleged

2     occasional infringement, the last point on the slide.

3          So bottom line, Your Honor, we believe that when

4     the plain meaning of that claim term is applied, as you have

5     instructed now in two cases, that Genentech cannot meet its

6     burden of proof on infringement.  And since it cannot meet

7     its burden of proof -- it has no evidence.  It has only

8     speculation from its expert and argument from its counsel --

9     that summary judgment of noninfringement of claim 33 should

10    be granted.

11         THE COURT:  Thank you.

12         MS. DURIE:  Your Honor made reference earlier in

13    the day to an argument having come out of the blue, and this

14    is in fact one such argument.

15         The Court will recall in the context of the

16    Medimmune claim construction that the question of how to

17    construe this limitation in claim 33 "independently

18    expressing so as to produce the heavy and light chain as

19    separate molecules" was at issue, and Genentech and City of

20    Hope have consistently taken the position that this is one

21    limitation that needs to be understood together, and that

22    the "so that" language is there to make clear that the

23    molecules being produced as separate molecules is simply the

24    consequences of independent expression.

25         There is independent expression of the heavy and

```
 1    light chain.  The consequence of that independent expression

 2    is so that they are produced as separate molecules.

 3            Now, Ms. Eldrikin suggested in her argument with

 4    reference to our expert's opinion that this could not be a

 5    correct claim construction because in the case of making an

 6    antibody in nature, it will always be the case that the

 7    heavy and light chain are independently expressed in that

 8    sense.

 9            THE COURT:  Yes.

10            MS. DURIE:  That is true, but that was not the

11    relevant point of distinction being made here.  The point of

12    distinction being made with respect to claim 33 was not over

13    how antibodies are produced in nature.  It was over the

14    prior art, and specifically over prior art that did not

15    involve the independent expression of two protein chains but

16    instead prior art such as prior art directed to insulin that

17    involved the expression of a single stranded -- a single

18    strand of protein where you might have more than one gene.

19    But it would be under the same regulatory control; you would

20    have one mRNA transcript and one chain of protein which then

21    might later be cleaved.

22            That was the critical distinction that is being

23    addressed in claim 33.  Whether you are expressing one gene

24    under -- or set of genes under one set of regulatory

25    controls or whether you are independently expressing two
```

1    genes, co-expression, that was the critical distinction.

2    And the "so that" language "produced as separate molecules"

3    explains the consequences of that critical limitation.

4           Now, Centocor's counsel also suggested that the

5    patent specification discussed in the embodiment described

6    therein the idea that heavy and light chain were separately

7    produced and remained as separate molecules for some period

8    of time inside the cell and that that was somehow germane to

9    the invention here.

10          In fact, however, the embodiment that is described

11   in the specification is one in which heavy and light chain

12   are produced inside an E.coli cell as a mess of protein all

13   bound together.

14          If you could pull up the '415 patent, column 11,

15   line 15 through about 42 --

16          THE COURT:  I have it here.

17          MS. DURIE:  Very good, Your Honor.

18          So the portion --

19          THE COURT:  What's the -- wait a minute?  What's

20   the cite?

21          MS. MULLIN:  It's column 23, and the relevant

22   portion of the specification begins around line 15.  And it

23   begins, To confirm the production of heavy and/or light

24   chains in the transformed cells, and then there is a

25   discussion that continues on column 23, from about line 15

1   through about 42, that discusses a procedure that takes the

2   protein out of the E.coli cell.  There's a re-agent of beta

3   mercaptoethanol that's referred to around line 23.  The

4   sample is boiled, and then the individual protein chains are

5   taken out from what previously had been this inclusion body,

6   and there is an examination to see whether heavy and light

7   chain protein had been found within that inclusion body

8   after the sample had been subject to beta mercaptoethanol, a

9   denaturant, to break apart all of the disulfide bonds and to

10   be able to make this assessment about the individual protein

11   chains.

12          That is not a suggestion that this invention has

13   anything to do with the idea that the individual heavy and

14   light chain remain as separate molecules rather than that

15   they are merely initially coming up different polyribosome

16   sites and are being separately produced, which was, in fact,

17   the point here of the invention.

18          In fact, it was instructive, I thought, Your

19   Honor, that in the Court's *Markman* work from the Medimmune

20   case, the Court referenced "the moment of creation"; that --

21          THE COURT:  Yes.

22          MS. DURIE:  -- the molecules are produced as

23   separate molecules at the moment of creation.  And that is

24   what happens here.  We have two separate sites at which

25   polyribosomes attach.  We have two separate molecules

 1  formed.  At that moment of creation, it is undisputed that

 2  they are separate molecules.

 3          THE COURT:  Well, I've got to say that if you

 4  write that, you will never forget having written it.

 5          MS. DURIE:  No doubt, Your Honor.

 6          And I thinks it's important that, one, the idea

 7  that these are separate molecules at the moment of creation

 8  is entirely consistent with this Court's prior claim

 9  construction order from Medimmune.

10          And that if Centocor had some different

11  understanding of what "produced as separate molecules"

12  meant, it should have raised that as an issue in connection

13  with claim construction rather than waiting to raise it as

14  an issue only now, because it has been apparent throughout

15  that Genentech's understanding of what this claim requires

16  on its face is simply that there be independent expression

17  and that as a consequence of the independent expression, we

18  have two separate protein chains that are formed.

19          Now, I've discussed the portion of the

20  specification to which Centocor's counsel pointed, which is

21  not addressed to this issue at all.  It is interesting to

22  note that the specification does shed some light on the

23  meaning of "molecule" in this context.

24          If we can take a look at column 13 of the

25  specification, at lines 12 through 14, in discussing

1   immunoglobulin, the specification states that the tetramer

2   is stabilized intra and intermolecularly by 15 or more

3   disulfide bonds, making clear, even, that in the usage of

4   the specification, the separate chains exist as separate

5   molecules even where there are disulfide bonds

6   intermolecularly and intramolecularly, both within one of

7   the individual given chains of molecule and between them.

8          Now, Centocor in its briefing had referenced the

9   fact that this language "produced as separate molecules"

10  made its way into claim 21 in connection with the

11  reexamination proceedings and pointed to the same portion of

12  the specification that we had been looking at previously,

13  which was in a relatively long list of citations for the

14  inclusion of the larger phrase and a number of changes that

15  had been made to claim 21.

16         But I think it's worth noting that one of the

17  other portions of the specification that was referenced in

18  that list of citations is found at column 4.  This begins at

19  line 24 and continues on to line 29.  And it says as

20  follows:  Where the gene is properly inserted with reference

21  to portions which govern the transcription and translation

22  of the encoded DNA message, the resulting expression vector

23  is useful to produce the polypeptide sequence for which the

24  inserted gene codes, a process referred to as expression.

25         In other words, it's interesting to note that one

1   of the pieces of support for adding the "produced as

2   separate molecules" language in claim 21 had to do with

3   expression and the idea of expression being under particular

4   transcription and translational control, which is consistent

5   with the view that "independent expression" and "produced as

6   separate molecules," as they are used in -- as they are used

7   in claim 33, joined together by that "so that" language are

8   simply two sides of the same coin.

9          Unless Your Honor has further questions --

10          THE COURT:  I don't.

11          MS. DURIE:  -- with respect to the claim

12   construction piece of this, let me address the questions

13   about the state of the evidence.

14          And let me note that Centocor's counsel pointed to

15   one question-and-answer exchange with our expert in which he

16   was asked about whether there was evidence in his report

17   about the showing the heavy and light chain proteins being

18   bonded together, and he said, No, I don't think we present

19   evidence in the report, we just cite literature, well, of

20   course, literature is evidence.  He clearly was thinking of

21   evidence in a more experimental sense.  And it is, I think,

22   critical in this context to look at that literature.

23          If we can see Exhibit 30, which is Baychock, at

24   page 7, there are two articles that Centocor showed you in

25   their presentation that they have relied on to attempt to

 1    demonstrate that the heavy and light chain are not produced

 2    as separate molecules in the Centocor product.

 3            And let me preface this by saying that, I thought

 4    that it was instructive that when the Court asked Centocor's

 5    counsel, So your products don't work that way, rather than

 6    getting a straightforward yes or no as a response, the

 7    response was qualified.  And the reason for that is that it

 8    is in fact undisputed that much of the time in Centocor's

 9    products, even under Centocor's definition, the heavy and

10    light chains will be fully translated prior to any

11    interactions taking place between them.

12            In Baychock -- if we can pull up in the middle --

13    if we can blow up in the middle of the screen, this is --

14    and, actually, if you can get the top chart that Centocor's

15    counsel pointed to, and then go down so we can see it -- no.

16    Can you start with the part that Centocor's counsel pointed

17    to, up with the HL pathway and then go down?  Good.

18            Your Honor, Centocor's counsel pointed to you what

19    appears at the top of the page, where it says H plus L, and

20    then there's an arrow, and it says HL --

21            THE COURT:  Yes.

22            MS. DURIE:  -- that is the HL pathway, and you'll

23    see that there are these different pathways that can be

24    followed for antibody assembly.

25            What is important here is, if you go a little

```
 1   further down, and it's two-thirds of the way down the

 2   screen, this very article says that although there are

 3   preferred pathways of assembly, minor pathways invariably

 4   occur.  Minor pathways invariably occur.

 5           What we have here is evidence of what happens some

 6   of the time; that it may be the case some of the time that

 7   heavy and light begin to associate before they are

 8   completely translated.  But Baychock himself says, as our

 9   expert said, and as even Dr. Wall admitted, that there will

10   be instances where that does not happen; where minor

11   pathways are followed; that what we have is different

12   situations taking place, and at least some of the time, the

13   process of claim 33 will be followed such that there will be

14   independent expression of the heavy and light chain and they

15   will be produced as separate molecules.

16           Bergman is to similar effect.  This is the other

17   article on which Centocor relies.

18           If we can pull up Exhibit 31, and it's at page 18

19   of Exhibit 31, and if you can blow up the bottom half of

20   that including the text that appears below -- so here again

21   we have the illustration that Centocor's counsel showed you

22   that illustrates that in some circumstances, it is possible

23   that a light chain may begin to associate with a heavy chain

24   before the heavy chain is completely translated.

25           And if we see the very last sentence in the
```

1    explanation of what figure 8 depicts, it says approximately

2    half of the nascent heavy chains form an interchain

3    disulfide bond with a complete light chain before heavy

4    chain completion and release from the polyribosomal complex.

5    So what Bergman is saying here is that this association of

6    heavy and light chain happens about half the time and about

7    half the time it doesn't.

8           Now, in order to infringe claim 33, what is

9    required is that we have the implementation of a process

10   where we have a heavy chain and a light chain that are

11   independently expressed and the heavy and light chain are

12   produced as separate molecules.  The fact that there may be

13   other things that also take place that do not infringe under

14   Centocor's claim construction does not take away from the

15   fact that there is infringing activity even under their

16   definition.

17          Centocor has not cited any authorities challenging

18   the very well-established proposition that when a process is

19   infringed some of the time, even if that process is not

20   infringed all of the time, the instances of infringement are

21   still infringement.  Nothing in claim 33 indicates that it

22   must always be the case.

23          There is no requirement of always that the heavy

24   and light chain be produced as separate molecules.  It

25   requires that this process be followed.  And it is in fact

```
 1    undisputed that with respect to the manufacture of
 2    Centocor's products, there are instances in which a first
 3    DNA sequence and a second DNA sequence are independently
 4    expressed and, even under Centocor's definition, are
 5    produced as separate molecules, and that is all that is
 6    required for infringement.
 7              Let's go on to the next subject.
 8              MS. ELDERKIN:  Your Honor, can I respond to just a
 9    few points that Ms. Durie made?
10              THE COURT:  Yes.  I -- as I said to you, I've
11    really spent a lot of time thinking about this.
12              MS. ELDERKIN:  We appreciate that, Your Honor.
13    I'll be very brief.
14              First of all, with respect to Ms. Durie's
15    suggestion that this -- Centocor's position was divulged
16    late in the game --
17              THE COURT:  You can leave that.
18              MS. ELDERKIN:  Okay.  Because it's quite
19    remarkable that Genentech can come forward with a
20    complicated tripartide plain-meaning construction of a term
21    that we've already been instructed twice should be construed
22    according to its plain meaning, but -- I guess I'll just go
23    back to, the bottom line is, they have -- the bottom line
24    is, counsel can argue all they want about what the Baychock
25    and the Bergman articles say.  And that's all they have, is
```

 1   counsel's argument, because their expert, Dr. Dolnick, said

 2   what's on the screen here.

 3          I asked him, "I'm going to ask you to assume that

 4   'produced as separate molecules,' the language in claim 33,

 5   means that the heavy light chains are not chemically bonded

 6   together until after they are fully translated -- can you

 7   keep that in mind?

 8          "I will try.

 9          "Okay.  If that is the case, you did not provide

10   any opinion on infringement in your report, correct?

11          "Answer:  I don't think I addressed that."

12          And he did not address that.  They have no

13   evidence.  They have supposition.  And it's not for us to

14   come forward and disprove infringement, as counsel seems to

15   suggest.  They have to prove infringement, and they have not

16   done so.  Even occasional infringement, they have no

17   evidence whatsoever.

18          If you look at the Baychock and Bergman

19   articles -- I forget which one it is, but one of them shows

20   a Western blot analysis, the kind of analysis you can do to

21   determine how much heavy chain is there, how much light

22   chain, they didn't do that analysis.  They could have.  They

23   did not.

24          They have no evidence, and summary judgment should

25   be granted.

```
 1              Ms. Mullin will address the last motion, Your
 2    Honor.
 3              THE COURT:  All right.
 4              MS. DURIE:  Your Honor, before that, I would like
 5    to respond briefly to this point with respect to the
 6    infringement motion --
 7              THE COURT:  All right.
 8              MS. DURIE:  -- because I think it is important to
 9    note that Centocor never set forth this new noninfringement
10    theory in any way that was intelligible and allowed us to
11    respond to it.  We went through the claim construction
12    process.  We prevailed on our construction of "produced as
13    separate molecules."
14              We wrote a letter to Centocor saying that it
15    appeared to us that they had no noninfringement argument as
16    a result and that they should supplement their
17    noninfringement contentions, and in their supplement they
18    simply recited the claim language, not merely this
19    limitation but in the context of a much larger phrase, and
20    said that they did not infringe, with no explanation.
21              There was nothing to which our expert could
22    provide a detailed response.  They had not cited Bergman or
23    Baychock.  He did say in his expert report that it did not
24    matter to his conclusion the ways in which the chains might
25    come together or the type of cell with the type of
```

 1   immunoglobulin at issue.  And then upon seeing the opinions

 2   of Centocor's expert, which for the first time articulated

 3   this noninfringement theory, which had not been briefed at

 4   claim construction, then provided a detailed response at his

 5   deposition, addressed those articles, and explained that in

 6   his opinion, it was unquestionably the case that there would

 7   be, even under Centocor's definition, both heavy and light

 8   chain fully translated in some instances prior to there

 9   being any interactions.

10        MS. ELDERKIN:  Your Honor, I'm sorry.  I have to

11   take a minute to respond to that.

12        There was a supplemental interrogatory that

13   Centocor served before expert reports that laid out this

14   issue.  It was not provided to Dr. Dolnick, their

15   infringement expert.  Nonetheless, in his expert report he

16   does address our argument, and at his deposition he said he

17   considered it.  He discusses -- that's where he comes up

18   with the argument about, Well, "produced as separate

19   molecules" really means not connected -- where the heavy and

20   light chains are not connected by peptide bonds.

21        There was no need for Centocor to come forth and

22   tell Genentech, Well, this is what you're going to have to

23   prove in order to prove infringement under the very plain

24   meaning of this claim language.  That seems to be what

25   they're suggesting.  They had given us no infringement

```
 1    contentions to suggest they were going to come forward with
 2    evidence of this.  We were entitled to sit and wait with --
 3    and see what their experts did.
 4           We keyed them into the fact that, you know,
 5    there's this issue about separate molecules, and here --
 6    that here's the Baychock article and the Bergman article.
 7    They ignored it, and now they're trying to force blame on us
 8    somehow for their failure of proof.  That just shouldn't
 9    wash, Your Honor.
10           THE COURT:  Thank you.
11           MS. DURIE:  Your Honor, could we look at that
12    interrogatory response?  I think it's important for the
13    Court to see it.
14           THE COURT:  All right.
15           MS. DURIE:  There were two interrogatory
16    responses.  There was one in March.  There was one in April.
17    We provided our expert with the one from March.  The one
18    from April was the same in relevant respects.
19           And I think it's important for the Court to see
20    the way that Centocor articulated its theory.
21           THE COURT:  Wait a minute.
22           Go on.
23           MS. DURIE:  In their interrogatory response,
24    Centocor simply said, Centocor denies that Remicade
25    infringes -- and there's one for each of the products --
```

1    infringes the asserted claims and contends that Genentech

2    and City of Hope have failed to offer any evidence, for

3    example, that Remicade contains an immunoglobulin produced

4    using expression plasmids in a host cell line that

5    independently expresses heavy and light chain DNA sequences

6    and produces -- and then can we go over -- heavy and light

7    chains as separate molecules.

8            They took that entire phrase; that was the sum and

9    substance of their disclosure.  They did not tell us about

10   Bergman.  They did not tell us about Baychock.  We had to

11   wait to receive their expert report in order to learn that

12   information.

13           And I think, again, most critically, this is a

14   claim construction issue.  Both sides believe that their

15   construction is consistent with the plain meaning of the

16   phrase.  That happens all the time when the parties contend

17   that the plain meaning supports their claim construction

18   position.

19           But if Centocor believed it had a noninfringement

20   argument predicated on what this term means, it should have

21   sought clarification as to the meaning of this term,

22   particularly when it was apparent from Genentech and City of

23   Hope's arguments that it believed that "independent

24   expression" and "produced as separate molecules" are

25   implementing the same idea and that "produced as separate

1    molecules" is simply the consequence of independent

2    expression.

3            THE COURT:  We're not going to go on.

4            MS. ELDERKIN:  Okay.  Well, your Honor, if I could

5    just on the record, then, ask you to look at Dr. Dolnick's

6    report, which is Exhibit 27, paragraph 65, where he -- it is

7    his opening infringement report where he expressly addresses

8    Centocor's noninfringement position.

9            THE COURT:  I will do that.

10           MS. ELDERKIN:  Thank you, Your Honor.

11           THE COURT:  Go ahead.

12           MS. MULLIN:  Thank you, Your Honor.

13           The quid pro quo for patent exclusivity is

14    disclosing your inventive contribution to people in the

15    field.  And the written description requirement is meant to

16    ensure that the scope of the right to exclude is limited to

17    the invention that's described in the patent, that it's

18    limited to the contribution it's made to the field as

19    reflected within the four corners of the patent

20    specification.

21           It is clear from the law that there are some

22    things that are absolutely not sufficient to meet the

23    written description requirement, and two of them are very

24    important to this motion.  One is it's not sufficient to

25    say, Here's our goal, our goal is to produce an antibody,

1    and then to leave it to other people in the field to figure

2    out actually how to accomplish that.

3            And it's not even sufficient if you provide a

4    description that might make it obvious or enable somebody

5    else in the field to do it.  Because the issue of written

6    description is, what does the specification convey that the

7    applicants possessed as part of their invention; were the

8    applicants in possession of the invention that they claim.

9            So the claim at issue here in Centocor's motion

10   No. 4 is claim 33.  This is a claim for a process for

11   producing immunoglobulin molecule.  That's the goal.  And

12   the issue for written description in the context of claim 33

13   is, does the specification convey that the Cabilly

14   applicants were in possession of a functioning process of

15   producing antibody.

16           Identifying that as a goal and leaving it to

17   others to figure out how to do it is not sufficient, even if

18   it would have been obvious to other people in the field how

19   this might have been accomplished.  The question is, did the

20   Cabilly applicants possess it and describe it in a way that

21   conveyed that they possessed what they claimed to be part of

22   their invention.

23           And here the claim is broad, because it

24   encompassed processes where the antibody is assembled in

25   vivo, in the cell, as well --

```
 1              THE COURT:  That's right.

 2              MS. MULLIN:  -- as processes where it's assembled

 3    in vitro.  All we know from the claim is that you have heavy

 4    and light chain produced as separate molecules in a single

 5    host cell.  How and where they are combined is not

 6    specified.

 7              So the question here is, does the specification

 8    convey that the applicants were in possession and that they

 9    invented what they've claimed, which would encompass in vivo

10    and in vitro processes for making an antibody.

11              So what does the specification -- and, again, the

12    written description test looks at the four corners of the

13    specification to see what is conveyed.  And what does the

14    specification say about whether the applicants were in

15    possession of a process for producing antibody in vivo?

16              They say, Well, when the heavy and light chain are

17    co-expressed in the same host, the isolation procedure is

18    designed to recover reconstituted antibodies.  This can be

19    accomplished in vitro, as described below, or might be

20    possible in vivo.  "Might be possible in vivo," that's what

21    the specification says.

22              Even if there's other places in the specification,

23    as defendants argue, that could be interpreted as indicating

24    that in vivo assembly would be preferred, that you might use

25    mammalian host cells for in vivo assembly -- and they are
```

```
 1   mentioned -- that really begs the question, because the
 2   question for written description is, does the specification
 3   convey that the Cabilly applicants possessed the claimed
 4   invention of producing an antibody in vivo.
 5           It's not sufficient to just say, Well, there's
 6   mammalian host cells that are described that could have done
 7   that.  People skilled in the art would know that you could
 8   use mammalian host cells.  It would have been obvious or
 9   somebody else could have done it.  The dispositive fact here
10   is that the -- what the Cabilly applicants say is that it
11   might be possible, and no --
12           THE COURT:  I must --
13           MS. MULLIN:  -- no reasonable --
14           THE COURT:  -- have looked at those words --
15           MS. MULLIN:  More than once.
16           THE COURT:  -- five hundred times and over a
17   period of years, so I understand what you're talking about.
18           MS. MULLIN:  Right.  And no reasonable jury could
19   conclude that when the Cabilly applicants say in their
20   specification that this is only something that might be
21   possible, that they actually possess that process.
22           And defendants' experts agree.  Dr. Scott was
23   asked, did they demonstrate that they actually formed any
24   immunoglobulins inside a host cell.  He says, Well, I, you
25   know, would rather say prove than demonstrate, but whatever
```

```
 1    it is, they did not demonstrate that they were successfully

 2    assembled inside the host cell.  And this is dispositive.

 3            The claim encompasses in vivo assembly, and they

 4    were not in possession of this aspect of what is claimed,

 5    and that's dispositive of the motion.  Claim 33 should be

 6    declared invalid.

 7            Now, defendants argue that, Well, we showed

 8    in vitro assembly.  And it's really not Centocor's burden

 9    under the law to show that they didn't demonstrate

10    possession of every aspect of what's claimed, only that they

11    didn't demonstrate possession of what's claimed.  But even

12    if you say it's Centocor's burden to show that the

13    application does not demonstrate in vitro assembly, we can

14    do that.

15            So this is actually the process that is described

16    a little bit in the Cabilly specification, and this is what

17    they did.  They transformed E.coli with the heavy and light

18    chain genes.

19            THE COURT:  I know.

20            MS. MULLIN:  And as Ms. Durie said, what comes out

21    of that -- I think she called it a mess of protein.  I think

22    their expert called it a clump of protein.  And what you do,

23    is then you break apart or you lyse the E.coli cells, and

24    you get that clump out of there.  And what comes out is

25    actually 99 percent junk protein, we'll call it.
```

1  One percent, they approximate, 1 percent of what comes out

2  of the E.coli might be heavy and light chain.

3          But they take this whole 100 percent of all this

4  protein and they put it through some various processes, some

5  dialysis, and then they take -- actually, two dialysis

6  steps, and they take what comes out of those two dialysis

7  steps, and they put them -- they put the product of that

8  into an ELISA assay.

9          And the way an ELISA assay works is you take

10 antigen -- in this case they were trying to make anti-CEA

11 antibodies -- they put down CEA antigen.  They coat a well

12 with that.  And then you put this solution of stuff that

13 came out of the dialysis on top of that, and when stuff

14 sticks -- you add some other stuff, enzymes, et cetera, and

15 when stuff sticks, it changes the color, and then you use

16 the level of color change to approximate how much stuff you

17 have sticking to the bottom of a well.

18          But the problem is that don't know what is

19 sticking to the bottom of the well.  All you know is that

20 you've got a color change because something is sticking.

21 And the defendants' expert admitted that what could be

22 sticking, Well, it could be antibodies, but it could be just

23 light chains, it could be just heavy chains, it could be

24 heavy and light chain fragments, it could be heavy and light

25 chain dimers, it could be aggregates of protein.

1          So looking at this a little bit graphically,

2     you've got this clump of protein that comes out of the

3     co-transformed E.coli, 99 percent of it is other proteins,

4     1 percent they approximate to be heavy and light chain.

5     They stick it in the ELISA, and they say -- what they report

6     in the Cabilly patent in column 25 is actually the number

7     .76 percent.  That's the number that actually appears in

8     column 25 of the Cabilly patent for reported recombination

9     of the E.coli sample that was co-transformed with heavy and

10    light chain DNA.

11          But that .76 percent -- and it's not 76 percent.

12    It's .76 percent -- that is that they're getting a signal in

13    the ELISA assay that approximates protein that constitutes

14    .76 percent of the 1 percent that might be heavy and light

15    chains.

16          So what they're really saying is, we put this

17    whole big glob through the processing, we put it into an

18    ELISA assay, and we have a signal generated by something

19    less than 81 millionths of the protein that came out.

20          But what's responsible for that signal?  You can't

21    tell that there's any antibody there.  There's no evidence

22    that there's any antibody there.  They could have done some

23    things to test that; and actually they did, but it's not in

24    the patent, and it would prove that they hadn't.  But it's

25    not in the patent, and we have to stick with what's in the

1   patent.

2           And what the patent doesn't give us is enough

3   information for someone skilled in the art to recognize, to

4   convey to someone skilled in the art that they had actually

5   made any tetrameric antibody.

6           There is data in column 25 of the patent that

7   gives you a signal for light-chain-only binding, but that's

8   not enough.  That would be like saying, Okay.  We've got six

9   people in the room and we have a contribution basket in

10  there.  And, at the end of the day, we've got 76 cents in

11  the basket.  You say, Okay.  Ms. Eldriken, how much did you

12  put in?  She says, 40 cents.  So we know that's what she

13  did.  But that doesn't convey that I contributed anything to

14  the 76 cents.

15          All it says is that there's some protein sticking

16  or there's 76 cents in the bin, and we know that 40 cents of

17  it didn't come from me.  We know that came from

18  Ms. Eldriken.  But it doesn't convey that I contributed

19  anything, just like what's reported in the Cabilly patent

20  does not convey that there was any tetrameric antibody

21  formed that contributed to that signal.

22          Now, their expert -- they have offered expert

23  testimony from Dr. Freedman, especially where he says, Well,

24  you know, I think probably it's not all due to something

25  else.  It's likely there could be some antibody there.  But

```
 1   what he relies upon for those opinions are things outside

 2   the patent.

 3           Look at what Dr. Freedman relies upon in paragraph

 4   60, paragraph 62 of his expert declarations they rely on so

 5   heavily.  He looks at laboratory notebook pages.  He looks

 6   at laboratory notebook pages from a non-inventor.  He looks

 7   at different tests and says, Well, based on all this

 8   information, I think probably there's some antibody there.

 9   Well, that has zero probative value for the purposes here

10   because that's looking outside the scope of the

11   specification.

12           They have not proffered any opinion from any

13   expert who looked just within the four corners of the

14   specification, as you're required to do, in assessing

15   written description and can even offer the opinion that

16   based just on that, there is information that conveys the

17   applicants possessed a process for assemblying an antibody

18   in vitro.

19           So we have a piece of data report from the patent

20   that is .76 percent.  That's .76 percent of 1 percent of

21   something that generated a signal.  That does not convey,

22   and what our experts have said it does not convey, is

23   evidence that any antibodies were actually formed as a

24   result of the process that is described in the Cabilly

25   patent.
```

1          Now, it's true -- I know they're going to get up

2     here and say, We didn't have to provide any example at all.

3     That's not required for written description, that's true.

4     They didn't have to have an actual reduction to practice.

5     But the issue here is that is the only description.

6          They had one place where they described how you

7     might assemble -- or what a process might be for assembling

8     antibody in vitro, and they didn't show that it worked.  And

9     that's the dispositive part on the in vitro assembly; not he

10    whether he had an example or not, because that's not the

11    law, but whether or not, however it's described, they

12    conveyed that the applicants -- that the Cabilly applicants

13    actually had a process where they made antibody, and the

14    answer is no, they did not.

15         THE COURT:  All right.  Thank you.

16         Please.

17         MS. DURIE:  Your Honor, let me begin by framing

18    the question.  In Centocor's reply brief at page 5 it says,

19    This is not a case where the issue is whether applicants

20    provided sufficient description of enough species to support

21    a claim to a broad genus.

22         THE COURT:  No, it isn't that.

23         MS. DURIE:  And then they say, Although claim 33

24    is analogous to a traditional genus claim in its spread, the

25    fault is not in failing to describe sufficient embodiments

 1  or species.  Claim 33 is invalid because there is no

 2  description of a process that results in an antibody being

 3  formed.

 4         We just heard from Centocor's counsel an argument

 5  that whether the patent specification adequately describes

 6  in vivo assembly ought to be dispositive on the written

 7  description question, but that is inconsistent with the

 8  argument that Centocor has presented to this Court.  It is

 9  not an issue that was briefed.  It was an issue that was

10  raised, at most, in a footnote to Centocor's reply brief,

11  with no argument, no analysis, merely a statement and a

12  citation to *Ariad*.

13         The basis on which Centocor brought this motion is

14  that the patent specification does not describe any method

15  of making an antibody, and that is the basis on which the

16  Court should resolve this motion.

17         Now, having said that, let me turn to the two

18  substantive arguments that Centocor makes.  The first has to

19  do with in vivo assembly.  Centocor focuses very heavily on

20  the one line from the patent specification, with which we

21  are all very familiar.

22         If we can pull up column 12, line 50 to 56.

23  Column 12, line 50, and beginning actually at line 53, says,

24  This can be accomplished in vitro, as described below, or

25  might be possible in vivo in a microorganism which secretes

1    the immunoglobulin chains out of the reducing environment or

2    the cytoplasm.

3         That is a statement that is specific to

4    microorganisms.  It has nothing to do with the question

5    whether in vivo assembly would take place within the

6    mammalian host cells that are elsewhere described in the

7    specification.

8         And our expert put forward extensive evidence

9    explaining that elsewhere in the specification the patent

10   has disclosures that would be understood by a person of

11   skill in the art as referring to in vivo assembly within

12   mammalian cells.

13        He testified, for example, that the language at

14   column 8 of the specification, beginning around line 33,

15   which discusses the recovery -- can we -- which discusses

16   the recovery -- column 8, starting at line 33, this

17   discusses the recovery of antibodies from cells and says, It

18   can be either from spun-down whole cells or from a cell

19   culture with both the medium and the suspended cells.  He

20   explained, if you're recovering antibody from spun-down

21   whole cells, that is -- the implication is that the antibody

22   has assembled in vivo.

23        And, likewise, there's a reference in the

24   specification to -- immediately before, actually, the

25   language we were looking at previously, at column 12, it's

1    around line 48 where it says that tissue culture cells, that

2    is to say mammalian host cells, as hosts also appear, in

3    general, to permit reasonably facile recovery of

4    heterologous protein; again, language that he testified a

5    person skilled in the art would understand as referring to

6    the fact that one would expect to achieve in vivo assembly

7    through the use of mammalian host cells.

8            Now, Centocor's counsel has agreed Genentech and

9    City of Hope were not required to experimentally demonstrate

10   practicing the invention in each of its potential

11   embodiments, but this language in this specification does

12   demonstrate possession of an invention involving the use of

13   mammalian host cells in which all of the experts, even

14   Centocor's expert, Dr. Wall, are in agreement; that a person

15   of skill in the art through the use of mammalian host cells

16   would have expected in vivo assembly.

17           That -- that address the in vivo assembly issue.

18   At worst, there is a question of fact raised by our expert

19   testimony as to how a person of ordinary skill in the art

20   would understand the significance of the disclosure.  At

21   worst, I would suggest that there is not because their

22   expert is in agreement with us.

23           Now, the other issue is in vitro assembly.

24           THE COURT:  Yes.

25           MS. DURIE:  And here Centocor appears to be making

1    two arguments.  The first is that the process described in

2    the patent in the actual experiments yield a .7 percent of

3    the theoretical yield of correctly refolded antibody, and,

4    second, that the use of an ELISA assay was not sufficient to

5    prove that antibodies had been formed.

6           With respect to the first argument, it is

7    important, here again, to note that in their brief, Centocor

8    agreed that, quote, The issue here is not whether the

9    described in vitro process yields a substantial amount of

10   antibody, but whether someone skilled in the field would

11   believe that the inventors were in possession of a process

12   where any antibody was formed as result of the described

13   process.

14          That is the inquiry as Centocor has framed it.

15   That is correct.  And, therefore, the percentage of antibody

16   that was made is not germane to the question.

17          That takes us to the use of an ELISA assay.

18   Dr. Freedman explained in his report, not with reference to

19   sort of other portions of Dr. Wetzel's lab notebook but from

20   the perspective of a person of skill in the art -- and this

21   is from paragraph 23 of Dr. Freedman's report -- that in

22   April of 1983, immunoassays such as ELISAs were routinely

23   utilized to determine whether denatured -- proteins had been

24   properly reconstituted to their active state.  And he then

25   further went on to say that, in fact, current and former

1   scientists at Centocor testified that this is a common assay

2   used at Centocor to confirm antibody production.

3           Dr. Freedman did elsewhere in his report carefully

4   review and analyze much of the rest of Dr. Wetzel's and

5   Dr. Perry's notebooks to confirm that antibody -- to make

6   sure that there was nothing in there that undercut the

7   conclusion that antibody in fact was formed.  And he did.

8           But he did not rely on that in reaching this

9   conclusion that the use of the ELISA assay in the Cabilly

10  specification was a well-accepted method of confirming

11  antibody production, and that a person of skill in the art

12  reading the Cabilly specification would have understood it

13  as such.

14          Now, Centocor's second point here is that it was

15  simply not credible -- strike that.  Sorry.

16          Centocor's second argument here is that a person

17  of skill in the art looking at the ELISA signal would not be

18  able to conclude that that signal was attributable to

19  correctly form antibody because it could be attributable, in

20  part, to other things, and Dr. Freedman could not rule out

21  the possibility that some portion of the signal might, for

22  example, result from a heavy-light chain dimer --

23          THE COURT:  Yes.

24          MS. DURIE:  -- or something else.

25          THE COURT:  Yes.

1          MS. DURIE:   However, in his report Dr. Freedman

2    was very clear that while it was possible that some portion

3    of that signal might be attributable to other things, that

4    did not render the signal as a whole something that was not

5    appropriately viewed as a demonstration of the formation of

6    antibody.

7          And, in fact, in paragraph 62 of his report, he

8    explained that, In my opinion, it is highly improbable that

9    the measured activity is due solely to nonspecific

10   combinations of heavy and light chains.   The generation of

11   antigen recognition activity depends on the correct folding

12   and association of sites in the heavy and light chains, and

13   it is known that correctly folded heavy and light chains

14   form tetrameric immunoglobulin molecules in vitro in

15   accordance with thermodynamic principles of spontaneous

16   self-assembly, citing a paper from 1974.

17         He goes on to say, I simply do not believe that

18   the activity observed could be entirely due to

19   non-tetrameric molecules.

20         That testimony, in particular, combined with his

21   testimony that the ELISA assay was recognized at the time as

22   an appropriate way to measure antibody formation, at a

23   minimum creates a disputed issue of fact as to whether the

24   test results shown in the Cabilly specification do -- would

25   have convinced a person of skill in the art that the

1    inventors were in possession of a method for making

2    antibody.

3           And I say that notwithstanding that, of course,

4    the specification did not even need to provide those test

5    results, and that in the specification the inventors do

6    repeatedly state that they have invented a process for

7    making immunoglobulin and explain what that process is.

8           The purpose of the written description requirement

9    is to ensure that the specification defines the metes and

10   bounds of the invention, that it is possible from reading

11   the specification to understand what the inventors invented,

12   and what the inventors -- what is not part of the inventors'

13   invention.

14          And here the inventors clearly articulated that

15   they had invented a process for making immunoglobulin

16   recombinantly by independently expressing the heavy and

17   light chain, be practiced across a wide range of host cells.

18   Nothing more was required to satisfy the written description

19   requirement, but even to the extent it were, Dr. Freedman's

20   testimony, at worst, creates a disputed issue of fact with

21   respect to how a person of skill in the art would read the

22   description of the test results in the specification.

23          THE COURT:  All right.  You will get a decision

24   from us very soon.

25          MS. MULLIN:  One moment, Your Honor.  A few

1    points.  One, as to this phrase "might be possible in vivo

2    in a microorganism," just even assuming what Ms. Durie said

3    to be true, the fact that they didn't possess a process for

4    doing this in vivo in a microorganism -- and that is within

5    the scope of claim 33 -- is dispositive as to Centocor's

6    motion.  Okay.  That is a process that is accomplished

7    within the claim.

8            In vivo assembly in a microorganism is encompassed

9    within the scope of claim 33, and the best that the Cabilly

10   applicants can say about this is that it might be possible.

11   That does not convey that they were in possession of a

12   process which is part of the invention claimed in claim 33.

13           There were other parts of the specification that

14   the defendants point to and say, Well, our experts said that

15   people of skill in the art would have understood that you

16   could do this.  Again, obviousness is not the test.

17   Enablement is not even the test.  And that's hard to grapple

18   with, because you could describe something in a way that is

19   obvious for others to do and you could describe things, and

20   based on what is known in the art others could be enabled to

21   do it, but that's not the question.  The question is, is

22   there evidence in the specification that the applicants

23   possessed the invention that's claimed.

24           Now, on the specifics of Dr. Freedman's expert

25   report, look at paragraph 23 of his report that you've been

1    referred to, and what Dr. Freedman says is that in April of

2    1983, and even thereafter, immunoassays such as ELISA were

3    routinely utilized to determine whether denatured and

4    reduced proteins had been properly reconstituted, and he

5    refers to an article by Weidle (ph).  And there are cases

6    where it would be proper.

7          For example, I think -- I haven't looked at Weidle

8    recently, but, as I recall, they were taking antibodies that

9    had been made in vivo and subjecting them to an ELISA assay.

10   Whereas Dr. Freedman admitted during his deposition there

11   would be a natural cell machinery that would perform quality

12   control so that when you're doing the ELISA assay in the

13   context, in that particular context, there is something that

14   can be gleaned from it.

15         But notice in paragraph 23, he doesn't say

16   anything about the Cabilly specification.  He doesn't say

17   anything about the reliability of the ELISA assay and the

18   context of what is described in the Cabilly specification.

19         And if you look at paragraph 62 of Dr. Freedman's

20   report -- I know it was up on the screen, but it starts by

21   saying, As a result, it's my opinion -- and it goes on and

22   on -- so that he simply does not believe that all the

23   activity observed could be entirely due to non-tetrameric

24   molecules.  Well, that's really a wishy-washy statement as

25   to whether or not there's any evidence that there's an

```
 1   antibody there.

 2           But look at what he's referring to as the "as a

 3   result."  Look at the preceding paragraph, 61, where he's

 4   talking about a laboratory notebook page that includes more

 5   data than is included in Cabilly patent.  That opinion in

 6   paragraph 62 of Dr. Freedman's report, just like the opinion

 7   in paragraph 23, don't relate to the disclosure of the

 8   Cabilly patent.  They relate to other things.

 9           And so they're just not probative, and they can't

10   create a disputed fact about what is disclosed in the

11   specification by having their expert look at things that are

12   outside of the specification, and saying, When I look at all

13   of this other stuff, I have a different opinion.  That's not

14   a disputed fact about what is disclosed in the Cabilly

15   patent specification, and it can't be used to defeat summary

16   judgment.

17           THE COURT:  Thank you.

18           MS. DURIE:  May I respond on the first point, Your

19   Honor?

20           THE COURT:  And then we're finished.

21           MS. DURIE:  Centocor's counsel argued that if the

22   patent failed to describe in vivo assembly simply in

23   microorganisms, that that would be a sufficient basis for

24   this Court to resolve this motion.  Centocor in its papers

25   made no such argument.  We had no opportunity to respond to
```

1    that argument.

2            THE COURT:  State it again.

3            MS. DURIE:  Centocor's counsel made an argument

4    that to the extent that the patent specification failed to

5    describe --

6            THE COURT:  That's right.

7            MS. DURIE:  -- in vivo assembly in microorganisms,

8    that that was independently a sufficient basis for this

9    Court to rule.  That argument is no where in their brief.

10   We did not have an opportunity to respond to it.  That is

11   precisely the genus/species argument that Centocor

12   affirmatively disclaimed in its reply papers.

13           The question of whether the specification would

14   need to describe in vivo assembly at all was not briefed.

15   Indeed, the claims of the patent are not directed to the way

16   in which assembly takes place.  The claims of the patent are

17   directed to a process for producing an immunoglobulin in a

18   host cell and recovering antibody.  And the patent

19   specification describes the application of that method

20   across the full range of host cells.

21           The argument that Centocor is now for the first

22   time trying to make is one that would suggest that Genentech

23   and City of Hope were required to describe every conceivable

24   improvement to the invention, that people might come along

25   and come up with easier ways to practice the invention on

 1    certain types of host cells.  So maybe on a microorganism

 2    you could skip the step of having to reconstitute the

 3    antibody in vitro because you would learn a way for the cell

 4    to do it itself in vivo.  It's not a claim limitation.  It

 5    doesn't matter to the practice of the invention.  It was not

 6    required to say anything.

 7              THE COURT:  You're now talking about assembly?

 8              MS. DURIE:  Correct, where the -- the mechanism by

 9    which assembly happens.

10              In other words, the inventors teach a way to

11    practice the invention in all host cells.  You co-express

12    the heavy and light chain.  Protein is formed.  You

13    reconstitute the antibody in vitro.

14              THE COURT:  Well, that, of course, is discussed in

15    Medimmune.

16              MS. DURIE:  That's right.  And that can be -- that

17    can be practiced across all of the host cells of the

18    invention.  That can be done in mammalian cells.  That can

19    be done in bacterial cells.  It can be done in all

20    microorganisms.

21              Now, some host cells will make life easier for you

22    and the antibodies will assemble in vivo, and the patent

23    does describe that happening in mammalian cells.  But the

24    patentees are not required as a matter of written

25    description law to describe every possible improvement to

1    the invention that might allow you to short circuit the

2    in vitro assembly process by figuring out how to cause

3    particular types of cells to do that for you.

4           The written description requirement requires the

5    patentee to describe the invention as claimed.  There are

6    not claims specific -- at issue in this case specific to

7    in vivo assembly.  Therefore, written description is

8    measured by the scope of the claims, by what is claimed,

9    which is a process for making antibodies across the range of

10   host cells.

11          And this is -- and, again, the point I want to

12   make here is this is not an issue that was raised by

13   Centocor in this motion.  This is not an issue that we

14   briefed.  There is a great deal of law that we would be in a

15   position to cite as to why we would not be required to

16   describe the specifics of in vivo assembly with respect to

17   particular types of host cells in order to support the

18   claims at issue here.

19          THE COURT:  I remember discussing the assembly

20   issue some years ago every day for three weeks.

21          MS. DURIE:  That is correct.  Because there, there

22   was a claim construction issue presented.

23          THE COURT:  I should say so.

24          MS. DURIE:  Right.  And the Court correctly -- I

25   think in this case, correctly concluded that the claims are

```
 1    not limiting in terms of where assembly takes place.

 2            THE COURT:  But there is nothing wrong with their

 3    raising this point.  It's just that I had to listen

 4    carefully to what you were all saying more carefully than I

 5    would in any other case because of the many, many

 6    discussions there have been in the past about this -- about

 7    Cabilly.

 8            One discussion in particular was about assembly.

 9    And I cannot say that I have ever once retreated from the

10    position on assembly that we took in Medimmune, and I do

11    remember spending every day for three weeks discussing that

12    issue.  I didn't take eight hours a day or ten hours a day,

13    but every day it was discussed again.

14            Assembly is something that I -- right until today

15    I have never had any reason to retreat from before.  I'll

16    think it over now, but I -- that's ground I've already

17    walked on.

18            MS. DURIE:  I understand that the Court has

19    considered the question in the context of claim

20    construction --

21            THE COURT:  Yes, I have.

22            MS. DURIE:  -- as to how the claim should be

23    construed.

24            THE COURT:  Yes.

25            MS. DURIE:  But that is a different question.
```

```
 1              THE COURT:  That is a different question

 2   altogether than the one I just listened to.

 3              MS. DURIE:  Correct.  And the question whether

 4   Genentech and City of Hope would be required to describe

 5   separately specific embodiments of the invention with

 6   respect to where assembly takes place is not something that

 7   was presented by Centocor's motion.

 8              THE COURT:  Well --

 9              MS. DURIE:  And, indeed, in Centocor's reply

10   brief, they were very clear that the issue here, the issue

11   on which they were proceeding, was whether the patent

12   specification taught any way of making an antibody.

13              THE COURT:  Yes.

14              MS. DURIE:  And that is the basis on which we

15   briefed --

16              THE COURT:  Yes.

17              MS. DURIE:  -- this motion, and that is the basis

18   on which the issues should be --

19              THE COURT:  I understand.

20              MS. DURIE:  -- submitted to the Court.

21              THE COURT:  I understand your point.  And I repeat

22   what I said, we'll take it under submission, and you will

23   hear from us quite soon.

24              Thank you very much.  The arguments were quite

25   stimulating, I've got to say.
```

1          (Proceedings concluded at 2:03 p.m.)

2

3

4

5                    C E R T I F I C A T E

6

7          I hereby certify that the foregoing is a true and

8     correct transcript from the stenographic record of the

9     proceedings in the foregoing matter.

10

11    /s/ Bridget R. Montero
      Bridget R. Montero              Date:  August 20, 2010
12    Official Court Reporter
      CSR No. 10020
13

14

15

16

17

18

19

20

21

22

23

24

25